DANA A. SUNTAG, (State Bar No.: 125127)
JOSHUA J. STEVENS, (State Bar No.: 238105)
HERUM\CRABTREE\SUNTAG
*A California Professional Corporation*
5757 Pacific Avenue, Suite 222
Stockton, California 95207
Telephone: (209) 472-7700
Facsimile:   (209) 472-7986
dsuntag@herumcrabtree.com
jstevens@herumcrabtree.com

Attorneys for All Defendants

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FILIBERTO VALENCIA, SR., et al,<br><br>            Plaintiffs,<br>     v.<br><br>CITY OF STOCKTON, et al.,<br><br>            Defendants. | Case No.: 2:16-CV-02081-JAM-AC<br><br>**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**<br><br>DATE:   March 27, 2018<br>TIME:    1:30 p.m.<br>PLACE: Courtroom 6, 14th Floor |

Pursuant to 260(a) of the Local Rules, all Defendants respectfully submit this Statement of Undisputed Facts in support of their motion for summary judgment, or, alternatively, partial summary judgment/summary adjudication.

The undisputed facts set forth show that there is no genuine dispute as to any material fact such that Defendants are entitled to judgment as a matter of law under Rule 56(a) of the F.R.C.P.

| Moving Party's Undisputed Facts: | Evidence in Support: |
|---|---|
| 1. Filiberto Valencia, Jr. ("Valencia"), was 26 years old at the time of this incident, on January 19, 2016. | (Ex. 1, p. 1.) |
| 2. He was 5'11" tall and 202 pounds. | (Ex. 5, p. 9.) |
| 3. He lived with his father, mother, and youngest sister at 3234 Barbara Street, in Stockton. | (Ex. 1, p. 1; Ex. 2, 40:5-7.) |
| 4. Valencia was diagnosed with paranoid schizophrenia around 2010, and took medications for mental illness. | (Ex. 3, 24:1-10; 47:20-25; 57:11-12.) |
| 5. The incidents giving rise to this lawsuit occurred while Valencia was experiencing a schizophrenic and manic episode as a result of withdrawal from his medications. | (Ex. 5, p. 6; Ex. 6, 145:18-23.) |
| 6. On January 16, 2016, Valencia started to experience mental health symptoms. | (Ex. 3, 67:19 – 69:23.) |
| 7. This included closing curtains and doors, acting scared, commenting that people wanted to kill him, anxiety, and sleeplessness. | (Ex. 3, 67:24-25; 69:5-8; Ex. 4, 46:5-8, 47:2-17.) |
| 8. His parents recognized these mental illness symptoms because he had exhibited them before. | (Ex. 4, 47:22 – 48:4.) |
| 9. On January 18, 2016, Valencia was still exhibiting mental health symptoms and had run out of his medication, so his mother and sister took him to the San Joaquin County Behavioral Health Services clinic. | (Ex. 4, 48:12 – 49:18, Ex. 2, 27:13-16, 29:3-19; Ex. 3, 74:23 – 75:6.) |
| 10. The clinic kept him for evaluation. | (Ex. 2, 32:17-25, 33:10-22.) |
| 11. Valencia reported complaints of sleeplessness and paranoid ideations, and that he had been off his medications for three days. | (Ex. 5, p. 45.) |
| 12. That night, the clinic phoned Valencia's family to pick him up and they did. | (Ex. 2, 34:1-24; Ex. 4, 56:10-19.) |

| **Moving Party's Undisputed Facts:** | **Evidence in Support:** |
|---|---|
| 13. Once home, he went to sleep and slept through the following morning (January 19, 2016), getting up at noon to eat before going back to sleep. | (Ex. 4, 58:21 – 59:25; Ex. 2, 35:20-24.) |
| 14. Around 5 p.m. on January 19, 2016, Valencia got up again, when his father was coming home from work. | (Ex. 4, 59:22 – 60:5.) |
| 15. Valencia's father saw Valencia sitting alone and looking scared in the garage. | (Ex. 3, 77:1-9, 86:17-87:3.) |
| 16. Valencia's father asked him what was going on, but Valencia did not respond, and his father thought that was odd. | (Ex. 3, 87:1-5.) |
| 17. The family then had dinner. | (Ex. 3, 87:7-15.) |
| 18. Valencia appeared sad throughout dinner. | (Ex. 3, 87:9-15.) |
| 19. After dinner, around 6:00 p.m., an alarm salesman rang the doorbell. | (Ex. 3, 86:7-9, 89:11-17; Ex. 4, 63:11-23; Ex. 2, 41:16-22.) |
| 20. Valencia reacted by saying, "they're going to kill me," "they're trying to kill you too," and he pleaded with his family not to open the door. | (Ex. 2, 41:16-22; Ex. 4, 63: 16-18; Ex. 3, 89:11-23.) |
| 21. Valencia's family tried to calm him down, but he did not calm down. | (Ex. 4, 63:20-22; Ex. 2, 42:19-25; Ex. 3, 89:18-23.) |
| 22. Valencia begged his family to call the police. | (Ex. 2, 43:23-25; Ex. 3, 89:21-23; Ex. 4, 64:10-12.) |
| 23. Valencia's father walked outside, got his cell phone from his truck, and called the police. | (Ex. 3, 90:7-13.) |
| 24. Valencia's father made that call at 6:13 p.m. | (Ex. 7; Ex. 3, 90:7-22.) |
| 25. Since Valencia's father did not speak English, he called Valencia's youngest sister outside and had her translate for him. | (Ex. 4, 65:6-10; Ex. 3, 92:21-25; Ex. 2, 44:1-12.) |
| 26. She told the SPD Valencia was still in the house, had a mental health issue, was not armed, and he might try to harm himself. | (Ex. 3, 90:7-22, 98:18 – 99:2; Ex. 2, 47:6-15.) |
| 27. The SPD told the family they were having trouble locating their address, so Valencia's mother exited the home to try and flag down a passing police vehicle. | (Ex. 2, 44:7-12; Ex. 4, 67:22 – 68:5.) |

| **Moving Party's Undisputed Facts:** | **Evidence in Support:** |
|---|---|
| 28. This left Valencia alone inside the home. | (Ex. 4, 70:14 – 71:2; Ex. 2, 56:2-3; Ex. 3, 98:1-3.) |
| 29. The family made no efforts to keep him in the home. | (Ex. 2, 56:9-16; Ex. 4, 71:8-11; Ex. 3, 99:10-13.) |
| 30. As a result, Valencia left through a back door without his family knowing he had left. | (Ex. 3, 96:20 – 97:25; Ex. 4, 73:2-7.) |
| 31. The family might have been outside for as long as 45 minutes before realizing he had left. | (Ex. 4, 72:25 – 73:2.) |
| 32. At 6:35 p.m., Valencia's father had called the SPD again, and this time told them his son had schizophrenia, had grabbed him, was not taking his medications, and he thought Valencia was inside the home. | (Ex. 7; Ex. 3, 106:22 – 108:17; Ex. 8, 46:5-10.) |
| 33. At 6:45 p.m., Valencia's sister called and told SPD dispatch Valencia had mental health issues. She threatened that if he hurt himself the family would hold the SPD responsible, and she yelled at the SPD dispatch. | (Ex. 7; Ex. 2, 56:17 – 58:1.) |
| 34. At 6:54 p.m., another one of Valencia's sisters called. | (Ex. 7; Ex. 9, 55:6-11). |
| 35. She called about the SPD's delay and told the SPD dispatch of the family's concern that Valencia might harm himself. | (Ex. 7; Ex. 9, 55:12-19.) |
| 36. During this time, Valencia was running amok through the neighborhood. | (Ex. 3, 96:20 – 97:25; Ex. 4, 73:2-7; Ex. 10, pp. 1-2.) |
| 37. Neighbors reported he was trying to break into their homes from their backyards and made statements about people trying to kill him, and one neighbor reported he climbed and ran across their roof. | (Ex. 10, pp. 1-2.) |
| 38. A neighbor eventually walked by when the Valencia family was outside and told them there were a lot of police on the neighboring street. | (Ex. 4, 73:5-7; Ex. 3, 99:20-25; Ex. 2, 58:2-18.) |
| 39. Valencia's mother suspected this might be due to Valencia, and directed Valencia's father to go and see. | (Ex. 4, 74:4-11; Ex. 3, 99:22 – 100:4.) |

| **Moving Party's Undisputed Facts:** | **Evidence in Support:** |
|---|---|
| 40. At 6:11 p.m. (*i.e.*, 2 minutes before Valencia's father's first call), the first call by a neighbor was made, from a resident at 3161 Nicole Street. | (Ex. 10, p. 1; Ex. 8, 18:20 – 19:23; Ex. 11, 51:18 – 52:17.) |
| 41. The call was for an unknown disturbance and prowler. | (Ex. 11, 52:25 – 53:3.) |
| 42. Barbara Street is near Nicole Street. | (Ex. 12, 32:16-18.) |
| 43. This unknown disturbance/prowler call is what Officers DiGiulio and Amant were initially dispatched to handle. | (Ex. 11, 53:1-13; Ex. 12, 32:16-24.) |
| 44. Other calls about Valencia also continued to pour in. | (Ex. 10, pp. 1-2; Ex. 12, 35:13-19.) |
| 45. Valencia eventually entered the house at 3133 Nicole Street, which is a group home for mentally disabled women ("the Home"). | (Ex. 10, pp. 2-3; Ex. 14, ¶ 1.) |
| 46. Renee Brown was the caretaker on duty for three clients of the Home - Tamika Wilson, Norma Britton, and Nora Valdez. Renee's 9 year old daughter, Dawn, was also there. | (RB Decl., ¶ 2.) |
| 47. Shortly after dinner, Renee heard a strange man's voice inside the Home from the kitchen area. The voice was Valencia's. He asked for someone to call 9-1-1, and stated someone was trying to hurt him. This frightened Renee, and, per the Home's protocol, she gathered the clients and Dawn to bring them into the bathroom for safety, while they contacted the police. | (RB Decl., ¶ 3.) |
| 48. Renee was able to gather Tamika and Norma in the bathroom. However, Valencia caught Dawn in the hallway, grabbing her hair. He ordered her and Renee to "get in the fucking bathroom," forced his way into the bathroom while holding Dawn hostage, and locked Renee, Tamika, Norma, and Dawn in with him. (Nora was safely in the back of the house, and at approximately 6:20 p.m. she also called the police.) | (Ex. 10, p. 2; RB Decl., ¶ 4.) |
| 49. In the bathroom, Valencia threatened to kill Dawn unless they complied with his demands. Renee could not tell if Valencia was mentally ill or on drugs. | (RB Decl., ¶ 5.) |
| 50. Valencia shoved Tamika into the bathroom's shower and made Norma crouch down and place her head inside the toilet, which was filled with water. He threatened to drown Norma in the toilet. | (RB Decl., ¶ 6.) |

| **Moving Party's Undisputed Facts:** | **Evidence in Support:** |
|---|---|
| 51. He pulled hard on Dawn's hair, and held her in a chokehold with his arm wrapped around her throat from behind. He also had Dawn's neck gripped and twisted at an angle. He threatened to snap Dawn's neck and stab her to death with the toilet plunger in the bathroom, and he threatened to gouge out Dawn's eyes with his fingers. He repeatedly struck Dawn with an open hand and/or his fist, giving Dawn a partial black eye and a fat lip. He also threatened to gouge Renee's eyes out with his fingers, and he threw a heavy bathroom scale at her. | (RB Decl., ¶ 7.) |
| 52. Renee hit Valencia with her fists several times, but her strikes had no effect on him. She also kicked him in the genitals as hard as she could, but this too had no effect on him. | (RB Decl., ¶ 8.) |
| 53. He had Norma remove her head from the toilet and began striking her while she lay helpless on the floor. | (RB Decl., ¶ 10.) |
| 54. Renee pleaded with Valencia to release Dawn, offering to give him anything he wanted. Valencia asked Renee to call the police, but did not explain why. | (RB Decl., ¶ 9.) |
| 55. His behavior was so frightening it caused Renee to urinate on herself. Immediately after the incident, she quit her job at the Home and has never returned. | (RB Decl., ¶¶ 13, 19.) |
| 56. At approximately 6:20 p.m., after hearing the calls over dispatch, Sgt. Mosher left SPD headquarters and proceeded towards Nicole Street to assist. | (Ex. 10, pp. 2-3; Ex. 14, 30:23 – 31:8.) |
| 57. Sgt. Mosher estimates he was 5 miles away from the location and it took him about 10 minutes to arrive. | (Ex. 14, 30:23 – 31:8.) |
| 58. In the meantime, when Officers DiGiulio and Amant approached the front door of the Home, they were informed by SPD dispatch that someone inside had reported a person had gotten into the bathroom, there was a struggle, and people were stuck in the bathroom. | (Ex. 10, p. 3; Ex. 12, 39:18 – 40:3, 49:3-8.) |
| 59. Officer DiGiulio radioed dispatch and suggested he kick in the front door so the officers could enter. | (Ex. 10, p. 3; Ex. 12, 49:11 – 51:4.) |
| 60. Sgt. Mosher, still driving to the location, directed DiGiulio to kick in the door and enter. | (Ex. 12, 51:1-11; Ex. 14, 30:23 – 31:2; 36:1-5.) |

| **Moving Party's Undisputed Facts:** | **Evidence in Support:** |
|---|---|
| 61. Officer DiGiulio kicked in the front door, and upon entering he and Officer Amant could hear the women yelling and crying in the bathroom, in obvious distress. | (Ex. 10, p. 3, Ex. 12, 78:19 – 79:13, 88:1-3; Ex. 15, 43:1-12.) |
| 62. Officers DiGiulio and Amant both entered the home with their guns drawn. | (Ex. 15, 43:13-21.) |
| 63. The bathroom door was closed so Amant kicked it in and DiGiulio entered. | (Ex. 15, 44:12-21; RB Decl., ¶ 11.) |
| 64. Officer DiGiulio's first limited view into the bathroom was of Valencia in a crouching position, with his arm around Dawn's neck, and Dawn crying. | (Ex. 12, 80:13-22, 84:7-17; RB Decl., ¶ 7; Ex. 15, 44:22 – 45:5, 48:3-7.) |
| 65. Officer DiGiulio entered the bathroom with Amant behind him, and quickly crossed the approximately 3 ½ feet of distance towards Valencia, with his gun in his left (dominant) hand. | (Ex. 12, 80:4-12; Ex. 16, 58:17 – 60:15; Ex. 17.) |
| 66. DiGiulio scooped Dawn up, and, with his free right hand, passed her behind him to Officer Amant. | (Ex. 12, 81:21 – 83:7; RB Decl., ¶ 11; Ex. 15, 53:5-15.) |
| 67. DiGiulio directed Valencia to put his hands up, and Valencia raised his hands in response. | (Ex. 12, 85:10 – 86:19; Ex. 15, 57:20-21.) |
| 68. The "ladies [were] screamin'," and DiGiulio knew he needed to get control of Valencia. | (Ex. 12, 88:1-2.) |
| 69. Not knowing whether Valencia was armed. | (Ex. 12, 87:7-9). |
| 70. He used the heel of his palm or his forearm to try to control Valencia by pinning him in the corner. | (Ex. 12, 86:23 – 88:4.) |
| 71. As DiGiulio stated, if he was able to control Valencia in that manner, "[h]opefully [Officer Amant] can get these people out." | (Ex. 12, 88:17 – 89:2.) |
| 72. Officer DiGiulio intended to arrest Valencia. | (Ex. 12, 86:23-25.) |
| 73. Given the circumstances, this decision was appropriate, as was DiGiulio's decision to make physical contact with Valencia to affect the arrest. | (Ex. 13, 78:5-13, 96:3 – 98:5.) |
| 74. DiGiulio's strategy was successful at first; he was able to "get some control on him" | (Ex. 12, 88:19 – 89:10) |
| 75. Amant was able to get the women out of the bathroom. | (Ex. 15, 53:16 – 54:25, 59:11 - 60:1; RB Decl., ¶ 11.) |

| **Moving Party's Undisputed Facts:** | **Evidence in Support:** |
|---|---|
| 76. However, Valencia then started fighting with DiGiulio and began "swinging," "kicking, [and] throwing up elbows." | (Ex. 12, 89:2-5.) |
| 77. DiGiulio realized if he could get Valencia's head pinned to the wall, he would be able to slow him down and perhaps gain more control over him. | (Ex. 12, 89:6-10.) |
| 78. Plaintiffs' police expert concedes this was an appropriate decision. | (Ex. 13, 132:9-24.) |
| 79. DiGiulio also attempted to use police hands-on tactics, both an arm bar and a wrist lock, to gain control of Valencia. | (Ex. 12, 92:3-14.) |
| 80. DiGiulio assumed a "half mount" position over Valencia; while Valencia was down in a seated position, DiGiulio was on his right knee with his left leg over Valencia's waist. | (Ex. 12, 99:1-17.) |
| 81. However, Valencia refused to comply: he swatted and hit DiGiulio's gun and grabbed at it. | (Ex. 12, 89:10-21, 103:7-9; Ex. 15, 60:4 – 61:19.) |
| 82. In response, DiGiulio pulled the gun back. | (Ex. 12, 89:13-14.) |
| 83. But, Valencia reached for the gun again. | (Ex. 12, 89:14-15.) |
| 84. The gun had no safety and had a bullet loaded in the chamber, such that merely pulling the trigger would cause it to fire. | (Ex. 12, 47:3; Ex. 13, 116:3-24.) |
| 85. Valencia's attempt to grab it put everyone in imminent danger. | (Ex. 13, 116:22 – 117:3.) |
| 86. Since pulling the gun back did not work, this time DiGiulio hit Valencia on the top of the head with it. | (Ex. 12, 89:15-19.) |
| 87. However, that still did not stop Valencia; he continued to fight, so DiGiulio hit him again with it, and that slowed him down. | (Ex. 12, 89:19-22.) |
| 88. That allowed DiGiulio to resume controlling Valencia, and DiGiulio was able to get his forearm across Valencia's head and pin it to the wall, as he had been trying to do before Valencia reached for his gun. | (Ex. 12, 89:22 – 90:4.) |
| 89. Valencia stopped for an instant, allowing DiGiulio to reholster his gun. | (Ex. 12, 90:1-4, 111:25 – 112:1.) |
| 90. DiGiulio believed holstering any sooner would have left him vulnerable. | (Ex. 12, 111:11-20.) |

| **Moving Party's Undisputed Facts:** | **Evidence in Support:** |
|---|---|
| 91. As DiGiulio was holstering, Officer Amant "speared" Valencia in the stomach with his baton. | (Ex. 15, 63:12 – 64:2.) |
| 92. But, this had no effect on Valencia; it appeared he felt no pain. | (Ex. 15, 64:3-10.) |
| 93. Amant continued to try to gain control over Valencia by striking him in the shins with the baton two or three times. | (Ex. 15, 65:1 – 67:2.) |
| 94. This also had no effect. | (Ex. 15, 67:1-11; RB Decl., ¶ 12.) |
| 95. Valencia maintained a "thousand-yard stare." | (Ex. 15, 64:9-24; Ex. 14, 62:14-20.) |
| 96. Sgt. Mosher then arrived on scene, and Amant radioed him to bring a Taser. | (Ex. 15, 67:12-21.) |
| 97. After DiGiulio holstered his gun, he tried controlling Valencia with his hands, but Valencia grabbed at DiGiulio and punched him in the face. | (Ex. 12, 112:1-6.) |
| 98. He also clawed at DiGiulio's face, gouged his eye, scratched the bridge of his nose and forehead, and ripped DiGiulio's glasses off of his face. | (Ex. 12, 112:6-13.) |
| 99. He crushed DiGiulio's glasses in his hand, and DiGiulio then started using closed-fist punches, while Valencia simultaneously continued grabbing, kicking, and hitting DiGiulio. | (Ex. 12, 112:12-19; 114:2-9.) |
| 100. Because of Valencia's combativeness, DiGiulio was not able to get a full mount position in the bathroom. | (Ex. 12, 120:21 – 121:14.) |
| 101. Amant suggested trying to move Valencia into the hallway, where there was more room. | (Ex. 12, 115:19-25.) |
| 102. With DiGiulio in a half-mount position over Valencia, Amant was able to grab Valencia's ankles and legs and pull him into the hallway. | (Ex. 12, 119:25 – 120:3; Ex. 15, 50:18-25.) |
| 103. DiGiulio was then able to get a full mount position on Valencia, with Valencia on his back, DiGiulio's body over Valencia, and DiGiulio's legs straddling across Valencia's hips. | (Ex. 12, 145:5-25.) |
| 104. Valencia continued to punch DiGiulio and DiGiulio fought back in response. | (Ex. 12, 139:16 – 141:6.) |
| 105. Sgt. Mosher arrived with the Taser. | (Ex. 15, 69:13-17.) |

| **Moving Party's Undisputed Facts:** | **Evidence in Support:** |
|---|---|
| 106. He heard DiGiulio and Amant yelling at Valencia, telling him to stop resisting and to give them his hands. | (Ex. 14, 41:11-20.) |
| 107. Sgt. Mosher fired the Taser and the prongs hit Valencia mid-torso. | (Ex. 12, 142:3 – 143:23; Ex. 15, 69:13-17; 70:1-10; Ex. 14, 47:14-22.) |
| 108. But, the Taser had no effect on Valencia. | (Ex. 12, 143:11-25; Ex. 15, 70:11-22; Ex. 12, 153:20 – 154:8; Ex. 14, 48:24 – 49:1.) |
| 109. In fact, Valencia reached up and tried to pull the Taser prongs out of his skin. | (Ex. 12, 143:13 – 144:4.) |
| 110. Sgt. Mosher applied the Taser to Valencia four times in total (5 seconds of electrical current each time, 20 seconds in total), but it had no effect. | (Ex. 15, 72:12-16; Ex. 21; Ex. 14, 47:1-3, 48:1, 48:11 – 49:1; RB Decl., ¶ 15.) |
| 111. Plaintiffs' medical expert conceded the Taser had no physiological effect on Valencia and did not cause his death. | (Ex. 6, 145:2-17.) |
| 112. Once DiGiulio saw the Taser had no effect, he reassumed his full mount position and again tried to gain control over Valencia, who was still on his back. | (Ex. 12, 143:25 – 145:18.) |
| 113. Amant went to handcuff Valencia, but Valencia grabbed for the handcuffs. | (Ex. 15, 74:16 – 75:15.) |
| 114. DiGiulio was able to take one of Valencia's swinging arms and pin it against Valencia's face, across his cheek, not covering Valencia's nose or mouth. | (Ex. 12, 146:2 147:10.) |
| 115. Valencia bit into Officer DiGiulio's hand. | (Ex. 15, 77:16-21; Ex. 12, 44:16 – 45:3; Ex. 18; Ex. 14, 88:3-14.) |
| 116. Officer Amant stepped on the side of Valencia's face to pry Valencia's head off of DiGiulio's hand and held his boot there for approximately 30 seconds, until Valencia stopped struggling. | (Ex. 15, 77:21 – 78:13.) |
| 117. Officer Amant did not kick Valencia. | (Ex. 15, 77:21-22; RB Decl., ¶ 16.) |

| **Moving Party's Undisputed Facts:** | **Evidence in Support:** |
|---|---|
| 118. Before losing consciousness, Valencia swung his unpinned arm at DiGiulio. | (Ex. 12, 147:12-19.) |
| 119. Amant suggested they roll Valencia onto his stomach to handcuff him. | (Ex. 12, 148:11 – 149:12.) |
| 120. Another officer, Officer Wells, arrived and he and Amant rolled him onto his stomach while DiGiulio maintained an arm lock on him. | (Ex. 12, 150:1-16.) |
| 121. They cuffed him and immediately rolled him onto his back. | (Ex. 12, 150:9 – 151:18.) |
| 122. Officer Amant noticed Valencia had lost consciousness. | (Ex. 12, 151:20 – 152:5; Ex. 15, 79:8-21.) |
| 123. Sgt. Mosher ordered the officers to uncuff him so CPR could be started. | (Ex. 15, 83:1-15; Ex. 14, 81:7 – 83:7.) |
| 124. They called for medical personnel. | (Ex. 10, p. 3.) |
| 125. Neither the Officers nor the medical personnel could revive Valencia, but Plaintiffs' expert conceded their efforts were appropriate. | (Ex. 13, 98:8-16.) |
| 126. During the altercation, DiGiulio and Amant could not determine whether Valencia was having a mental health episode, or was on drugs. | (Ex. 12, 99:23 – 101:17; Ex. 15, 89:12 – 90:10.) |
| 127. Sgt. Mosher believed it was drugs. | (Ex. 14, 62:1-7, 92:5-24.) |
| 128. Plaintiffs' police expert conceded certain drugs can mimic mental health symptoms, and officers are required to respond only to the behaviors they observe, not distinguish the underlying cause of the behavior. | (Ex. 13, 172:22 – 173:7, 173:17 – 175:2.) |
| 129. At the time of the incident, body cameras were a new technology the SPD was rolling out and their use was permissive, not mandatory. | (Ex. 14, 25:9-18; Ex. 19, 32:24 – 33:3; Ex. 20, p. 2; Ex. 14, 29:14-24.) |
| 130. When the Officers arrived, they did not turn their cameras on | (Ex. 12, 29:4-11; Ex. 15, 21:15-19; Ex. 14, 25:9-11) |
| 131. The quickly moving events prevented them from turning them on. | (Ex. 14, 25:9-22; Ex. 19, 32:24 – 35:3.) |

Case 2:16-cv-02081-JAM-AC   Document 22-1   Filed 02/27/18   Page 12 of 12

| **Moving Party's Undisputed Facts:** | **Evidence in Support:** |
|---|---|
| 132. Plaintiffs' police expert testified the SPD's general orders and policies in effect at the time were all appropriate. | (Ex. 13, 179:10 – 180:1.) |
| 133. Because it is a death case, the San Joaquin County District Attorney's Office is conducting its investigation; but it has not yet issued a report. | (Ex. 19, 23:17 – 26:5, 26:25 – 28:22, 42:23-25, 44:21 – 45:23.) |
| 134. Per standard procedure, once the DA's Office issues its report, the SPD and Chief Eric Jones will conduct their review of the Officers' actions. | (Ex. 13, 167:21 – 169:2, 183:2-7; Ex. 19, 94:24 – 95:14.) |

Dated: February 27, 2018

HERUM\CRABTREE\SUNTAG
*A California Professional Corporation*


By:   /s/ Joshua J. Stevens
      JOSHUA J. STEVENS
      Attorneys for All Defendants

11
STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT