Walter H. Walker, III (SBN 63117)
Peter J. Koenig (SBN 132437)
Beau R. Burbidge (SBN 267267)
WALKER, HAMILTON & KOENIG, LLP
50 Francisco Street, Ste. 460
San Francisco, CA 94133
Telephone: (415) 986-3339
Facsimile: (415) 986-1618

Attorneys for Plaintiffs FILIBERTO VALENCIA, SR.
and GRISELDA VALENCIA, individually and as
successors in interest to FILIBERTO VALENCIA, JR.

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA - SACRAMENTO DIVISION

| | |
|---|---|
| FILIBERTO VALENCIA, SR. and GRISELDA VALENCIA, individually and as successors in interest to FILIBERTO VALENCIA, JR.<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF STOCKTON, CHIEF ERIC JONES, SERGEANT DANA MOSHER, OFFICER KYLE AMANT, OFFICER JASON DIGIULIO, and DOES 1-50, inclusive,<br><br>Defendants. | Case No. 2:16-CV-02081-JAM-AC<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**<br><br>**Date:  March 27, 2018**<br>**Time:  1:30 p.m.**<br>**Place:  Courtroom 6, 14th Floor** |

# TABLE OF CONTENTS

I.      **INTRODUCTION** ................................................................................. 1

II.     **STATEMENT OF AUTHORITY** ....................................................... 2

III.    **THE PARTIES' CONCESSIONS** ...................................................... 4

IV.    **ARGUMENT IN OPPOSITION** ........................................................ 5

      A.      **Defendants Are Not Entitled to Qualified Immunity on Plaintiffs' Excessive Force Causes of Action.** ................................ 5

            1.      The Force Used by DiGiulio, Amant and Mosher Was Beyond Any Rational Concept of What is Reasonable. ................................ 5

                  *a.*     *Smashing a Man's Head into the Wall is Unreasonable Force.* ................................................................................. 8

                  *b.*     *Repeatedly Punching a Man on His Knees is Unreasonable Force.* ................................................................................. 8

                  *c.*     *Weapon Blows to the Head Are Considered Unreasonable Force.* ................................................................................. 8

                  *d.*     *Spearing a Suspect with a Baton is Unreasonable Force.* ............... 9

                  *e.*     *Asphyxia Constitutes Unreasonable Force.* ...................................... 9

                  *f.*     *Kicking a Suspect in the Head Constitutes Unreasonable Force.* ................................................................................. 10

                  *g.*     *Failing to Warn a Suspect Prior to Using Force is Unreasonable.* ................................................................................. 11

                  *h.*     *Using Deadly Force When the Suspect is No Threat to Officer Safety is Unreasonable Force.* ............................................ 11

                  *i.*     *Using Deadly Force When the Suspect Is Subdued and on Ground Is Unreasonable Force.* ....................................................... 12

            2.      Defendants Have Failed to Show Justification for Qualified Immunity in the Beating and Asphyxiation Death of Filiberto Valencia, Jr. ................................................................................. 12

            3.      There is No Qualified Immunity for State-Law Claims. ............................. 14

      B.      **Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Claims Against the City and Chief Jones** ................................ 15

      C.      **Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Fourteenth Amendment Claim.** ................................ 16

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

**D.**     **Defendants Are Not Entitled to Summary Judgment on Plaintiffs' ADA Claim.** ........................................................................................................... 18

**E.**     **Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Bane Act Claim.** ..................................................................................................... 19

**F.**     **Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Emotional Distress Claims.** ........................................................................... 20

**V.**     **CONCLUSION** .................................................................................................. 20

PLAINTIFFS' OPPOSTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

1

## **TABLE OF AUTHORITIES**

2

3

**Cases:**

4   *A.C. v. Griego*, No. 2:16-cv-00746-JAM-CKD, 2016 U.S. Dist. LEXIS 141508 (E.D. Cal. Oct. 11, 2016) .................................................................................................................................. 19

5   *A.D. v. California Highway Patrol*, 712 F.3d 446 (9th Cir. 2013) ............................................. 17

6   *Anderson v. Creighton*, 483 U.S. 635 (1989) ............................................................................. 14

7   *Arce v. Blackwell*, 294 F.App'x 259 (9th Cir.2008) ................................................................... 10

8   *Barnes v. Cty. of Placer*, 654 F.Supp.2d 1066 (E.D. CA 2009) ................................................. 2

9   *Blankenhorn v. City of Orange*, 458 F.3d 463 (9th Cir. 2007) .................................................... 8

10  *Boarman v. Cty. of Sacramento*, 55 F. Supp. 3d 1271 (E.D. Cal. 2014) .................................... 19

11  *Cameron v. Craig*, 713 F.3d 1012 (9th Cir. 2013) ..................................................................... 19

12  *Chaudhry v. City of L.A.*, 751 F.3d 1096 (9th Cir. 2014).................................................... 19, 20

13  *Davis v. City of Las Vegas*, 478 F.3d 1048 (9th Cir. 2007) ..................................................... 8, 14

14  *Davis v. City of San Jose*, 69 F. Supp. 3d 1001 (N.D. Cal. 2014) ............................................. 19

15  *Davis v. United States*, 854 F.3d 594 (9th Cir. 2017) ................................................................... 7

16  *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) ............................................................. 6, 13

17  *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003).................................................. 5, 9

18  *Estate of Crawley v. Kings Cty.*, No. 1:13-cv-02042-LJO-SAB, 2014 U.S. Dist. LEXIS 71407 (E.D. Cal. May 23, 2014) .......................................................................................................... 19

19

20  *Estate of Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017) ....................................................... 2, 3

21  *Garlick v. County of Kern*, 167 F.Supp.3d 1117 (E.D.Cal. 2016) ............................................... 8

22  *George v. Morris*, 763 F.3d 829 (9th Cir. 2013) ......................................................................... 3

23  *Glenn v. Wash. Cty.*, 673 F.3d 864 (9th Cir. 2011) ............................................................ passim

24  *Graham v. Connor*, 490 U.S. 386 (1989) ................................................................................ 7, 13

25  *Gravelet-Blondin v. Sheldon*, 728 F.3d 1086 (9th Cir. 2013) ................................................... 11

26  *Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997) .................................................................... 12

27  *Hutton v. City of Berkeley Police Dep't*, No. 13-cv-03407-JCS, 2014 U.S. Dist. LEXIS 126300, at *51 (N.D. Cal. Sep. 9, 2014) ................................................................................................... 19

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

*Johnson v. Bay Area Rapid Transit*, 724 F.3d 1159 (9th Cir. 2013)................................................ 14

*Lam v. City of Los Banos*, No. 2:15-cv-00531-MCE-KJN, 2017 U.S. Dist. LEXIS 48418 (E.D. Cal. Mar. 30, 2017) ..................................................................... 19

*Luchtel v. Hagemann*, 623 F.3d 975 (9th Cir. 2010) ................................................ 5

*Mattos v. Agarno*, 66 F.3d 433 (9th Cir. 2011) ........................................................ 8, 9

*Meredith v. Erath*, 342 F.3d 1057 (9th Cir. 2003) .................................................... 11

*Monell v. Department of Social Services*, 436 U.S. 658 (1978) .............................. 15, 16

*Newmaker v. City of Fortuna*, 842 F.3d 1108 (9th Cir 2016) .................................. 2

*Orr v. Cal. Highway Patrol*, No. 2:14-585 WBS EFB 2015 U.S. Dist. LEXIS 88831 (E.D. Cal. July 8, 2015).................................................................... 11

*Porter v. Osborn*, 546 F.3d 131 (9th Cir. 2008)....................................................... 17

*Rochin v. California*, 342 U.S. 165 (1952) .............................................................. 11

*Rodriguez v. City of Modesto*, No. 1:10-CV-01370-LJO-MJS, 2013 U.S. Dist. LEXIS 172958 (E.D. Cal. Dec. 9, 2013)................................................................. 19

*Scott v. Henrich*, 39 F.3d 912 (9th Cir. 1994)......................................................... 2, 3

*Sheehan v. City and County of San Francisco*, 743 F.3d 1211 (9th Cir. 2014)........... 18

*Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) (*en banc*) ............................. 2, 12

*Tennessee v. Garner*, 471 U.S. 1 (1985) ................................................................ 9, 12, 13

*Ting v. United States*, 972 F.2d 1504 (9th Cir. 1991) .............................................. 12

*United States v. Cameron*, 538 F.2d 254 (9th Cir. 1976)........................................ 11

*Wilkinson v. Torres*, 610 F. 3d 546 (9th Cir. 2010) ................................................ 16, 17

*Young v. Cty. of L.A.*, 655 F.3d 1156 (9th Cir. 2011) .............................................. 8, 9

*Zion v. County of Orange*, 874 F.3d 1072 (9th Cir. 2017)....................................... 10, 12, 17

**Statutes:**

Cal. Civ. Code § 52.1 .............................................................................................. 19

**Rules:**

F.R.C.P. 56 ............................................................................................................. 2

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

1    I.    **INTRODUCTION**

2           On the evening of January 16, 2016, Jason DiGiulio, a 6'2", 275-pound Stockton Police

3    Officer, beat a mentally ill man to death with his fists and the butt of his gun.  (*See* Defendants'

4    Exhibit 1 (San Joaquin County Coroner's Report listing the death of Filiberto Valencia, Jr., as

5    homicide by blunt force trauma to the head, neck and torso); Plaintiffs' Exhibit T, at 31:2-21,

6    63:16-64:18 72:16-74:3, 104:12-21, 105:5-11 (Deposition of Dr. Bennett Omalu, the County

7    Medical Examiner who performed the autopsy on Filiberto); Plaintiffs' Exhibit X, at 37:7-38:23,

8    42:22-24, 58:11-12, 59:1-4, 101:9-24, 102:3-10, 104:1-5, 130:7-131:1 (Deposition of Dr. Judy

9    Melinek, who performed a second autopsy on Filiberto); Plaintiffs' Exhibit A, at 69:6-10, 87:14-

10   88:4, 88:19-21, 89:4-10 (Deposition of Jason DiGiulio); Plaintiffs' Exhibit F, at p. 10 of 40

11   (transcript of DiGiulio interview with Stockton Police).)[1]  (*See also*, Plaintiffs' Statement of

12   Disputed Material Facts ("DMF") Nos. 1, 33-61, 66-68.)

13          Officer DiGiulio was assisted in this homicide by Officer Kyle Amant of the Stockton

14   Police SWAT Team, who speared Filiberto in the stomach with his baton while Filiberto sat on the

15   floor, ripping a three-inch tear in his liver that would have proved fatal if he had not first died from

16   the blunt force trauma and compression asphyxiation inflicted by DiGiulio.  (*See* Ex. T (Omalu

17   Depo, 70:19-20, 78:10-24, 80:3-15, 85:14-86:16); Ex. E (Amant Depo, 63:11-21).)  (*See also,*

18   DMF Nos. 6, 48-50, 90-95.)

19          Officer DiGiulio was further assisted in his assault and battery on Filiberto by his

20   supervising officer, Sergeant Dana Mosher, who Tased Filiberto four times in the space of about

21   half a minute from a distance of four feet, in violation of Stockton Police General Order No. Q-Ic.

22   (Ex. G (Mosher Depo, 51:8-24; 52:7-18; 73:24-74:9); Ex. G-1.)  (*See also,* DMF Nos. 7, 52.)

23          All three of these Stockton Police Officers failed to activate their body cameras while they

24   beat, speared and Tased Filiberto, in violation of Stockton Police General Order No. J-2.  (Ex. I.)

25   ───────────────

26   [1] All plaintiffs' exhibits are identified and verified in the accompanying Declaration of Walter H.
     Walker, III ("Dec. of Walker").  These exhibits will henceforth simply be referenced by Exhibit

27   letter designation in the order by which they appear in Plaintiffs' Statement of Disputed Material
     Facts.

28

1 | (*See also,* DMF Nos. 9, 62.)

2 |     The Chief of the Stockton Police Department, Eric Jones, has conducted no investigation

3 | into the death of Filiberto in the more than two years since the homicide took place and has made

4 | no attempt to determine if his officers violated any laws, orders, or protocol.  (Ex. H (Jones Depo,

5 | 8:10, 10:14-15, 23:17-25:22, 26:9-31:20, 43:1-8); *see also* DMF Nos. 116-125.)

6 |     Plaintiffs' complaint alleges ten causes of action against these men and against the City of

7 | Stockton, their employer. Defendants, while not denying the homicide, seek summary judgment of

8 | each and every cause of action.

9 | ## II.    <u>STATEMENT OF AUTHORITY</u>

10 |     By defendants' own admission, summary judgment requires that the movant show *both*

11 | that there is no genuine dispute as to any material fact *and* that the movant is entitled to judgment

12 | as a matter of law.  (Defendants' Memo. of Points and Authorities ("DMPA"), at 10:1-11 (citing

13 | F.R.C.P. 56(a) and *Barnes v. Cty. of Placer*, 654 F.Supp.2d 1066, 1070 (E.D. CA 2009)).)

14 |     Speaking directly to the issue of excessive force claims against police officers, the Ninth

15 | Circuit has made clear that summary judgment should be granted sparingly.  "Because [the

16 | excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions,

17 | and to draw inferences therefrom, we have held on many occasions that summary judgment or

18 | judgment as a matter of law in excessive force cases should be granted sparingly."  *Glenn v. Wash.*

19 | *Cty.*, 673 F.3d 864, 871 (9th Cir. 2011) (*quoting Smith v. City of Hemet*, 394 F.3d 689, 701 (9th

20 | Cir. 2005) (*en banc*) ).

21 |     This holds especially true in cases involving deadly force.  "In such cases, we must ensure

22 | that the officer is not taking advantage of the fact that the witness most likely to contradict his

23 | story—the person shot dead—is unable to testify."  *Estate of Lopez v. Gelhaus*, 871 F.3d 998,

24 | 1006 (9th Cir. 2017).  Thus, "Summary judgment is not appropriate in § 1983 deadly force cases

25 | that turn on the officer's credibility that is genuinely in doubt."  *Newmaker v. City of Fortuna*, 842

26 | F.3d 1108, 1116 (9th Cir 2016).  "[T]he court may not simply accept what may be a self-serving

27 | account by the police officer."  *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).  A court "must

28 |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR,
ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

1    also examine circumstantial evidence that, if believed, would tend to discredit the police officer's

2    story." *Estate of Lopez, supra,* 871 F.3d at 1006.

3        In cases such as this, "The judge must carefully examine all the evidence in the record,

4    such as medical reports, contemporaneous statements by the officer and the available physical

5    evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the

6    officer's story is internally consistent and consistent with other known facts." *Scott, supra,* 39

7    F.3d at 915.  "In cases where the best (and usually only) witness who could offer direct testimony

8    for the plaintiff about what happened before a shooting has died, our precedent permits the

9    decedent's version of events to be constructed circumstantially from competent expert and

10   physical evidence, as well as from inconsistencies in the testimony of law enforcement." *George*

11   *v. Morris*, 763 F.3d 829, 834 (9th Cir. 2013).

12       As the Court will note, plaintiffs have the only medical reports, one coming from the San

13   Joaquin County and world-renowned Medical Examiner, Dr. Bennett Omalu, and one from a

14   private pathologist, Dr. Judy Melinek, both of whom performed autopsies on the decedent.  (*See*

15   Ex. BB (autopsy report of Dr. Omalu); Melinek Decl., ¶ 5.)  Defendants have no medical reports

16   and performed no autopsy.

17       Plaintiffs have videotaped and recorded statements from the involved officers and an

18   eyewitness, all taken within hours of the victim's death.  Defendants offer only a declaration that

19   the eyewitness purportedly signed in 2017 and that is at odds with much of what she can be seen

20   and heard saying on videotape on January 20, 2016.  (*See* Exs. Q, Q-1, and Q-2.)

21       Plaintiffs have expert testimony from medical as well as police procedural specialists;

22   defendants offer none of their own.  Plaintiffs demonstrate repeated inconsistencies "in the

23   testimony of law enforcement;" defendants attempt to ignore the inconsistencies and simply rely

24   on "self-serving account[s]" by officers whose "credibility . . . is genuinely in doubt."

25   ///

26   ///

27   ///

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR,
ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

### III.    THE PARTIES' CONCESSIONS

Plaintiffs, the parents of Filiberto Valencia, Jr., acknowledge that on the night of January 19, 2016, there was a need for police intervention with Filiberto.  He was holding people against their will and threatening them.

Defendants, for their part, concede that Filiberto was severely mentally ill and that "[t]he incidents giving rise to this lawsuit occurred while Valencia was experiencing a schizophrenic and manic episode as a result of withdrawal from his medications."  (Moving Party's (*sic*) Undisputed Facts ("MPUF") No. 5, and also Nos. 4 and 6-37.)

Plaintiffs do not contest the conduct of defendants until after Officers DiGiulio and Amant pulled a little girl named Dawn Posas out of a bathroom where Filiberto was holding her while demanding that police be called to his aid.  Plaintiffs' contentions against DiGiulio, Amant, and Mosher begin after the girl was freed, when those officers commenced beating, spearing, Tasing, kicking, and asphyxiating Filiberto until he died.  Those officers' actions are thoroughly discussed in Plaintiffs' Statement of Disputed Material Facts, which contains a detailed account of the events leading to Filiberto's death and the causes of his death.  (*See* DMF Nos. 14-115, 128-131.)

Defendants, for their part, admit that DiGiulio repeatedly punched Filiberto while he was sitting or kneeling on the floor, pinned or pressed his head into the bathroom wall, twice hit him over his head with a gun, and "mounted" Filiberto's body while he lay on the floor; that Amant speared Filiberto in the stomach and beat him on the legs with his baton and "stepped" on his face; and that Mosher Tased him four times in five-second intervals.  (MPUF Nos. 70, 77, 80, 86, 87, 88, 91, 93, 102, 103, 107, 110, 112, 114, 116, 130.)

Defendants offer no opposition to the testimony of the County Medical Examiner that Filiberto suffered a fractured skull, brain hemorrhages due to blows to his head from a blunt object, fatal tears of his liver and inferior vena cava, and a sustained, slow, agonizing death.  (Ex. T (Omalu Depo, 31:10-12; 64:1-18; 70:19-20; 78:22-24; 80:3-15; 85:14-86:16; 92:9-93:11; 96:4-97:9; 99:5-100:6; 100:19-101:15; 101:6-15; 101:22-103:3; 104:12-105:11; 176:19-177:15); Melinek Decl.; DMF Nos. 39, 42, 66-69, 71-75, 79, 83-96, 98-99, 100-106, 108-114.)

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR,
ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

IV.   **ARGUMENT IN OPPOSITION**

   A.   **Defendants Are Not Entitled to Qualified Immunity on Plaintiffs' Excessive Force Causes of Action.**

   In moving for summary judgment, defendants divide plaintiffs' ten causes of action into State claims and Federal claims, contending that the State claims of negligence, wrongful death, assault, and battery are but counterparts to plaintiffs' Federal 28 U.S.C. § 1983 excessive force claim, and arguing from there that if the court finds the police conduct was "objectively reasonable" so as to defeat the § 1983 claim, that would bar all the State claims.  (DMPA at 10:20-28.)  By this short-hand method, defendants proceed to claim that DiGiulio, Amant and Mosher used "reasonable force" and are entitled to qualified immunity.  Defendants fail at both contentions.

   1.   The Force Used by DiGiulio, Amant and Mosher Was Beyond Any Rational Concept of What is Reasonable.

   The facts simply do not weigh in defendants' favor, even by their own heavily shaded rendition.  Filiberto had no weapons, was begging for the police to come help him, did just as the police demanded when they arrived, was confronted at all times in a tiny confined area first by two large and powerful officers, and then by three such officers, all of whom supposedly forgot to turn on their body cameras while they beat him with a gun, fists, and a baton, while they Tased him, and while they asphyxiated him.  Under defendants' own (and presumably best) scenario, this beating took place over six minutes, including 30 seconds of Amant standing on his head and 20 seconds of Mosher Tasing him.  (DMPA at 12:26, 8:10, and 8:19-21.)

   There is no evidence that the officers gave warnings to Filiberto before they started beating him.  (*See* DMF Nos. 24-33, 128.)  There is, however, much evidence offered by defendants themselves that Filiberto was mentally ill.  (*See* MPUF Nos. 4-37.)  Ninth Circuit precedent "holds that a detainee's mental illness *must* be reflected in any assessment of the government's intervention in the use of force."  *Luchtel v. Hagemann*, 623 F.3d 975, 988 (9th Cir. 2010) (*quoting Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003) (emphasis in original)).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

By contrast, courts have described two factors that are ***not*** relevant to the analysis.  First, "the desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury."  *Glenn v. Wash. Cty., supra*, 673 F.3d at 876-877 (citation omitted).  Second, "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."  *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001).

These cases notwithstanding, defendants try to make it seem that the officers' brutal actions against Filiberto were necessary because of the need to resolve quickly a threat to the safety of others.  This is belied by the statements of defendants themselves.  According to Amant, when he and DiGiulio entered the bathroom with their guns drawn, DiGiulio "immediately pulled the girl out," Amant himself "[j]ust told" one of the women "just to get out," and "just called [another woman] to me" who "[j]ust stepped around."  (Ex. E (Amant Depo, 53:4-54:6).)  Also according to Amant, all this was going on "while DiGiulio was holding the suspect at gunpoint." (*Id*. at 59:1-7.)  Indeed, he made the following admission (*id*. at 59:8-10):

> Q.   Stopping there. At this point there is no fighting going on between DiGiulio and Mr. Valencia?
>
> A.   No.

It was only after the others were out of the bathroom that DiGiulio set about beating Filiberto (*id*. at 59:11-17):

> Q.   Okay. You said,
>
> > "I get her out and then there is a girl in the bathtub or in the shower who was behind the suspect. So eventually I was able to get her to crawl over, crawl out. ***At that point DiGiulio goes in to mount this guy or put his hands on him*** . . . ."
>
> Is that accurate so far?
>
> A.   Yes.

(emphasis added).

Moreover, the "guy" to whom Amant was referring was sitting down with his hands raised

1  over his head.  (*Id.* at 60:17-19; defendants' Ex. 12 at 86:5-9; MPUF No. 67; and Ex. R (photo of

2  DiGiulio demonstrating during his post-mortem recorded statement how Filiberto had his hands

3  over his head).)  (*See* also, DMF Nos. 24-33, 128.)

4        Defendants admit that DiGiulio, Amant, and Mosher beat, speared, Tased, and mounted

5  Filiberto while he was on the ground; they admit he died during his encounter with these three

6  officers; the County coroner and the County medical examiner found that Filiberto's death was a

7  homicide due to blunt force trauma; and two qualified pathologists found that he had been

8  asphyxiated.  (*See* DMF Nos. 34-115.)

9        Defendants' attempts to show that the officers' conduct was reasonable under these

10  circumstances ring so hollow that they have to focus almost entirely on their claims of what went

11  on *before* they arrived in the bathroom at 3133 Nicole.

12        In this regard, they have a number of problems.  The law clearly establishes that "[t]he

13  'reasonableness' of a particular use of force must be judged from the perspective of a reasonable

14  officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham v. Connor*, 490 U.S.

15  386, 396 (1989).  In other words, what is unknown to an officer on the scene cannot be considered

16  in determining the reasonableness of his actions.  As the Ninth Circuit said in *Glenn v.*

17  *Washington County, supra*, 693 F.3d at 873, n.8,  "We cannot consider evidence of which the

18  officers were unaware—the prohibition against evaluating officers' actions 'with the 20/20 vision

19  of hindsight' cuts both ways."  *See also Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017).

20        Yet the first 55 of defendants' Undisputed Facts all pertain to matters that were unknown

21  to DiGiulio and Amant before they began beating Filiberto.

22        What they knew was that as soon as DiGiulio reached out for the little girl Filiberto let her

23  go.  (Defendants' Ex. 12 at 86:5-9; Ex. Q at pp. 4 and 24 of 50).

24        What they knew was that when DiGiulio told the man on the floor to get his hands up, the

25  man did exactly as he was told to do.  (Defendants' Ex. 12 at 86:5-9 and Ex. R (photo)).  (*See*

26  *also,* DMF Nos. 24-31, 128.)

27        And then they began to beat him, and they kept on beating him until he was dead.

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR,
ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

Addressing the specifics of the defendant officers' behavior:

### a. _Smashing a Man's Head into the Wall is Unreasonable Force._

"Any reasonable officer . . . would have known . . . that swinging a handcuffed man into a wall head-first multiple times and then punching him in the face while he lay face-down on the ground, and breaking his neck, as a result, was unnecessary and excessive." _Davis v. City of Las Vegas_, 478 F.3d 1048, 1957 (9th Cir. 2007).  Here, the violence of DiGiulio's "pinning" Filiberto's head against the wall is made manifest by the photographs of the blood-spattered wall (Ex. S) and by Renee Brown's post-incident statement about seeing blood everywhere.  (Ex. Q at pp. 4 and 24 of 50.)  And while it is true that DiGiulio did not break Filiberto's neck, he did punch him multiple times while he was down, and Filiberto's death was found to be a homicide due to blunt force trauma to his head, neck and torso.  (Exs. T, X, and BB, replete; Melinek Decl.)  (_See also,_ DMF Nos. 33-36.)

### b. _Repeatedly Punching a Man on His Knees is Unreasonable Force._

Filiberto did what DiGiulio told him to do—put his hands up over his head—before DiGiulio began hitting him with his gun and his fists.  (_See_ DMF 25-32, 43-47, 53.)  In _Blankenhorn v. City of Orange_, 458 F.3d 463, 481 (9th Cir. 2007), an officer was found to be on notice that punching a suspect under similar circumstances was a Fourth Amendment violation.

### c. _Weapon Blows to the Head Are Considered Unreasonable Force._

DiGiulio used his gun to smash in the skull of an unarmed suspect who had been sitting or kneeling on the floor with his hands in the air.  (_See_ DMF Nos. 26-42, 94, 103-107, 111.)  This was an unreasonable use of force and a violation of a clearly established right.

Baton blows to the head are recognized as deadly force.  _Garlick v. County of Kern_, 167 F.Supp.3d 1117, 1147 (E.D. Cal. 2016); see also _Young v. Cty. of L.A._, 655 F.3d 1156, 1162 (9th Cir. 2011).  This is because, "The standard issue baton is a deadly weapon that can cause deep bruising as well as blood clots capable of precipitating deadly strokes." _Mattos v. Agarno_, 66 F.3d 433, 454 (9th Cir. 2011) (citation omitted).  Thus, a baton blow to the head may not be inflicted "unless it is necessary to prevent the escape and the officer has probable cause to believe that the

1  suspect poses a significant threat of death or serious physical injury to the officer or others."

2  *Tennessee v. Garner*, 471 U.S. 1, 3 (1985).

3      Filiberto was beaten on the head with a gun rather than a baton, but both are hard weapons

4  capable of delivering similar damage.  Indeed, Stockton Police Department General Order No. Q-

5  Ik (Ex. G-2), is entitled "Mechanical/Impact Devices" and states at paragraph "E.":

6            Officers shall avoid striking a person in vital areas (i.e., head, neck,

7            throat, heart, kidney, groin, knees, and spine) unless the use of
          deadly force is justified.

8      This policy comports with Ninth Circuit precedent.  In *Young, supra,* 655 F.3d at 1162, it

9  was noted:

10            Young's evidence shows that California law enforcement officers

11            are taught that a baton is a deadly weapon that can cause deep
          bruising as well as blood clots capable of precipitating deadly

12            strokes, and that batons should therefore be used only as a response
          to aggressive or combative acts. Furthermore, Los Angeles County

13            Sheriff's Department policies instruct officers that head strikes
          with an impact weapon are prohibited unless circumstances justify

14            the use of deadly force.

15      A gun is most definitely an impact weapon and, as Amant testified, "Obviously, hitting

16  someone with a pistol is not something they teach in the department."  (Ex. E at 97:8-10; *and see*

17  Declaration of police procedures expert Roger Clark, ¶¶ 18-22.)

18         *d.  Spearing a Suspect with a Baton is Unreasonable Force.*

19      Amant admits to using his baton to spear Filiberto in the stomach while DiGiulio was on

20  top of him, and this resulted in a torn liver that the County Medical Examiner said was a fatal

21  wound.  (Ex. E at 63:14-21; Ex. T at 78:10-24, 80:3-15.)  (*See also,* DMF Nos. 48-50, 90-93, 95.)

22  This too was unreasonable force.  *See Mattos, supra,* 66 F.3d at 454; *Young, supra,* 655 F.3d at

23  1162.

24         *e.  Asphyxia Constitutes Unreasonable Force.*

25      It is clearly established that crushing a suspect on the ground by pressing weight on his

26  neck and torso—also known as "compression asphyxia"—constitutes unreasonable force where

27  the suspect is on the ground and not resisting.  *Drummond, supra,* 343 F.3d at 1061-62.

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR,
ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

1   Once again, the very statements of defendants in this case damn them, especially in

2   conjunction with the multiple findings of fatal compression injuries in the autopsies of Drs.

3   Omalu and Melinek.  Amant says, "I wasn't doing anything good 'cause there was a very large

4   officer on top of [Filiberto]."  (Ex. E at 68:15-17.)  "And when I dragged them into the hallway,

5   DiGiulio kind of got off him for a second and then kind of mounted him again."  (*Id*. at 68:20-

6   69:2.)  "It seemed like [DiGiulio] got up for a second . . . and then right back on top."  (*Id*. at

7   71:20-22.)  "[Q.] You saw DiGiulio with his chest on top of Mr. Valencia's chest, correct?  A.

8   Yes."  (*Id*. at 77:12-14.)  (*See also, id*. at 80:5-16, where he describes DiGiulio continuing to lie

9   on top of Filiberto even after others said he was "out.")  (*See also,* DMF Nos. 47, 52, 54-61, 71-

10   74, 78-79, 81-82, 85-86, 89, 96-102, 112.)

11   In *Arce v. Blackwell*, 294 F.App'x 259, 261 (9th Cir.2008), a case involving a suspect's

12   death by restraint or positional asphyxia, the court held, "We have had similar cases in the past

13   that would have put reasonable police officers on notice that their response to Arce—keeping an

14   individual who is in a state of excited delirium restrained with his chest to the ground while

15   applying pressure to his back and ignoring pleas that he cannot breathe—constituted excessive

16   force under the Fourth Amendment."

17   ### *f.   Kicking a Suspect in the Head Constitutes Unreasonable Force.*

18   While witness Brown saw an officer kicking Filiberto in the head (Ex. Q at pp. 4 and 24 of

19   50), defendant Amant admits to putting his foot onto the side of Filiberto's face and pinning it to

20   the ground.  (Ex. E at 77:22-24, 78:8-22.)  (*See also,* DMF No. 56.)

21   Just four months ago, the Ninth Circuit addressed this issue in *Zion v. County of Orange*,

22   874 F.3d 1072, 1075 (9th Cir. 2017), where then-Chief Judge Kozinski, having given an officer

23   the benefit of the doubt for "emptying his weapon" at the suspect, declared: "The head stomps are

24   different."

25   The court called head stomps "exactly the kind of 'brutal' conduct the Due Process Clause

26   protects against," and declared (*id*.):

27   Like forced stomach-pumping, head stomping a suspect curled up

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR,
ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

in a fetal position "is bound to offend even hardened sensibilities."
*Rochin v. California*, 342 U.S. 165, 172 (1952); see *United States
v. Cameron*, 538 F.2d 254 (9th Cir. 1976).

      g.   *Failing to Warn a Suspect Prior to Using Force is Unreasonable.*

None of the officers warned Filiberto prior to using force. (DMF Nos. 24-33, 128.) None of the officers gave Filiberto the opportunity to surrender prior to using force. (*Id.*) DiGiulio told Filiberto to get his hands up, Filiberto complied, then DiGiulio attacked him without further warning. (*Id.*)

This was not only a violation of department policy (*see* DMF No. 127), it was also clearly unreasonable. *See Glenn v. Wash. Cty.*, *supra*, 673 F.3d at 876 ("Appropriate warnings comport with actual police practice and such warnings should be given, when feasible, if the use of force may result in serious injury").

      h.   *Using Deadly Force When the Suspect is No Threat to Officer Safety is Unreasonable Force.*

Filiberto was unarmed and smaller than the officers he confronted. (DMF Nos., 1, 6, 130.) He complied with DiGiulio's order to put his hands up, and he kept his hands up until he was attacked, his head was smashed into a wall, and he was hit over the head with DiGiulio's gun. (DMF Nos. 24-38, 128.) He never got off the ground and DiGiulio remained on top of him for the rest of the six minutes before he died. (DMF Nos. 43-61.) Any resistance he gave was a natural and defensive reaction to the officers' infliction of grievous and fatal injuries. Under these circumstances, the officers' use of force was a violation of a clearly established right.

In *Orr v. Cal. Highway Patrol*, No. 2:14-585 WBS EFB 2015 U.S. Dist. LEXIS 88831, at *13 (E.D. Cal. July 8, 2015), the court held that the officers could not reasonably have feared for their safety so as to justify force: "Plaintiff's hands-up posture could not reasonably have been interpreted by [the officer] as 'physical abuse' or an immediate threat to officer safety."

*Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003), likewise clearly established that even resistance to being handcuffed does not alone justify the use of force. And in *Gravelet-Blondin v. Sheldon*, 728 F.3d 1086, 1093 (9th Cir. 2013), it was held, "The right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established

prior to 2008." *See also, Smith, supra,* 394 F.3d at 703.

                i.   <u>Using Deadly Force When the Suspect Is Subdued and on Ground Is</u>
                    <u>Unreasonable Force.</u>

"When police confront a suspect who poses an immediate threat, they may use deadly force against him.  But they must stop using deadly force when the suspect no longer poses a threat." *Zion, supra*, 874 F.3d at 1075.  It is clearly established "that the use of deadly force against a non-threatening suspect is unreasonable." *Id.* at 1076; *Garner*, 471 U.S. at 11-12; *Harris v. Roderick*, 126 F.3d 1189, 1209 (9th Cir. 1997).

"If the suspect is on the ground and appears wounded, he may no longer pose a threat; a reasonable officer would reassess the situation rather than continue [using force]." *Zion, supra,* 874 F.3d at 1076.  "This is particularly true when the suspect wields a knife rather than a firearm." *Id*.  It must hold even more true where, as here, the suspect was completely unarmed.

It is also clearly established "that continued force against a suspect who has been brought to the ground can violate the Fourth Amendment." *Zion*, 874 F.3d at 1076.

And in *Ting v. United States*, 972 F.2d 1504, 1511 (9th Cir. 1991), it was noted, "A jury could reasonably conclude that it would not be reasonable for an officer to believe the use of deadly force was lawful under Ting's version of shooting, i.e., an unarmed and injured felon lying or kneeling on the floor surrounded by five heavily armed agents."

Here, by the time DiGiulio got on top of Filiberto, Filiberto had already sustained a skull fracture from DiGiulio hitting him with his gun.  (DMF Nos. 38-42.)  DiGiulio then remained on the subdued Filiberto while he and his fellow officers continued to punch, kick, spear, beat with a baton, Tase, and asphyxiate Filiberto.  (DMF Nos. 43-66.)  Their continued use of serious and deadly force violated Filiberto's clearly established rights.

          2.   <u>Defendants Have Failed to Show Justification for Qualified Immunity in the</u>
               <u>Beating and Asphyxiation Death of Filiberto Valencia, Jr.</u>

Defendants ask the Court to look at whether the officers reasonably believed their conduct in striking Filiberto with a gun, spearing him with a baton, repeatedly punching him, Tasing him, kicking him in the head and asphyxiating him did not violate a clearly established right.  (DMPA

1   at 11:21-23.)  This situation, however, of three officers with multiple weapons carrying out a 6-

2   minute attack on a mentally-impaired man in a confined space from which he could not escape is

3   not one for which the qualified immunity doctrine was designed.

4          There is, of course, a clearly established right to life ("We hold these truths to be self-

5   evident . . .").  In *Tennessee v. Garner, supra*, 471 U.S. at 7, the Supreme Court declared, "[T]here

6   can be no question that apprehension by the use of deadly force is a seizure subject to the

7   reasonableness requirement of the Fourth Amendment."  And, more to the point,

8   "[N]otwithstanding probable cause to seize a suspect, an officer may not always do so by killing

9   him."  *Id.* at 9.

10          Four years after *Garner*, the Court attempted to add some clarity in *Graham v. Connor*,

11   490 U.S. 386 (1989), by saying that determining reasonableness of an officer's use of force

12   requires analyzing the totality of the circumstances, including [1] "the severity of the crime at

13   issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and

14   [3] whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* at 388, 396.

15   And then in 2011, the Ninth Circuit followed this by explaining, "We examine the totality of the

16   circumstances and consider whether specific factors may be appropriate in a particular case,

17   whether or not listed in *Graham*."  *Glenn v. Washington County, supra*, 673 F.3d at 872.  "Other

18   relevant factors include the availability of less intrusive alternatives to the force employed,

19   whether proper warnings were given and whether it should have been apparent to officers that the

20   person they used force against was emotionally disturbed." *Id.*

21          In this case, clearly no warning was given.  Defendants do not even pretend that a warning

22   was given.  DiGiulio just got Filiberto to put up his hands and then attacked.

23          Similarly, despite *Glenn*, no consideration and certainly no deference was paid to the fact

24   that Filiberto was, or even might be, emotionally disturbed.  "[W]here it is or should be apparent

25   to the officers that the individual involved is emotionally disturbed, that is a factor that must be

26   considered in determining, under *Graham*, the reasonableness of the force employed." *Deorle v.*

27   *Rutherford, supra*, 277 F.3d at 1283.  Once again, DiGiulio does not even pretend he considered

28

13

1  Filiberto's condition, he just attacked. Amant, seeing Filiberto's "thousand-yard stare,"

2  nonetheless speared him, whacked away at his legs, and kicked him in the head.  Mosher, seeing

3  the same thousand-yard stare, just repeatedly deployed his Taser into him.

4       Should any of them, the two patrol officers and their sergeant, have known that any of

5  them was violating Filiberto's Fourth Amendment rights, or that his conduct in assaulting,

6  battering, and "smothering" Filiberto was unlawful?  The California Penal Code, which Chief

7  Jones acknowledges officers are expected to know (Ex. H, 14:6-15; Ex. AA), says yes. So do the

8  numerous cases set forth above, including *Davis v. City of Las Vegas*, *Blankenhorn*, *Garlick*,

9  *Young*, *Drummond*, *Arce*, and most particularly *Zion*.

10      But, even where there is no federal case analyzing a similar set of facts, a plaintiff may

11 nonetheless demonstrate that a reasonable officer would have known that the force he used was

12 excessive.  *Davis*, 478 F.3d at 1056.  "Otherwise, officers would escape responsibility for the most

13 egregious forms of conduct simply because there was no case on all fours prohibiting that

14 particular manifestation of unconstitutional conduct."  *Id.* (citation omitted). All that has to be

15 asked is whether the state of the law at the time of the alleged wrong gave the defendants fair

16 warning that their alleged treatment of the plaintiff was unconstitutional."  *Id.*; *and se*e *Anderson*

17 *v. Creighton*, 483 U.S. 635, 640 (1989).

18      Defendants DiGiulio, Amant and Mosher (who was supposed to be supervising) had fair

19 warning here. Just as in *Zion*, *supra*, the multitude of acts committed against the victim was, in

20 and of itself, enough to put anyone on notice that what they were doing was not just

21 unconstitutional, but barbaric.

22              3.    There is No Qualified Immunity for State-Law Claims.

23      Having lumped together plaintiffs' Fourth Amendment and State-law claims in pursuit of

24 expediency, defendants neglect to note that the defense of qualified immunity is inapplicable to

25 State-law claims.  *Johnson v. Bay Area Rapid Transit*, 724 F.3d 1159, 1171 (9th Cir. 2013).  As

26 shown, qualified immunity clearly does not shield defendants in this case, but even if it did

27 plaintiffs' State-law causes of action would survive.

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR,
ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

**B.     Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Claims Against the City and Chief Jones**

Defendants seek dismissal of all causes of action against the City of Stockton and Chief Jones, claiming they do not qualify for jury consideration under *Monell v. Department of Social Services*, 436 U.S. 658, 690-692 (1978), or concepts of vicarious liability.  But plaintiffs have established evidence that Chief Jones was the implementer of policy for the City of Stockton as it pertained to "the entire police department" (Ex. H at 10:14-15) and that he has "final say in all policies and protocols for the Stockton Police Department."  (*Id.* at 16:3-5.)

In this context, Chief Jones implemented a policy whereby no meaningful review takes place of in-custody deaths, he himself does not bother looking at the evidence, and officers involved are allowed to continue operating exactly as if they had not committed homicide.  (*See, e.g., id.* at 23:17-24, 24:6-23, 25:11-25, 26:8-27:2, 28:13-19; *see also* DMF Nos. 116-125.)  Plaintiffs' police procedure expert calls what Chief Jones does, "a stall technique," that is either "meaningless, ineffective, or amounts to de facto ratification."  (Declaration of Clark at ¶ 57.)

Since Chief Jones is the City's agent in charge of the police department, his practice and policy of stalling into perpetuity is attributable to his employer as well as himself.  (*See* Ex. H at 8:5-13.)

Because nothing ever happens to violent officers, Jason DiGiulio has been allowed to continue carrying weapons and attacking citizens, despite the charges and findings that have been made over the years against him.  (*See* Ex. B; Ex. H at 54:13-55:1; DMF Nos. 2-5, 122.)  It is true there were General Orders that were supposed to be in effect to control officers like DiGiulio, but Chief Jones does not enforce them and in many cases does not even know what they are.  (*See, e.g.,* Ex. H at 28:23-30:21, 33:24-34:20.)

Chief Jones says his department has a policy for dealing with persons with mental health issues, but he has almost no idea what it is and does not recall if he is aware of in-custody deaths of people with mental health issues since he became police chief.  (*Id.* at 59:9-23, 58:23-59:1.)  Importantly, Chief Jones claims his officers undergo training for dealing with persons with mental

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

1   health issues (*id.* at 62:6-65:24), yet neither DiGiulio nor Amant had ever undergone any such

2   training.  (Ex. E (Amant Depo, 15:16-19, 98:6-99:14); Ex. A (DiGiulio Depo, 26:3-11).)  (*See*

3   *also,* DMF Nos. 10-13).

4       Any "policies" the City and the Chief claimed to have that pertained to the situation at

5   issue when DiGiulio, Amant and Mosher confronted Filiberto Valencia, Jr., were a sham.  The real

6   policy that caused the violation of Filiberto's constitutional rights was no policy at all.  *See*

7   *Monell, supra*, 436 U.S. at 690-692.  The overriding motivation for a sham policy that is no policy

8   at all is deliberate indifference.

9       **C.    Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Fourteenth**
        **Amendment Claim.**

10      It is to be noted that defendants never even told Filiberto he was under arrest or was going

11  to be arrested.  The evidence as presented by defendants themselves is that they went into the

12  bathroom with their guns drawn, DiGiulio told Filiberto to put up his hands, which he readily did,

13  and then kept his gun pointed at Filiberto until they got the other people out of the room, at which

14  point DiGiulio commenced hitting Filiberto.

15      As Filiberto's parents, plaintiffs had a Fourteenth Amendment liberty interest in the

16  companionship and society of their son.  *Wilkinson v. Torres*, 610 F. 3d 546, 554 (9th Cir. 2010).

17  "Officer conduct that 'shocks the conscience' in depriving parents of their interest is cognizable as

18  a violation of due process."  *Id.*

19      The fact that DiGiulio had his gun trained on a man kneeling or sitting on the floor long

20  enough to get either three or four people out of the bathroom meant that no snap judgment had to

21  be made.  (*See* DMF Nos. 24-33, 128.)  The fact that Filiberto's hands were over his head meant

22  that no escalating situation was taking place.  (*See, id.*)  Indeed, Filiberto had been begging,

23  beseeching, demanding for the police to come and the circumstantial evidence indicates he was

24  glad to see them and doing whatever they wanted until DiGiulio began to hit him in the head.  (*See*

25  DMF Nos. 16-19, 21-22.)

26      "In determining whether excessive force shocks the conscience, the court must first ask

27

28

1  whether the circumstances are such that actual deliberation [by the officer] is practical." *Id.*

2  quoting *Porter v. Osborn*, 546 F.3d 131, 1137 (9th Cir. 2008).  "Where actual deliberation is

3  practical, then an officer's 'deliberate indifference' may suffice to shock the conscience."

4  *Wilkinson*, 610 F.3d at 554.  "On the other hand, where a law enforcement officer makes a snap

5  judgment because of an escalating situation, his conduct may only be found to shock the

6  conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives."

7  *Id.*

8         Deliberation was practical for DiGiulio, meaning that his deliberate indifference to the

9  consequences of his action shocks the conscience.  Both his history of violence and his obvious

10  pleasure in giving his post-mortem videotaped statement support the contention that he intended to

11  harm Filiberto outside any legitimate law enforcement objective. Similarly, both Amant and

12  Mosher who came in *seriatum*, deploying their weapons to wild and harmful effect, had the

13  opportunity for deliberation and de-escalation but chose to join the fray instead.

14         The Ninth Circuit said in *Zion, supra*, at 1077:

15              This case is akin to *A.D. v. California Highway Patrol*, where we
              found that an officer violated due process by shooting a suspect
16              who posed no immediate threat. 712 F.3d 446, 451, 458 (9th Cir.
              2013).  The suspect there had repeatedly rammed her car into the
17              officer's vehicle, but the officer saw that the suspect had no
              weapons and ten seconds elapsed between the ramming and the
18              shooting.  *Id.* at 451.  Similarly, here a reasonable jury could find
              that Higgins knew he had rendered Zion incapable of causing harm
19              or fleeing. Higgins had just fired eighteen bullets in Zion's
              direction, half of them at very close range while Zion lay on the
20              ground.  No competent officer could have failed to at least wound
              his target under these conditions.  Higgins then paused before
21              delivering what appear to be vicious blows to Zion's head.  A jury
              could reasonably find that Higgins knew or easily could have
22              determined that he had already rendered Zion harmless.  If so, a
              reasonable jury could also conclude that Higgins was acting out of
23              anger or emotion rather than any legitimate law enforcement
24              purpose.

25         Certainly, a reasonable jury could conclude the same in the instant case.  After all, with

26  the girl gone, followed by the women, and the suspect on his knees or buttocks with hands in the

27

28

---

17

air, no snap judgment was required.  As Officer Amant testified, "[H]e didn't have anything in his hands" (Ex. E, at 58:5-12), he was sitting down (*id.* at 60:17-19), "[he wasn't armed.  He wasn't a very big guy."  (*Id.* at 91:23.)

  **D.**  **Defendants Are Not Entitled to Summary Judgment on Plaintiffs' ADA Claim.**

  Defendants build their argument around the assertion that Filiberto "was committing crimes."  It is difficult to reconcile that with their offering of undisputed material facts that Filiberto was a paranoid schizophrenic suffering a psychotic break.  (See MPUF Nos. 4-26, 32-33; DMF Nos. 14-19.)  Plaintiffs, again, concede that police intervention was needed, but beating and smothering him to death after the danger was past not only was unreasonable but took advantage of Filiberto's disabled mental state.

  Amant and Mosher, at least, recognized Filiberto was not in any sort of reasonable frame of mind, saying it was like he wasn't there and looked right through them.  (*See, e.g.*, Ex. E (Amant Depo, 64:3-24); Ex. G (Mosher Depo, 62:14-20, 92:5-11); DMF No. 129.)  They knew something was wrong with him mentally and clearly had him in a position of physical disability.  Addressing such a situation in *Sheehan v. City and County of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), the Ninth Circuit said:

> It is undisputed that Sheehan had a disability and that the officers knew it at the time they encountered her. We turn, therefore, to whether the city discriminated against Sheehan by failing to provide a reasonable accommodation during the second entry. Sheehan asserts that the city failed to provide a reasonable accommodation when the officers forced their way back into her room without taking her mental illness into account. She asserts that the officers should have respected her comfort zone, engaged in non-threatening communications and used the passage of time to defuse the situation rather than precipitating a deadly confrontation. We acknowledge that the officers were forced to make split-second decisions. A reasonable jury nevertheless could find that the situation had been defused sufficiently, following the initial retreat from Sheehan's room, to afford the officers an opportunity to wait for backup and to employ less confrontational tactics, including the accommodations that Sheehan asserts were necessary. For the reasons stated here, and because the reasonableness of an accommodation is ordinarily a question of fact, we hold that the city is not entitled to judgment as a matter of law on Sheehan's ADA claim.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

(Citation omitted).

### E.    Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Bane Act Claim.

Defendants confuse and complicate the elements of a Bane Act claim (Cal. Civ. Code § 52.1) in their attempt to obtain summary judgment.  However, for excessive force cases such as this, a Bane Act claim is identical to a Fourth Amendment Claim.  As the Ninth Circuit has made clear, "the elements of the excessive force claim under § 52.1 are the same as under § 1983." *Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013); *see also*, *Chaudhry v. City of L.A.*, 751 F.3d 1096, 1105 (9th Cir. 2014) ("the City defendants concede in their brief to us that a successful claim for excessive force under the Fourth Amendment provides the basis for a successful claim under § 52.1"); *and see A.C. v. Griego*, No. 2:16-cv-00746-JAM-CKD, 2016 U.S. Dist. LEXIS 141508, at *12 (E.D. Cal. Oct. 11, 2016).[2]

Because plaintiffs have shown ample evidence of excessive force by defendants, and because coercion is inherent in an act of excessive force, they have also shown ample evidence of a Bane Act violation.

///

///

---

[2] *See also, e.g., Boarman v. Cty. of Sacramento*, 55 F. Supp. 3d 1271, 1287 (E.D. Cal. 2014) (citing to *Chaudhry* and *Cameron*); *Rodriguez v. City of Modesto*, No. 1:10-CV-01370-LJO-MJS, 2013 U.S. Dist. LEXIS 172958, at *37 (E.D. Cal. Dec. 9, 2013) ("A plaintiff bringing a Bane Act excessive force need not allege a showing of coercion independent from the coercion inherent in the use of force"); *Lam v. City of Los Banos*, No. 2:15-cv-00531-MCE-KJN, 2017 U.S. Dist. LEXIS 48418, at *23 (E.D. Cal. Mar. 30, 2017) ("where plaintiffs bring a Bane Act claim alleging that officers used excessive force, they do not need to allege any coercion that is independent from the excessive force itself"); *Davis v. City of San Jose*, 69 F. Supp. 3d 1001, 1008 (N.D. Cal. 2014). The two district court cases cited by defendants (DMPA, p. 24), are in alignment with all of these holdings.  *Estate of Crawley v. Kings Cty.*, No. 1:13-cv-02042-LJO-SAB, 2014 U.S. Dist. LEXIS 71407, at *37 (E.D. Cal. May 23, 2014), approvingly quoted *Rodriguez*, "[W]here Fourth Amendment unreasonable seizure or excessive force claims are raised and intentional conduct is at issue, there is no need for a plaintiff to allege a showing of coercion independent from the coercion inherent in the seizure or use of force."  *Hutton v. City of Berkeley Police Dep't*, No. 13-cv-03407-JCS, 2014 U.S. Dist. LEXIS 126300, at *51 (N.D. Cal. Sep. 9, 2014), held, "The undersigned has concluded that in cases involving Fourth Amendment violations that include allegations of excessive force, the excessive force is enough to meet the intimidation, threats, or coercion requirement."

---

**F.      Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Emotional Distress Claims.**

Defendants make a fundamental legal error in contending that plaintiffs, as parents of the decedent, cannot recover for his emotional distress. On May 19, 2014, the Ninth Circuit ruled in *Chaudhry v. City of Los Angeles, supra*, 751 F.3d at 1105, "that California's prohibition against pre-death pain and suffering damages limits recovery too severely to be consistent with § 1983's deterrence policy. [CCP] Section 377.34 therefore does not apply to § 1983 claims where the decedent's death was caused by the violation of federal law."

In *Chaudhry*, the decedent was a young autistic man sleeping in a doorway who, after being roused by police, was shot in the chest and abdomen and died on the spot.  A jury awarded his estate $1 million for his pain and suffering.  In the instance case, by defendants' own admission, Filiberto's ordeal lasted six minutes, in which, Dr. Omalu tells us, he experienced a slow, agonizing death.  (*See* DMF Nos. 66-69, 108-110.)  Under *Chaudhry*, plaintiffs are entitled to recover for that.

As for plaintiffs' claim of intentional inflection of emotional distress, which bears with it the prospect of punitive damages against the officers, defendants' only argument is that the officers' conduct was not outrageous.  The facts, however, as borne out by the autopsies of Omalu and Melinek, speak for themselves.  (*See* DMF Nos. 39-42, 63-75, 77-99, 101-115.)

**V.      CONCLUSION**

Defendants' motion should be denied in its entirety, and denied as to each and every one of plaintiffs' causes of action.

DATED: March 27, 2018                 WALKER, HAMILTON & KOENIG, LLP


By:      /s/ Walter H. Walker, III
                Walter H. Walker, III
                Attorney for Plaintiffs FILIBERTO
                VALENCIA, SR. and GRISELDA
                VALENCIA, individually and as
                successors in interest to FILIBERTO
                VALENCIA, JR.