Walter H. Walker, III (SBN 63117)
Peter J. Koenig (SBN 132437)
Beau R. Burbidge (SBN 267267)
WALKER, HAMILTON & KOENIG, LLP
50 Francisco Street, Ste. 460
San Francisco, CA 94133
Telephone: (415) 986-3339
Facsimile: (415) 986-1618

Attorneys for Plaintiffs FILIBERTO VALENCIA, SR.
and GRISELDA VALENCIA, individually and as
successors in interest to FILIBERTO VALENCIA, JR.

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA - SACRAMENTO DIVISION

| | |
|---|---|
| FILIBERTO VALENCIA, SR. and GRISELDA VALENCIA, individually and as successors in interest to FILIBERTO VALENCIA, JR.<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF STOCKTON, CHIEF ERIC JONES, SERGEANT DANA MOSHER, OFFICER KYLE AMANT, OFFICER JASON DIGIULIO, and DOES 1-50, inclusive,<br><br>Defendants. | Case No. 2:16-CV-02081-JAM-AC<br><br>**DECLARATION OF ROGER CLARK IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: April 10, 2018<br>Time: 1:30 p.m.<br>Place: Courtroom 6, 14th Floor |

I, Roger Clark, declare:

1. I am a police practices expert retained by the plaintiffs in this case. I have personal knowledge of the matters contained in this declaration and if called upon I could and would testify to them.

**Qualifications:**

2. I am a twenty-seven-year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993.

1
DECLARATION OF ROGER CLARK IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5, 1988). The POST Command College was a master's level two-year course of study requiring a thesis, in Police Administration, with the diploma awarded by the California Department of Justice (and not the California University system).

3. Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, New York and Wisconsin. I

4. Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26, Model X26 and Model X2 ECDs. I own each, along with the download software. I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices. I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage.

**Retention and Review of Materials:**

5. I was retained to analyze and render opinions regarding the January 19, 2016 lethal use of force (including taser and baton), inflicted on Mr. Filiberto Valencia (Mr. Valencia) by Stockton Police Department (SPD) Sergeant Dana Mosher (Sergeant Mosher), and Officers Kyle Amant (Officer Amant), and Jason DiGiulio (Officer DiGiulio).

6. In forming my opinions regarding the lethal force inflicted on Filiberto Valencia, I reviewed the following documents: (i) Complaint for Damages; (ii) Defendants' Initial Disclosures Pursuant to Federal Rule of Civil Procedure, Rule 26(a)(1); (iii) Scene Sketch Drawn by EIT Lambert #2458; (iv) American Medical Response San Joaquin Pre-Hospital Care Report; (v) San Joaquin County Mental Health Services, Community Adult Treatment Services, June 25, 2016, Custer Copy (receipt); (vi) Google Maps Internet Satellite Images of 3133 Nicole Street

(Incident Scene); (vii) Stockton Police Department, Name Master Information Sheet, Filiberto Valencia; (viii) Stockton Police Department, Body Camera Video Request, January 21, 2016; (ix) Stockton Police Department, Dispatch Records Request, January 21, 2016; (x) Stockton Police Department, Taser Printout, January 19, 2016 (Incident Date); (xi) Sergeant Mosher's Sketched Diagram of Scene; (xii) Stockton Police Department, Property Tags; (xiii) Office of District Attorney, Investigation and Report, Pages 1-5; (xiv) Stockton Police Department Incident Report, 16-2494, Bate Stamped, COSO 048056-COSO 048294; (xv) Search Warrant Affidavit and Search Warrant Return, February 26, 2016; (xvi) Stockton Police Department, Calls for Service Reports; (xvii) Stockton Police Department, Crime Scene Log;  (xviii) Deposition Transcripts: (a) Officer Kyle Amant, June 26, 2017; (b) Officer Jason DiGiulio, June 26, 2017; (c) Sergeant Hector Alaniz, August 14, 2017; (d) Officer Jason DiGiulio, August 14, 2017, Volume II; (e) Sergeant Dana Moser, August 14, 2017; (f) American Medic Garret Brown, June 27, 2017; (g) American Medic Ken Le, June 27, 2017; (h) Officer Pancho Freer, August 14, 2017; (i) Officer Christopher Slate, September 21, 2017; (j) 9-1-1 Operator Cheryl Teague, September 21, 2017; (k) 9-1-1 Operator Kim Washington, September 21, 2017; (l) Lieutenant Travis DiGiulio, August 14, 2017; (xix) Audio Recordings: (a) Officer Radio Communications; (b) 9-1-1 Call, Filiberto Valencia, Sr., translated by Griselda (daughter), 6:11 p.m.; (c) 9-1-1 Calls Related to Mr. Valencia; (d) Stockton Fire Department and AMR Interviews; (xx) Video Recordings: (a) Video of Scene; (b) Interview of Dawn Posas; (c) Canvass/Witness Interviews; (d) Interview of Filiberto Valencia, Sr. at Scene; (e) Officer DiGiulio's Injuries; (f) Body-worn Cameras, Officers Dana Mosher, Pancho Freer, Kyle Amant, Kao Saefong, and Kenneth Tuy; (xxi) Photographs: (a) Dawn Posas (Juvenile Female Victim), small scrape on chin, and bruise on top of scalp; (b) Renee Brown (Victim), Staff Member at 3133 Nicole Street; (c) Tomika Wilson (Victim), small bruise on right cheek, and small scrape on right leg; (d) Norma Britton (Victim), small cut on forehead; (e) Scene; (f) Mr. Valencia's injuries; (g) Involved Officers; (xxii) Media Articles: (a) Cano Funeral Home Post, January 19, 2016; (b) Fox 40, January 20, 2016; (c) KCRA 3 Article, January 20, 2016; (d) Record.net Article January 20, 2016; (e) Record.net Article March 8, 2016; (xxiii) California POST Basic Learning Domains as Follows: (a) #1. "Leadership, Professionalism & Ethics."; (b)

#2: "Criminal Justice System."; (c) #3: "Policing in the Community."; (d) #5: "Introduction to Criminal Law."; (e) #15: "Laws of Arrest."; (f) #20: "Use of Force."; (g) #21: "Patrol Techniques."; (h) #23: "Crimes in Progress."; (i) #33: "Arrest Methods/Defensive Tactics."; (j) #34: "First Aid and CPR."; (k) #35: "Firearms/Chemical Agents."; (l) #37: "People with Disabilities."; (xxiv) County of San Joaquin Sheriff-Coroner Report, January 19, 2016; (xxv) 2011 Electronic Control Weapon Guidelines. U.S. Department of Justice Office of Community Oriented Policing Services and Police Executive Research Forum. Washington, D.C., 2011; (xxvi) Additional TASER International Training Materials; (xxvii) Nationally recognized law enforcement training regarding Restraint/Positional Asphyxia: (a) The Los Angeles Police Department Training Bulletin: "In-Custody Deaths." July 1999; (b) Training Video produced by the Georgia Bureau of Investigation: "Preventing Restraint Asphyxia."; (c) Training Video produced by the New York Police Department: "Best Practices, Positional Asphyxia."; (d) National Law Enforcement Technology Center: "Positional Asphyxia - Sudden Death." June 1995.; (e) "Restraint and Sudden Death", Donald T. Reay, M.D.; (f) "Positional Asphyxia And Sudden Death", U.S. Department of Justice; (xxviii) Stockton Police Department Interview of Witness Renee Brown, Bate Stamp COS048243-COS048269; (xxix) Overview of the incident scene, via the Internet.

**Apparent Uncontested Facts:**

7. There are a number of apparent uncontested facts important to an evaluation of this incident. They include:

8. Mr. Valencia was not armed throughout the entirety of the incident.

9. Both Filiberto Valencia, Sr. (Mr. Valencia's father) and Griselda (Mr. Valencia's sister) called 9-1-1 at or before 6:11 p.m. (Nearly five minutes prior to Mr. Valencia entering 3133 Nicole Street residence), and reported that Mr. Valencia was mentally ill, trying to hurt himself, and needed police assistance.

10. At least three trained SPD officers entered the bathroom, rescued the occupants and then subdued Mr. Valencia; therefore, the ratio of officers to subject was 3 to one.

11. Mr. Valencia was on the floor when the officers forced entry into the bathroom, and

4

1 never got off the floor and onto his feet throughout the duration of the incident.

2    12.    Mr. Valencia sustained at least two blows to the head with Officer DiGiulio's handgun.

3    13.    Mr. Valencia sustained at least 10 closed-fisted blows to the head and body by Officers DiGiulio and Amant.

4    14.    Mr. Valencia sustained no less than four baton blows to the stomach and shins by Officer Amant.

5    15.    Mr. Valencia was subjected to four full (five-second) cycles within a 38-second span, by Sergeant Mosher in excess of the 15 second limit set by the nationally accepted Electronic Control Weapon Guidelines

6    16.    As documented by the autopsy, Mr. Valencia suffered a skull fracture, lacerations, cuts, and deep muscle contusions to his body and arms.

7    17.    As documented by the autopsy, Mr. Valencia died as a result of blunt force trauma.

**Use of Impact Weapons by Officers Amant and DiGiulio:**

18.    Mr. Valencia sustained injuries to legs, body and head, which appear consistent with blunt force caused by Officer DiGiulio's firearm blows and Officer Amant's baton blows. SPD policy states that any such use of force would only be justified as lethal force necessary to counter a lethal threat.

19.    This is also consistent with the POST training as stated below:

> "Every peace officer must understand that an impact weapon (i.e. baton) should be used only when an officer is acting in a reasonable manner or to repel and protect in certain tactical considerations." (Post Learning Domain #33, page 7-3. Emphasis added.)

> "A peace officer's impact weapon is a deadly weapon as defined in Penal Code Section 12020. In law enforcement, however, to be used in an authorized manner, it must be used reasonably to repel or protect." (Post Learning Domain #33, page 7-3. Emphasis added.)

> "Illegal use by an officer:

> "Any officer who uses an impact weapon against a subject beyond objectively reasonable (i.e., Graham vs. Connor) force can be criminally liable under the following statutes."

> "Penal Code 149: Any officer unnecessarily assaulting or beating any person under color of authority."
>
> "Penal Code 245: Assault with a deadly weapon or force likely to produce great bodily injury." (Post Learning Domain #33, page 7-4.)

20. Further, officers are taught (and as recently stated by the 9th Circuit) that among other obvious injuries, the use of the baton can cause deep bruising and clotting that can eventually reach the heart and/or lungs and cause stroke and/or death.  In the matrix of subject behaviors, the use of the baton is justified only as a response to aggressive or combative acts.  Officer Amant has testified that he considered Mr. Valencia's behaviors a lethal threat, yet they saw no weapons and Mr. Valencia remained seated or kneeling throughout the entirety of his interaction with SPD Officers.

21. Under this set of facts, the admitted blows to the head and body by a baton and firearm are not justified.

22. Additionally, as to DiGiulio, using a firearm as an impact weapon and within arms' reach of the target suspect is not reasonable or justified.

**Use of Taser by Sergeant Mosher:**

23. I am very familiar with the Taser weapon and its operation.  I have also reviewed established federal standards for use of the Taser, including the standards of the International Association of Chiefs of Police, which along with several other organizations and associations, developed and published defining documents regarding use of the Taser.  These standards express the accepted professional standard of care for use of such weapons and are endorsed by the U.S. Department of Justice.

24. I have noted a number of significant specific apparent departures from the guidelines by Sergeant Mosher which, in my opinion, contributed significantly to this incident and inflicted very serious injury on Mr. Valencia in violation of published and trained Federal guidelines, as follows:

> **"Medical Considerations: Repeated or multiple applications may increase risk of death**
>
> "It is important to recognize that ECWs have been cited by

medical authorities as a cause of, or contributing factor in, some deaths. A number of factors appear to be associated with fatal and other serious outcomes. These factors include how the ECW was used and the physical or medical condition of the subject who received an ECW application. Indeed, in July 2010 the American Academy of Emergency Medicine issued a Clinical Practice Statement advising physicians that they should consider additional evaluation and treatment for individuals who experienced an ECW application longer than 15 seconds.

"Although causation factors are not clear, the most common factors that appear to be associated with fatal and other serious outcomes include 1) repeated and multiple applications, 2) cycling time that exceeds 15 seconds in duration, whether the time is consecutive or cumulative, and 3) simultaneous applications by more than one ECW. Officers must be trained to understand that repeated applications and continuous cycling of ECWs may increase the risk of death or serious injury and should be avoided." (Page 13.)

**"Medical Considerations: High-risk populations**

"Some populations currently believed to be at a heightened risk for serious injury or death following an ECW application include pregnant women, elderly persons, young children, visibly frail persons or persons with a slight build, persons with known heart conditions, persons in medical/mental crisis, and persons under the influence of drugs (prescription and illegal) or alcohol. Personnel should be trained about the medical complications that may occur after ECW use and should be made aware that certain individuals, such as those in a state of excited delirium, may be at a heightened risk for serious injury or death when subjected to ECW application or other uses of force to subdue them." (Page 14.)

**"Medical Considerations: Positional asphyxia**

"Agencies also need to be cognizant of how positional asphyxia may exacerbate the condition of any individual who has received an ECW application. Positional asphyxia is a death that occurs when a subject's body position interferes with breathing, either when the chest is restricted from expanding properly or when the position of the subject's head obstructs the airway. Positional asphyxia has been mentioned as a possible contributing factor in a number of cases in which subjects died after one or more ECW applications. Police personnel should be trained to use a restraint technique that does not impair a subject's respiration following an ECW application." (Page 14.)

**Electronic Control Weapon Guidelines:**

- Personnel should be trained to use an ECW for one standard cycle (five seconds) and then evaluate the situation to determine if subsequent cycles are necessary. Training protocols should emphasize that multiple applications or continuous cycling of an ECW resulting in an exposure longer than 15 seconds (whether continuous or cumulative) may

increase the risk of serious injury or death and should be avoided.

- Training protocols should emphasize the risk of positional asphyxia, and thus officers should be trained to use a restraint technique that does not impair the subject's respiration following an ECW application.

- Personnel should be trained to attempt hands-on control tactics during ECW application, including handcuffing the subject during ECW application (i.e., handcuffing under power). Training should emphasize that personnel who touch a subject during ECW application will not receive exposure to the electrical charge, so long as caution is taken not to touch the subject along the circuit (i.e., between the locations of the two probes).

- Command staff, supervisors, and investigators should receive ECW awareness training appropriate to the investigations they conduct and review.

- In addition to providing an overview of ECWs, agencies should provide ECW awareness training to personnel who are not certified to carry the devices and emphasize their responsibilities. The training should also cover situations such as attempting to handcuff subjects during ECW application and transitioning to other force options.

- Personnel should use an ECW for one standard cycle (five seconds) and then evaluate the situation to determine if subsequent cycles are necessary. Personnel should consider that exposure to the ECW for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious injury. Any subsequent applications should be independently justifiable, and the risks should be weighed against other force options.

- A warning should be given to a subject prior to activating the ECW unless doing so would place any person at risk. Warnings may be in the form of verbalization, display, laser painting, arcing, or a combination of these tactics.

25. In my opinion, Sergeant Mosher's departure from the standards is reflective of the custom and practice of the SPD to endorse the gross over-dependence on the Taser weapon when other far more reasonable and appropriate methods of force (if actually necessary) should be deployed. In my opinion, the use of a taser in this instance grossly deviated from the POST and federal training that Sergeant Mosher had allegedly participated in and completed.

**Mentally Ill Suspect:**

26. As POST Certified Law Enforcement Officers, all SPD officers allegedly received

the POST Basic training as required by law and as outlined in Learning Domain #37. The requirement is as follows:

> 13515.25 PC.
>
> (a) By July 1, 2006, the Commission on Peace Officer Standards and Training shall establish and keep updated a continuing education classroom training course relating to law enforcement interaction with mentally disabled persons. The training course shall be developed by the commission in consultation with appropriate community, local, and state organizations and agencies that have expertise in the area of mental illness and developmental disability, and with appropriate consumer and family advocate groups. In developing the course, the commission shall also examine existing courses certified by the commission that relate to mentally disabled persons. The commission shall make the course available to law enforcement agencies in California.
>
> (b) The course described in subdivision (a) shall consist of classroom instruction and shall utilize interactive training methods to ensure that the training is as realistic as possible. The course shall include, at a minimum, core instruction in all of the following:
>
> (1) The cause and nature of mental illnesses and developmental disabilities.
>
> (2) How to identify indicators of mental disability and how to respond appropriately in a variety of common situations.
>
> (3) Conflict resolution and de-escalation techniques for potentially dangerous situations involving mentally disabled persons.
>
> (4) Appropriate language usage when interacting with mentally disabled persons.
>
> (5) Alternatives to lethal force when interacting with potentially dangerous mentally disabled persons.
>
> (6) Community and state resources available to serve mentally disabled persons and how these resources can be best utilized by law enforcement to benefit the mentally disabled community.
>
> (7) The fact that a crime committed in whole or in part because of an actual or perceived disability of the victim is a hate crime punishable under Title 11.6 (commencing with Section 422.55) of Part 1.
>
> (c) The commission shall submit a report to the Legislature by October 1, 2004, that shall include all of the following:

> (1) A description of the process by which the course was established, including a list of the agencies and groups that were consulted.
>
> (2) Information on the number of law enforcement agencies that utilized, and the number of officers that attended, the course or other courses certified by the commission relating to mentally disabled persons from July 1, 2001, to July 1, 2003, inclusive.
>
> (3) Information on the number of law enforcement agencies that utilized, and the number of officers that attended, courses certified by the commission relating to mentally disabled persons from July 1, 2000, to July 1, 2001, inclusive.
>
> (4) An analysis of the Police Crisis Intervention Training (CIT) Program used by the San Francisco and San Jose Police Departments, to assess the training used in these programs and compare it with existing courses offered by the commission in order to evaluate the adequacy of mental disability training available to local law enforcement officers.
>
> (d) The Legislature encourages law enforcement agencies to include the course created in this section, and any other course certified by the commission relating to mentally disabled persons, as part of their advanced officer training program.
>
> (e) It is the intent of the Legislature to reevaluate, on the basis of its review of the report required in subdivision (c), the extent to which law enforcement officers are receiving adequate training in how to interact with mentally disabled persons.

27. In accordance with the Penal Code, specific training to persons with mental illness is included in the POST Basic curriculum (Learning Domain #37: "Persons with Disabilities," Chapter 4, "Mental Illness.") and states in part:

> "Law enforcement routinely encounters persons with mental illness in a variety of settings. The causes and impacts of mental illness vary and are not bound by race, gender, or socioeconomic status.
>
> "How peace officers respond to persons living with a mental disorder can have tremendous impact on how these encounters will be resolved. The basic philosophy of any law enforcement officer should be to respond in a manner that is humane, compassionate, and supportive.
>
> "Mental illnesses are a medical condition that affect a person's thinking, feeling, mood, ability to relate to others, and disrupts daily functioning. Persons managing a mental illness can have a substantially diminished capacity for coping with the ordinary

10

    demands of life. Mental illnesses can affect people of any age, race, religion, or income and background. Several million people in this country are diagnosed with a serious long term mental illness. The good news about mental illness is that recovery is possible."

    (POST Learning Domain #37, page 4-4.)

28. As stated above, the basic training materials regarding persons suffering from mental illnesses express concerns for the safety of the public, the responding officers, and the subject of the incident. A centerpiece of the basic training and policies includes the recognition that all mentally disturbed subjects are considered to be ill - - not a criminal suspect.

29. This expectation applies to this incident and includes:

- Dealing with the "Threat Triad" (feeling threatened, out of control and out of options).
- Interpersonal engagement and de-escalation (slowing down to reduce anxiety).
- Use of backups (reduces necessity for force).
- Tactical considerations (proper use of basic field tactics).
- Effective communication and initial response (understanding mental illness behaviors and the use of tactical communication methods).
- The crisis cycle (as anxiety increases, the subject's ability to comply decreases).
- Crisis intervention teams (the use of trained personnel to intervene).
- Force options (must be reasonable and suited to the situation).

30. In his treatise "Unreasonable Seizures of Unreasonable People: Defining the Totality of Circumstances Relevant to Assessing the Police Use of Force Against Emotionally Disturbed People," Professor Michael Avery wrote, "Untrained officers, or those who forget or disregard their training, are far more likely to exacerbate the tensions inherent in confrontations with emotionally disturbed people are thus more likely to escalate the risk of a violent outcome."

31. In my opinion, this is precisely what occurred here. Sergeant Mosher has testified that he was aware, based on his observations and 9-1-1 calls, that Mr. Valencia was either mentally ill or gripped by some narco-induced psychosis - under either condition, Sergeant Mosher should have known that Mr. Valencia was not in a frame of mind to obey orders as a typical suspect might.

**Use of Force and Restraint that Occurred:**

32. POST documents that "Unreasonable Force" occurs when the, "type, degree and duration of force employed was not necessary, nor appropriate." (POST LD #20). POST training also clearly states that all force applied by police must be "Objectively Reasonable."

33. In order to be "reasonable," POST states that the type and amount of force used in any situation must match the circumstances facing the officer(s) ("Totality of Circumstances"). Factors to be considered include:

- The nature of the crime (felony versus misdemeanor— violent versus non-violent);
- The actions of the suspect (passively non-compliant, actively noncompliant, or assaultive/combative);
- The presence and type of any weapons;
- The physical size and number of the suspects versus the size and numbers of the Deputies; and
- Other resources at hand (such as more personnel available for callout, the availability of specialized equipment, etc.).

34. Every day, Officers encounter situations that require them to restrain persons. Properly trained Officers learn how improper restraining techniques can block the flow of air into the individual's lungs contributing to a life-threatening condition known as "positional, or restraint, asphyxia." Proper training also covers the multiple effective options available such as avoiding compression of the chest, rolling the subject over on his side, and sitting or standing the subject up.

35. Properly trained Officers are trained that risk factors for positional asphyxiation include all or some of the following conditions:

- Preexisting medical conditions such as heart problems or head and neck injuries;
- The length of the struggle;
- The physical environment in which the struggle takes place;
- Whether the suspect suffers from a mental condition;
- Whether the suspect has been drinking alcohol; and

- The presence of depressant or stimulant drugs (substances such as cocaine and methamphetamine).

36. Properly trained Officers are trained that excessive restraint, combined with one or more of these factors, some of which are present in this instance, can impair the cardiovascular and respiratory systems.

37. Properly trained Officers know that breathing requires two actions: Increasing the size of the chest by expanding the ribs, and contracting the diaphragm, allowing air to fill the lungs. Training includes knowing that:

- When a person is laying with his face, chest, and/or stomach down, performing both of these functions can be more difficult;

- The contents of the abdomen are pressing against the diaphragm;

- In order to raise the ribs or use the diaphragm when forced into a prone position, the weight of the body must be lifted;

- An Officer kneeling or applying weight to an individual's back aggravates the situation because the additional weight of the deputy(s) must be lifted along with the weight of the person's body;

- The greater the weight or more intense the compression, the harder it becomes to breathe. As a result, the suspect struggles more violently, and untrained deputies respond by using more force; and

- With no reserve oxygen left and unable to take deep breaths, the individual slips into unconsciousness and after a short period of time, could be dead.

38. Properly trained Officers know this scenario can be easily avoided by using proper restraint techniques and following simple guidelines that are key to the possibility that a struggling subject could be in danger of death due to positional or restraint asphyxia. One of the most important factors is the longer the physical contact, the more fatigued the body will become.

39. All police departments throughout California train their officers regarding positional and restraint asphyxia, in part, to reduce the number of deaths which have occurred over the past several years. As noted in the LAPD Training Bulletin regarding in-custody deaths:

> "Once the officers are at the scene and recognize they are confronting an "at risk" suspect, they must be mindful of the potentially deadly cycle of suspect resistance and officer restraint. Normally, the best position to control a suspect is for him to be face down on the ground. However, this position increases the difficulty in breathing, especially when pressure is applied to the back, further compressing the lungs. The suspect is already winded

> during the struggle of the takedown, now his lungs are being further compressed and the natural reaction of the body is to demand more oxygen. The suspect panics and becomes more violent, seeking this much needed air. The officers increase their efforts to control him because they believe him to be trying to escape. This action/reaction cycle continues several minutes until the officers overcome his resistance and the suspect is restrained. Offices must gain control of the suspect as quickly as possible and reduce the time spent in the prone position, especially with added pressure to the back area." LAPD Training Bulletin Vol. XXXI, Issue 2 (1999).

40. Additionally, Officers are also trained that they must act quickly to return the subject to an upright position, preferably to a sitting position, cease applying restraint, especially when risk factors are present, because the restraint techniques used could mean the difference between life and death.

41. Basic guidelines include avoiding placing weight on the neck or back, avoiding "straddle" positions and "pile-on," and immediately positioning the subject so he can breathe. It does not appear that the SPD officers followed policy and training during this incident, and allowed Mr. Valencia to remain prone, handcuffed, and with body weight upon his head, neck and back, for an excessive amount of time.

**Summary of Opinions:**

42. Throughout the country, law enforcement officers are trained regarding the methods and means of response when dealing with citizens. Above all, they are required to avoid excessive and unnecessary force. In this instance, Officers Amant and DiGiulio, and Sergeant Mosher appear to have failed in their duty to utilize these methods and follow these standards. Rather, their response and use of force appears grossly unjustified, excessive, and unnecessary in the totality of the circumstances confronting them, and includes their collective failure to abide by POST standards, and law (as taught by POST).

43. There is nothing in the record to indicate that Mr. Valencia posed a credible significant threat to the Defendant Officers to justify the level of force they inflicted on him. He was unarmed, out-manned, and sitting on the floor, or at most kneeling on the bathroom floor. Although he had assaulted three women (who suffered minimal injuries), the females were removed from the bathroom, and Mr. Valencia sat on the floor. His behavior simply did not justify

the significant use of any physical force. Rather, Officers DiGiulio and Amant failed to use the required more reasonable (less forceful) methods when dealing with Mr. Valencia; and instead, they reached out, grabbed him, hit Mr. Valencia in the head, delivered baton blows to Mr. Valencia's body and legs, stepped on Mr. Valencia's head, forced Mr. Valencia's head against the bathroom and hallway walls, and hit Mr. Valencia in the head with a handgun. As such, Officers' DiGiulio's and Amant's use of force in this set of facts was exceptionally reckless and beyond Mr. Valencia's ability to control or mitigate.

44.     Taking Sergeant Mosher's set of facts as true, that the only resistance he observed during the encounter with Mr. Valencia was Mr. Valencia swatting hands away from him, then Sergeant Mosher failed in his duty to intervene with the others to prevent and/or stop the unnecessary and excessive force inflicted on Mr. Valencia:

> "The community expects that its peace officers will use only reasonable amounts of force. Likewise, it expects that someone, including peace officers, will intervene if reasonable force is exceeded. For the community and the officer's protection, the officer must know the laws pertaining to intervention.
>
> "Peace officers are required by their position to intervene in any force situation they perceive as excessive." (POST Learning Domain: #20 "Use of Force," Chapter 6 - Consequences of Unreasonable Force, page 6-7.)
> "The United States Constitution protects individuals from unlawful actions of peace officers. NOTE: The officer who fails to intervene, for whatever reason, is also held accountable by the United States Code." (POST Learning Domain: #20 "Use of Force," Chapter 6 - Consequences of Unreasonable Force, page 6-8.)

45.     Sergeant Mosher has testified that he never saw a weapon in Mr. Valencia's hands, never observed Mr. Valencia hit any Officer, and only observed Mr. Valencia defending himself against blows from the Officers by swatting their hands away; and nonetheless, tased Mr. Valencia, delivering 4 cycles in 38 seconds, and therein violated policy and law when he failed to re-evaluate Mr. Valencia's lethality.

46.     POST's Re-evaluation of Force Requirement is as follows:

> "Peace officers must use the force option appropriate for the situation as conditions may change rapidly. Officers must continually reevaluate the subject's action and must be

prepared to transition as needed to the appropriate force options." (POST Learning Domain 20, page 2-7.)

Taking the physical evidence into account, the SPD Defendants' actions in this case were directly connected to the beating death of Mr. Valencia, and reflect a deliberate indifference to the life and safety of Mr. Valencia. In my opinion, Mr. Valencia did not pose an "imminent lethal threat" to the Defendants when they inflected such significant lethal force on Mr. Valencia. Accordingly, the Defendants did not follow the tactical guidelines required of every Basic POST certified law enforcement officer in this incident and their use of deadly force was therefore inappropriate, excessive, and unreasonable and also violated POST standards.

47. The autopsy report documents a stunning list of traumas that appear to far exceed the admitted use of force in the officer interviews and SPD investigative reports.

48. The ratification of this incident by the SPD also demonstrates an existing custom and practice within the department of an unconstitutional use of deadly force (as taught by POST). The inadequate training and ratification of the beating/tasing/asphyxia related death of Mr. Valencia is very alarming. I have seen no evidence that the Defendants were either disciplined or at a minimum retrained in proper arrest methods, tactical deployments or use of force.

49. All these opinions et forth above were delivered to counsel for defendants prior to my deposition on January 12, 2018.

**Response to Defendants' Claims Regarding My Testimony**

50. I have read the quotations and citations to my deposition testimony that defendants included in their Memorandum of Points and Authorities in Support of Motion for Summary Judgment, and take issue with most of them as being out of context and not truthful expressions of the question posed or the answer given.

51. Defendants cite me as saying that it was appropriate to arrest Mr. Valencia and for Officer DiGiulio to make physical contact with him to effect the arrest. (Moving Party's Undisputed Fact No 73). What I said was not a direct affirmation of DiGiulio's conduct but an acknowledgement that Mr. Valencia had to be taken into custody and that would require physical contact. Specifically, I said, "Well, I wouldn't care whether it's classified as a detention or arrest until you determine what's going on. If he's mentally ill and delusional, he's not going to jail; he's

1    going to a mental hospital." (Depo. at 96:17-23).

2    52.    Defendants cite me as saying it was an appropriate decision to attempt to pin Mr. Valencia's head against the wall. (No. 78), but what was appropriate in principle did not pertain to what Officer DiGiulio actually did, which was a gross overuse of force that crossed boundaries into a life-threatening category that was entirely unnecessary. In the context of the event, physical contact was necessary, but it must be appropriate.

53.    Defendants cite me as endorsing the dangerous nature of Officer DiGiulio's handgun (No. 84), which I did, but as a means to show that he never should have had that gun in hand when he was engaging physically with someone he intended to take into custody. (See my deposition at 116:3-24). DiGiulio having his gun in hand was inexcusable.

54.    Defendants cite me as saying that an attempt by Mr. Valencia to grab DiGiulio's gun put everyone in danger. (No. 85), but I was not confirming that is what Mr. Valencia did. I said, again being critical of Officer DiGiulio for engaging with his gun drawn, "If the gun is within reach of the subject, then everyone's is at risk of the subject getting the gun." (Deposition at 115:22-24). This is a maxim of police procedure, where fundamental training is to holster the gun. If holstered, the holster itself had at least two (some have three) securing mechanisms so it cannot be pulled out. If the gun is in the holster, it is safe. If it is pulled out and being waved around, everyone is in danger.

55.    Defendants assert that I conceded certain drugs can mimic mental health symptoms, which I did. (No. 128). It is true that officers are to operate based on the symptoms they see, but, as noted above, officers are supposed to be trained in recognizing and dealing with mental health issues. Moreover, the overall approach to both drug-induced behavior and mental health issues is to de-escalate and asses until it can be determined what is causing the behavior. In the instance of Mr. Valencia, the officers' immediate and constant use of force was out of range for getting him under control and inappropriate.

56.    Defendants cite me as testifying that SPD's general orders and policies were all appropriate. (No. 132). Indeed, all the written orders were appropriate, but we did not address policies and my criticism is that the officers involved did not follow the written general orders,

1 | including use of body cameras and "use of force, certainly." (Deposition at 179:10-20).

2 | 57.  Defendants cite me as approving the procedure of the SPD for reviewing the
3 | officers' actions (No. 134), but that is not what I was doing. I believe the procedure that SPD
4 | claims to be in force amounts to a stall technique and I have seen it used in Fresno as well, where
5 | an investigation is allowed to go on for too long without resolution or discipline of the officers
6 | involved that is either meaningless, ineffective, or amounts to de facto ratification.

7 | I declare under penalty of perjury that the foregoing is true and correct. Executed on
8 | March 7, 2018, at Santee, California.

By:    /s/ Roger Clark
           Roger Clark