Walter H. Walker, III (SBN 63117)
Peter J. Koenig (SBN 132437)
Beau R. Burbidge (SBN 267267)
WALKER, HAMILTON & KOENIG, LLP
50 Francisco Street, Ste. 460
San Francisco, CA 94133
Telephone: (415) 986-3339
Facsimile: (415) 986-1618

Attorneys for Plaintiffs FILIBERTO VALENCIA, SR.
and GRISELDA VALENCIA, individually and as
successors in interest to FILIBERTO VALENCIA, JR.

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA - SACRAMENTO DIVISION

| | |
|---|---|
| FILIBERTO VALENCIA, SR. and GRISELDA VALENCIA, individually and as successors in interest to FILIBERTO VALENCIA, JR.<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF STOCKTON, CHIEF ERIC JONES, SERGEANT DANA MOSHER, OFFICER KYLE AMANT, OFFICER JASON DIGIULIO, and DOES 1-50, inclusive,<br><br>Defendants. | Case No. 2:16-CV-02081-JAM-AC<br><br><br>**PLAINTIFFS' EXHIBITS**<br><br><br><br>**Date:  April 10, 2018**<br>**Time:  1:30 p.m.**<br>**Place:  Courtroom 6, 14th Floor** |

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA-SACRAMENTO DIVISION
---oOo---

Filiberto Valencia, Sr., and )
Griselda Valencia, )
individually and as )
successors in interest to )
Filiberto Valencia, Jr., ) No.
) 2:16-cv-02081-JAM-
Plaintiffs, ) AC
)
vs. )
)
City of Stockton, Chief Eric )
Jones, Sergeant Dana Mosher, )
Officer Kyle Amant, Officer )
Jason DiGiulio, and DOES 1 )
through 50, inclusive, )
)
Defendants. )
)
)
_____ )

**COPY**

VIDEO DEPOSITION OF:  POLICE OFFICER JASON DIGIULIO
DATE:  June 26, 2017 at 10:00 a.m.
DEPOSITION OFFICER:  Beth Douglas, RPR
CSR No. 8019

TAKEN IN THE OFFICES OF:
GAROUTTE'S CERTIFIED SHORTHAND REPORTERS
120 North Hunter Street
Stockton, California 95202

GAROUTTE'S
Certified Shorthand Reporters
120 North Hunter Street
Stockton, California  95202
(209) 942-2100 or Nationwide (800) 942-2103
FAX (209) 942-2150

1    department, we have half-day, one-day training seminars

2    on mental health off and on.

3    Q.    When was the last time you attended a seminar on

4    mental health, or dealing with people with mental health

5    issues?

6    A.    I think that was -- that was a block of training in

7    my last CPT course in the fall.

8    Q.    That was in about October of 2016?

9    A.    I -- I think so.  Like I said, I can't --

10   Q.    Okay.

11   A.    -- remember for sure.

12   Q.    How about before that?  When was the last time you

13   had received any training on dealing with people with

14   mental health issues?

15   A.    Oh, I don't remember.

16   Q.    Do you have any -- have you been given any written

17   documents in connection with your employment on dealing

18   with people with mental health issues?

19   A.    Oh, we get fliers or -- there was a -- kinda like a

20   little laminated notebook handout thing that I got

21   probably over a year ago.

22   Q.    And what was that?

23   A.    Oh, it was just a very basic, you know, signs to

24   look for, how to talk and -- approaching and just real

25   general stuff.

1  Q.   And that also has an audio recording facility;

2  correct?

3  A.   Yes, sir.

4  Q.   Did you have a body camera on January 19th, 2016,

5  when you went to 2133 Nicole Street?

6  A.   Yes, sir.

7  Q.   Did you have it on your body?

8  A.   Yes, sir.

9  Q.   Did you activate it when you went to the home on

10  Nicole Street?

11  A.   No, sir.

12  Q.   Why was that?

13  A.   I was having issues with the camera.  It didn't

14  have very good clips, and they were continually falling

15  off.

16       That night I was wearing -- it was raining

17  heavily earlier, and I was wearing my cortex jacket, and

18  I was having a lot of issues with the camera falling off.

19  So at one point I had put it in my pocket of my jacket.

20  And I didn't get it back on when going to the call.

21  Q.   Okay.

22       When is it you first realized you did not

23  activate your body camera?

24  A.   When Sergeant Mosher started -- it was well into

25  the incident and Sergeant Mosher started asking people,

1    Q.    Did you stop your car in the middle of the street

2    or along a curb?

3    A.    I pulled my car along the south curb line.  It

4    would be across the street from the odd number addresses.

5    Q.    And who was the first person at the scene to whom

6    you spoke?

7    A.    When I spoke?

8    Q.    To whom you spoke, yeah.  When you parked your car,

9    who was the first person at the scene to whom you spoke?

10    Was it somebody in a crowd?  Or somebody standing?

11    A.    Well, I parked quite a bit down from the crowd.

12    Q.    Okay.

13    A.    I'm not going to pull right up into it because I

14    also knew there was multiple -- multiple callers on

15    Nicole.  And the -- the way the call had come out, with a

16    juvenile calling and making the statements of what was

17    going on in her house, so I gave myself some space

18    knowing I'm gonna pull up short of all the different call

19    locations.

20        And then when I got out, Officer Amant arrived

21    directly behind me.  And we decided to walk -- walk in

22    and contact -- make contact at the first call location

23    because that's where the crowd was.

24    Q.    When you arrived on Nicole, from what you could

25    tell you were the first police officer to arrive;

1    correct?

2    A.    Yes.  Officer Amant actually had pulled in right

3    behind me.

4    Q.    When you and Officer Amant went up to the house at

5    3167 Nicole, as of that time you were the only police

6    officers on scene; is that correct?

7    A.    Yes, sir.

8    Q.    Okay.  So did you go up and knock on the door or

9    ring a bell?

10    A.    Not immediately, but yes.

11    Q.    And somebody came to the door -- is that correct --

12    at 3167?

13    A.    Well, not immediately.  We had to knock numerous

14    times; announce police, and they still -- dispatch still

15    had people from inside that house.

16    Q.    Inside which house?

17    A.    3167; that's where we are at now.

18    Q.    Okay.

19    A.    Because the crowd had made statements.

20    Q.    I'm sorry.  I misunderstood what you were saying.

21    You said they still had people inside the house.

22          They were telling you that there were people

23    still inside 3167?

24    A.    Yes.  Dispatch had them on -- had an open line.

25    Q.    Okay.

1  someone on the line that a person had gotten into the

2  house and that there was a struggle, and people were

3  stuck in a bathroom or somethin' like that.

4      So Officer Amant and I made the decision to --

5  we had -- that -- everybody was out of that house; the

6  whole family, they were across the street.  And by now we

7  probably had a group of maybe 20-plus people standing

8  across the street.  So we figured we'll just leave this

9  house as is, and we'll get down to 3133.  Which the three

10  houses, they sit in a row.  So we are at the farthest

11  house, the east 3167.  So we decided to go check 3133.

12  Q.    Okay.

13      Now, Officer Amant was a SWAT officer; is that

14  correct?

15  A.    Yes, he is assigned to SWAT.

16  Q.    Was he senior to you?

17  A.    No.

18  Q.    Were you senior to him?

19  A.    Yes.

20  Q.    So was it up to you to make a decision as to where

21  you were going to go and what you were going to do?

22  A.    I kind of just, in my nature being a senior

23  officer, although I am going to look -- my tactics are

24  pretty good after almost 15 years.  I know how to move

25  with SWAT officers.  Although he obviously gets to go to

1    start kicking in doors.

2    Q.    Okay.

3    A.    Dispatch, from what they're hearing, yes.  But I am

4    not -- I am not hearing the struggle.  I'm not hearing

5    all of what they are hearing because they got somebody on

6    the phone.  So that's when I come over the radio and I

7    advise the sergeant, "Hey, we want to kick a door in and

8    go in."  We are not hearing anything, but we want to kick

9    a door in and go in based on what dispatch is getting

10   from a person on the phone inside the residence.

11   Q.    You said -- you said that to your sergeant.  That

12   was Sergeant Mosher.

13   A.    On the radio.

14   Q.    Is that Sergeant Mosher?

15   A.    I didn't realize it was Sergeant Mosher, but yes.

16   I advised a sergeant.

17   Q.    Okay.  Did you understand that sergeant was on his

18   way to the scene?

19   A.    I did not know he was on his way.  I -- just based

20   on everything that was going on up to that point.

21   Q.    You are simply going up the chain of command?

22   A.    Yes.

23   Q.    You are saying, "Sergeant, I need to go in, or I

24   want to go in.  Should I kick in the door?"

25   A.    Yes.

1  Q.   At the beginning of this report pertaining to you,

2  the detective identified you as standing 6'2" and

3  weighing 235 pounds.  Were those accurate measurements?

4  A.   I'm a little bit heavier than that.  I don't know

5  where he got that weight from.

6  Q.   As of January 2016, what was your approximate

7  weight?

8  A.   Oh, 275.

9  Q.   And you are 6'2"?

10  A.   Yes, sir.

11  Q.   I assume you were a high school athlete?

12  A.   Yes, sir.

13  Q.   Did you play football?

14  A.   Yes.

15  Q.   What did you play?

16  A.   A little bit of defensive tackle, backup center,

17  long snapper, and offensive tackle.

18  Q.   And did you play any beyond high school?

19  A.   No, sir.

20  Q.   You didn't play in the service at all?

21  A.   Not -- not really.

22  Q.   Okay.  Have you participated in any other sports

23  after you got out of high school on a competitive level?

24  A.   A little bit of adult softball for a short time.

25  Q.   If we turn to the next page, 48194, you talked

1          here. So I check this as I come

2          around, a lady's coming out obviously

3          distraught. She's got the phone. She

4          goes, 'I called. I called. They're

5          in the bathroom.' And that's where we

6          can hear people crying. Now getting

7          louder. Crying and whatnot. And

8          obvious distress in the bathroom."

9     Do you see that part that I have just been

10    reading?

11    A.    Yes, sir.

12    Q.    That appears to be accurate, does it?

13    A.    Yes.

14    Q.    Okay.  And then you talk about Officer Amant, whom

15    you call Kyle.  You say that,

16          "He goes, 'I'm kicking it.' 'Cause he

17          did try, I guess he did try it, and it was

18          locked. So he kicks the door. And this

19          door comes open. It comes open about

20          halfway and stops. 'Cause turned out there

21          was a lady behind the door. So when he

22          kicked it, it went right into her."

23    That's accurate?

24    A.    Yes, sir.

25    Q.    Now, at this point once you kicked in the door,

1    Officer Amant's done the kicking, and you are the first

2    person to enter into the bathroom?

3    A.    Yes.

4    Q.    And you enter with your gun -- with your gun drawn?

5    A.    Yes.

6    Q.    And at this point were you holding it out in front

7    of you with both hands?

8    A.    No.

9    Q.    You are left-handed?

10   A.    Yes.

11   Q.    Were you holding it in your left hand?

12   A.    Yes.

13   Q.    As we look at the photograph that is Exhibit 15 --

14   if you would just hold that up to the camera for a

15   moment -- we see that you enter, you observed a man to be

16   on the floor near the bathtub; correct?

17   A.    Yes.

18   Q.    And he had his arm around the neck of a little

19   girl?

20   A.    Yes.

21   Q.    And was the little girl standing?

22   A.    Yes.

23   Q.    So first thing you did upon entering with your gun

24   drawn was to grab the little girl; correct?

25   A.    Which is why I only had one hand.  Yes.

1  angle into the bathroom. And it

2  was a toilet, a bathtub with the glass

3  shower doors on the edge of the, on

4  the rail of the tub. You know

5  connected to the wall."

6  You go on to say,

7  "Those type of deals. And kind of

8  against the wall on the floor like at

9  the corner of the wall and the tub.

10  Hispanic male. Like he was, I don't

11  know if he was on his knees or

12  actually sitting. But he was down.

13  And he, and there was a little girl

14  sitting there crying. And he had his

15  arm up around her neck. And I can't

16  remember if it was left or right, but

17  it was definitely his arm around her

18  neck."

19  That's an accurate recording of what you said?

20  A.  Yes, sir.

21  Q.  And that's in keeping with what you remember now;

22  correct?

23  A.  Yes.

24  Q.  And if we turn to the next page, 196, and at the

25  top of the page you talk about the little girl.  You say,

1           "And she was right in front of him.

2           And I just can't remember. I know he

3           had a tattoo. And I, so I want, it

4           could have been the right arm. He was

5           behind her. He had her in front of

6           him. She was standing up and I think

7           he was I think standing down. But he

8           had his arm up around her neck like

9           this. And so I had already had the

10          gun up and out. And I start yelling

11          at him, 'Get your hands up. Get your

12          hands up.' I can't remember if I said,

13          'Let her go.' But I know, 'Get your

14          hands up.'"

15        Is that all accurate?

16   A.   Yes.

17   Q.   Okay.  Do you have any different memory now from

18 what you said then?

19   A.   No.

20   Q.   You went on to state,

21          "And I just, so I moved straight out.

22          And that's when I know the lady was

23          on the ground here so the door

24          couldn't get all the way open. 'Cause

25          she is on the floor. The door is

1       he's on the ground. I don't see

2       anything of where I can or anything.

3       But I can't see his whole body. 'Cause

4       he's on the floor. So as I come at

5       him, I retract my arm like this."

6    What did you mean you retracted your arm?

7    A.    Okay.  My gun's out.  Well, if I am in close

8    quarters with somebody that I need to detain, and I don't

9    know if they have a weapon or anything.  I can't holster

10   up because that puts me in a vulnerable spot.  I will

11   retract like this.  That's when I say I retract.  I pull,

12   hold it still at the ready, but back in it like this

13   (indicating).

14   Q.       "So I can close without, hopefully, you

15            know protecting my gun. So I close

16            and I hit him. I didn't really hit.

17            More like kind of here. And I'm

18            telling him to get his hands up. And

19            I want to pin him."

20       What did you mean when you say "So I close, and

21   I hit him.  I didn't really hit.  More kind of here"?

22   A.    So I close in on him. And reading this, I don't

23   know, the transcription -- so I don't know if I heel palm

24   strike or a forearm, but into him.  He is -- I mean, I

25   don't know if he has got a weapon, or I don't know what

1    he's got.  So I just know I need to -- I got -- the

2    ladies are screamin' and he's here.  So I just need to

3    get control of him.  And I don't remember if it was a

4    heel palm strike or a forearm, but into him like this.

5    Q.    As of that time when you first made contact with

6    him, had he said anything to you?

7    A.    I don't -- I know he was -- during there was a

8    bunch of "fuck you's."

9    Q.    But was it at that point?  Because when you mention

10   it in your statement it comes later.

11   A.    I don't remember exactly at what point that

12   started.

13   Q.    Do you have any memory of him saying anything to

14   you before you made contact with the palm of your hand or

15   the forearm?

16   A.    No.

17   Q.    Okay.  All right.  You go on to say,

18                 "And I'm telling him to get his hands

19                 up. And I want to pin him. My

20                 intention is to pin him in that corner.

21                 And I'm just going to smother, pin him.

22                 Hopefully he can get these people out.

23                 And then I get some control on him.

24                 But if I figure I pin him on him or

25                 something maybe Kyle and can get these

1    people out or get something going.

2    Get some control on him. So as I do that,

3    that's when the fight starts. So he is

4    swinging. He is kicking, throwing up elbows

5    and I'm trying to block him. Trying

6    to grab him. And I figure if I can

7    pin his head on the wall, I can get

8    some, maybe some control, or slow him

9    down. So I'm trying to push his head

10    into the wall. And he swats and hits

11    my gun and grabs my gun at one point.

12    I -- I believe I feel him grab my gun

13    because I felt a yank on my gun. And

14    I pulled it back.  And he was reaching

15    for it again. And that's when I just

16    hit him on top of the head.  Somewhere

17    in the head or face up in there. I just

18    came down like this and I hit him with

19    my gun.  I hit him once and he is

20    still fighting. And I hit him twice, I

21    hit him again. And he, it slowed him

22    down. Stunned him. And I got my

23    forearm across his head and I pinned

24    it down to the wall. And the kind --

25    and he kind of seemed to stop for a

1              minute. And Amant is going, 'Okay.

2              Holster, holster.'"

3        Is that all accurate?

4   A.   Yes.

5   Q.   So I interpret this to mean that after you got the

6   little girl out, you struck Mr. Valencia, the man who was

7   on the ground, with either the palm of your hand or your

8   forearm in an effort to get control of him.

9        Am I correct so far?

10  A.   Yes.

11  Q.   And your idea was you were going to smother him;

12  you were going to dive on top of him or throw your body

13  on top of him?

14  A.   No.

15        And I know that at some point I -- I say the

16  word "smother" is not a good -- it's kind of a slangish

17  way to use it.

18        Okay.  Smother means I am going to cover him.

19  I am gonna close in on him.  If I am close on him, he is

20  going to have a harder time getting a weapon to use

21  against me.  He is gonna have a harder time to set

22  himself in a position of advantage on me, or even get a

23  good -- he is not gonna be able to hit me with much

24  force.  He can't rear back.  He can't set.  So I am going

25  to close my distance, and I'm gonna stay on him to try to

1    A.    Arrest control techniques.

2    Q.    What are arrest control techniques?

3    A.    Control holds, wrist locks, arm bars.  Just

4    different control techniques.

5    Q.    Did you attempt to use any of those arrest control

6    techniques that you had learned when you initially

7    confronted Mr. Valencia?

8    A.    Yes.

9    Q.    What did you attempt to do?

10   A.    Well, arm bar and wrist locks.

11   Q.    Is that while he was still sitting or kneeling on

12   the floor?

13   A.    Yes.

14   Q.    That was before you hit him with your gun?

15   A.    Yes.

16   Q.    Repeating what I read, you said,

17              "And I want to pin him. My intention

18              is to pin him in that corner."

19         To which corner are you referring?

20   A.    The corner -- you are not going to see it in that

21   photo.

22   Q.    Okay.  Let's see if we can come up with another

23   photo.

24         MR. WALKER:  What's the next number?

25         THE REPORTER:  17.

1   Q.   How did the blood --

2   A.   I didn't see the blood.

3   Q.   -- get on the wall?

4   A.   I don't know.  I can speculate.

5   Q.   You said,

6          "So I'm trying to push his head into

7          the wall.  And he swats."

8      You weren't trying to do that gently, were you?

9      MR. STEVENS:  I will object.  That's

10  argumentative.

11      MR. WALKER:  Q.  I mean, at this point you said

12  the fight was on.  So when you are trying to push his

13  head into the wall, you are using some force to put his

14  head into the wall, aren't you?

15  A.   The force necessary to gain the compliance I need.

16  Q.   And is that when the blood appeared on the wall?

17  A.   No.

18  Q.   And you said,

19          "And he swats and hits my gun and

20          grabs my gun at one point."

21      So while you are trying to push his head into

22  the wall, you have got the gun in your left hand, and you

23  are pushing his head with your right hand?

24  A.   Yes, right hand, forearm.

25  Q.   Is that what happened?

1  A.    Yes.

2  Q.    Okay.  And you are still on your feet; correct?

3  A.    No.

4  Q.    Where were you?

5  A.    I was -- had him in a half mount, which I was down

6  on one knee with my left leg kind of over his body

7  probably about his thighs or waist.

8  Q.    So he was face up from the floor; right?

9  A.    Yes.

10  Q.    His face was towards the ceiling as opposed to

11  towards the floor?

12  A.    No.  Wasn't towards the ceiling.

13  Q.    Towards the wall -- where was his face --

14  A.    He was sitting.  He was sitting up.

15  Q.    Okay.  So when you say you are in a half mount, you

16  are in a position where you were face-to-face with him?

17  A.    Yes.

18  Q.    Okay.  And what do you remember about his face at

19  that point?

20  A.    He was looking at me and -- and the "fuck you's"

21  were coming out.  I kept telling him to put his hands up;

22  put his hands behind his back.

23  Q.    Did you have any sense that he was not in his right

24  mind at that point?

25  A.    As far as what?  What's your definition of right

1    A.    Yes.

2    Q.    And you know that when somebody is mentally

3    impaired, you are not going to be able to rationalize

4    with them as you would with somebody who is not mentally

5    impaired; correct?

6          MR. STEVENS:  I will object to the term

7    "mentally impaired."  Because it can encompass a wide

8    range of symptoms and conditions.

9          MR. WALKER:  Q.  Am I correct?

10   A.    I'm not a mental health clinician.  And in this

11   situation, there is absolutely no way that I'm going to

12   be able to tell that quickly from what was going on at

13   that moment whether he was -- had mental health issues or

14   intoxication issues or narcotic issues.

15   Q.    Did you believe that he had one of those issues as

16   you were struggling with him there on the floor?

17   A.    At that point I didn't know.

18   Q.    Okay.  Now, when you got into this half mount and

19   he was -- he was seated, his buttocks were on the floor;

20   correct?

21   A.    Yes.

22   Q.    Okay.  So your face was only inches way from his;

23   correct?

24   A.    Well, I don't know the distance.  We were close.

25   Q.    Pretty close, wasn't it?

1   Q.   And in fighting, he was still sitting down on the

2   ground; right?  He didn't have any leverage on you?

3   A.   I wasn't going to give him any leverage.

4   Q.   But he didn't have any when he was fighting with

5   you?

6   A.   I wasn't giving it to him.

7   Q.   Okay.  And was he swinging with both hands?

8   A.   Yes.

9   Q.   So you knew then that he didn't have a weapon?

10   A.   No.

11   Q.   Well, if he is swinging with both hands, he didn't

12   have a weapon in either hand; correct?

13   A.   He can still have a weapon on his person.  He could

14   be sitting on a weapon.  He could grab anything to use it

15   as a weapon.  I didn't know what -- what's in the

16   bathroom or what's around that he can grab.  I'm not

17   gonna give him the chance.

18   Q.   What you saw was that both his hands were

19   weapon-free, though?

20   A.   Yes.

21   Q.   When you gave the statement to Detective Alaniz.

22   A.   Alaniz.

23   Q.   Alaniz.  When you gave the statement to him, was it

24   videotaped?

25   A.   Yes.

1    A.    Quite a bit afterwards.

2    Q.    And after you hit him the second time, you said,

3                "And he -- it -- it slowed him down.

4                Stunned him. And I got my forearm

5                across his head, and I pinned it down

6                to the wall."

7                Where did you get your forearm across his head?

8    Where on his head?

9    A.    Come up and kind of -- well, it would have been his

10   left side, kind of right across here.  I was able to hold

11   him here (indicating).

12   Q.    Okay.  So you are still holding your gun in your

13   left hand, and you are using your right forearm to press

14   it against his head and push it into the wall.  Is that

15   what you're testifying?  Or were you doing it with your

16   left forearm, the one that was holding the gun?

17   A.    No.  I was doing it with my right.  I was still

18   trying to protect my gun.

19   Q.    And you managed at that point to pin his head to

20   the wall; correct?

21   A.    Yes.

22   Q.    And if we look at exhibit number -- is that 16 or

23   17?

24   A.    That's 18, sir.

25   Q.    18.  If you look at Exhibit 18, where you were

1    moving, I mean, my blows can land dead center.

2    Q.    Did he ever hit you with a closed fist?

3    A.    I believe he did.

4    Q.    Where did he hit you?

5    A.    I took numerous blows to the -- the shoulders and

6    the face.

7    Q.    Do you think those numerous blows included closed

8    fists?

9    A.    I believe so.

10    Q.    And he was sitting on the ground when he was

11    swinging; is that right?

12    A.    Yes.

13    Q.    Okay.  And you were above him when you were

14    swinging?

15    A.    Somewhat above him.  I was down on one knee.

16    Q.    Well, at one point, you told us you were in a half

17    mount?

18    A.    Yes, yes.

19    Q.    You were on top of him?

20    A.    That's on one knee.

21    Q.    Okay.

22    A.    But because of the walls on the bathtub, I wasn't

23    over him.  But I did have a better position of leverage

24    and advantage, and I wasn't going to give him any

25    position of advantage or leverage.

1    Q.    When you said he scrunched your glasses, do you

2    remember, do you have a memory of him scrunching them?

3    A.    I remember he did something like that (indicating).

4    That's why I said "scrunch."  That's kind of a goofy

5    word.

6    Q.    I understand exactly what you are describing with

7    your hand gesture now.  I think it is a legitimate word.

8            You said you,

9                "Don't remember how many closed-fist

10                blows, but I hit him, and I was trying

11                to get his arms. And he is grabbing

12                and kicking and hitting on me. And so

13                I'm trying to get him further down onto

14                the ground. Because now he is still

15                kind of sitting up."

16            Is that the way you remember it --

17    A.    Yes.

18    Q.    -- still sitting up?

19                "And I've got -- and I've kind of got

20                a half mount on him. If you know, ground

21                fighting. I've got, I think I'm on my knee,

22                but I've got my left leg kind of over him.

23                I'm trying to get a good full mount. And I

24                remember Kyle saying something about 'let's

25                get him in the hallway, we got more room.'"

1    EXHIBIT 19: Xerox Color Photo

2    MR. WALKER:  Q.  19; if you would show that to

3   the camera.  Thank you.

4    That door has marks on it.  Do you know how

5   those marks got there?

6   A.    Well, I can only speculate.  The marks around the

7   door handle would be where Officer Amant kicked it.

8   Q.    Okay.

9   A.    Right here, sir.

10   Q.    And the mark that's in the middle of the door above

11   that, where did that come from?

12   A.    I have no idea.

13   Q.    You didn't see Mr. Valencia make contact with the

14   door as he was being pulled out?

15   A.    No.  He never contacted that.

16   Q.    Because he was on the ground the whole time he is

17   being pulled out; right?

18   A.    Yes.

19   Q.    He was on the floor?

20   A.    Yes.

21   Q.    I'm going to show you what we'll mark as

22   Exhibit 20, I believe.  This is a picture of a toilet,

23   and if you would show that to the camera.  Thank you.

24    The toilet has the toilet seat off.  Do you

25   know how that toilet seat got taken off the toilet?

1    would be his left. Was trying to

2    hook his arm and eventually -- at the same

3    time he's still swinging. I am still

4    delivering some punches. And I -- I get a

5    full mount on him. Do I need to describe a

6    full mount?"

7    This is going over to page 48197.

8    A.    Yes.  I'm following you.

9    Q.    Now, at this point Mr. Valencia was on his back;

10   you got a full mount, meaning the center of your body was

11   over his; correct?  You had a leg on each side of him?

12   A.    Yes.

13   Q.    And where were you?  Were you -- were your legs

14   around his hips?  Or around his torso?

15   A.    No.  Down around his hips.  Maybe even a little bit

16   below --

17   Q.    Was your --

18   A.    -- right about the hip area.

19   Q.    Was your chest making contact with his chest?

20   A.    No.

21   Q.    You said,

22         "The full mount is you are straddling a

23         person, and you -- you -- you are just

24         above their waistline and hips with both of

25         your legs. So their legs are behind you

STATE OF CALIFORNIA, )

COUNTY OF SAN JOAQUIN.)

I, Beth Douglas, the Certified Shorthand Reporter herein, do hereby certify:

That on June 26, 2017, at 10:00 a.m., the witness herein, JASON DIGIULIO, was by me duly sworn;

That said witness' testimony and the proceedings had at the time of such testimony were taken down in shorthand notes by me; I thereafter caused said shorthand notes to be transcribed into longhand typewriting, the following being a full, true, and correct transcription thereof;

That I am a disinterested person and am not in any way interested in the outcome of said action, nor connected with nor related to any of the parties in said action, nor to their respective counsel;

On July 24, 2017, all counsel and the deponent were given notice of the preparation of the deposition, and the original deposition was available for reading, correcting, approval, or signing in our offices until, September 4, 2017.

---o0o---

_____The witness signed the deposition and made no corrections.

_____The witness and parties waived examination and reading of the deposition at the time of the taking of the deposition.

_____The witness corrected, approved, or refused to approve the deposition by letter to me attached hereto, and copies of the letter were sent to all counsel.

_____The witness failed to appear at my office.

_____The witness appeared in my office, made changes to the deposition, and counsel were provided with copies of the changes.

_____The witness refused to approve or sign the deposition for the following reason:_____.

Other:_____.

IN WITNESS WHEREOF, I have hereunto subscribed my hand.

DATE_July 24, 2017_____

_Beth Douglas_____

BETH DOUGLAS, RPR, CSR-8019

COUNSEL: YOU WILL BE NOTIFIED OF ANY CORRECTIONS OR
CHANGES. CONTACT OUR OFFICE IF YOU HAVE ANY QUESTIONS.

5

# EXHIBIT B



HERUM \ CRABTREE \ SUNTAG
ATTORNEYS

**Joshua J. Stevens**
jstevens@herumcrabtree.com

January 5, 2018

**VIA HAND DELIVERY**

Walter H. Walker, III, Esq.
Walker, Hamilton, Koenig & Burbidge
50 Francisco Street, Suite 460
San Francisco, California 94133

Re:    Valencia v. City of Stockton, et al.
       U.S.D.C., E.D.C.A., Case No. 2:16-CV-02081-JAM-AC

Dear Skip:

Per our agreement, enclosed herein are Bate Stamped documents COS 048420 – 048444, which are all documents from Officer Jason DiGiulio's personnel file responsive to Plaintiffs' Request for Production of Documents, Set No. 2, Request Nos. 17 through 21. These documents are being provided to you unredacted, save only for redaction of Officer DiGiulio's home address where indicated on the documents. Given the sensitive nature of these documents, please disseminate them only to necessary parties and destroy them once a final resolution is reached in this case.

This letter also confirms that you are hereby withdrawing your motion to compel in its entirety, currently scheduled for hearing on January 10, 2018. Thank you.

Very truly yours,

JOSHUA J. STEVENS
Of Counsel

JJS/ad
Enclosures



# CITY OF STOCKTON

POLICE DEPARTMENT
22 East Market Street • Stockton, CA 95202-2876
www.stocktongov.com

June 17, 2010

Dawniell A. Zavala, Attorney at Law
Mastagni, Holstedt, Amick, Miller & Johnsen
1912 I Street
Sacramento, CA 95811-3151

Officer Jason Digiulio
22 East Market Street
Stockton, CA 95202

## RESULTS OF SKELLY HEARING FOR OFFICER JASON DIGIULIO
(Internal Affairs Investigation #09-83)

In follow up to the Skelly hearing held on Tuesday, May 18, 2010, concerning Internal Affairs Investigation #09-83, this is to inform you that the proposed disciplinary action of three (3) ten (10)-hour workdays (30 hours) against you be retracted and the sustained allegation be changed to "Not Sustained" as per the attached Skelly Officer's Written Statement dated June 16, 2010. You have been afforded an opportunity to present before a Skelly Officer any evidence, orally and/or in writing, documents, or other information that may contradict and/or mitigate the basis for the proposed discipline.

RECEIVED THIS 22 DAY OF June, 2010

BLAIR ULRING
CHIEF OF POLICE

OFFICER JASON DIGIULIO        #1620

BU:pkh

#6533

Attachment

(209) 937-8217

OFFICER SERVING NOTICE

cc: Human Resources Department

Stockton

COS048420

## MEMORANDUM TO FILE

June 16, 2010

RE:     **SKELLY OFFICER'S WRITTEN STATEMENT FOR OFFICER**
        **JASON DIGIULIO (#1620)**
        **(Internal Affairs Investigation #09-83)**

It is alleged that Officer Jason Digiulio ("Digiulio") violated Stockton Police Department
Rule and Regulation 3.63, "Court Attendance and Testimony" as it is alleged that he
failed to appear in Traffic Court on October 20, 2009, in response to a subpoena.

### Background

The Internal Affairs Section sustained the allegation that Officer Digiulio was derelict in his
duties for failing to appear in court, and the Internal Affairs Review Committee concurred
with the sustained finding. Based on two prior sustained allegations for failing to appear in
court with a prior one day suspension, the Committee recommended a suspension of three
(3), ten (10)-hour workdays for a total of thirty (30) hours.

### Skelly Results

On Tuesday, May 18, 2010, a Skelly hearing was held with Chief of Police Blair Ulring,
DiGiulio, his legal representative, Dawniell Zavala from the law firm of Mastagni et al., and
Deputy City Attorney DeAnna Solina. DiGiulio stated he had no recollection of ever being
served with a subpoena. His tone was sincere and apologetic. He stated that on his prior
two investigations, he recalled receiving the subpoenas and accepted full responsibility.
He further stated since the last failure to appear, he invoked a new filing method, whereby
he keeps copies of all subpoenas, and since has had no further incidences of missed
court. He currently has no paperwork on the subpoena in this case. He expressed this
incident was different than his prior incidents because he truly cannot recall receiving the
subpoena. He asked that I reconsider the recommended three (3) days of suspension.

### Recommendation

Based on the investigation and the information presented by DiGiulio at the Skelly, I do not
concur with the sustained allegation. After reading the investigation, and considering
DiGiulio's statement at the Skelly, I do not believe the Department can prove DiGiulio was
served with the subpoena at issue. Therefore, I recommend the sustained allegation be
changed to "Not Sustained" and the recommended discipline be retracted.

BLAIR ULRING
CHIEF OF POLICE

BU:ds

COS048421



# CITY OF STOCKTON

POLICE DEPARTMENT
22 East Market Street • Stockton, CA 95202-2876
www.stocktongov.com

March 19, 2010

Dawniell A. Zavala, Attorney at Law
Mastagni, Holstedt, Amick, Miller & Johnsen
1912 I Street
Sacramento, CA 95811-3151

Officer Jason Digiulio
22 East Market Street
Stockton, CA 95202

## NOTICE OF INTENT TO TAKE DISCIPLINARY ACTION

I have enclosed herewith copies of the investigative reports (I.A. #09-83) into the allegation that you violated Stockton Police Department Rules and Regulations Section 3.63, "Court Attendance and Testimony" as it is alleged that you failed to appear in Traffic Court on October 20, 2009, in response to a subpoena.

At the present time, the Internal Affairs Review Committee has made the recommendation that you be suspended for three (3) ten (10)-hour workdays (30 hours). This is an appropriate sanction for the offense charged considering the prior sustained failure to appear in court on July 31, 2008 (and previous one-day suspension), and in keeping with the City of Stockton's disciplinary policy. You should be prepared to address the possibility of being suspended for three (3) ten (10)-hour workdays (30 hours).

I have scheduled a hearing for you in my office on Tuesday, March 30, 2010, at 9:00 a.m. At that time, you may present any evidence, orally or in writing, concerning the facts of the investigation and/or in mitigation of the proposed discipline. You, of course, are entitled to have legal representation at said hearing.

BLAIR ULRING
CHIEF OF POLICE

BU:pkh

Enclosure

(209) 937-8217

cc: Dianna Garcia, Director of Human Resources

RECEIVED THIS 23 DAY OF March, 2010

OFFICER JASON DIGIULIO #1620
#6533

OFFICER SERVING NOTICE

Stockton
All-America City
2004
1999

COS048422

 

# CITY OF STOCKTON

**POLICE DEPARTMENT**
22 East Market Street • Stockton, CA 95202-2876
www.stocktongov.com

February 17, 2009

Officer Jason DiGiulio

███████████████

## SUSPENSION

As indicated in the letter to you dated January 28, 2009, you are suspended (I.A. #08-54) on Wednesday, February 25, 2009. On February 25, 2009, you are ordered to take no police action and have no police authority. You are not eligible to hire back during your suspension date of February 25, 2009.

You are to surrender your City-issued weapons, badge, and identification to the Officer serving this notice at the end of your last shift prior to the above suspension date.

BLAIR ULRING
ASSISTANT CHIEF OF POLICE

BU:ds

(209) 937-8217

RECEIVED THIS 17 DAY OF FEBRUARY, 2009.

OFFICER JASON DIGIULIO

OFFICER SERVING NOTICE  # 6533





COS048423

REDACTED



# CITY OF STOCKTON

POLICE DEPARTMENT
22 East Market Street • Stockton, CA 95202-2876
www.stocktongov.com

January 28, 2009

Jason DiGiulio
Police Officer, Stockton Police Department

### SUSPENSION

This is to inform you that disciplinary action shall be taken against you in the form of a suspension based on the facts and statements contained in the "Notice of Intent to Recommend Employment Action" dated January 9, 2009. You have been afforded an opportunity to present before a Skelly Officer any evidence, orally and/or in writing, documents, or other information that may contradict and/or mitigate the basis for the proposed discipline.

You are hereby suspended from City employment without pay for one (1), ten (10) hour work day on February 25, 2009. You shall return to work on February 26, 2009. Attached is Form CS-23 implementing the final disciplinary action.

You have the right to file a written appeal to the Stockton Civil Service Commission within ten (10) days of receipt of this notice, or file a written grievance as contained in Sections 7 and 8 of the Memorandum of Understanding within ten (10) business days of receipt of this notice.

BLAIR ULRING
ASSISTANT CHIEF OF POLICE

BU:ds

Attachment

cc:    Dianna Garcia, Director of Human Resources
       Department Personnel File
       Civil Service Commission

RECEIVED THIS 3 OF ~~JANUARY~~ February, 2009.

OFFICER JASON DIGIULIO

#6555

OFFICER SERVING NOTICE

Stockton
All-America City
2004
1999

COS048424

<u>MEMORANDUM</u>

January 15, 2009

TO:     Human Resources Department

FROM:   Blair Ulring, Assistant Chief of Police

SUBJECT:  **<u>RECOMMENDATION TO TAKE EMPLOYMENT ACTION (SUSPENSION)</u>**

I hereby recommend disciplinary action in the form of a suspension against Jason DiGiulio, Police Officer, based on the reasons contained in the "Notice of Intent to Recommend Employment Action" dated January 9, 2009.

The employee has been provided with notice of and reasons for employment action and materials which the action is based and relied upon, an opportunity to be represented, and to present additional information either orally and/or in writing, in an effort to mitigate or refute the charges through the pre-disciplinary Skelly process.

On January 9, 2009, I transmitted written findings and recommendations as attached. I recommend the proposed discipline be sustained; however, the recommendation is advisory only.

Based on my careful and thorough review and consideration of all available information, including the information presented at the pre-disciplinary Skelly hearing, it is my intent to take disciplinary action in the form of a one (1), ten (10) hour work day suspension. Upon completion of your review, please sign below and sign Form CS-23 (City of Stockton Report of Personnel Action).

BLAIR ULRING
ASSISTANT CHIEF OF POLICE    Reviewed by _____
                                    Human Resources Department

BU:ds

Attachments

<u>MEMORANDUM</u>

January 9, 2009

TO: Human Resources Department

FROM: Blair Ulring, Assistant Chief of Police

SUBJECT: **NOTICE OF INTENT TO RECOMMEND EMPLOYMENT ACTION**
**OFFICER JASON DIGIULIO - I.A. #08-54**

This matter involves allegations against Officer Jason DiGiulio that he failed to appear in court in response to a subpoena he was served, in violation of Stockton Police Department Rules and Regulations Section 3.63, "Court Attendance and Testimony."

**Background**

On June 25, 2008, Sergeant Lawrence Parino served Officer Jason DiGiulio with a subpoena to appear in Traffic Court on July 31, 2008, at 1330 hours, regarding Traffic Citation #A985707, involving defendant Djuan Lamar Adger. On August 6, 2008, Court Coordinator Robin Williams notified Court Liaison Program Manager Cris Trulsson that Officer DiGiulio had failed to appear in court on July 31, 2008.

**Skelly Hearing**

On November 12, 2008, a Skelly hearing was conducted in my office. Present were Officer Jason DiGiulio, Attorney Sean D. Currin, representing Officer DiGiulio, Deputy City Attorney Charmaine Jackson and I. Officer DiGiulio was advised that the Skelly hearing was his opportunity to offer any evidence he wished, to dispel or mitigate the allegations against him.

Mr. Currin spoke on behalf of Officer DiGiulio. He stated that the recommended discipline of one day's suspension was based on two prior failures to appear. In the first incident, Officer DiGiulio was not aware that he could respond within 30 days and did not do so. Officer DiGiulio would have advised that he did appear in court, which was not reflected in the Letter of Written Reprimand that he was given. Regarding the second incident, Officer DiGiulio did advise the court liaison officer, in advance, pursuant to Rules and Regulations Section 3.63 and had a legitimate reason for not being in court. Therefore, according to Mr. Currin, the failure to appear on July 31, 2008, should be considered his first offense and

COS048426

he should be given a Letter of Written Reprimand rather than a one-day suspension.

Officer DiGiulio spoke on his own behalf and stated that he did miss court on July 31, 2008, but that it was a traffic offense rather than a criminal matter. Mr. Currin added that Officer DiGiulio has a good record regarding court attendance other than the July 31, 2008, incident. Assistant Chief Ulring stated that Officer DiGiulio must follow the same rules as other Officers, and that typically the Department requires a Letter of Written Reprimand for a first offense and a suspension for a second offense. Assistant Chief Ulring explained that Officer DiGiulio had, in fact, been given a Letter of Written Reprimand for the second incident, because he did show up in court. Assistant Chief Ulring also stated that a subpoena carries the same weight, whether it involves a traffic or criminal matter.

## Recommendation

It is my determination that Officer Jason DiGiulio violated Stockton Police Department Rules and Regulations Section 3.63, "Court Attendance and Testimony" on July 31, 2008.

As a result, I recommend Officer Jason DiGiulio be suspended for one, ten-hour work day without pay, to be imposed by his supervisor when it is practical to do so.

BLAIR ULRING
ASSISTANT CHIEF OF POLICE

BU:jm

COS048427



# CITY OF STOCKTON

March 9, 2007

Officer Jason DiGiulio
Stockton Police Department
22 East Market Street
Stockton, CA 95202

## LETTER OF WRITTEN REPRIMAND

On June 3, 2006, you were involved in a traffic accident on private property at 2309 West Hammer Lane. This was an accident where your vehicle skidded during a turning movement and collided with a fixed stop sign and a tree. On February 6, 2007, the Vehicle Accident Committee met to determine a finding related to this accident. The Vehicle Accident Committee determined this accident was "chargeable".

In reviewing your vehicle accident record, I found this was your fifth accident since your employment began with the City of Stockton. Four were "chargeable" and one was "preventable."

Traffic safety and vehicle safety are critically important to law enforcement in that Officers are expected to enforce traffic laws and investigate vehicle collisions, as well as expected to operate police vehicles in a safe manner. As a Stockton Police Officer, you are expected to drive with due diligence.

### Dereliction of Duty

> *All members of the Department shall perform their duties as required or directed by law, Departmental rule, policy, or order. The improper performance of or failure to perform a required police duty, or neglecting assigned duties to conduct unauthorized activities, shall be deemed dereliction of duty.*



COS048428

You are entitled to an administrative hearing before a member of Police
Department management. Requests for such a hearing must be submitted to the
Office of the Chief of Police within 10 days of receipt of this letter.

WAYNE HOSE
CHIEF OF POLICE

CAPTAIN ERIC JONES
FIELD SERVICES DIVISION

EJ:ej:cc

(209) 937-8489

cc: Dianna Garcia, Director of Human Resources

CONCUR:

_____
WAYNE HOSE
CHIEF OF POLICE

I have discussed my job performance and this letter with Lieutenant Kevin Hatano,
and I was advised a copy of this Letter of Written Reprimand will remain in my City
personnel file, my Department personnel file, and my Divisional personnel file for
five years. I acknowledge I also received a copy of this letter.

Signed: _____          Dated: 3/12/07
Officer Jason DiGiulio

COS048429



# CITY OF STOCKTON

POLICE DEPARTMENT
22 East Market Street • Stockton, CA 95202-2876
www.stocktongov.com

November 28, 2006

Officer Jason DiGiulio
Stockton Police Department
22 East Market Street
Stockton, CA 95202

## LETTER OF WRITTEN REPRIMAND

On September 26, 2006, Sergeant Scott Votino personally served you two subpoenas ordering you to appear in Traffic Court at 08:30 a.m., on October 20, 2006, in the matters of People versus G. Young (Citation #A927871) and People versus J. Farah (Citation #A926988). In addition, on October 8, 2006, Sergeant Scott Votino personally served you a subpoena ordering you to appear for a DMV hearing at 11:15 a.m., on October 20, 2006, in the matter of People versus V. Banh (Citation #A454822). You subsequently failed to appear in each of these three cases as ordered. As a result, the traffic citations were dismissed and the DMV hearing proceeded without your presence.

On October 31, 2006, you told Sergeant Baur you remembered receiving only two of the subpoenas for October 20, 2006, and that you had left a voicemail message for the Police Department's Court Liaison about a week prior to the subpoena date, indicating you would be out of state on the date in question and could not make the court appearances. You mistakenly presumed this voicemail message excused you from the court appearances and did not request permission to do so from a Court or DMV authority.

Failure to obey a subpoena constitutes failure to perform an official duty in accordance with the Stockton Police Department Rules and Regulations, Section 3.63. This Section states:

> ### 3.63 (Court Attendance and Testimony):
> "Attendance at a court or quasi-judicial hearing as required by subpoena is an official duty assignment. Members shall attend punctually as indicated on the subpoena. Request for permission to omit this duty must be cleared with the prosecuting attorney handling the case or other competent court authority."



Stockton
All-America City
2004
1999

COS048430

Furthermore, you received a Letter of Written Reprimand in March 2005, for a prior failure to appear in court per subpoena. This document will serve as a Letter of Written Reprimand for the most recent violations described above. Any future violations of this nature will result in more severe disciplinary action. It will remain in your City, Department, and Divisional personnel files for five years.

You are entitled to an Administrative Hearing before a member of Police Department management. Requests for such a Hearing must be submitted to the Office of the Chief of Police within ten days of receipt of this letter.

WAYNE HOSE
CHIEF OF POLICE

CAPTAIN TAMMIE MURRELL
FIELD SERVICES DIVISION

TM:TJ:cc

(209) 937-5077

cc: Di Smith, Acting Director of Human Resources

CONCUR:

_____
WAYNE HOSE
CHIEF OF POLICE

I have discussed my job performance and this letter with Lieutenant Robert Paoletti and was advised a copy of this Letter of Written Reprimand will remain in my City, Department, and Divisional personnel files for five years. I acknowledge I also received a copy of this letter.

Signed: _____     Dated: 120506
Officer Jason DiGiulio

COS048431

 

# CITY OF STOCKTON

POLICE DEPARTMENT
22 East Market Street • Stockton, CA 95202-2876
www.stocktongov.com

October 18, 2006

Officer Jason DiGiulio

## **SUSPENSION**

As indicated in the letter to you from the City Manager dated September 26, 2006, you are suspended (I.A. #06-40) on October 24 and 25, 2006. On October 24 and 25, 2006, you are ordered to take no police action and have no police authority. You are not eligible to hire back during your suspension dates of October 24 and 25, 2006.

You are to surrender your City-issued weapons, badge, and identification to the Officer serving this notice at the end of your last shift prior to the above suspension dates.

**WAYNE HOSE**
CHIEF OF POLICE

WH:ds

(209) 937-8217

RECEIVED THIS _____ DAY OF OCTOBER, 2006.

OFFICER JASON DIGIULIO

OFFICER SERVING NOTICE

Stockton
All-America City
2004
1999

COS048432



**REDACTED**

# CITY OF STOCKTON

OFFICE OF THE CITY MANAGER

City Hall • 425 N. El Dorado Street • Stockton, CA 95202-1997 • 209/937-8212 • Fax 209/937-7149
www.stocktongov.com

September 26, 2006

Officer Jason DiGiulio

## SUSPENSION

I have reviewed the material (I.A. #06-40) forwarded to me by Chief of Police Wayne Hose. I concur with Chief Hose's recommendation and hereby advise that you are suspended from duty without pay for two (2), ten (10)-hour workdays, as follows: October 24 and October 25, 2006.

If you wish to appeal this suspension, you must do so by filing an appeal with the Civil Service Commission within ten (10) days of receipt of this letter, or by filing a grievance as provided for in Sections 7 and 8 of the Memorandum of Understanding within ten (10) business days of receipt of this letter.

J. GORDON PALMER, JR.
CITY MANAGER

JGP:ds

cc:  Wayne Hose, Chief of Police
Terry Parker, Director of Human Resources

RECEIVED THIS 4 DAY OF OCTOBER, 2006.

OFFICER JASON DIGIULIO

OFFICER SERVING NOTICE



**Stockton**
All-America City
1999

COS048433

September 22, 2006

TO:     J. Gordon Palmer, Jr., City Manager

FROM:   Wayne Hose, Chief of Police

SUBJECT:  **RECOMMENDED DISCIPLINE—OFFICER JASON DIGIULIO I.A. #06-40**

This matter involves allegations against Officer Jason DiGiulio, that he intentionally struck the complainant's windshield with his flashlight, causing the windshield to shatter, in violation of Stockton Police Department Rules and Regulations Section 3.5, "Conduct Toward the Public."

**Background:**

On May 16, 2006, Officer Jason DiGiulio was assigned to the Traffic Section working as a DUI enforcement unit. He assisted other Officers investigating a traffic accident by establishing traffic control at Main Street and Wilson Way.

While directing traffic, Officer DiGiulio claimed he was almost struck by a vehicle that was traveling southbound around his marked patrol car. Officer DiGiulio claimed he pushed away from the vehicle, with the flashlight in his hand, causing the windshield of the vehicle to shatter. The driver of the vehicle alleged she did not see Officer DiGiulio as she drove into the intersection. She claimed Officer DiGiulio slammed his hands on the hood of her car and then smashed her windshield with his flashlight.

**Skelly Hearing:**

On September 19, 2006, a Skelly Hearing was conducted in my office. Present were Officer Jason DiGiulio, Attorney Straun Boston representing Officer DiGiulio, Deputy City Attorney Charmaine Jackson, and I. Officer DiGiulio was advised that the Skelly Hearing was his opportunity to offer any evidence he wished, to dispel or mitigate the charges against him.

Mr. Straun indicated Officer DiGiulio was sorry the incident occurred, but that it was just an accident; that he felt he was being penalized over something that was just an accident and the recommended five days' suspension was too harsh. Officer DiGiulio apologized for the incident, but again said it was just an accident.

COS048434

Officer DiGiulio stated he knew it would be a problem as soon as he saw the windshield, but reported the incident to his supervisor immediately.

## Recommendation:

It is my determination that Officer Jason DiGiulio violated Stockton Police Department Rules and Regulations Section 3.5, "Conduct Toward the Public," on May 16, 2006. As a result, I recommend Officer DiGiulio be suspended for two, ten (10)-hour days without pay as a result of this violation, to be imposed by his supervisor when practical to do so.

I CONCUR:

WAYNE HOSE
CHIEF OF POLICE

TERRY PARKER
DIRECTOR OF HUMAN RESOURCES/
EMPLOYEE RELATIONS OFFICER

WH:jm

COS048435



# CITY OF STOCKTON

**POLICE DEPARTMENT**
22 East Market Street • Stockton, CA 95202-2876
www.stocktongov.com

REDACTED

August 17, 2006

Officer Jason DiGiulio

## NOTICE OF INTENT TO TAKE DISCIPLINARY ACTION

I have enclosed herewith copies of the investigative reports into the allegation (I.A. #06-40) that you violated Stockton Police Department Rules and Regulations Section 3.5, "Conduct Toward the Public."

At the present time, Assistant Chief Thomas Morris has made the recommendation that you be suspended for five (5) ten (10)-hour workdays (50 hours). This is an appropriate sanction for the offense charged and in keeping with the City of Stockton's disciplinary policy. You should be prepared to address the possibility of being suspended for five (5) ten (10)-hour workdays (50 hours).

I have scheduled a hearing in my office on Tuesday, September 19, 2006, at 2:00 p.m. At that time, you may present any evidence, orally or in writing, concerning the facts of the investigation and/or in mitigation of the proposed discipline. You, of course, are entitled to have legal representation at said hearing.

RECEIVED THIS 21 DAY OF AUGUST, 2006.

**WAYNE HOSE**
**CHIEF OF POLICE**

OFFICER JASON DIGIULIO #6533

OFFICER SERVING NOTICE

WH:ds

Enclosure

cc: Terry Parker, Director - Human Resources

Stockton
All-America City
2004
1999

COS048436

MEMORANDUM

August 8, 2006

TO:         J. Gordon Palmer, Jr., City Manager

FROM:    Wayne Hose, Chief of Police

SUBJECT:  **RECOMMENDATION TO WITHOLD SALARY INCREASE**

Officer Jason DiGiulio has been employed with the City of Stockton as a Police Officer since September 23, 2002.  Officer DiGiulio has not achieved the level of performance required to attain seventh salary step status.

Officer DiGiulio has been rated as "Sub-Standard" in six (6) of the eleven (11) Job Functions in his current performance evaluation.  The Sub-Standard ratings are in the following critical performance areas:  *Enforcement/Service Delivery, Safety, Public Relations and Customer Service, Work Habits, Equipment Use and Maintenance, and, Controlling Stressful/Volatile Situations and Evaluating Emergencies.*

Officer DiGiulio has been the subject of a number of misconduct investigations.  In three (3) of these sustained investigations, he has received a letter of reprimand, a three (3) day suspension without pay, and a recommendation for a five (5) day suspension without pay.  He has also had four (4) preventable vehicle collisions since November 9, 2004.

Officer DiGiulio is being placed on a Performance Improvement Plan in an effort to bring his performance to an acceptable level in all categories.  Officer DiGiulio's performance will be evaluated by utilizing special evaluations every sixty (60) days.

I recommend that Officer DiGiulio's salary increase to seventh step be withheld until he is performing at a satisfactory level in all categories for a period of time not to exceed six (6) months.

WAYNE HOSE
CHIEF OF POLICE

WH:tm

CONCUR:

RECEIVED THIS 14 DAY, AUGUST, 2006,

OFFICER JASON DIGIULIO

OFFICER SERVING NOTICE

TERRY PARKER, DIRECTOR
HUMAN RESOURCES DEPARTMENT

COS048437



**REDACTED**

# CITY OF STOCKTON

POLICE DEPARTMENT
22 East Market Street • Stockton, CA 95202-2876
www.stocktongov.com

November 18, 2005

Officer Jason DiGiulio

## SUSPENSION

As indicated in the letter to you from the City Manager dated November 1, 2005,
you are suspended (I.A. #05-15) on November 28, 29, and 30, 2005. From
November 28, 2005, to November 30, 2005, you are ordered to take no police
action and have no police authority. You are not eligible to hire back during your
suspension period, November 28, 2005, through November 30, 2005.

You are to surrender your City-issued weapons, badge, and identification to the
Officer serving this notice at the end of your last shift prior to the above
suspension dates.

MARK W. HERDER
CHIEF OF POLICE

MWH:ds

(209) 937-8217

RECEIVED THIS 21 DAY OF NOVEMBER, 2005.

_____ 1620
OFFICER JASON DIGIULIO

_____ #8631
OFFICER SERVING NOTICE

**Stockton**
All-America City
2004
1999

COS048438



# CITY OF STOCKTON

### OFFICE OF THE CITY MANAGER
City Hall • 425 N. El Dorado Street • Stockton, CA 95202-1997 • 209/937-8212 • Fax 209/937-7149
www.stocktongov.com

November 1, 2005

Officer Jason DiGiulio

███████████████████████

## **SUSPENSION**

I have reviewed the material (I.A. #05-15) forwarded to me by Chief of Police
Mark W. Herder. I concur with Chief Herder's recommendation and hereby
advise that you are suspended from duty without pay for three (3), ten (10)-hour
workdays, as follows: November 28, 29, and 30, 2005.

If you wish to appeal this suspension, you must do so by filing an appeal with the
Civil Service Commission within ten (10) days of receipt of this letter, or by filing
a grievance as provided for in Sections 7 and 8 of the Memorandum of
Understanding within ten (10) business days of receipt of this letter.

**MARK LEWIS**
**CITY MANAGER**

ML:ds

cc: Chief of Police Mark W. Herder
Terry Parker, Director of Human Resources

RECEIVED THIS 20 DAY OF NOVEMBER, 2005.

OFFICER JASON DIGIULIO

OFFICER SERVING NOTICE  #8631

Stockton
All-America City
1999

COS048439

## MEMORANDUM

October 31, 2005

TO:        Mark Lewis, City Manager

FROM:    Mark W. Herder, Chief of Police

SUBJECT:  **RECOMMENDED DISCIPLINE - OFFICER JASON DIGIULIO**
            **(I.A. #05-15)**

It is alleged that on May 15, 2005, Officer Jason DiGiulio, during the arrest of Anthony Love, used excessive force by repeatedly using, on this individual, a Taser in violation of Stockton Police Department Rules and Regulations 3.24, "Use of Force." An Internal Affairs Investigation was conducted and this allegation was SUSTAINED. Jason DiGiulio was notified of intent to discipline him with a suspension of five (5), ten (10)-hour workdays without pay.

### Background:

On May 15, 2005, Officers Jason DiGiulio and Christopher Slate were dispatched to West Oak Street on a report of an intoxicated individual causing a disturbance. An altercation occurred between Anthony Love and Officers Slate and DiGiulio wherein Officer DiGiulio believed it necessary to use his Taser and baton. A complaint was filed by Mr. Love alleging excessive force by the use of a Taser on him multiple times during the altercation. There were also allegations that Mr. Love was struck with a baton and that his head was repeatedly pushed into the ground. A determination was made that the Taser was used five (5) times. Officer DiGiulio indicated that he believed this increased use was necessary because of the combative nature of Mr. Love.

### Skelly Hearing Results:

A Skelly Hearing was conducted in my office on September 28, 2005. Present were Officer Jason DiGiulio, his attorney Roy Yang, Assistant City Attorney Michael Rishwain, and I. I advised Officer DiGiulio that the Skelly Hearing was his opportunity to offer any further evidence which might dispel or mitigate the charges against him.

Roy Yang, on behalf of his client, expressed that he felt the recommended discipline of five (5) days' suspension should be reduced to a Letter of Reprimand plus requiring additional training in the use of Tasers. Mr. Yang further indicated Mr. Love was resisting arrest in such a manner that it necessitated Officer DiGiulio using the Taser multiple times. He also indicated that his client did not slam Mr. Love's head into the ground repeatedly, but only put pressure there to keep him from coming up since he was struggling to do so.

COS048440

Officer Jason DiGiulio then, himself, stated he has worked hard for this Police Department in the past. He stated that if his interpretation of the "Taser Policy" was incorrect and he wasn't supposed to deploy the Taser multiple times, that he would benefit from more training rather than a suspension from work as recommended as a result of the Internal Affairs investigation.

I explained to Officer DiGiulio that by using the Taser multiple times, the recipient could experience medical trauma which might not otherwise occur if the device was used more reasonably. I further explained that his Sergeant, who personally observed this incident, drafted a Memorandum with respect to criticizing Officer DiGiulio's performance which clearly indicated his superior's position was that Officer DiGiulio's behavior violated a Department policy on the use of force.

## Recommendation:

After reviewing the information available as a result of the Internal Affairs investigation and having heard evidence offered by Officer DiGiulio and his attorney at the Skelly Hearing, it is my opinion Officer DiGiulio violated Stockton Police Department Rules and Regulations 3.24, "Use of Force," by repeatedly using a Taser on Anthony Love during the incident in question. Since the Department policy for the use of Tasers prohibits its repeated use when the device is not overcoming resistance or seemingly having no effect.

I concur with the recommendation that Officer DiGiulio be suspended from duty without pay. I recommend, however, three (3), ten (10)-hour days' suspension without pay instead of the recommend five (5) days, but further recommend Officer DiGiulio receive additional formal training regarding the use of Tasers as part of the discipline to be imposed by his supervisor as is practicable.

I CONCUR:

MARK W. HERDER
CHIEF OF POLICE

TERRY PARKER
DIRECTOR OF HUMAN
RESOURCES/EMPLOYEE
RELATIONS OFFICER

MWH:plc

::ODMA\GRPWISE\COS.CA.CA_LIBRARY:35152.1

COS048441


September 6, 2005

Officer Jason DiGiulio

## NOTICE OF INTENT TO TAKE DISCIPLINARY ACTION

I have enclosed herewith copies of the investigative reports into the allegation (I.A. #05-15) that you violated Stockton Police Department Rules and Regulations Section 3.24, "Use of Force."

At the present time, Assistant Chief Wayne Hose has made the recommendation that you be suspended for five (5) ten (10)-hour workdays (50 hours). This is an appropriate sanction for the offense charged and in keeping with the City of Stockton's disciplinary policy. You should be prepared to address the possibility of being suspended for five (5) ten (10)-hour workdays (50 hours).

I have scheduled a hearing in my office on Thursday, September 22, 2005, at 2:00 p.m. At that time, you may present any evidence, orally or in writing, concerning the facts of the investigation and/or in mitigation of the proposed discipline. You, of course, are entitled to have legal representation at said hearing.

**MARK W. HERDER**
**CHIEF OF POLICE**

MWH:ds

Enclosure

cc: Terry Parker, Director - Human Resources

RECEIVED THIS _8_ DAY OF SEPTEMBER, 2005.

_____ 1620
OFFICER JASON DIGIULIO

CAPT JONES 1116
OFFICER SERVING NOTICE

Stockton
★ ★ ★ ★
All-America City
1999

COS048442



# C I T Y  O F  S T O C K T O N

POLICE DEPARTMENT
22 East Market Street • Stockton, CA 95202-2876
www.stocktongov.com

March 15, 2005

Officer Jason DiGiulio
Stockton Police Department
22 East Market Street
Stockton, CA  95202

## LETTER OF WRITTEN REPRIMAND – ATTENDANCE IN COURT

On February 28, 2005, Sergeant Osborne personally served you a subpoena commanding you to appear in court on March 7, 2005, at 8:30 a.m., in the matter of People vs. M. Armstrong. On March 7, 2005, the Court Liaison advised Lieutenant Wells that you failed to appear in court as commanded.

You have a responsibility to appear in court as required by subpoena. You also have a duty to immediately notify the appropriate person(s) when you become aware of circumstances that may cause you to miss a court appearance. You failed to make such notifications in this instance.

Failure to obey a subpoena constitutes a failure to perform an official duty in accordance with the Stockton Police Department Rules and Regulations, sections 3.10 and 3.63. These sections state:

> *"**3.10 (Dereliction of Duty):** All members of the Department shall perform their duties as required or directed by law, Departmental rule, policy, or order. The improper performance of or failure to perform a required police duty, or neglecting assigned duties to conduct unauthorized activities, shall be deemed dereliction of duty."*

> *"**3.63 (Court Attendance and Testimony):** Attendance at a court or quasi-judicial hearing as required by subpoena is an official duty assignment. Members shall attend punctually as indicated on the subpoena. Requests for permission to omit this duty must be cleared with the prosecuting attorney handling the case or other competent court authority. Members failing to appear in court as required by subpoena subject themselves to disciplinary action."*

**Stockton**
★★★★
All-America City
1999

COS048443

This document will serve as a Written Reprimand for the violations described above. It will remain in your City, Department, and Divisional personnel files for five years.

MARK W. HERDER
CHIEF OF POLICE

CAPTAIN ERIC T. JONES
FIELD SERVICES DIVISION

MWH:ETJ:jct

(209) 937-8667

cc: Terry Parker, Director of Human Resources

Concur:

MARK W. HERDER
CHIEF OF POLICE

I acknowledge receipt of this document and that I have discussed my job performance and the contents of this Written Reprimand with Lieutenant Trulsson. I was also informed a copy of this document would be retained in my City, Department, and Division files for a period of five years.

Signed: _____     Dated: _03 26 05_____

Jason DiGiulio

COS048444

# EXHIBIT C

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA - SACRAMENTO DIVISION


FILIBERTO VALENCIA, SR., and GRISELDA
VALENCIA, individually and as
successors in interest to Filiberto
Valencia, Jr.,

        Plaintiffs,

                             CASE NO.:
    vs.                       2:16-CV-02081-JAM-AC

CITY OF STOCKTON, CHIEF ERIC JONES,
SERGEANT DANA MOSHER, OFFICER KYLE
AMANT, OFFICER JASON DiGIULIO, and
DOES 1 through 50, inclusive,

        Defendants.
_____/




DEPOSITION OF SERGEANT JASON DIGIULIO

VOLUME II

August 14, 2017




Reported by:
LaRelle M. Fagundes, CSR No. 9762


PATRICIA CALLAHAN REPORTING
Certified Shorthand Reporters
(510) 885-2371   (415) 788-3993
Depos@callahanreporting.com

| | | |
|---|---|---|
| 17:03:38 | 1 | A.    Yes. |
| 17:03:38 | 2 | Q.    And who was the sergeant? |
| 17:03:41 | 3 | A.    Sergeant Rose, Aaron Rose. |
| 17:03:43 | 4 | Q.    And what did Sergeant Rose do to control the |
| 17:03:49 | 5 | suspect? |
| 17:03:49 | 6 | A.    I don't know. |
| 17:03:50 | 7 | Q.    What is it that you were accused of doing |
| 17:03:53 | 8 | incorrectly or improperly such that you were given a |
| 17:03:56 | 9 | three-day suspension? |
| 17:03:58 | 10 | A.    I was accused of pushing his head into the |
| 17:04:04 | 11 | ground in an inappropriate manner. |
| 17:04:06 | 12 | Q.    Did you push the suspect's head into the ground? |
| 17:04:15 | 13 | A.    I don't feel I pushed him into the ground.    I |
| 17:04:18 | 14 | tried to pin him to the ground. |
| 17:04:22 | 15 | Q.    You tried to pin his head to the ground? |
| 17:04:23 | 16 | A.    I tried to pin his whole upper body to the |
| 17:04:25 | 17 | ground, yes. |
| 17:04:25 | 18 | Q.    Okay.  So you tried to pin his head to the |
| 17:04:28 | 19 | ground? |
| 17:04:29 | 20 | A.    I was trying to get whatever I could to the |
| 17:04:31 | 21 | ground. |
| 17:04:31 | 22 | Q.    Here's my question:  You were accused, you told |
| 17:04:33 | 23 | us, of pushing his head into the ground.  Because you |
| 17:04:36 | 24 | told me that, I now ask, did you try to pin his head to |
| 17:04:39 | 25 | the ground? |

17:04:40 1    A.       Yes.

17:04:40 2    Q.       Who said that was inappropriate?

17:04:52 3    A.       Sergeant Rose.

17:04:52 4    Q.       The second question that I asked you, on June

17:05:03 5    26th, was "As a result of this prior incident, did you

17:05:06 6    alter your method of operations in any way?"

17:05:08 7    A.       No.

17:05:09 8    Q.       Was there a hearing held in to -- held by the

17:05:33 9    department as to your conduct in that incident?

17:05:39 10   A.       There was a Skelly hearing.

17:05:41 11   Q.       A Skelly hearing?

17:05:42 12   A.       Yes.

17:05:42 13   Q.       You had a representative?

17:05:44 14   A.       Yes.

17:05:44 15   Q.       Did you give testimony in that Skelly hearing?

17:05:51 16   A.       Yes.

17:05:51 17   Q.       Who else testified besides Sergeant Rose and

17:05:58 18   you?

17:05:59 19   A.       I don't remember everybody they interviewed.

17:06:02 20   Q.       Did Officer Slate give testimony?

17:06:04 21   A.       Yes, he did.

17:06:06 22   Q.       How soon after the incident was -- did the

17:06:24 23   hearing take place?

17:06:27 24   A.       Um, I -- it was months, a couple of months.  I

17:06:34 25   don't remember exactly, though.

17:09:15 1    which you have been investigated for your activities as

17:09:17 2    a police officer?

17:09:20 3          MR. STEVENS: Investigated implies there was

17:09:22 4    one. The one incident which he was reprimanded, that's

17:09:25 5    what he's here to talk about.

17:09:27 6          MR. STEVENS: Q. Have you had other Skelly

17:09:30 7    hearings besides this one?

17:09:31 8    A.     Yes.

17:09:31 9    Q.     How many?

17:09:35 10    A.     Um, several.

17:09:40 11    Q.     Did they all involve accusations of excessive

17:09:45 12    use of force?

17:09:45 13    A.     No.

17:09:45 14    Q.     How many of them did?

17:09:48 15    A.     Just the one we're speaking about.

17:09:50 16    Q.     What were the other Skelly hearings? What was

17:09:55 17    the accusation in the other Skelly hearings?

17:09:58 18          MR. STEVENS: Generally, what kind of

17:09:59 19    accusations. Don't go into the facts.

17:10:04 20          THE WITNESS: Missing court. Um, one of them I

17:10:21 21    was hit by a car while directing traffic.

17:10:28 22          MR. WALKER: Q. Why did that result in a

17:10:31 23    hearing?

17:10:31 24    A.     Because I was accused of cracking the windshield

17:10:40 25    when the car hit me.

17:10:41 1   Q.     Cracking the windshield with what?

17:10:43 2   A.     With a flashlight that was in my hand. It was

17:10:46 3   dark out.

17:10:48 4   Q.     Was that the incident which you hurt your back?

17:10:59 5   A.     No.

17:10:59 6   Q.     Okay. What else besides missing court and being

17:11:04 7   accused of hitting and cracking a windshield with your

17:11:07 8   flashlight?

17:11:07 9       MR. STEVENS: In terms of Skelly hearings?

17:11:09 10       MR. WALKER: Yes.

17:11:09 11       THE WITNESS: I think that's it.

17:11:09 12       MR. WALKER: Q. You said there were several, so

17:11:13 13   several is more than two.

17:11:18 14   A.     I had two for missing court.

17:11:21 15   Q.     When was the last Skelly hearing you had?

17:11:30 16   A.     Let me see. Court in 2010, maybe. I don't

17:11:39 17   remember, to be honest with you.

17:11:41 18   Q.     And you had no Skelly hearing in conjunction

17:11:45 19   with your interaction with Filiberto Valencia on January

17:11:49 20   19th, 2016?

17:11:50 21   A.     No, sir.

17:11:50 22   Q.     There was no hearing whatsoever involving your

17:11:54 23   conduct?

17:11:54 24   A.     No, sir.

17:11:54 25       MR. WALKER: Okay. Pursuant to our agreement,

1                        CERTIFICATE

2          I, the undersigned, a Certified Shorthand

3    Reporter, State of California, hereby certify that the

4    witness in the foregoing deposition was by me first duly

5    sworn to testify to the truth, the whole truth, and

6    nothing but the truth in the within-entitled cause; that

7    said deposition was taken at the time and place therein

8    stated; that the testimony of said witness was reported

9    by me, a disinterested person, and was thereafter

10   transcribed under my direction into typewriting; that

11   the foregoing is a full, complete and true record of

12   said testimony; and that the witness was given an

13   opportunity to read and, if necessary, correct said

14   deposition and to subscribe the same.

15          I further certify that I am not of counsel or

16   attorney for either or any of the parties in the

17   foregoing deposition and caption named, nor in any way

18   interested in the outcome of the cause named in said

19   caption.

20          Executed this 28th day of August, 2017.

21

22

23                    _____

24          LARELLE M. FAGUNDES, CSR 9762

25

# EXHIBIT D

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA - SACRAMENTO DIVISION


FILIBERTO VALENCIA, SR., and GRISELDA
VALENCIA, individually and as
successors in interest to Filiberto
Valencia, Jr.,

       Plaintiffs,

          vs.

CITY OF STOCKTON, CHIEF ERIC JONES,
SERGEANT DANA MOSHER, OFFICER KYLE
AMANT, OFFICER JASON DiGIULIO, and
DOES 1 through 50, inclusive,

       Defendants.
_____/

CASE NO.:
2:16-CV-02081-JAM-AC


DEPOSITION OF LIEUTENANT TRAVIS DIGIULIO

August 14, 2017


Reported by:
LaRelle M. Fagundes, CSR No. 9762


PATRICIA CALLAHAN REPORTING
Certified Shorthand Reporters
(510) 885-2371    (415) 788-3993
Depos@callahanreporting.com

| | | |
|---|---|---|
| 16:22:06 | 1 | A.    I was notified by our dispatch that we had an |
| 16:22:08 | 2 | in-custody death at that location, and I was on call as |
| 16:22:13 | 3 | a robbery homicide supervisor, so I was the one that was |
| 16:22:19 | 4 | called to come out to respond to that incident. |
| 16:22:21 | 5 | Q.    When you were called, because you were the |
| 16:22:26 | 6 | on-call officer or on-call supervisor? |
| 16:22:28 | 7 | A.    On-call supervisor. |
| 16:22:30 | 8 | Q.    Were you informed that there was an officer |
| 16:22:33 | 9 | named DiGiulio who was involved in the in-custody death? |
| 16:22:36 | 10 | A.    Not that at moment, no. |
| 16:22:39 | 11 | Q.    Are you related to Jason DiGiulio? |
| 16:22:41 | 12 | A.    I am. |
| 16:22:42 | 13 | Q.    How are you related? |
| 16:22:43 | 14 | A.    He's my brother. |
| 16:22:43 | 15 | Q.    Is he your full brother? |
| 16:22:45 | 16 | A.    Half brother. |
| 16:22:46 | 17 | Q.    Half brother. |
| 16:22:48 | 18 | And are you older or younger than Jason? |
| 16:22:52 | 19 | A.    Younger. |
| 16:22:52 | 20 | Q.    Did you assist in getting Jason a job with the |
| 16:23:01 | 21 | Stockton Police Department? |
| 16:23:03 | 22 | A.    Other than notifying him that there's openings. |
| 16:23:07 | 23 | Q.    Did you do anything else to assist him in |
| 16:23:10 | 24 | actually securing a job? |
| 16:23:11 | 25 | A.    Other than preparing him, like giving him |

1 CERTIFICATE

2         I, the undersigned, a Certified Shorthand

3 Reporter, State of California, hereby certify that the

4 witness in the foregoing deposition was by me first duly

5 sworn to testify to the truth, the whole truth, and

6 nothing but the truth in the within-entitled cause; that

7 said deposition was taken at the time and place therein

8 stated; that the testimony of said witness was reported

9 by me, a disinterested person, and was thereafter

10 transcribed under my direction into typewriting; that

11 the foregoing is a full, complete and true record of

12 said testimony; and that the witness was given an

13 opportunity to read and, if necessary, correct said

14 deposition and to subscribe the same.

15         I further certify that I am not of counsel or

16 attorney for either or any of the parties in the

17 foregoing deposition and caption named, nor in any way

18 interested in the outcome of the cause named in said

19 caption.

20         Executed this 28th day of August, 2017.

21

22                              *Larelle M. Fagundes*

23 _____

24         LARELLE M. FAGUNDES, CSR 9762

25

# EXHIBIT E

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA-SACRAMENTO DIVISION
---o0o---

Filiberto Valencia, Sr., and          )
Griselda Valencia,                     )          **COPY**
individually and as                    )
successors in interest to              )
Filiberto Valencia, Jr.,               )          No.
                                       )          2:16-cv-02081-JAM-
     Plaintiffs,                       )          AC
                                       )
vs.                                    )
                                       )
City of Stockton, Chief Eric           )
Jones, Sergeant Dana Mosher,           )
Officer Kyle Amant, Officer            )
Jason DiGiulio, and DOES 1             )
through 50, inclusive,                 )
                                       )
     Defendants.                       )
                                       )
_____)

VIDEO DEPOSITION OF:  OFFICER KYLE AMANT
DATE:   June 26, 2017 at 2:24 p.m.
DEPOSITION OFFICER:  Beth Douglas, RPR
                     CSR No. 8019

TAKEN IN THE OFFICES OF:
GAROUTTE'S CERTIFIED SHORTHAND REPORTERS
120 North Hunter Street
Stockton, California 95202

_____

GAROUTTE'S
Certified Shorthand Reporters
120 North Hunter Street
Stockton, California  95202
(209) 942-2100 or Nationwide (800) 942-2103
FAX (209) 942-2150

1    Q.    And how many officers did you have as field

2    training officers?

3    A.    Six different ones.

4    Q.    Did you have any delays in your probationary

5    period?

6    A.    Delays?

7    Q.    Did you have to repeat any part of a program?

8    A.    Oh, no.

9    Q.    Did you become an officer right at the end of that

10   18 months of probation?

11   A.    Yes.

12   Q.    And what was your first job as an officer once you

13   completed probation?

14   A.    Patrol.

15   Q.    Did you have a particular area of the city?

16   A.    Yes.  I worked park district, southeast.

17   Q.    How long did you remain in park district,

18   southeast?

19   A.    Approximately two years.  Something like that.

20   Q.    In January of 2016, what was your district?

21   A.    Park district.

22   Q.    Southeast again?

23   A.    Yes.

24   Q.    So did you go away and then come back?

25   A.    Yes.

1  statement in the past week?

2        MR. STEVENS:  I'll just object.  It's not a true

3  transcript.  It says it's a summary.

4        MR. WALKER:  Q.  All right.  Have you reviewed

5  what was transcribed or what was written down to reflect

6  your interview with Detective Var in the past week?

7  A.    Yes.

8  Q.    How many times since January 2016 have you reviewed

9  that summary, or I call it a transcription?

10  A.   Just once.

11  Q.   Okay.  And did you bring that with you?

12  A.   It's in my truck.

13  Q.   That's okay.  I have got a copy for you.

14        I understand that you are a member of a SWAT

15  team; is that correct?

16  A.   Yes.

17  Q.   And I saw -- I have a picture of you on the night

18  of January 19th that was probably taken in the early

19  morning hours of the 20th, but it says SWAT over the left

20  breast pocket.  Today you don't have that on your jacket.

21  Is there a reason?

22  A.   This is my SWAT uniform.  I just came from a SWAT

23  call that we had.  It is a different uniform than that

24  one.

25  Q.   So what does SWAT stand for?

1    A.    Special Weapons And Tactics.

2    Q.    When did you become a member of the SWAT team?

3    A.    I believe it was 2012, January of 2012.

4    Q.    What did you have to undergo to become a member of

5    that?

6    A.    We do a physical test, a shooting test, and an oral

7    board assessment.  And then you have to go to basic SWAT

8    school for the last two weeks.

9    Q.    And what's covered in the SWAT school, generally?

10   A.    Generally?  Shooting, searching, pretty much

11   anything involved with tactics, really.  Rappelling,

12   swimming, all that stuff.

13   Q.    Does any part of SWAT school deal with

14   confrontations with mentally ill people?

15   A.    No.

16   Q.    Have you taken any courses or received any training

17   in how to deal as a police officer with mentally ill

18   people?

19   A.    No.

20   Q.    When you were at the academy was there any such

21   training?

22   A.    I don't recall.  I don't think there was at the

23   time.  I think they do it now, but I don't remember if

24   there was at the time.

25   Q.    Have you gone to continuing education courses since

1  locked and nobody was responding to your knocks on the

2  door; correct?

3  A.    Yes.

4  Q.    And at some point, when nobody responded, Officer

5  DiGiulio received permission to kick in the door.

6        Do you agree with that?

7  A.    Yes.

8  Q.    And he did kick in the door?

9  A.    Yes.

10  Q.    Why did you not activate your body camera then?

11  A.    Completely forgot.

12  Q.    At any time while you were at 3133 Nicole, did you

13  activate your body camera?

14  A.    Yes.

15  Q.    When?

16  A.    When Sergeant Mosher advised me to turn it on.

17  Q.    And when was that in relation to the encounter with

18  Mr. Valencia?

19  A.    That was right around the time that he went

20  unconscious.

21  Q.    Is it your testimony that from the time you arrived

22  on scene on Nicole Street until Sergeant Mosher told you

23  to turn on your body camera after Mr. Valencia was

24  unconscious, that you had simply forgotten to turn it on?

25  A.    Yes.

1   Q.    Professional?

2   A.    Yes.  Continued professional training.  And so when

3   the officers rotate through that, you -- you are not

4   necessarily teaching that every time, but you are in a

5   group of instructors that, you know, teach as they can.

6   Q.    Okay.  So sometimes you are teaching officers with

7   more experience than you?

8   A.    Yes.

9   Q.    And you are still doing that?

10  A.    No.  I stopped doing that in about 2015.  So I

11  didn't do it for very long.

12  Q.    Why did you stop?

13  A.    To be honest, it was taking away from my SWAT

14  trainings.  And I like going to SWAT more than I like

15  doing that.

16  Q.    You can't do every bloody thing; right?

17  A.    That's right.

18  Q.    Have you applied to be a sergeant?

19  A.    No.

20  Q.    Have you taken any tests to be a sergeant?

21  A.    No.

22  Q.    And you appear to be quite physically fit.  Are you

23  a weight lifter?

24  A.    Yes.

25  Q.    You do that on a regular basis?

A.    Yes.

Q.    How long have you been doing that?

A.    A long time.  Probably since I was about 16 years old.

THE VIDEOGRAPHER:  Excuse me.  Please leave the camera alone.

THE WITNESS:  Oh, sorry.

MR. WALKER:  Q.  How much can you bench press?

A.    I don't know.

Q.    You don't do it for weight; you just do it for repetitions?

A.    I just do it to stay in shape.  I don't -- I don't record my max weight or anything like that.

Q.    Do you do anything else to stay in shape?

A.    Besides lift weights?

Q.    Yes.

A.    Cardiovascular training.

Q.    Do you have any experience in boxing?

A.    No.

Q.    How about wrestling?

A.    No.

Q.    I'm going to show you a photograph that we'll mark as -- we are going in continuous numbers -- I think this is 33?

THE REPORTER:  33.

1    about a third of the way down the page Detective Var asks

2    you to tell him what type of call you were dispatched to,

3    and you answered,

4                    "We received a call of a subject 910, so a

5                    prowler."

6         When you say, "we received a call," you were

7    the only one in your car when you received the call;

8    correct?

9    A.    Yes.

10   Q.    You went on to say,

11                   "So a prowler that was knocking on

12                   front door, and then as we started making

13                   our way there, the guy had made it around

14                   to the subject. Had made it around to the

15                   back door, and he was banging on the back

16                   door. And then as the call progressed, he

17                   was now inside someone else's residence.

18                   So it was a prowler inside, so a 910A."

19        Once you received that, did you go code three

20   in your car?

21   A.    I don't recall.

22   Q.    How far away were you?  Do you have a recollection

23   now?

24   A.    I think we were getting pretty close, but I don't

25   -- I don't recall exactly where we were.

1    Q.    You do recall that the dispatch was sending you to

2    Nicole Street; correct?

3    A.    Yes.

4    Q.    Were you familiar with Nicole Street at that time?

5    A.    No.

6    Q.    Were you familiar with the area where Nicole Street

7    is located?

8    A.    Yes.

9    Q.    Did you know Barbara Street?

10   A.    No.

11   Q.    How about Madrid Drive?

12   A.    Madrid, yes.

13   Q.    Is that a -- a thoroughfare?

14   A.    Not really.  It's one of the -- only way in and out

15   of that little neighborhood there.

16   Q.    What do you call that neighborhood?

17   A.    Just a neighborhood.

18   Q.    Had it been a place to which you had made service

19   calls in the past?

20   A.    Yes.

21   Q.    Was it known for any gang activity or particular

22   problems as opposed to other neighborhoods?

23   A.    Just normal south Stockton.

24   Q.    Okay.

25           Did you know Officer DiGiulio was responding to

1   the same call as you?

2   A.    Yes.

3   Q.    How did you know that?

4   A.    I was following him.

5   Q.    The two of you arrived at about the same time?

6   A.    Exactly the same time, yes.

7   Q.    And where did you go once you got out of your car?

8   A.    We -- we parked a little bit a ways down; there is

9   just kind of a procedure that we do.  We park a little

10  bit of ways away.

11        As soon as we got out of the car, we heard

12  people yelling down the street, so we ran over to them.

13  Q.    These were people standing on the sidewalk or

14  standing on the street outside?

15  A.    Front yard, sidewalk, yes.

16  Q.    And were they yelling to you to get your attention?

17  A.    Yes.

18  Q.    And were they yelling in English, if you recall?

19  A.    I don't recall.

20  Q.    So you went down and you talked to them.  That was

21  the first thing you did?

22  A.    Yes.

23  Q.    Do you recall getting any information from them?

24  A.    I just remember someone telling me -- somebody

25  telling me that there was someone inside of their house.

1    If you would turn that to the camera and show

2 us, please?

3 A.    They were right here (indicating).

4 Q.    All right.

5 A.    Somewhere right there.  I can't remember if they

6 were more in the corner or towards the toilet, but they

7 were in between the two.

8 Q.    Can you see that on the camera?

9    THE VIDEOGRAPHER:  Yes.

10    MR. WALKER:  Okay.  Thank you.

11    MR. WALKER:  Q.  There is -- hold it up still.

12    There is a trash bucket or wastebasket there.

13 Do you recall that being in the bathroom at the time?

14 A.    No.

15 Q.    And there is some blood on the wall just above the

16 trash basket or bucket.  Do you see that?

17 A.    Yes.

18 Q.    How did that blood get there?

19 A.    I believe that came from the subject, Valencia.

20 Q.    What part of Mr. Valencia?

21 A.    I do not recall.

22 Q.    Did you see Mr. Valencia strike that wall?

23 A.    No, I didn't.

24 Q.    Do you recall seeing the blood on the wall?

25 A.    No.  Not until this picture.

1  A.    He was -- he was kind of seated, slash, laying in

2  the corner when him and Officer DiGiulio were fighting,

3  and that was all that was exposed for me was the lower

4  half of his body.

5  Q.    So were his legs sticking toward the door?

6  A.    Yes.

7  Q.    Were you standing in the doorway while DiGiulio was

8  having physical contact with him?

9  A.    I think I was in the bathroom.  But, yeah, very

10 close to the doorway.

11 Q.    Was anybody else in the bathroom at that point?

12 A.    No.

13 Q.    When Officer DiGiulio first went in the door he had

14 his gun drawn -- first went in the bathroom he had his

15 gun drawn; correct?

16 A.    Yes.

17 Q.    Did you still have your gun drawn when you kicked

18 in the door?

19 A.    Yes.

20 Q.    Were you still holding with two hands?

21 A.    Yes.

22 Q.    So,

23              "Officer DiGiulio went in -- he has told us

24              he is left-handed -- is holding the gun in

25              his left hand and he got hold of the little

1      girl somehow with his right hand."

2      Is that consistent with your memory?

3   A.   Yes.

4   Q.   And,

5           "He immediately pulled the girl out behind

6           or pulled the girl behind him."

7      Do you recall that?

8   A.   Yes.

9   Q.   Were you able to then get the girl out of the

10  bathroom?

11  A.   Yes.

12  Q.   Did you just sort of scoot her out?  Or push her

13  out?  How did you do it?

14  A.   I don't remember if I physically touched her.  I

15  just told her to get out.

16  Q.   And the woman who was sitting on the floor behind

17  the door who kept the door from opening all the way, when

18  you kicked it in, did you get her out of the bathroom?

19  A.   Yes.

20  Q.   How did you do that?

21  A.   Just told her -- just to get out.

22  Q.   You didn't grab her and pull her out?

23  A.   I don't remember if I had any physical contact with

24  her.

25  Q.   How about the woman that was in the bathtub?  Did

Page 54

1  you get her out?

2  A.    Yes.

3  Q.    How?

4  A.    I believe we just called her to me.  She --

5  Q.    Just stepped around?

6  A.    Hm-hmm.

7  Q.    And in stepping around, if we look at -- may I see

8  these, please?  Thanks, that's fine.

9         If we look at Exhibit 18 -- if you would hold

10  that up so everybody can see what I am talking about.

11         To step around she would have had -- you would

12  have had Officer DiGiulio, a large man, and Mr. Valencia

13  in the left-hand corner of that picture between the wall

14  and the bathtub.  And we have the toilet on the right.

15         Where would she have stepped?

16  A.    I believe she just crawled right over; just crawled

17  right over the toilet and came to me --

18         THE REPORTER:  I'm sorry?

19         THE WITNESS:  I'm sorry.

20         THE REPORTER:  You are talking really soft.  "I

21  believe she just crawled right over here -- ?"

22         THE WITNESS:  I believe she just crawled right

23  through here.  I mean, she had enough room.  She wasn't

24  like a giant person.  So she just squeezed through this

25  little area and came out.

1    choking her or if he was just kind of using

2    her as a shield or what he was doing. But

3    he was holding this girl behind her neck,

4    and she was crying. So DiGiulio grabs the

5    girl. I holster up at that point because I

6    see he didn't have anything in his hands."

7    Stopping there.  That's accurate; correct?

8    A.    Yes.

9    Q.    And when you said, "You see he didn't have anything

10   in his hands."  You are referring to the man that Officer

11   DiGiulio was dealing with you now know to be Filiberto

12   Valencia; correct?

13   A.    Yes.

14   Q.    You say,

15         "I holster up 'cause I knew one of us

16         was going to have to go hands-on him."

17         Why did you know one of you was going to have

18   to go hands-on him?

19   A.    I knew somebody was going to have to handcuff the

20   guy --

21   Q.    Okay.

22   A.    -- that's all.

23   Q.    Did you get out your handcuffs at that point?

24   A.    No.

25   Q.    You went on to state,

1     "So I pull the girl out. I tell her to go

2     into the living room. There was two more

3     girls in the bathroom. One was stuck

4     behind the door. When we open the door she

5     was hiding behind the door. So then I, so

6     I grabbed her out while DiGiulio was

7     holding the suspect at gunpoint."

8    Stopping there.  At this point there is no

9 fighting going on between DiGiulio and Mr. Valencia?

10 A. No.

11 Q. Okay.  You said,

12     "I get her out and then there is a girl

13     in the bathtub or in the shower who was

14     behind the suspect. So eventually I was

15     able to get her crawl over, crawl out.

16     At that point DiGiulio goes in to mount

17     this guy or put hands on him.  And the guy

18     grabs his gun, grabs the barrel of his

19     gun, like puts his hand around it."

20    Is that accurate so far?

21 A. Yes.

22 Q. So when that happened, when you saw the guy

23 grabbing at his gun or grabbing the barrel of the gun,

24 like putting his hand around it, all the other people had

25 gotten out of the bathroom?

1    A.    Yes.

2    Q.    You said,

3                "So DiGiulio."

4          You went on to say -- we are at page 48228 now.

5                "So DiGiulio rips it away, tells him not to

6                grab his gun, and hits him over the head

7                with the gun."

8          Which part of the gun did he use to hit this

9    man over the head?

10   A.    I don't recall.

11   Q.    Is it your belief it was the barrel of the gun?

12   A.    I -- I honestly don't recall.

13   Q.          "The guy at that point starts swinging at

14                DiGiulio, and he grabs his glasses at one

15                point. And he is kind of like gouging at

16                his face, like scratching his face."

17          So this guy that you are referring to, was he

18   sitting down at this time?

19   A.    Yes, I believe he was sitting down at this time.

20   Q.    And was his back against the wall or against the

21   bathtub?

22   A.    I am -- I mean, I'm assuming by the pictures it was

23   against the wall, but I don't recall.

24   Q.    You don't recall?

25   A.    No.

1  Q.   And what you recall is that from a seated position

2  he was swinging at DiGiulio and grabbing his glasses?

3  A.   Yes.

4  Q.   And scratching his face?

5  A.   Yes.

6  Q.   Did you see that?  Him scratching his face?

7  A.   I saw him grab his glasses.  And in doing so, it

8  scratched his face.

9  Q.   Okay.  So in grabbing the glasses, his fingernails

10  raked down --

11  A.   Yes.

12  Q.   -- Officer DiGiulio's face?

13  A.   Yeah.

14  Q.   Okay.

15       And then you said,

16            "So DiGiulio gives him another one.  Hits

17            him again with his gun."

18       You saw that?

19  A.   Yes.

20  Q.   Did you hear it?

21  A.   Like the impact?

22  Q.   Yes.

23  A.   No.  I don't recall hearing an impact.

24  Q.   You saw both hits of the gun onto this man's head;

25  correct?

1   A.   Yes.

2   Q.   Were they both in the same place?

3   A.   I don't recall if they were exactly in the same

4   place or not, no.

5   Q.   Okay.

6        Was there anything different about the second

7   hit than the first hit?

8   A.   Not to my recollection, no.

9   Q.   Was one harder than the other, could you tell?

10  A.   No.

11  Q.   Okay.

12       And have you ever hit a suspect with a gun?

13  A.   No.

14  Q.   Have you ever seen another officer do that?

15  A.   No, I don't believe so.

16  Q.   You went on to state,

17            "I then tell DiGiulio to holster up. So he

18            holsters up."

19       What was your thought at that point when you

20  told him to holster up?

21  A.   I was afraid that that gun might get out of Officer

22  DiGiulio's hands.  So I wanted him to put it away so we

23  could deal with this guy accordingly.

24  Q.   When you drew your gun to enter the house at 3133,

25  did you take the safety off at the moment?

1    A.    We don't have a safety.

2    Q.    The SIG doesn't have a safety?

3    A.    No, sir.

4    Q.    It's a semiautomatic?

5    A.    Yes.

6    Q.    So once you start squeezing, it's gonna keep on

7 shooting until you let go of the trigger; right?

8    A.    No.  One trigger pull.

9    Q.    It's one trigger pull?

10    A.    Per round, yes.

11    Q.    You say,

12           "DiGiulio holsters up."

13        And then you state,

14           "I got my baton out, and I kind of

15           like speared him in the belly."

16        You are referring to Mr. Valencia?  You speared

17 him in the belly?

18    A.    Yes.

19    Q.    In what position was he in when you speared him in

20 the belly?

21    A.    He was -- I think he was in the seated position.

22    Q.    Okay.  And where was DiGiulio in relation to him?

23 What allowed you to spear this man in the belly?

24    A.    He was still on top of him.  I just had like this

25 little area of his torso that I tried to --

1   Q.    So did you go in straight when you hit him?

2   A.    Yes.

3   Q.    Okay. You then went on to state,

4               "It had zero effect. The guy had like this

5               blank stare like he was feeling no pain.

6               And he wasn't understanding what we were

7               saying, maybe, he was talking, but he was

8               still fighting."

9       Can you give any further description of this

10 blank stare?

11   A.    Just kind of looked like he was looking at you, but

12 he was looking right through you. I think they call it

13 like the "thousand-yard stare" to where they just are --

14 they are not recognizing you, but they are looking at you

15 type of thing. I don't know how like medically to

16 describe it.

17   Q.    But you had seen that before with people with whom

18 you had to deal with as a police officer; correct?

19   A.    Yes.

20   Q.    And you knew that was a sign of concern to you as a

21 police officer because the person didn't appear to be

22 acting in a normal way when he had that blank stare or

23 thousand-yard stare?

24   A.    Correct.

25   Q.    You said,

1          "So speared him once. That didn't have no

2           effect. So all I had left was his shins

3           'cause Officer DiGiulio was like in a full

4           mount on top of him at this point. He was

5           trying to control his hands, and they were

6           punching each other back and forth."

7          Stopping there.  Officer DiGiulio now is on top

8     of Mr. Valencia; correct?

9     A.    Yes.

10    Q.    So he was punching down on him?

11    A.    Well, the way he was seated, they were kind of -- I

12    mean, almost, eye level.  DiGiulio was a little bit on

13    top of him because he was sitting on him, but they were

14    punching right and forth -- right back and forth to each

15    other.

16    Q.    So DiGiulio was swinging with both hands?

17    A.    I don't recall.

18    Q.    Was the fellow actually punching him back or kind

19    of slapping at him?

20    A.    I feel like they were punching, but I don't recall

21    to this day what they were -- what the hands were like

22    during the encounter.

23    Q.    So, this is what you are observing as you take

24    out your baton. Your baton is on your left hip. You reach

25    with your right hand; pull it across your body -- pull it

1  out and across your body."

2  A.    Sometimes.  I mean, you can pull it out.

3  Q.    On this particular incident?

4  A.    I don't know.

5  Q.    If you don't recall, that's fine.

6  A.    Hm-hmm.

7  Q.    But you are right-handed?

8  A.    Yes.

9  Q.    So you got yourself in a position where you wanted

10  to assist your fellow officer?

11  A.    Yes.

12  Q.    And the only thing that you could find to do that

13  would assist your officer -- your fellow officer at that

14  point was to hit this guy on the exposed legs?

15  A.    Yes.

16  Q.    And you hit him as hard as you could?

17  A.    Yes.

18  Q.    How many times?

19  A.    I believe I testified two to three times.  I don't

20  remember the exact number.  It was only a couple times.

21  Q.    And were you able to get yourself in a good

22  position to leverage to bring that baton down on his

23  legs?

24  A.    Yes.

25  Q.    You stated,

1            "So I give him two or three hard whacks on

2            the shins. I look up at him to see if that

3            had any effect. Nothing. It was like I

4            didn't even touch him. So I was like

5            that's not working. So I go to holster my

6            baton. I missed the ring, so I just dropped

7            it. And then I kicked it to the hallway,

8            because I didn't want this guy to try and

9            grab that."

10       Is that all accurate?

11   A.   Yes.

12   Q.   You then went on and said,

13            "At that point I heard Sergeant Mosher on

14            the radio saying he was 987."

15       What does that mean?

16   A.   On scene.  It means he was there.

17   Q.   So you say,

18            "I told him to bring a Taser."

19       How did you tell Sergeant Mosher to bring a

20   Taser?

21   A.   Just over the radio.

22   Q.   Did you have to activate it with your hand?

23   A.   Yes.

24   Q.   Where was your radio on your body?

25   A.   Oh, I don't know if I was wearing an earpiece or if

1    I was wearing just a regular mike, but typically it's

2    either here or right here (indicating).

3    Q.    It's either on your shoulder or your chest?

4    A.    I believe I was wearing an earpiece that night, so

5    it would have been right here (indicating).

6    Q.    You would have activated that with your right hand

7    and said, "Bring a Taser"?

8    A.    Right or left, either one.

9    Q.    You went on and stated,

10                 "So he brings -- I know he is coming with

11                 a Taser.  Him and DiGiulio were fighting.

12                 I mean they are fighting. It's a good

13                 fight. So I grabbed the guy by his pants.

14                 And I knew we needed to get him out of the

15                 bathroom. I wasn't doing anything good

16                 'cause there was a very large officer on

17                 top of him. I couldn't help because there

18                 was nothing to help him with -- to help

19                 with. So I dragged both of them out into

20                 the hallway. And when I dragged them into

21                 the hallway, DiGiulio kind of got off him

22                 for a second and then kind of mounted him

23                 again."

24                 So at one point you were actually pulling

25    Mr. Valencia out by the legs with the 275-pound Officer

1   DiGiulio on top of him; correct?

2   A.   Yes.

3   Q.   And was Officer DiGiulio still punching him while

4   this was going on?

5   A.   No.  Once I started tugging on him he kind of --

6   kind of got up for a sec so I could drag him.  It wasn't

7   like I was dragging both of them the whole time.  I was

8   just -- I started pulling on him.  He realized that, got

9   off of him for a sec, and then got back on him.

10  Q.   Officer DiGiulio says you are real strong.

11       All right.  After DiGiulio mounted him again

12  you said,

13            "And they are still fighting, and then

14            Sergeant Mosher says, 'I am going to tase

15            him.' So I tell Officer DiGiulio, 'Taser,

16            Taser, Taser.' He kind of got off; he kind

17            of didn't."

18       What do you mean by that?

19  A.   I felt like he kinda halfway rolled off of him, but

20  didn't want to completely let him go.  I think maybe he

21  was afraid that if he completely let him go he was able

22  to stand back up.  So he kind of...

23  Q.   You never once saw Mr. Valencia stand up, did you?

24  A.   No.

25  Q.   You went on to state,

1   correct?

2   A.    Yes.

3   Q.    And your thought is this will give you more room to

4   control the individual?

5   A.    Yes.

6   Q.    And all the time Officer DiGiulio never breaks

7   contact with him?

8   A.    No.

9   Q.    Am I correct?

10  A.    Yes, yes.

11  Q.    All right.  About the middle of the page you said,

12              "So Mosher gives it to him for a third

13              time. Nothing. So he rips it out and is

14              going to go -- I think he was going to try

15              and dry stone him, but I don't know if he

16              did it."

17         What is dry stone?

18  A.    So on the Taser cartridge or the Taser itself the

19  cartridge pulls out, and then the probes are inside there

20  as well.  So you can apply it to someone's body and pull

21  the trigger so it gives them, like, if you stuck your

22  hand in a socket, it will shock him like that.  It is

23  direct.

24  Q.    A direct contact, as opposed to being shot from a

25  distance?

1  A.    Yes.  It wasn't like he was -- he was just trying

2  to get away.

3  Q.    Out in the hallway you said,

4              "DiGiulio was in a full MMA mount over

5              him, like a full guard or whatever it is

6              called."

7         What's MMA?

8  A.    Mixed martial arts.

9  Q.       "So there is really again nothing they

10             could do. He was kind of just laying on

11             top of him."

12        You saw DiGiulio with his chest on top of

13  Mr. Valencia's chest; correct?

14  A.    Yes.

15  Q.    You said,

16             "So I went around to his head and I was

17             getting over there. I was thinking maybe I

18             could grab a wrist and pull his arm around

19             or something, but there was really no room.

20             And then Officer DiGiulio said, 'He is

21             biting me.' So at that point I didn't kick

22             him or anything. I just put my foot onto

23             the side of his face like this and pinned

24             it to the ground. So I pinned his head to

25             the ground so Officer DiGiulio could get

1   A.    I had no idea.  I just --

2   Q.    Did that occur to you that he might be dead?

3   A.    No, not at all.

4   Q.    You said,

5             "Officer DiGiulio thought he might be

6             playing possum, like he wasn't unconscious.

7             That he was just faking it so he could get

8             away or something. So he kind of lays on

9             top of him for a couple more seconds. And

10            then I go, 'No Jason, I think he is out.'

11            So Jason rolls off of him and sure, he was

12            unconscious."

13        That's all accurate?

14  A.    Yes.

15  Q.    And he is lying on his back at this point; correct?

16  A.    Yes, I believe so.

17  Q.    Your next sentence is,

18           "We roll him over, handcuff him. Rolled him

19           back over. He was unconscious. So I then

20           tried to do a sternum rep."

21  A.    It's supposed to be "rub."

22  Q.    "Rub to wake him up. That wasn't working."

23        So when you noticed he was unconscious, he was

24  lying on his back, and Jason was lying on top of him --

25  DiGiulio was lying on top of him?

1    Q.    That's where I was going with that.

2    A.    Yeah.

3    Q.    But the gun is in your left hand?

4    A.    Yes.

5    Q.    The little girl would have been to your left --

6    A.    No.

7    Q.    -- as you entered the door?

8    A.    No.  She was -- this is not a good angle of the

9    angle I had.

10    Q.    Okay.

11          Where was the little girl in relation to the

12    toilet we see in that photograph?

13    A.    You wouldn't see her where she was at in this

14    photograph because she was more towards this wall.  She

15    was back in this corner.

16    Q.    Thank you.  If you would hold that again.

17          You are saying that she was out of sight behind

18    the wall as you entered?

19    A.    From the angle this photo was taken at.

20    Q.    Okay.

21          But the man who was on the floor would have

22    been to the right of her; correct?

23    A.    No.  He was behind her.

24    Q.    He was behind her.

25          You have your gun in your left hand.  You

1        (Break taken in proceedings.)

2        THE VIDEOGRAPHER:  Beginning video number 2.

3    The time is 3:57 p.m.  Back on the record.

4        MR. WALKER:  Q.  I would like you to turn to

5    page 48283.  And you were asked by Detective Var,

6            "When you guys went into the

7            restroom -- the bathroom, were there any

8            commands given to the suspect?"

9        This is at the top of the page.  You answered,

10            "Yes.  We were both giving commands both

11            time to -- you know, a typical 'Show me

12            your hands.' At first it was 'Don't move.'

13            We kind of held him there at gunpoint while

14            I got the girls, or Officer DiGiulio held

15            him there at gunpoint while I got the girls

16            out while he was giving him the typical

17            of 'Don't move. Show me your hands'

18            command."

19        Is that accurate?

20    A.    Yes.

21    Q.    Okay.

22        So the first thing that happens when you go in

23    is you are holding Mr. Valencia at gunpoint saying, "Show

24    me your hands."  And getting the girls out?

25            There is no physical contact between either of

1      height."

2   A.    Yeah.  I don't know if that was one knee, two

3   knees.  If he was --

4   Q.    Could he have been sitting?

5   A.    He could have been, yeah.  I don't recall, though.

6   Q.    And looking towards the bottom of page 48285.

7         You were asked about when you came into the

8   room, DAI Rodriguez says,

9              "Okay.  And this -- this guy -- this guy,

10             is he talking or yelling or?"

11        And you answered,

12             "He is just sitting there with this like

13             deer-in-the-headlight look like, you know,

14             somebody that wasn't in the right frame of

15             mind in my opinion, my personal opinion.

16             Something was off about him."

17        You -- that's accurate, isn't it?

18  A.    Yes.

19  Q.    And you recognized that right away as soon as you

20  looked at him?

21  A.    Yes.

22  Q.    The investigator asked,

23             "Any strange smells like alcohol or drugs?"

24        I wasn't aware that too many drugs smelled

25  other than marijuana, but your answer was,

1  but no, I couldn't make out anything he

2  was saying."

3  That's accurate, isn't it?

4 A.  Yes.

5 Q.  And Rodriguez said,

6  "Was he responding at all to anything you

7  guys are telling him?  Is he acting a

8  certain way when you guys tell him

9  something or?"

10  He seems to end all his questions with "or."

11  And you said,

12  "He is just, it was just, almost like it

13  wasn't registering.  But at the same time

14  he was defensive."

15  Is that accurate?

16 A.  Yes.

17 Q.  You said,

18  "And I think initially we probably took him

19  for granted."

20  So stopping there.

21  Why do you say that?  And what did you mean by

22 "taking him for granted"?

23 A.  He wasn't armed.  He wasn't a very big guy.  We

24 were hoping to just walk up to him, place him in

25 handcuffs, and take him to jail.  That was it.  We

1  weren't expecting a fight.

2  Q.    Okay.  So you go into the room with your guns

3  drawn, two experienced police officers.  You see this man

4  in a lowered position either sitting or kneeling or

5  crouching down with a little girl.  You saw he didn't

6  have any weapons.  He is looking at you with a blank

7  stare, a thousand-yard stare, and looking like he is a

8  deer in the headlights.  And you think, "Well, we are

9  just going to take him into custody at this point."

10 Correct?

11 A.    Yes.

12 Q.    And all went well in terms of you got the little

13 girl out of the room, and you got the women out of the

14 room before there was any physical contact with Mr. Di --

15 Mr. Valencia?

16 A.    Yes.

17 Q.    And you went on to say,

18                "We thought we could just walk in and grab

19                him and, you know, we could just put him

20                in cuffs, and that, I think that is why he

21                made his initial approach."

22            Whose initial approach?  You are talking about

23 Officer DiGiulio?

24 A.    Officer DiGiulio, yes.

25 Q.    You went on to say,

1    to you,

2              "Do you believe that yourself, Officer

3              DiGiulio, or Sergeant Mosher from what you

4              observed today could have used any -- could

5              have used less force than you did in that

6              situation?"

7         And you answered,

8              "I don't think so. Obviously hitting

9              someone with a pistol is not something they

10             teach in the department. But it was a gut

11             reaction because he could have easily

12             pulled the trigger when this guy grabbed

13             his gun. But he decided to use less force

14             by hitting him."

15        I believe that's supposed to be "with it."

16   A.    Yes.

17   Q.         "So in my opinion it was reasonable for

18             the circumstances."

19        First of all, are there any circumstances where

20   it is approved by the police department to use your

21   handgun as a bludgeon?

22        MR. STEVENS: I will just assert an objection.

23   It calls for a legal conclusion and a potential expert

24   opinion.  But if you know, you can respond.

25        THE WITNESS:  We are able to use any force

1  necessary to effect the arrest.  To my knowledge that

2  doesn't include a pistol, but if that's all you have to

3  use at the time and if it is a life-saving measure for

4  yourself then absolutely you can use it, yes.  But it is

5  not a practiced procedure.  No, it is not taught.

6          MR. WALKER:  Q.  So you have never received any

7  instruction on how to hit somebody with a gun; is that

8  correct?

9  A.    Correct.

10 Q.    I asked an interrogatory of the city of Stockton to

11 identify all training received as of January 19th, 2016,

12 by Stockton police officers regarding dealing with people

13 thought to be suffering from mental illness.

14          And the question received an objection because

15 it was unduly overbroad, and it fails to identify with

16 any reasonable specificity which officers it refers to.

17          So let me ask the question specifically of you.

18          Please identify all training you received as of

19 January 19th, 2016, regarding dealing with people thought

20 to be suffering from mental illness.

21          MR. STEVENS:  Any training that in any way deals

22 with mentally ill individuals?

23          MR. WALKER:  I would like to start with that,

24 yeah.

25          THE WITNESS:  This is not going to be that

1  accurate, but I don't feel like we have gotten -- like I
2  said, they implemented this eight-hour course.  That's
3  recently been -- everybody in the department has been
4  having to go through.  I just haven't came up on the list
5  yet.
6          I feel like all we get to -- all we get taught
7  about is our mental health liaison officers, which are
8  specific officers that you can -- you know, if you go to
9  a call and believe somebody is mentally disturbed, you
10 can call them, and they will come over and help you with
11 the situation.
12         Other than that, I have never sat in a classroom
13 and have been taught anything about how to identify if
14 somebody is mentally ill or not.
15 Q.    How long has the department had these mental health
16 liaison officers?
17 A.    Pretty recent.  I would say to my knowledge in the
18 last year or two.
19 Q.    Did they have mental liaison officers in January
20 of 2016?
21 A.    I just came back to patrol.  I had only been back
22 to patrol for about three weeks when this happened.  I
23 was on our gang enforcement team, so I never came into
24 contact with mentally disturbed people.  So I don't
25 remember if they had started it before that because I was

1  kind of out of -- out of the know, if I could say, with

2  what goes on, on patrol.

3  Q.    So you have never called for a mental liaison

4  officer to come to a scene?

5  A.    I have, yes.  After this.

6  Q.    After January 2016?

7  A.    Yes.

8        MR. WALKER:  Okay.

9        Thank you very much, Officer.

10       THE WITNESS:  You are welcome, sir.

11       THE VIDEOGRAPHER:  This now concludes the

12 deposition.  The time is 4:18.  Off the record.

13

14       (Whereupon the deposition of OFFICER KYLE AMANT

15 concluded at 4:18 p.m.)

16

17                    ---o0o---

18

19       Signature:_____

20

21       Date:_____

22

23

24

25

STATE OF CALIFORNIA,                    )

COUNTY OF SAN JOAQUIN.                   )

       I, Beth Douglas, the Certified Shorthand Reporter herein, do hereby certify:

       That on June 27, 2017, at 2:24 p.m., the witness herein, OFFICER KYLE AMANT, was by me duly sworn;

       That said witness' testimony and the proceedings had at the time of such testimony were taken down in shorthand notes by me; I thereafter caused said shorthand notes to be transcribed into longhand typewriting, the following being a full, true, and correct transcription thereof;

       That I am a disinterested person and am not in any way interested in the outcome of said action, nor connected with nor related to any of the parties in said action, nor to their respective counsel;

       On July 24, 2017, all counsel and the deponent were given notice of the preparation of the deposition, and the original deposition was available for reading, correcting, approval, or signing in our offices until September 4, 2017.

       ------

_____The witness signed the deposition and made no corrections.

_____The witness and parties waived examination and reading of the deposition at the time of the taking of the deposition.

_____The witness corrected, approved, or refused to approve the deposition by letter to me attached hereto, and copies of the letter were sent to all counsel.

_____The witness failed to appear at my office.

_____The witness appeared in my office, made changes to the deposition, and counsel were provided with copies of the changes.

_____The witness refused to approve or sign the deposition for the following

reason:_____.

Other:_____.

       IN WITNESS WHEREOF, I have hereunto subscribed my hand.

DATE _July 24, 2017_____

_Beth Douglas_____

BETH DOUGLAS, RPR, CSR-8019

COUNSEL:  YOU WILL BE NOTIFIED OF ANY CORRECTIONS OR
CHANGES.  CONTACT OUR OFFICE IF YOU HAVE ANY QUESTIONS.

4

**EXHIBIT F**

# EXHIBIT F

Video Footage of

Officer Jason DiGiulio's Statement

Contained in Flash Drive that is

Lodged to the Court

interview. Griselda said I could. DAI Rodriguez and I then stepped out of the interview room. I subsequently made a copy of the sheet. Moments later I walked into the interview room and handed them the appointment sheet.

*(End of Statement)*

DAI Rodriguez and I then returned into the interview room and walked Filiberto and Griselda out.

**INVESTIGATION CONTINUED:**
After speaking with the Valenicia's, DAI Sant and I met with Officer DiGiulio.

*The following interview was recorded and has been summarized below. The purpose of the summary is to render an overview of what was described; however, they are not transcriptions of the recorded interview. The summary should not be viewed as containing only the important facts of the interview. They are intended to provide the reader with a general understanding of what was said; therefore, refer to the recording itself for the exact wording.*

*It should be noted there is a 29 minute difference from the video time to real time. All times noted in the report should only be used as reference to the video recording.*

At 00.50.43: Detective Alaniz, DAI Sant, Officer DiGiulio, and Attorney Collins enter the room.

**STATEMENT OF (VIC) Jason DiGiulio:**
Detective Alaniz: So it's January 20th, it's 1:20 in the morning. I'm Detective Hector Alaniz. This is my partner David Sant. We're here with Jason DiGiulio and his Attorney Shawn B Collins from Mastagni and Holstedt. Appreciate you guys speaking with us. At any given time you wish to step out you know and take a break. Let me know. And you guys can step outside. First off if I can just get some basic information from you. What's your first name?

Officer DiGiulio: Jason. J-A-S-O-N.

Detective Alaniz: How do you spell your last name?

Officer DiGiulio: D-I, capital G, I-U-L-I-O.

Detective Alaniz: Your date of birth.

Officer DiGiulio: 5/8 of '68.

Detective Alaniz: What's your ID number?

Officer DiGiulio: 1620

Detective Alaniz: And how long have you been a police officer?

Officer DiGiulio: Over thirteen years.

Detective Alaniz: What's your current rank?

Officer DiGiulio: Police Officer.

Detective Alaniz: And how long have you been a police officer?

Officer DiGiulio: Over thirteen years.

Detective Alaniz: Over thirteen years. And I see that you're wearing like regular jeans and a shirt. Were you in uniform today?

Officer DiGiulio: Yes.

Detective Alaniz: Other than being a police officer do you have any special training?

Officer DiGiulio: As far as what?

Detective Alaniz: Special assignments? Have you been part of like Mobile Field Force?

| Report Officer | Printed At | |
|---|---|---|
| 2081/ALANIZ,HECTOR | 04/11/2016 08:03 | Page 7 of 40 |

COS048193

# STOCKTON POLICE DEPARTMENT

**Narrative**

Officer DiGiulio: Oh. Department Admin guy for shot spotter. I've been to the DUI Standard Field Sobriety Tests. I've been to the A-Ride school. The, that's about it for specialty stuff.

Detective Alaniz: Now I understand today that you responded to some, a call on Nicole Street.

Officer DiGiulio: Yes.

Detective Alaniz: OK. Now, if you can go ahead and pretty much give me a run down on how it happened. How is it that you were called to respond to this call? And what you saw when you got there. What you heard. And if anything that happened while you were at this location.

Officer DiGiulio: I was dispatched to an address on Nicole Street. I believe the address was 3167? I think? It was 3160's. Which that comes into play in a minute. So I, I think I was about Fremont, East Fremont and maybe Wizard when I got the call. So that's quite a good distance off. As I was driving to the call dispatch kept giving further updates that initially a man was in the house. It was a juvenile calling. A man was in the house, they were trying to kill his dead or something like that. It was basically a, a strange person in the house. Some type of disturbance. So then continued calls and updates started coming. So I, by this time now I'm on Wilson. Traffic was kind of heavy. Cause it's near the end of the day. Where you know business is, so I kind of decide maybe I better go code three. So I start going code three on Wilson somewhere maybe about Miner. So I'm going code three and I'm getting continued updates. Now they're getting callers from other locations. Saying, then there's a guy on a roof. Guy's coming through our door and it, it's really sounding confusing. Cause it's basically it's multiple callers, multiple locations. On the street. And of a guy going in just barging in homes. And so I reduce sirens on Farmington. So cause now I've definitely, I don't want to alert too much and I, I turn off emergency lights because I'm on Madrid. Farmington, left on Madrid. Northbound Madrid and Nicole's a little distance down. Right hand turn. Now I'm using my map because I've, we're getting different locations that this thing is bouncing like from different houses. Different callers. So it's kind of confusing. Then at one point a caller from Barbara Street which is a street on the back side of Nicole on the north which means it would be houses on the north side of Nicole. And the south side which is shared yards. So it's kind of, it was just, it was just kind of confusing. So the two main addresses were 31, I think it's 3167 was the initial address. And then callers from 3133 Nicole. So I know as I make my left, my right onto Nicole of course 3167 going to be further down then 3133. But this thing seemed to start there and I don't, you know it was just confusing. As far as what's going on. All I know is I've got some type of 910A or prowler or some type of home invasion something going on like that. So I, my beat partner who was with me, Officer Amant. Amant's right behind me as we pull on Nicole. So I pull up short and he of course pulls up with me short. Because I figure we'll walk in. Because we're going to have to pass 3133 before we get to the, to the original call location. And I'm not quite sure what's exactly what's going on. So I was walking up, we're getting up to where the initial dispatch is. We're adjacent, we're literally in front of 3133. Lights are on. Porch lights on. We don't hear anything. And there's a crowd of people in front not the next house but one house over. And they're saying, 'Hey he went in there. He was on the roof and he's in the house. You know we know the family. We know they're home. They're always home.' They're pretty frantic so Amant and I decide OK well let's go to the original call location first. So we go up and we tell people, you know, 'Stay back at the street.' You know and they're, they're pretty frantic. That this guy was on the roof. He's in the house. So we're peeking over the fences and I'm looking into the living room and the lights are on. We're not hearing anything. So we decide, I'm going to start knocking on the door and see what, OK what happens. So knocking on the door announcing police. Dispatch comes up and asks if I can't get the order now. I can't remember if I had told dispatch have them come to the door or if they said, dispatch asked if, if that was us. Cause they had them on the line. If that was us banging on the door. You know, and I know I said, 'Yes. Have them come to the door.' And so then you know I was knocking and saying police. So the door opens. And Amant he was, I'm kind of at the front door and Amant's kind of watching through the front living room window. He says, people are coming. So the door opens and I see a, a it kind of looked like two families. Just a large group of, of Hispanic people. And there was a juvenile female I believe holding the phone and she's the one, she starts saying, 'Oh he was trying to kill my dad. He was here after my dad.' And I saw pretty much that everybody spoke Spanish. And I said, I'm like, 'OK is he in the house?' And people they start shaking their heads. They don't know. You know, 'We don't know. We don't know where he's at.' We don't know where he's at. OK so we start, we get him out of the house. We're, 'OK everybody. Is this everybody accounted for in your family?' You know, 'Let's all get out of the house.' So I mean it was a large group of people. Seven or eight I think. I didn't get a good head count but get them out of the house. Tell them to get

| Report Officer | Printed At | |
|---|---|---|
| 2081/ALANIZ,HECTOR | 04/11/2016 08:03 | Page 8 of 40 |

COS048194

# STOCKTON POLICE DEPARTMENT

## Narrative

back to the sidewalk. Amant I figure OK, let's go clear the house. Well as we're getting ready to clear the house dispatch updates again that they're getting calls again from 3133 Nicole that people are in the bathroom. And there's, people are in the bathroom and the, something about a struggle. You know. And we've got people on the street that are yelling and you know then a guy, the house that's in between are two locations. This guy comes out and he was saying someone was on his roof. So we're like, 'OK.' Dispatch says, 'People are in the bathroom. Can't get out. 3133 and something about a struggle in there.' So we go, you know what? OK we got everybody out of the house here. They appear to be safe. No injuries or nothing. Let's pull back from here and let's go check 3133. So we go to 3133, it's a single story home. And we, we cut through the front yards. We didn't walk like down the street. Just cut right through the front yards. Cause it's one house over. Yeah, one house over and we go up I think. I think Amant was checking the first over the fence and I was looking through the front window. And in the living room and lights were on I couldn't see anything. No movement, nobody. And I'm trying to hear. I can't hear anything. So I shift the front door. Amant's checking the front window. He's keeping an eye on the front window. Security screens open, unlocked. I pull it open. I bang on the door. And dispatch came up again saying that, that they, they had a caller from inside. They were stuck in the bathroom and couldn't get out and it was kind of sketchy exactly what was going on. But they sounded distressed. But we weren't hearing anything from the outside. So at that point I remember getting on the radio and telling dispatch to advise a sergeant that there's you know, we weren't hearing anything in the outside. We want to kick the door. We can do it. Going to do it. And then I remember Sergeant Mosher's voice coming over saying, 'Get inside. Do it.' So I get first time, one good kick on the door.' Boom goes open cause I had already it was locked. So, I hit the door. So I hit the door got lucky I guess. One good kick. Door pops, and with guns drawn and enter it's living room that you can see into like another which would be like an informal living room, family room I guess and kind of kitchen. It's semi open. Well I could see there, and so and there's a hallway to my left. So I pull up to the corner of the hallway. Amant tells me to hold there and I'm yelling, 'Police.' As I come in I'm yelling, 'Police.' You know, 'Police.' And I hold at the corner, Amant tells me to hold. So I guess I believe that he's doing a quick security scan. The open areas we can see real quick. Cause we're being told they're in a bathroom. So I hold the hallway, then Amant comes up on my back and says, 'OK. Let's go.' So as we start down the hallway there's a door to my right. Door to my left. And then the hallway T intersects. As I get pretty far down the hallway, I could tell there's movement. Past the doors at the T intersection. It sounds like someone's like around the corner. Which would be front kind of to my left. So now we can hear people, I can hear people to my left. Which that room, which turned out to be the bathroom. Is like, so but I'm hearing movement here. So I check this as I come around a lady's coming out obviously distraught. She's got the phone. She goes, 'I called. I called. They're in the bathroom.' And that's where we can hear people crying. Now getting louder. Crying and whatnot. And obvious distress in the bathroom. So I spin to the bathroom. And I'm at an angle to the bathroom door. Come to the back kind of my left now. So I'm off, if you're facing to where I would be kind of off to the right. At an angle. And Kyle at the same time his leg's coming up. He goes, 'I'm kicking it.' Cause he did try, I guess he did try it. And it was locked. So he kicks the door. And this door comes open. It comes open about half way and stops. Cause turned out there was a lady behind the door. So when he kicked it, it went right into her. She was sitting on the floor. The door wouldn't open up all the way. My first sight was at an angle into the bathroom. And it was a toilet, a bathtub with the glass shower doors on the edge of the, on the rail of the tub. You know connected to the wall.

Detective Alaniz: Mm hmm.

Officer DiGiulio: Those type of deals. And kind of against the wall on the floor like at the corner of the wall and the tub. Hispanic male. Like he was, I don't know if he was on his knees or actually sitting. But he was down. And he, and there was a little girl sitting there crying. And he had his arm up around her neck. And I can't remember if it was left or right. But it was definitely his arm around her neck.

Detective Alaniz: So through the front?

Officer DiGiulio: Yeah.

Detective Alaniz: Pretty much his forearm?

Officer DiGiulio: He was behind her.

Detective Alaniz: Mm hmm.

COS048195

# STOCKTON POLICE DEPARTMENT

## Narrative

Officer DiGiulio: And she was right in front of him. And I just can't remember. I know he had a tattoo. And I, so I want, it could have been the right arm. He was behind her. He had her in front of him. She was standing up and he was I think standing down. But he had his arm up around her neck like this. And so I had already had the gun up and out. And I start yelling at him, 'Get your hands up. Get your hands up.' I can't remember if I said, 'Let her go.' But I know, 'Get your hands up.' And I just, so I moved straight out. And that's when I know the lady was on the ground here so the door couldn't get all the way open. Cause she's on the floor. The door's right up against her and then the sink and so. He's got the, his arm around the girl. And I'm, when I have him. I get, I close pretty close. And I'm yelling at him to get his hands up. And as he releases and he comes up like this, I remember, I'm left handed. So I remember reaching, grabbing the girl. Kind of reach over and couldn't get her by her head cause she's, I don't know. So I get her from the back of the head, shoulders. I don't know. I just grab her. And I push her under my left arm, under my side. And I try and push her out. Back behind me. And I guess I, I got her to go. I don't know if Kyle grabbed her or not. And then I've got two ladies, not only this lady on the floor. And then there's two ladies in the bathtub. And they are just totally, they're screaming, 'Help us. He's got us here.' Just all kinds of different stuff. And I remember it was, it was a white lady and a black lady. And I remember the black lady was falling or something. And they're screaming and this guy's down here. So I'm, I'm just going to, to get some type of, get him in custody. And he's on the ground. I don't see anything of where I can or anything. But I can't see his whole body. Cause he's on the floor. So as I come at him, I retract my arm like this. So I can close without, hopefully, you know protecting my gun. So I close and I hit him, I didn't really hit, more kind of here. And I'm telling him to get his hands up. And I want to pin him. My intentions to pin him in that corner. And I'm just going to smother, pin him. Hopefully he can get these people out. And then, I can get some control on him. But if I figure I pin him, on him or something maybe Kyle and can get these people out or get something going. Get some control on him. So as I do that, that's when the fight starts. So he's swinging. He's kicking, throwing up elbows and I'm trying to block him. Trying to grab him. And I figure if I can pin his head on the wall, I can get some, maybe some control. Or slow him down. So I'm trying to push his head into the wall. And he swats and hits my gun and grabs my gun at one point. I, I believe, I feel him grab my gun. Cause I felt a yank on my gun. And I pulled it back and he was reaching for it again. And that's when I just hit him on top of the head. Somewhere in the head or face up in here. I just came down like this and I hit him with my gun. I hit him once and he's still fighting. And I get him twice, I hit him again. And he, it, it slowed him down. Stunned him. And I got my forearm across his head and I pinned it down to the wall. And he kind of seemed to stop for a minute. And Amant's going, 'OK, holster, holster.' So obviously so I can get both hands free. So leaned like this. I holster. And as soon as I turned to get both hands on him. Fight, fights, I'm sorry. Fights back on. Now he's punching, he's grabbing at me. He, I got punched in the face and up here and something. But then he also he grabbed, he grabbed my face. And grabbing at my face he clawed me. I've got some cuts. And on my eye I got like, it felt like an eye gouge. But I got cut up in here. Bridge of my nose and my forehead. But he also grabbed my glasses off my face. And he, I remember he pulled them down and was scrunching them. And that's when I started delivering just closed fist blows. I don't remember how many. But I hit him, and I was trying to get his arms and he's grabbing, and kicking and hitting on me. And so I'm trying to get him further down onto the ground. Cause now he's still kind of sitting up. And I've kind of got a half mount on him. And you know, ground fighting. I've got, I think I'm on my knee but I've got my left leg kind of over him. I'm trying to get a good full mount. And I remember Kyle saying something about let's get him in a hallway, we got more room. I still, I, you know there's screaming. I don't remember if the lady's had all gotten out yet or not. I just remember screaming. And Kyle who's got good strength, I guess he grabbed him and started dragging him out into the hallway. Well I didn't want to give the guy any, any distance to be able to set. To set himself for a fight. So I'm going to you know, I used to take on the ground so I'm on him. And I'm keeping close. And still trying to get some type of hold. So he get's him halfway, pull him into the hallway. So I'm still kind of half in the bathroom. Half in the hallway. And he's at an angle with me like this. I'm kind of on his side. And I'm still trying to get control of at least one arm. And that's when I remember hearing something about a taser. And I saw the red dot. Probably up in his mid-torso. Lower chest. And so I know, they're going to t, he's going to, he's going to get tased. And I think I heard Sergeant Mosher's voice. I don't remember exactly what he said. So, I kind of lean back to give room for the prongs. I hear the pop of the taser and I see the prongs hit him. And I hear the, the ticking noise of the taser deployment. And it's not doing anything to him. And he's grabbing at the prongs. So tha'ts at that point. I felt the taser wasn't, had absolutely no effect. So I need to get on him. So that's when I, I start trying to get back into a position of advantage and get control. He started to roll onto his, I guess it would be his left. Was trying to hook his arm. And eventually, at the same time he's still swinging. I'm still delivering some punches. And I, I get a full mount on

| Report Officer | Printed At | |
|---|---|---|
| 2081/ALANIZ,HECTOR | 04/11/2016 08:03 | Page 10 of 40 |

COS048196

# STOCKTON POLICE DEPARTMENT

him. Do I need to describe a full mount?

Detective Alaniz: Yeah, I was going to ask you about it.

Officer DiGiulio: The full mount is you're straddling a person and you, you, you're just above their waist line and hips with both of your legs. So their legs are behind you but you have a position of leverage on them. To where you can control their upper body more. And it's a position of disadvantage for them. So I actually get him in a full mount. And he swings and I know I pin his arm kind of up against his face and jaw. I pin that there and then I believe it was Kyle got his arm kind of pulled out. But he was still swinging. And so he had his arm pinned. I think he had his boot on his forearm pinned. And I had my hand here. And I had my forearm pinning his arm kind of like this. Or it would have actually been like this.

Detective Alaniz: So your forearm's against his arm?

Officer DiGiulio: Yes. My forearm's against arm. I'm leaning and now I feel like I have a good mount and control of him. So he's starting to slow his fight. So I believe he's starting to wear out. But I'm getting gas too. And that's what Amant's saying, 'Let's roll him.' And I, I wanted to say, 'Let's wait for more officers.' I remember saying that. You know cause I don't want to start fighting again. Cause when we roll him, I'm going to lose what little control I've got, I've fought for at this point. And he, he goes, 'No, no, let's roll him.' So then I believe it was Officer Wells came. He was kind of like just, cause by now we kind of scooted along the hallway and we're almost back into the living room. It seemed like. And so Officer Wells came and I remember we started to roll him. I had him kind of like a chicken wing on him. Cause I wanted to keep at least one arm locked as we rolled him. And as we started to roll him, I had to release to get him over. So we could get his arms behind his back. And that's when I pulled back. And then I believe it was Officer Wells and Officer Amant were the ones. And I was able to step back and they, they cuffed him. And so he was rolled over, cuffed. And we rolled him right back over. And at that point is when I believe it was at that point when it's, his eyes were open. And then, and then I remember Kyle saying something, 'I think he's out.' And that's, 'Let's get him up.' Somebody said, 'Let's get him up. Let's get him awake.' So we sit him up. And I tried to do a stern rub. And as I sit him up, I went to do a sternum, sternum rub. He kind of fell along against the wall away from me. And then, but I couldn't feel it. You know it didn't seem if he was letting himself go loose. If he was out. He was pretending. I wasn't quite sure. So then I, cause then we laid him back down and that's when I step back because I think it was Well's and I was pretty gassed at that point. And that's when they started medical aide. Checking him and, and then I, I heard something about I can't feel a pulse. And then that's when we went into first aide. And the officers, the other officers are doing that. While I stood there I checked people in the kitchen. And I sat there for a while. And I remember waiting for the ambulance. And then Freer looked like he was gassing out, because he was doing compressions for a while. So then I switched out with Freer and I started doing compressions. During the fight I did, he bit me really hard one, at one point. Received that along with the gashes and the punches. This is what, in the bathroom. Yeah actually.

Detective Alaniz: OK.

Officer DiGiulio: I had gloves on. But see he bit. Took a chunk out there.

Detective Alaniz: Alright. Just to go over pretty much what you already pretty much explained to me. If, just to clarify. OK, what was your call sign today?

Officer DiGiulio: I am 3B25. It's my normal call sign.

Detective Alaniz: And then what district are you assigned to?

Officer DiGiulio: Park district.

Detective Alaniz: Park? What phase?

Officer DiGiulio: Phase two. Third watch, phase two.

Detective Alaniz: And I think earlier you said your beat partner was Kyle Amant that day?

Officer DiGiulio: Yes.

Detective Alaniz: Is Kyle Amant your regular, regularly your beat partner?

COS048197

# STOCKTON POLICE DEPARTMENT

Officer DiGiulio:  We just did the switch over.  And he was at a school.  But I believe he's going to be regularly assigned to Park.  He has been a couple days.

Detective Alaniz:  OK.  When the call got, was first aired.  Where were you?

Officer DiGiulio:  Fremont and Wizard.  Right about in that area.

Detective Alaniz:  And what, what, if you can remember, what was the initial.  What was the first thing that caught your attention?

Officer DiGiulio:  Is that they, it was they're in the house.  It was a juvenile.  I believe they, dispatch said it was a juvenile in the house.  Or the juvenile is reporting that somebody's in the house.  And they were trying to kill her dad.  Something like that.  And then, and then it was something about people being on the roof.  You know?  And then it just kept calling these different locations.  And different updates that kind of weren't making sense.  It was getting confusing and like I said, I kicked it up to code three and went.

Detective Alaniz:  Now as part of the regular duties, you wear a uniform.  Correct?

Officer DiGiulio:  Yes.  Full PD uniform.

Detective Alaniz:  Is there any, and do you wear a body camera?

Officer DiGiulio:  Yes.

Detective Alaniz:  Were you wearing your body camera today?

Officer DiGiulio:  I had it.  Because the body cameras prone to fall off at times.  I had put it in my jacket pocket.  And normally I pull it out when I get to the call or enroute to the call.  But this one was getting so much, you know, just the details that were coming out.  I wasn't, I was concentrating on the call.  The different addresses.  And I pulled the map up to kind of get a, for you know.  Cause I know where Nicole's at.  I can get there fine.  But I needed to see for tactical reasons kind of the lay out on the map.  And I just never took my camera out of my jacket pocket.

Detective Alaniz:  OK.  So you're on your way to the call.  And you're getting these updates via dispatch.

Officer DiGiulio:  Yes.

Detective Alaniz:  At what point, is Officer Amant behind you the whole time?

Officer DiGiulio:  No, I don't know at what point he got in behind me.  Cause I didn't notice that it was him behind me until I was on Madrid, just, just about to turn onto Nicole.

Detective Alaniz:  OK.  And then as you arrived that's when you noticed he's behind you.

Officer DiGiulio:  Yes.

Detective Alaniz:  At that point you're getting conflicting information from dispatch?

Officer DiGiulio:  Yes.  We literally had at that point we had like three different locations.  The 3167 I think, I, I could be wrong in that.  But it was a 3160 address.  We, then we head to 3133 address.  And then there was one little thing about an address on Barbara.  And Barbara is, cause I checked the map and that came up.  Because dispatch, because I remember dispatch saying that's around the corner.  And so I quick look at the map.  And Barbara is the street.  It also, Nicole goes east, west.  Barbara goes east, west also.  And Barbara's to the north of Nicole.  And so the address would have been the backyards would have been.  So theoretically if a person was hopping fences, jumping on roofs because we had, that's what we had.  He's on the roof.  He's in the house.  He's on a roof.  He's in the house.  Cause there's different callers.  From what I could tell.  So he could have hopped a fence onto Barbara.  I, you know, from looking at the map that was kind of my general.

Detective Alaniz:  OK.  So you said when you arrived there was a group of people outside the house?

Officer DiGiulio:  Yes.  We pulled up real short of the location, because I knew the 3160 address was going to be

COS048198

# STOCKTON POLICE DEPARTMENT

farther down the street then 3133. So I pulled up real short for officer safety reasons. And walked in and as Kyle and I are walking down the street I think we're two or three houses down from 3133. And the whole time we can see a bunch of people out front of what was even the actual 3167, I think. 3160 house. Which was only one house over. And they were all frantic, 'He's in there.' Was on, they're yelling, 'He's in there. He's on the roof. We know that family. They're always home. And we know that there's people home now. And this guy went in.' You know.

Detective Alaniz:  Now were they saying this in English or in Spanish?

Officer DiGiulio:  Yes, they were saying it in English.

Detective Alaniz:  OK. So they direct you to the other house. Did these people direct you to the other house?

Officer DiGiulio:  We went, well we had to pass 3133. And I remember checking addresses as I'm walking. And I see 3133 and I paused. Seen lights on you know. I was on the sidewalk. So I wasn't up close. But I did pause and I was looking to see if I could tell if there's anybody in distress. Or hear anything. Well I didn't. So Kyle and I, that's when we made the decision cause everybody who was all frantic and yelling was actually in front of the one house over. So that's why we, we decided to check the original location.

Detective Alaniz:  Mm.

Officer DiGiulio:  First.

Detective Alaniz:  OK.

Officer DiGiulio:  But at that point we were getting dispatch is giving us updates on callers who were experiencing the same type of a guy in our house at two locations at one time.

Detective Alaniz:  Just so I can picture it better, you think you can draw me a little sketch of..

Officer DiGiulio:  Yeah. OK. And then I don't know it goes down like, I guess it loops or something like that. This would be Barbara. OK, and then. I want to say 3167, cause I'm pretty sure that was, I might not be right, but I'm pretty sure that was the original 67 or 69. Either way. Here and then we had a house here. And this person came out saying he thought someone was on his roof at one point too. And then here. And we had parked patrol cars kind of down. I can't, maybe two houses down. Other side of the street.

Detective Alaniz:  Are those marked patrol cars?

Officer DiGiulio:  Yes, fully marked patrol cars. We were both driving the Explorers.

Detective Alaniz:  OK. So you guys parked on the opposite side of the street?

Officer DiGiulio:  Yes.

Detective Alaniz:  On the corner.

Officer DiGiulio:  Yeah, we made the corner and I cut code three somewhere down here. The lights. I cut the sirens before, as on Farmington. We parked here, Kyle and when I made this, that's when I realized Kyle's right behind me. Made the turn. We parked and got out. And we walked crossing and then down the sidewalk. Is that, I'm a terrible drawer.

Detective Alaniz:  You go to this address first. And that's where all the people are at.

Officer DiGiulio:  Yes. Paused here, listened. But everybody was in the street here. Kind of the in the street.

Detective Alaniz:  Mm hmm.

Officer DiGiulio:  And right at the mouth of the driveway. Here. Yelling. I paused here to listen. I didn't, didn't hear anything. Didn't see any movement in the house. Lights were on inside. Didn't hear anything. No exigency even though we're getting calls from both. But the people were a little bit frantic down here. So we, we made the decision to check here first.

COS048199

# STOCKTON POLICE DEPARTMENT

## Narrative

Detective Alaniz: OK. Now so you keep getting updates from dispatch correct?

Officer DiGiulio: Mm hmm.

Detective Alaniz: And then you guys find, end up at 3133.

Officer DiGiulio: I'm sorry what?

Detective Alaniz: Am I right? You guys end up at 3133?

Officer DiGiulio: Yes. We, we knocking on the door here. We get the family out here.

Detective Alaniz: Mm hmm.

Officer DiGiulio: We're about to make the decision to clear this house. The original call location. Per the call history. And we have the family out. They don't know if a guy's in here, but now dispatch is updating us that they're getting callers from 3133 and they hear, there's a struggle. And there was something else I don't remember. So then we just went straight through the front yards. You know by like cross cut the driveways whatever. And came back. And we decided to come back here and, and basically do the same, get people out and see what's going on.

Detective Alaniz: Now did you and Officer Amant talk about what you guys were planning on doing, before you went in there?

Officer DiGiulio: Before we went here?

Detective Alaniz: Yeah.

Officer DiGiulio: Yeah, I mean it was like, we didn't like let's do this, this. It was I went to the front window. I was at the front window. Kyle automatically you know he's checking over the fences. We're just kind of you know, clicking, working good. No one, well you know, I know Kyle's doing that. I'll check this.

Detective Alaniz: OK.

Officer DiGiulio: And I'm guessing Kyle is kind of thinking the same way. I get if I'm doing this, he's going to do this. And then, the security screen was open, was unlocked. I opened it. I checked the front door. I kept checking the window. I know Kyle asked, 'Is the front door locked?' I said, 'Yeah it's locked.' You know and that's when dispatch came up again. People inside and I turn and I remember turning to Kyle and going, Officer Amant. You know I remember turning and going, 'I'm not hearing anything. Do you?' And he's like, 'I'm not hearing anything either.' And that's when I done realized dispatch, I go, I said, 'Hey advise a sergeant we're not hearing anything inside.' And I don't remember how they said it. But, 'We're not hearing anything inside. We want to go in.' I don't know if I used boot to door or what, but we want to go in. Based on what dispatch is telling us. But we're not hearing anything. But you know, and that's when the sergeant said, I remember hearing Sergeant Mosher's voice, 'Do it. Go in.'

Detective Alaniz: Was he there?

Officer DiGiulio: I heard him. I don't know where he was at. I heard him on the radio though.

Detective Alaniz: OK. So at this point it was just yourself and Officer Amant?

Officer DiGiulio: Yes.

Detective Alaniz: OK. So then you guys decide to go in.

Officer DiGiulio: Yes.

Detective Alaniz: And you kick the door in.

Officer DiGiulio: Yes.

Detective Alaniz: OK. So you could draw me the inside of the house? And then pretty much explain how it went

COS048200

# STOCKTON POLICE DEPARTMENT

## Narrative

from the moment you entered the door.

Officer DiGiulio: I'm kind of. My drawing's terrible. I'm sorry fellas. There's a door here, a door here, door here. I think it's a garage. This door's kind of here. OK. That's a terrible drawing. And this be the kitchen. OK. So when I, when I. I kicked the door.

Detective Alaniz: OK.

Officer DiGiulio: So I got lucky, you know how that goes sometimes. Kicked the door one good boom, and it, it went open. I immediately made entry yelling, 'Police.' Come in to straight to here. I could see this was an open living room with nobody. It's kind of open to the kitchen. I can see this was like a kind of a more of a relaxed family'ish room.

Detective Alaniz: Was that area. Were there lights or was it off?

Officer DiGiulio: Yes, the lights were all on.

Detective Alaniz: OK.

Officer DiGiulio: There was no, I don't think was a single light in the house that was off. Lights on here. Here, here, hallway light was on. So it was well lit. I didn't have my flashlight out.

Detective Alaniz: OK.

Officer DiGiulio: So I could see, I could see here nobody. Obviously nobody here. And I immediately went, I held the corner. And as I had stopped at the corner, well I maintained when I hit the corner. Amant, Amant told me to hold. And so I know, and I mean Amant's SWAT officer so. I, so I hold the corner. Cause my belief is cause he's doing a quick visual here. Cause at this point feel everybody's in the bathroom. You know and I know dispatch said something about they couldn't come out of the bathroom. Cause I think I asked, 'Can you get them to the front door?' And they, something came back about they can't get out of the bathroom. So I hold, I hold the corner here. And I don't remember how many times I yelled, 'Police.' And weren't really hearing anything at this point. I know Kyle advised me to, to push, to push down. However he said it. And so I come down the hallway along this wall. And there's a bedroom door here and you can kind of hear something coming from my, my left. Which is where the bathroom ended up being. But then I could tell there's movement around this corner of the hallway. The T intersection. So like the master bedroom here. I'll just write master if that's alright. So I come to here. And I meet a lady holding a phone up come this way. And she, she goes, 'I called. I called. They're in the bathroom.' That's when we can really hear them now. Crying. Whimpering. People, one lady in hysterics. So I turn. I guess I'm standing right about here. Facing back diagonally this way. Kyle tries the door. And then I just remember him saying, 'I'm kicking it.' Or something like, 'He's going to kick it.' His leg comes up. He gets one good kick. The door comes open. The door opens this way. But it doesn't go all the way. Cause there was a lady on the floor. So my view was from here straight in to here. This would, marking the bathtub shower.

Detective Alaniz: Mm hmm.

Officer DiGiulio: And this, the, the Hispanic male was right here. Kind of in the corner and then that's where he had the little girl in front of him. With his arm up around her neck.

Detective Alaniz: Can you tell me a little bit about the girl? What's she doing?

Officer DiGiulio: She was crying. She was just, she was just standing there crying.

Detective Alaniz: Did the male say anything?

Officer DiGiulio: I couldn't hear because there's so much hysterics. The women were in hysterics screaming, 'Help us.' And just, 'Help us.' And just lots of crying and screaming. And so I, my focus wasn't really on those ladies. It was on little girl that had a guy behind her. Almost like he was hiding behind her. With his arm around her neck.

Detective Alaniz: So were you?

| Report Officer | Printed At | |
|---|---|---|
| 2081/ALANIZ,HECTOR | 04/11/2016 08:03 | Page 15 of 40 |

COS048201

# STOCKTON POLICE DEPARTMENT

## Narrative

Officer DiGiulio:  So I moved on him.

Detective Alaniz:  What were you thinking was happening at that point?

Officer DiGiulio:  He was choking her.  He's going to hurt her.  I mean he's hide, it's like he's hiding behind her.  But he's got his arm around her neck.  And she's crying.  So she needs help.

Detective Alaniz:  That's when at that point you go in?

Officer DiGiulio:  I go straight at him.

Detective Alaniz:  Is your gun drawn?

Officer DiGiulio:  My gun is drawn.

Detective Alaniz:  And so you're left handed.  So?

Officer DiGiulio:  Yes.

Detective Alaniz:  I guess it would be this way.

Officer DiGiulio:  I come in like this.  As I get close, I somewhat retract, and like I said, I reach out for her.  Cause I'm yelling at him to get his hands up.  And his arm comes off and I'm not sure.  I know I'm in the doorway cause I could feel the door pressed against me.  And I'm reaching for her.  As his hands are coming up.  And I got my gun and then I kind of pull her under me and behind me.

Detective Alaniz:  So at that point, she gets out of the bathroom?

Officer DiGiulio:  I just, I.  I, yeah I guess.  Like I said.  I grabbed her.  I wasn't really watching her.

Detective Alaniz:  Mm hmm.

Officer DiGiulio:  I'm watching him.  But I, I know I got her kind of like this or just wanted to get her behind me.  And I, I know I pulled her under my arm and kind of behind me like this.

Detective Alaniz:  OK.  Then what happens after that?

Officer DiGiulio:  Well then I got these ladies screaming here.  I have this lady here kind of on the floor behind the door.  I don't really see her.  I kind of see her shoulder and hair.  But I know she's there.  And they're screaming for help.  And so I'm yelling at this guy, you know keep his hands up.  But.  I can't see if he's got a weapon.  He's not standing up.  He's down on the floor.  But, he obviously doesn't belong there.  This isn't right.  He needs to be controlled.

Detective Alaniz:  Now, when you said Officer Amant tells you to holster.  Or what's he say?

Officer DiGiulio:  OK.  That's after, as I said he's already on the ground.  Or sitting down.  But I don't, I mean I can't see if he's got a weapon.  I can't see if he's sitting on anything.  Nothings ever been said.  So, I, I pull back like this.  Cause I don't want him to get my gun.  So I'm like this.  And because I've already kind of got an advantage on him because I'm standing up.  I just want to pin him into that corner.

Detective Alaniz:  OK.

Officer DiGiulio:  So I know I get my hand on the side of his head and I'm yeling to him to get his hands up.  And I'm pinning him.  And they're, they're up like this.  I mean they're not up.  He's not like this.  They're kind of like this.  So as I push him, I'm telling him to stay there.  Keep your hands up.  And that's when he just, he just starts swinging.  You know and he's trying to spin so I'm using my weight to kind of hold him down.  He's spinning.  He's grabbing.  I'm trying to keep my gun back like this.  You know and I'm doing this.  And trying.  And I know he, he hit me.  Hit my gun.  Grabbed my gun.  And then that's when I just, I just came down on him like that.

Detective Alaniz:  Hmm.  So.

Officer DiGiulio:  Yeah, I.

COS048202

# STOCKTON POLICE DEPARTMENT

## Narrative

Detective Alaniz: Which, did you hit him with your fist or with a gun?

Officer DiGiulio: No gun.

Detective Alaniz: Which part of the gun did you hit him with?

Officer DiGiulio: I'm not sure. I don't know. I just know I hit him once. And I pulled back and he tried grabbing the gun again. I hit him again. And he, and then it slowed him down. It stunned him. And that's, and then now I'm, by I'm down on him more. I'm not standing up. I think I'm on one knee. I've got, now I've stepped over him. And I've got him pinned. And that's when Kyle goes, 'OK.' He's yelling, 'Holster up now.' You know cause we've got him stunned. We've slowed him, I've slowed him down.

Detective Alaniz: Mm hmm.

Officer DiGiulio: So I can obviously safely holster you know cause it takes some attention. I don't, I'm vulnerable if I'm dealing with my holster and I've opened myself up.

Detective Alaniz: OK.

Officer DiGiulio: Cause here, I've got. You know I can fight. But if I turn, I've opened up. So I pin him like this. And I'm holstering. And I holster and then I turn now. I've got both hands. I can get control. And just as soon as I grab him start controlling him. Fights back on.

Detective Alaniz: Now what is he, what is it that he's doing? When he's fighting?

Officer DiGiulio: He's down and he's doing this and swinging. He, he grabbed my face. I still, I don't know where my glasses are at. They're gone. I, they're probably broken. Cause he grabbed my face.

Detective Alaniz: So at the time you're wearing glasses.

Officer DiGiulio: Yes. I wear prescription glasses. I don't need them twenty-four, seven. But what twelve, thirteen, twelve and a half years ago I realized I had a hard time reading license plates. House numbers and street signs.

Detective Alaniz: OK.

Officer DiGiulio: So.

Detective Alaniz: So he pretty much ripped them off when he?

Officer DiGiulio: Yeah.

Detective Alaniz: OK.

Officer DiGiulio: He ripped them off. He pulled them down. And I remember yelling like, 'My 'ing glasses.' And then he, you know and then he's, he's not controlled. He's not controlled. He's not searched. You know so now this is, I just this is a fight to me. And this isn't going to be a good fight. Cause it already seems like he doesn't care. So, so I'm trying to grab him. And I'm trying to grab his, his arm. Cause he, I remember he pulled my, he, he's kind of now turned a little bit. So I've been working him trying to turn him. And so he's kind of like this. And I'm here. And he's got my glasses. And I remember, I don't remember which hand but. Cause he's down, I can remember seeing my glasses in his hand. He's doing this. And I go to grab his wrist. To, for control. And then some arm bar anything I can get. And that's when he leans over and he takes a chunk of my hand. Actually it looks good now.

Detective Alaniz: Your left hand?

Officer DiGiulio: Yes, this is my left hand. Actually my watch is still covered in blood. And that's when he grabbed my hand and that's when I started striking him again with a closed fist. Right handed closed fist. And then it just continued. You know grappling, flinging, punching, until Amant figured, 'Hey let's get out of this. Get some room.' And he just grabbed him by the legs I guess. I don't know how. I didn't see real how but I know he said, 'Let's get him in the hallway.' And he dragged him by the, the feet or the legs or something. Cause I was

COS048203

# STOCKTON POLICE DEPARTMENT

## Narrative

staying up on the upper body. Cause I didn't want to give the guy room.

Detective Alaniz:  OK.

Officer DiGiulio:  I didn't want him to reset to get any type of position of leverage or advantage.

Detective Alaniz:  So you're back, now you're on in the hallway.

Officer DiGiulio:  Now we're, he pulls him this way here.  So we're kind of like right here.  And that's when as, as I was starting to go to get right back on top of him.  That's when I hear something about taser.  I don't, I think it was Kyle's voice.  I'm not sure.  But then I see the red dot.  And so I hear Sergeant Mosher's voice and I don't remember exactly what he said.  You know, but I saw the red dot.  So I know what that means.  You know and I don't know how far he is or anything.  So I don't want to get hit with a prong.

Detective Alaniz:  Was he on his back or on his?

Officer DiGiulio:  He was on his back.

Detective Alaniz:  OK.

Officer DiGiulio:  So I, I lean back.  And I, I'm on my knees I guess.  I lean back.  And I've got my hands like this.  I lean back and I hear the pop.  And I see the prongs kind of hit him in the torso.  Center torso.  And I'm hearing the ticking.  And he's not locking up.  Like a person who gets hit with a taser.  I've seen enough people get hit.  They just kind of lock up and sometimes will shake a little.  He wasn't doing that.  He was ripping and pulling at the prongs.  And I'm hearing the taser and it's, it might have.  Taser wasn't doing nothing.  So that's when I went right back on him and went for the, went for the full mount.  So I figured I, believe me.  We, I got to do whatever I can to get some control on him.

Detective Alaniz:  OK.  So you're on a full mount and you turn, you guys turn him over?

Officer DiGiulio:  On the full mount I get him, his arm kind of across, across him.  Like this got him pinned.  We got this arm out.  And now, I'm honestly now trying to catch my breath and kind of assess, 'OK.' Cause we've got him kind of slowed down.  I can feel him kicking and squirming.  You know he's looking at me.  He wasn't saying a whole lot.

Detective Alaniz:  But when you were touching him, did he, did he feel unusual?  Was he?

Officer DiGiulio:  He was sweaty.

Detective Alaniz:  Very?

Officer DiGiulio:  Yeah.  But, by the time I was fairly sweaty.  Well I know he started to pull my jacket up over.  Cause I, now I remember now that Kyle, Kyle was asking me.  I had him on the mount.  And I was grabbing, that was right before I got his arm pinned right across his face.  I remember asking now Kyle goes, 'Are you alright?  Are you alright?' And I was like, 'Get my fucking jacket off me.' Cause it was raining so hard earlier I had buttoned my stupid hood on my jacket.  You know one of those Cortex ones?  5-11?  I had buttoned the stupid hood on it.  And during the struggle it flipped over like this and he had pulled it.  It was almost like a hockey thing.  But, so I know Kyle flipped it back off and that's when I went forward.  And pinned his face.  His arm across his face.  And then Kyle had this arm and I had this arm.  I had him on the wrist and like this.  And that's when I was trying to assess, 'OK what are we going to do now.'

Detective Alaniz:  So you've got your left, your left hand over his, his?

Officer DiGiulio:  His, like his wrist.

Detective Alaniz:  His wrist and then your other forearm just pin him down?

Officer DiGiulio:  Yeah.  He's kind of on his back, but slightly.

Detective Alaniz:  Mm hmm.

Officer DiGiulio:  Slightly like this.  And I was pinning arms just cause I was tired of getting hit.

COS048204

# STOCKTON POLICE DEPARTMENT

## Narrative

Detective Alaniz: And then at what point do you guys roll him over?

Officer DiGiulio: OK that's, at that point then I remember seeing Officer Wells comes up and he's on a knee. And I remember he's doing a RCB. You know you got to close it? They train them to hit it on the floor to close the thing. And I remember them doing that. And, and then let's turn him. So as we turn him, I'm still kind of got the mount. Kind of letting like between my legs. And I had him hooked as he started I hooked the arm bar and I, as I pivoted. Pivoted with the arm bar to, which losing basically you know going off mount. Losing the mount. And then at that point somebody was here. I think it was Officer Wells. And at that point that's when I just, I kind of backed up and got off because they, they cuffed him. I'm not sure if it was Officer Wells and Amant.

Detective Alaniz: Mm hmm.

Officer DiGiulio: I think. Cause I don't know what, at what point Freer. Cause I was watching this guy. So Freer was there at some point. And that's when, rolled him. They cuffed him. And when, and immediately rolled him right back over. And at that point his eyes were open but he was just kind of laying there. And I was like, 'Alright dude.' And they were like, 'Wake up.' So, somebody said, 'Wake up. Get up man.' And I'm like, 'Hey let's get him up.' So I, that's when I tried to sit him up and do a sternum rub, he kind of sat up but then he flopped over to his right. And went against the wall. And, and then started to, so we just laid him back down. And then that's when they started checking, I stepped back again and they started checking vitals and took the cuffs right back on him and went into first aide.

Detective Alaniz: OK. Now do you remember when, when the paramedics show up?

Officer DiGiulio: Honestly you know what? It, it seemed to take forever for them to show up. We kept asking each other, 'Was AMR called? Yes, AMR was called. Where are they? I don't know.' Poncho, Poncho or Officer Freer did, was doing compressions for a long time. Another new officer, I don't really know, he came in with a bag. So he started compressions and breathing. And then at one point you know, and I said, 'Hey the house isn't clear.' OK? I yell at Officer Mosher, 'Hey we haven't cleared the rest of the house.' So myself, Mosher and somebody else we cleared the rest of the house. We ended up kicking two locked doors that were just bed, empty bedrooms. So that, so then the rest of the house is clear. I come back. We're still waiting on AMR. And it's, and I don't know how long we kind of stood there as they were doing that. I know once Poncho started, it seemed like a long time. He started getting tired. So I switched out with him. I started doing compressions. And there was another officer doing the bag. And then paramedics showed up. And I remember they told me, just keep doing compressions. So I kept doing compressions until the paramedic told me, 'OK. Pull off.' And they did, whatever they do.

Detective Alaniz: Whatever happened to the other people that were in the house?

Officer DiGiulio: They, had eventually gotten them all into the kitchen, well the dining room and that little family room where there's, there's like a dining table and a couch in that area. In, in here. So there was a lady, two ladies at the table. And a lady on the couch. And then the little girl. Was in this room too.

Detective Alaniz: OK. So after the, the scene as been.

Officer DiGiulio: Yeah, the other lady. She kept, she was over here for a long time screaming and crying. I don't remember at what point they got her. But we had. So we had four ladies, four adult females and then the child. The juvenile female. They were, we had them here.

Detective Alaniz: OK. And how, how is it that you ended up at the SEB?

Officer DiGiulio: Well then I was waiting outside on the lawn where I was told to stand and just stand by. And then Lieutenant Will came. Sergeant Mosher. And that's when they had Officer Van transported Amant and I to the SEB in his patrol car.

Detective Alaniz: OK.

Officer DiGiulio: And went to that room on the fourth floor.

DAI Sant: When you guys first got on scene. You said you pulled up short. You parked on the south side of the

| Report Officer | Printed At | |
|---|---|---|
| 2081/ALANIZ,HECTOR | 04/11/2016 08:03 | Page 19 of 40 |

COS048205

# STOCKTON POLICE DEPARTMENT

**Narrative**

roadway?

Officer DiGiulio: Yes sir.

DAI Sant: And you were west of 3133 looking down towards 67, you think it is?

Officer DiGiulio: I think it's 3167.

DAI Sant: OK.

Officer DiGiulio: Both are on the north side of the street.

DAI Sant: You're looking past 33 though? Right?

Officer DiGiulio: Yes.

DAI Sant: A couple houses?

Officer DiGiulio: Yes, I, by 33 cause I knew that, I knew that number was in my call. It was the secondary location.

DAI Sant: Right.

Officer DiGiulio: And then the, the original, the original call location was 31, I want to say 67. It might be 69 but 67.

DAI Sant: OK.

Officer DiGiulio: Cause we could, you know it's just confusing. Cause we were getting calls from both locations. Guys on roof. Guys in bathrooms. You know it's always a guy. A guy. No real description was given that I remember.

DAI Sant: Mm hmm.

Officer DiGiulio: And so I had to pass 3133, but then we've got the people. Who were fairly frantic.

DAI Sant: Uh huh.

Officer DiGiulio: So that's what prompted us, OK let's deal with that first.

DAI Sant: OK. So that draws you down to that.

Officer DiGiulio: Yes. And it's literally the width of one house over.

DAI Sant: So when you pass 3133 going to them did you glance at their door when you're going past?

Officer DiGiulio: I paused. I stopped. I looked. All lights were on. No movement. And I couldn't hear anything.

DAI Sant: Do you remember if the garage door was opened or closed?

Officer DiGiulio: I think it was closed. I don't remember now. To be honest.

DAI Sant: OK.

Officer DiGiulio: Yeah.

DAI Sant: So you go down to 67 and then the events that you talked about occurred with the people saying, 'Hey there's a family inside. We know who they are. They're home. And there's somebody in there.'

Officer DiGiulio: Yes sir.

DAI Sant: So at some point do you, you're attention is redirected back at 33. Additional radio information?

Officer DiGiulio: Yes sir.

DAI Sant: OK, so when you come back you're cutting across the yard as you're. You didn't go down to the

COS048206

# STOCKTON POLICE DEPARTMENT

**Narrative**

sidewalk.

Officer DiGiulio:  No sir.  I cut straight across the yard.

DAI Sant:  OK.  So then you go up to the front door.

Officer DiGiulio:  Yes sir.

DAI Sant:  And you said that the, the security screen was open but the door was closed and locked?

Officer DiGiulio:  It, it was shut but it was unlocked.

DAI Sant:  OK.

Officer DiGiulio:  I was able to open it.

DAI Sant:  But the door was locked?

Officer DiGiulio:  The door was locked.

DAI Sant:  So you're at the door.  Are you ringing the doorbell?  Banging on the door?  Or what?

Officer DiGiulio:  No, I tried the door was locked.  And I, I just for obvious reasons, you know tactical reasons.  I'm looking, you know cause it's lit up.

DAI Sant:  Mm hmm.

Officer DiGiulio:  So I'm peering in the front window.

DAI Sant:  Mm hmm.

Officer DiGiulio:  Cause it's got some really sheer kind of sheerish blinds.

DAI Sant:  Mm hmm.

Officer DiGiulio:  But they were partially open.  So I kept kind of peering in trying to see something.  Of movement or anything.  And trying to hear.  It'd be easier to hear through a window then a door.

DAI Sant:  Mm hmm.

Officer DiGiulio:  And I'm not hearing anything and I'm not seeing anything.  So I start knocking on the door.  And that's when dispatch kept coming up that, 'They're in the bathroom.  They can't get out.'  I don't remember the exact wording.  But I, I, 'Someone's in the bathroom.  They can't get out of the bathroom.'  Something about a struggle.  And that's when I got on the radio and I advised dispatch, 'We're not hearing anything.  But we want to kick the door in and make entry.'  That's when I heard Sergeant Mosher's voice come up and say, 'Go.  Go in.'

DAI Sant:  So it was clear to, or was it clear to you at that point that the people in the bathroom, there's some type of struggle.  It's that house.  3133.

Officer DiGiulio:  I believe, that's why I believed it.

DAI Sant:  OK.  You walked us through as when you came.  You went to the first hard corner of the hallway.  Amant had you hold there.

Officer DiGiulio:  Yes, and, and.

DAI Sant:  And?

Officer DiGiulio:  And he's good.  He's SWAT.  So he's got.  Yeah, he's, I can, I've been doing this long enough I'm good at clearing houses with SWAT guys.  I know how to do it properly.  Hold wait for the tap.  And all that.  I was moving fast.  And I think he thought cause I went from the door to here fast.  He, and you know he thought the same time he hit the corner.  He told me to hold.  So I held the corner.  And I, I come up and I think I even told him, I said, 'Holding.'  And cause I knew, cause I, I figured.  That he was scan, he was going to do a quick scan.  Security scan of this.  And then we would move the hall.  And, and he came up on me and said, 'OK.'  So then we

COS048207

# STOCKTON POLICE DEPARTMENT

## Narrative

pushed down the hall.

DAI Sant: OK. So you guys get up. You moved onto the hallway. You go past the bathroom. You encounter a lady with a phone in her hand saying she's the one that's called. And she redirects you to the bathroom?

Officer DiGiulio: Yes.

DAI Sant: OK. So now you know that's where it's going. Do you hear something from the bathroom?

Officer DiGiulio: Yes.

DAI Sant: OK. Can you describe what you're hearing?

Officer DiGiulio: Crying. Whimpering. Hysterics. Getting louder. The more noise we make, the louder the hysterics got.

DAI Sant: Could you tell? Was it one person? Sound like more persons?

Officer DiGiulio: Sounded like multiple people.

DAI Sant: OK. So Amant kicks the door.

Officer DiGiulio: Yes.

DAI Sant: And you've got that angle view looking right in at the tub.

Officer DiGiulio: Yes.

DAI Sant: And you can see the, the Hispanic male that you described in the corner.

Officer DiGiulio: Yes.

DAI Sant: So he would be on the, as you're looking at the tub. He would be on your left hand side in the corner.

Officer DiGiulio: Yes.

DAI Sant: Right at the tub there.

Officer DiGiulio: Yes, sir.

DAI Sant: And he's got the little girl in front of him.

Officer DiGiulio: Yes.

DAI Sant: Is he on his knees? Is he sitting on his butt? Can you tell?

Officer DiGiulio: I couldn't tell. I, I think he was sitting on his butt. But I couldn't tell.

DAI Sant: Mm hmm.

Officer DiGiulio: But he was definitely behind her. And she, his head was a little you know. I don't, I figure she's small.

DAI Sant: Uh huh.

Officer DiGiulio: I mean very young because she's standing up and even if he was sitting down, I mean he was behind her and his head was maybe even a little bit lower then hers.

DAI Sant: OK. And like I said, his arm was around her neck.

Officer DiGiulio: OK.

DAI Sant: Now, so is it his right arm or his left arm? Or can you remember?

Officer DiGiulio: I can't say for sure. I, I think. I, I don't remember.

COS048208

# STOCKTON POLICE DEPARTMENT

## Narrative

DAI Sant: OK.

Officer DiGiulio: But, cause I know there was a tattoo on the forearm. That I saw.

DAI Sant: Mm hmm.

Officer DiGiulio: And I can't remember if he had her like this. Or he had her down over.

DAI Sant: So the arm was around.

Officer DiGiulio: I think it was the right. But his arm was around her neck.

DAI Sant: And there's a tattoo on that arm?

Officer DiGiulio: And she was. Yeah, I want to say. I know I saw a tattoo on the forearm. It happened so fast I can't remember exactly what arm. Cause as soon as the door opened, I saw the arm around her neck. And I, I was yelling get your hands up and I was going at him.

DAI Sant: OK. You told us that he had his arm around her neck. She was crying.

Officer DiGiulio: Yes.

DAI Sant: Just please clarify for me. Crying audibly or just you can see the tears coming down.

Officer DiGiulio: I could see that she was crying. And there was so much hysterics going on, the adult women in the bathtub were pretty loud.

DAI Sant: Mm hmm.

Officer DiGiulio: I believe I heard her too. But it was hard to tell because there was so much screaming and.

DAI Sant: OK. You said that one point, so you, you come in with your gun drawn. You're left handed.

Officer DiGiulio: Yes sir.

DAI Sant: So you're approaching him with your right arm forward.

Officer DiGiulio: Yes.

DAI Sant: And is he coming, you're withdrawing the gun back to a rest on maybe your ribs position for security.

Officer DiGiulio: Yes sir.

DAI Sant: But you still got your weapon there.

Officer DiGiulio: Yes sir.

DAI Sant: So you get to him and you, you said you, you're basically, your hand was over the top of the head of the little girl. And you slide her past you.

Officer DiGiulio: Yes.

DAI Sant: On your left hand side so she's now rescued.

Officer DiGiulio: Yeah. I just, I, I'm putting myself between her and him.

DAI Sant: Gotcha.

Officer DiGiulio: Cause I know this, cause I know Kyle's right on my back.

DAI Sant: Mm hmm.

Officer DiGiulio: OK, so I just reach over and you know I didn't grab anything on her.

DAI Sant: Mm hmm.

COS048209

# STOCKTON POLICE DEPARTMENT

Officer DiGiulio:  But my hands big enough I just got a good, I don't even want to say grip.  But just a good leverage on her.  And just, and I know as I pushed her I cause I'm going to move.  I know I extended out as I pushed her like this.

DAI Sant:  OK.

Officer DiGiulio:  And then came back like this.

DAI Sant:  OK.

Officer DiGiulio:  Cause I was moving forward as I was doing it.  So it was pretty fluid.

DAI Sant:  Well obviously.  Gotcha.  So you're obviously within arms reach.  You can touch him now.

Officer DiGiulio:  Yes, I went straight out.

DAI Sant:  At one point you said he was, you made contact with him.  He's grabbing, he's slapping, grabbing at your gun.

Officer DiGiulio:  He's punching.

DAI Sant:  He's punching at you.  Is he saying anything?  Yelling anything?  Or can you remember?

Officer DiGiulio:  You know there was some fuck yous and you know I, I'd given him commands.

DAI Sant:  Mm hmm.

Officer DiGiulio:  To you know, 'Get your hands up.'

DAI Sant:  Mm hmm.

Officer DiGiulio:  And then, 'Put them behind your back.'  And he's, I don't remember exactly what he was saying.  Because he just wasn't complying.

DAI Sant:  OK.

Officer DiGiulio:  I know there was some, F yous and and, and I, I just, I don't remember exactly what he was saying.

DAI Sant:  So you were providing him with direction.  You were telling him what you wanted to do.

Officer DiGiulio:  Yes.

DAI Sant:  And his response was other then compliance.  Physically.

Officer DiGiulio:  There was no compliance at all.

DAI Sant:  OK.  And verbally he's yelling.  I suppose it's at you.  As to what they were, you're not really sure.

Officer DiGiulio:  Yeah.

DAI Sant:  OK.

Officer DiGiulio:  I know that I heard a, 'Fuck you,' once.  And then you know, it's hard to hear.  I'm in a bathroom.  I've got three women screaming.  I'm trying to, I'm yelling, I'm yelling at him.

DAI Sant:  Mm hmm.

Officer DiGiulio:  So he knows exactly what I want him to do.  And he's just not doing it.

DAI Sant:  At what point you said he's fighting and it seemed like he doesn't care.  What give you that sense?

Officer DiGiulio:  Well he just wasn't stopping.  I, I think, I think it was at that point, I think it was after I hit him twice.

DAI Sant:  OK.

| Report Officer | Printed At | |
|---|---|---|
| 2081/ALANIZ,HECTOR | 04/11/2016 08:03 | Page 24 of 40 |

COS048210

# STOCKTON POLICE DEPARTMENT

**Narrative**

Officer DiGiulio: And then he just started fighting again. I mean. You have two armed policemen have you pinned in a bathroom. And you're just going to continue to fight and fight? To me that's, he doesn't care. He's not stopping.

DAI Sant: How was his strength?

Officer DiGiulio: I don't know because I kept, cause he was already kind of at a position just being on the floor. And me being on my feet.

DAI Sant: Right.

Officer DiGiulio: So I kept my position, I, I fought to keep my position of advantage.

DAI Sant: Mm hmm.

Officer DiGiulio: The whole time. And, and leverage on him. He, but he was, it was, it was, I mean I was pretty hot in there too. It was sweaty. I was sweating bad.

DAI Sant: OK.

Officer DiGiulio: So he was, you know you combine that with your fighting somebody who's sweaty. They're hard to grab anyway.

DAI Sant: Mm hmm.

Officer DiGiulio: So he wasn't. I mean he had good strength. I can't really give a description on it. I mean I wasn't able to, obviously didn't over power him right away. Even with fighting to keep the position of advantage. You know I wouldn't know how to explain it. He had good strength.

DAI Sant: So was your sense that at some point if you backed off he would then back off? Or if you backed off.

Officer DiGiulio: No.

DAI Sant: You'd be losing your position of advantage?

Officer DiGiulio: Exactly. That's, I, maybe I wasn't very good at communicating it. I was not going to give him any room.

DAI Sant: Uh huh.

Officer DiGiulio: Like I said, I wasn't going to give him room to reset himself.

DAI Sant: OK.

Officer DiGiulio: For the fight. And it just, do you understand? Does that make sense?

DAI Sant: Yeah, it does.

Officer DiGiulio: OK. That's why I kept on smothering him. I know I actually I think, Officer Amant was a little frustrated because he couldn't get in to help because I was on him. And I was smothering him. Kind of using my size and my, my weight and leverage. Just because he just, there was, he wasn't giving up. He was going to fight. Until somebody was lost. And clearly lost. It wasn't like, 'OK, you got me.' Then you put the cuffs on. No. He was not stopping.

DAI Sant: OK. You mentioned through your, through the interview and through your testimony a couple different tactical statements about positions. The, the mounting, arm bar, things of that nature.

Officer DiGiulio: Mm hmm.

DAI Sant: Where you've been, other then the advanced officer courses that you take every two years. Have you ever been a defensive tactics instructor?

Officer DiGiulio: No.

| Report Officer | Printed At | |
|---|---|---|
| 2081/ALANIZ,HECTOR | 04/11/2016 08:03 | Page 25 of 40 |

COS048211

### Narrative

DAI Sant: OK. At any point in this struggle did you apply any type of carotid restraint?

Officer DiGiulio: No.

DAI Sant: Any point in this struggle did you provide, apply any type of restraint that would restrict his airway?

Officer DiGiulio: No.

DAI Sant: OK. So when you say the term smother, you referring to what?

Officer DiGiulio: Wow man, probably wasn't a good. When I say smother, I mean on him to the point where he doesn't have room. To, to move. To get any type of advantage on me. To get a full swing. That was what I mean while I'm on him. And I'm not giving him, I'm not going to give him room. Cause nobody wants to be punched. If I'm going to take a punch, I'd rather take one of these, you know. Or a, you know a little half swing or whatever they can get. Rather then someone having enough room to sit there and reset himself. And give me a full on extension. I don't need that.

DAI Sant: Gotcha. I don't have anything else.

Detective Alaniz: Just real quick. I don't think I asked you about this guy. You said he was a Hispanic male?

Officer DiGiulio: He looked like he was a Hispanic male.

Detective Alaniz: Like how?

Officer DiGiulio: Dark colored skin, dark hair. He just, I would, I mean, I guess he could, could be a dark skinned Italian or something. He just kind of the quick glance I took to me he just appeared that he was Hispanic.

Detective Alaniz: Like how old do you think he was?

Officer DiGiulio: I would put him maybe late twenties. Maybe early thirties?

Detective Alaniz: Now how big did he seem?

Officer DiGiulio: You know he never, we never let him stand up. So I couldn't tell you how tall he was. I don't think, I'm 6'2". So kind of gauging, I'm thinking maybe he was just under six foot. Maybe between, right around 5'10". Not quite sure. Like I said, I never, he never, I never gave him a chance to stand up. Weight wise he was average to maybe a little bit thick. He, I don't know maybe two hundred?

Detective Alaniz: OK.

Officer DiGiulio: One-eighty, two hundred. Not quite sure.

Detective Alaniz: OK. I don't have anything further. Can you just do me a favor and write your name on that? Just show that's what we used as reference during our interview?

Officer DiGiulio: Sure.

Attorney Collins: If you guys are finished I'm going to ask him a few clarifying questions.

DAI Sant: Sure.

Attorney Collins: I'll wait till.

Officer DiGiulio: Do you need it both sides?

Detective Alaniz: The one side's fine. It's 1/20/16.

Officer DiGiulio: Now it's twenty?

Detective Alaniz: Yeah. Thank you.

Attorney Collins: Officer at one point you thought that he might be faking unconsciousness. Correct?

COS048212

# STOCKTON POLICE DEPARTMENT

## Narrative

Officer DiGiulio: I believe that to be a possibility. Yes.

Attorney Collins: Do you have any experience with that? Or trending with that? Or have you heard about people doing that?

Officer DiGiulio: Yes, I, I've seen in the field where people start to, they act like they give up. And they just lay there. Or, or they just totally stop fighting and start again. Or fake an injury. Like they can't go on. And then they try to bolt. You know.

Attorney Collins: And did you express, when you expressed that he might be faking. Did that in any way slow the attempt to revive him by the other officers?

Officer DiGiulio: No.

Attorney Collins: Earlier tonight you had, you met with an evidence technician that took some pictures and collected your, your service weapon?

Officer DiGiulio: Yes.

Attorney Collins: During the collection of that service weapon did a bullet that had been in the chamber of your service weapon fall into the garbage can?

Officer DiGiulio: Yes. Detective Donaldson when he cleared the weapon for whatever reason he held it over the trash can. Cause I think he was trying to, as minimal handle it as little as possible. And when he pulled the slide back, the chambered round. He held it over the garbage can and it fell into the garbage can that had a plastic liner in it.

Attorney Collins: Thank you. OK. Just a, just a few more. You said that once the suspect was out in the hallway, and you began to feel, you were getting some control of him because you had managed to get his left arm.

Officer DiGiulio: Mm hmm.

Attorney Collins: Over his face. Am I describing that right?

Officer DiGiulio: Yeah, it was just kind of just jaw line.

Attorney Collins: Near his jaw line?

Officer DiGiulio: Yeah.

Attorney Collins: But at that point did you still realize, did you still believe that he was conscious because he was looking directly at you?

Officer DiGiulio: Yeah, he was conscious. He was moving still.

Attorney Collins: OK.

Officer DiGiulio: And he was looking at me and.

Attorney Collins: Thank you. OK. This one may be confusing especially since I'm not a law enforcement professional. But when you're, when you arrest somebody, sometimes it's because you're able to arrest them. Because you have probable cause. And sometimes it's because also necessary to arrest someone because they're dangers to others or some other reason. Is that, is that a fair description? That there might be multiple reasons to arrest someone?

Officer DiGiulio: Yes.

Attorney Collins: Not only that you're able to but sometimes it's necessary to for the safety of others.

Officer DiGiulio: Yes.

Attorney Collins: Was that true in this case? That the arrest of this suspect was necessary for not only because there appeared to have been a crime committed but also because this person appeared to be dangerous to

COS048213

# STOCKTON POLICE DEPARTMENT

**Narrative**

civilians?

Officer DiGiulio:  Yes, he had his arm around a little girls neck.

Attorney Collins:  And, and even.

Officer DiGiulio:  Even that's, that's assault.  Which could cause great bodily injury or death.

Attorney Collins:  And, and even after you were able to scoop that little girl behind you, were there still other civilians in close proximity to this person?

Officer DiGiulio:  Yes.

Attorney Collins:  And finally you were asking questions to clarify about holstering your weapon and at what point did you decide to do that?

Officer DiGiulio:  Mm hmm.

Attorney Collins:  The, is it true that the reason you didn't holster your weapon earlier had to with your own safety in dealing with this particular suspect?

Officer DiGiulio:  Yes.

Attorney Collins:  Can you describe that?  What safety factors were at play when you decided you couldn't holster your weapon earlier in that, in the situation?

Officer DiGiulio:  Because, because I, the proximity and the fact that he wasn't getting up.  He didn't stop.  You know I mean I, it's been my experience that when you're up on a guy and you've got your gun out and you tell him to stop and put your hands up.  I mean ninety-nine percent of the time the person stops.  They know it's OK, they're caught, it's over with.  He wasn't stopping.  And I felt if I was going to, because with the way my body was positioned I would have to turn my shoulders and I would open myself up.  If you guys kind of understand what, what I mean.  I would open myself up.  And then I've only got one hand in front of me for protection and or action.  And my other hand I'm trying to put my, holster my service weapon.  And so when it was realized that, OK there's, he's slowed down.  There's a lull in the fight I guess you would say.  That's when Amant starts saying, 'Holster.' I think he told me twice. 'Holster now. Holster now.' Or something like that.  So that's when, OK yeah, I can holster. He's kind of slowing down.  And that was after the two blows I delivered with my duty weapon to his head.  I'm not quite sure exactly.  I think I caught him kind of up high part of the forehead.  Maybe on top.  I'm not quite sure. But it didn't stop him right away.  Cause it was, but then, I mean it was, I don't know what time frame.  But I mean it wasn't like an immediate stop.  But then there was like a lull and that's when Amant said, 'OK, holster.' And that's when I realized, OK I can holster now.  That's when I was able to holster and then go back.  And when I went back with both hands to get control.  Is when the fight just went right back to full.

Attorney Collins:  Thank you sir.  Thank you for allowing me those questions.

Detective Alaniz:  OK.  It's 2:38.  OK.

Interview is over at this time.

*(End of Statement)*

**INVESTIGATION CONTINUED:**
At the completion of the interview, Officer DiGiulio and his attorney walk out. We then spoke with Sergeant Mosher and his attorney David Kruckenberg.

*The following interview was recorded and has been summarized below. The purpose of the summary is to render an overview of what was described; however, they are not transcriptions of the recorded interview. The summary should not be viewed as containing only the important facts of the interview. They are intended to provide the reader with a general understanding of what was said; therefore, refer to the recording itself for the exact wording.*

*It should be noted there is a 29 minute difference from the video time to real time. All times noted in the*

COS048214

# EXHIBIT G

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA - SACRAMENTO DIVISION


FILIBERTO VALENCIA, SR., and GRISELDA
VALENCIA, individually and as
successors in interest to Filiberto
Valencia, Jr.,

        Plaintiffs,

                        CASE NO.:
      vs.                  2:16-CV-02081-JAM-AC

CITY OF STOCKTON, CHIEF ERIC JONES,
SERGEANT DANA MOSHER, OFFICER KYLE
AMANT, OFFICER JASON DiGIULIO, and
DOES 1 through 50, inclusive,

        Defendants.
_____/


DEPOSITION OF SERGEANT DANA MOSHER

August 14, 2017


Reported by:
LaRelle M. Fagundes, CSR No. 9762


PATRICIA CALLAHAN REPORTING
Certified Shorthand Reporters
(510) 885-2371   (415) 788-3993
Depos@callahanreporting.com

10:18:59 1    A.      Yes.

10:18:59 2    Q.      And did you have any particular assignment in

10:19:02 3    January of 2016?

10:19:03 4    A.      I was patrol.

10:19:04 5    Q.      What were your responsibilities as a patrol

10:19:09 6    sergeant?

10:19:11 7    A.      My main responsibility was to supervisor the

10:19:13 8    patrol officers assigned to my shift.

10:19:15 9    Q.      How many officers would you typically have

10:19:17 10   assigned to your shift?

10:19:20 11   A.      Typically there's about 20 to 25 on a shift.

10:19:24 12   Q.      And were you the only supervisor of 20 to 25 --

10:19:31 13   A.      No.  There's --

10:19:34 14   Q.      -- officers?

10:19:34 15   A.      Most shifts have four sergeants.

10:19:39 16   Q.      And typically when you were on a shift, in or

10:19:43 17   about January of 2016, with typically three other

10:19:50 18   sergeants and typically 25 officers, would you have a

10:19:54 19   particular geographic territory that was your primary

10:19:56 20   responsibility?

10:19:57 21   A.      Yes.

10:19:57 22   Q.      The incident that brings us here today took

10:20:05 23   place on January 19th, 2016.  Which shift did you have

10:20:12 24   at that time?

10:20:13 25   A.      I was assigned to third watch days two, which

10:20:17 1 third watches are swing shift.  It goes go from 3:00

10:20:21 2 o'clock in the afternoon till 1:00 in the morning.  Days

10:20:23 3 two means we have Thursday and Fridays with every other

10:20:28 4 Saturday and Sunday off.

10:20:29 5 Q.        Okay.  And did you have a particular geographic

10:20:32 6 area?

10:20:32 7 A.        Yes.

10:20:32 8 Q.        What was that?

10:20:35 9 A.        Park and Seaport District, which are our two

10:20:39 10 southern districts.

10:20:39 11 Q.        You were operating a black-and-white motor

10:20:54 12 vehicle?

10:20:54 13 A.        Yes.

10:20:54 14 Q.        And were you driving alone?

10:20:56 15 A.        Yes.

10:20:56 16 Q.        Where were you when you first received notice

10:20:59 17 that there was any kind of disturbance that led to your

10:21:03 18 appearance at 3133 Nicole Street in Sacramento (sic)?

10:21:07 19 A.        I was at the police department.

10:21:08 20 Q.        Is that located downtown Stockton?

10:21:12 21 A.        Yes.

10:21:12 22 Q.        What were you doing when you first received

10:21:15 23 notice that there was a disturbance?

10:21:16 24 A.        I was using the restroom.

10:21:18 25 Q.        What were you doing in general at the

10:34:37 1    A.      Yes.  I've known him since he was hired at the

10:34:41 2    Stockton Police Department.

10:34:41 3    Q.      And you consider him to be a friend?

10:34:43 4    A.      Yes.

10:34:43 5    Q.      Okay.  Did he, at any time, ask you why you had

10:34:48 6    not activated your body camera upon arrival at 3133

10:34:51 7    Nicole?

10:34:53 8    A.      I don't remember that question specifically, no.

10:34:54 9    Q.      You did not activate your body camera when you

10:34:59 10   arrived, did you?

10:34:59 11   A.      Correct.

10:34:59 12   Q.      Why was that?

10:35:00 13   A.      Well, it was a relatively new technology for us.

10:35:05 14   I have -- I had already been doing this job for several

10:35:09 15   years and have a established muscle memory from when I

10:35:12 16   arrive on scene to contacting whoever I'm going to go

10:35:18 17   contact.  The new piece of technology requires a change

10:35:30 18   in that muscle memory of activating that camera.  It was

10:35:34 19   a very fluid, rapidly evolving event.  When I arrived,

10:35:39 20   it was not the first thing I thought of.  It was getting

10:35:41 21   in there and helping my officers to help this young girl

10:35:46 22   that was about to be killed.

10:35:51 23   Q.      Well, what made you feel the young girl was

10:35:54 24   about to be killed?

10:35:56 25   A.      What the dispatchers were relaying to us over

10:37:08  1    Q.       As of January 2016, were you wearing a body

10:37:12  2    camera?

10:37:12  3    A.       Yes.

10:37:12  4    Q.       Where was it?

10:37:13  5    A.       It was on my chest.

10:37:14  6    Q.       And what did you have to do to activate it?

10:37:16  7    A.       I had to slide the activation slide to open to

10:37:20  8    expose the lens on the camera.

10:37:22  9    Q.       At some point, did you remember to open your

10:37:24 10    body camera?

10:37:25 11    A.       Yes.

10:37:25 12    Q.       What point was that?

10:37:27 13    A.       That was once I realized that the suspect was

10:37:38 14    not breathing.

10:37:41 15    Q.       At some point, did you tell other officers to

10:37:44 16    open their body cameras?

10:37:46 17    A.       At that moment.

10:37:46 18    Q.       The same moment you opened yours, you told

10:37:50 19    somebody else to open his; is that correct?

10:37:51 20    A.       The other two officers that were on scene, yes.

10:37:53 21    Q.       Okay.  And those two officers were?

10:37:55 22    A.       Officer DiGiulio and Officer Amant.

10:37:58 23    Q.       Was it your understanding that neither of them

10:38:01 24    had their body cameras activated while they were engaged

10:38:06 25    with Mr. Valencia?

10:38:07 1  A.    It was at that moment when I realized I didn't

10:38:10 2  have mine on that I told them to, hey, make sure your

10:38:15 3  camera is on.

10:38:15 4  Q.    Did the Stockton Police Department issue any

10:38:18 5  kind of written directive as to the use of body cameras,

10:38:22 6  once it supplied body cameras to its officer in, as you

10:38:25 7  say, the end of the summer or the beginning of fall

10:38:28 8  2015?

10:38:28 9  A.    Yes, there was a general order that was

10:38:32 10  published.

10:38:33 11  Q.    And how was that general order published?

10:38:37 12  A.    It was sent out through email and given during a

10:38:43 13  roll-call briefing.

10:38:44 14  Q.    When you say "given," was it handed out?

10:38:47 15  A.    I don't know if it was distributed to each

10:38:51 16  individual.  It was read off during roll call.

10:38:54 17  Q.    Did you maintain a hard copy of that general

10:39:00 18  order relating to use of body cameras?

10:39:02 19  A.    Did I at that time?

10:39:03 20  Q.    Yes.

10:39:04 21  A.    No.  Do I now?  Yes.

10:39:05 22  Q.    Where do you keep it now?

10:39:07 23  A.    It's in a binder in my office.

10:39:09 24  Q.    Is that a three-ring binder?

10:39:14 25  A.    Yes.

| | | |
|---|---|---|
| 10:43:42 | 1 | Q. And was that something that was just broadcast |
| 10:43:46 | 2 | over the radio that he needed some permission from |
| 10:43:49 | 3 | someone of authority? |
| 10:43:49 | 4 | A. Yes. |
| 10:43:50 | 5 | Q. And what was he seeking permission to do? |
| 10:43:52 | 6 | A. He wanted to force entry into the call location. |
| 10:43:55 | 7 | Q. By "force entry," you understood he meant to |
| 10:43:58 | 8 | kick in the door? |
| 10:43:59 | 9 | A. Yes. |
| 10:43:59 | 10 | Q. Okay. And you gave him permission to do that, |
| 10:44:02 | 11 | correct? |
| 10:44:02 | 12 | A. Yes. |
| 10:44:02 | 13 | Q. Okay. Now, you also stated here at page 30 -- |
| 10:44:07 | 14 | I'm sorry I didn't highlight it for you, but -- because |
| 10:44:09 | 15 | it's one big paragraph. But that you thought less |
| 10:44:14 | 16 | lethal shotgun would be appropriate. |
| 10:44:17 | 17 | Do you recall that? |
| 10:44:18 | 18 | A. Yes. |
| 10:44:18 | 19 | Q. Did you carry a -- by "less lethal shotgun," |
| 10:44:25 | 20 | that refers to a beanbag shotgun, doesn't it? |
| 10:44:27 | 21 | A. Yes. |
| 10:44:27 | 22 | Q. Did you carry a beanbag shotgun in your vehicle? |
| 10:44:29 | 23 | A. Yes. |
| 10:44:29 | 24 | Q. So you didn't get one from the department before |
| 10:44:31 | 25 | you left. You already had it in the vehicle. |

| | | |
|---|---|---|
| 10:51:34 | 1 | standing in the hallway holding your baton in two hands? |
| 10:51:40 | 2 | A.    Um, partially. |
| 10:51:42 | 3 | Q.    What else did you see? |
| 10:51:43 | 4 | A.    I saw the suspect's lower half with -- coming |
| 10:51:50 | 5 | out of the doorway of the bathroom into the hallway |
| 10:51:55 | 6 | while Officer DiGiulio's lower half was also in the |
| 10:51:58 | 7 | hallway. |
| 10:51:59 | 8 | Q.    By "lower half," are you referring to below the |
| 10:52:02 | 9 | waist? |
| 10:52:02 | 10 | A.    Yes. |
| 10:52:02 | 11 | Q.    Okay.  So you saw the suspect's legs sticking |
| 10:52:05 | 12 | out of the bathroom, correct? |
| 10:52:06 | 13 | A.    Yes. |
| 10:52:06 | 14 | Q.    And you could tell by the position of the legs |
| 10:52:10 | 15 | that he was on his back or in a sitting position? |
| 10:52:14 | 16 | A.    He was on his back. |
| 10:52:15 | 17 | Q.    He was on his back. |
| 10:52:16 | 18 |       And Officer DiGiulio, was he -- what position |
| 10:52:22 | 19 | was he as indicated by the legs that you observed? |
| 10:52:25 | 20 | A.    He was -- |
| 10:52:27 | 21 | Q.    By his legs that you observed. |
| 10:52:28 | 22 | A.    He was on top of him.  Is that what you're |
| 10:52:30 | 23 | asking? |
| 10:52:30 | 24 | Q.    Was he lying on top of him? |
| 10:52:32 | 25 | A.    Yes. |

| | | |
|---|---|---|
| 10:54:31 | 1 | Mr. Valencia coming out of the bathroom? |
| 10:54:37 | 2 | A.      I went closer to where the struggle was taking |
| 10:54:40 | 3 | place. |
| 10:54:40 | 4 | Q.      And what did you observe when you went closer? |
| 10:54:44 | 5 | A.      Um, Officer DiGiulio was on top of the suspect. |
| 10:54:48 | 6 | He was trying to gain control of his hands.  The suspect |
| 10:54:52 | 7 | was flailing them about swatting Officer DiGiulio's |
| 10:54:55 | 8 | hands away as Officer DiGiulio was trying to grab them |
| 10:54:59 | 9 | with his own. |
| 10:54:59 | 10 | Q.      As you approached Officer DiGiulio and |
| 10:55:05 | 11 | Mr. Valencia, did you have a weapon drawn? |
| 10:55:07 | 12 | A.      I had the beanbag shotgun in my hands. |
| 10:55:10 | 13 | Q.      Your taser was still on your hip, correct? |
| 10:55:12 | 14 | A.      Correct. |
| 10:55:12 | 15 | Q.      And you talked about Mr. Valencia swatting away |
| 10:55:23 | 16 | Officer DiGiulio's hands. |
| 10:55:24 | 17 | Did you see, in the transcript, that you said |
| 10:55:28 | 18 | that the guy kept swapping Jason's hands away? |
| 10:55:31 | 19 | A.      I believe that was one of those typos or |
| 10:55:34 | 20 | misrepresentations of what I said. |
| 10:55:35 | 21 | MR. STEVENS:  And I'll just make a standing |
| 10:55:37 | 22 | objection, and then I'll stay out of your way, Counsel. |
| 10:55:39 | 23 | Your references to this being a transcript and |
| 10:55:42 | 24 | the deponent says that it's a summary, and he's |
| 10:55:44 | 25 | identified there are a number of typographical errors. |

11:00:53 1   A.      Each deployment cycle is five seconds long.

11:00:57 2   Q.      Once that five seconds is up, what happens with

11:01:01 3   the taser?  Does it shut off?

11:01:04 4   A.      I'm not sure I understand what you mean by "shut

11:01:07 5   off."  It stops emitting electricity through it until

11:01:13 6   you pull the trigger again.

11:01:14 7   Q.      Can you pull the trigger immediately after it

11:01:18 8   stops emitting electricity?

11:01:19 9   A.      If you hold down on the trigger, it will

11:01:22 10  continue a second cycle.

11:01:24 11  Q.      And you have given the statement that you

11:01:28 12  deployed the taser three times.

11:01:31 13          Have you seen the deployment record for your

11:01:35 14  taser?

11:01:35 15  A.      Yes.

11:01:35 16  Q.      And it shows that you deployed it four times,

11:01:38 17  correct?

11:01:38 18  A.      Correct.

11:01:39 19  Q.      Can you explain that?

11:01:41 20  A.      Yes.  Looking at the taser log, which shows that

11:01:50 21  the first and second deployment were exactly five

11:01:50 22  seconds apart, which means that I more than likely held

11:01:52 23  down on the trigger for two cycles, which is -- to

11:01:59 24  explain, would be because I was quite shocked that he

11:02:02 25  grabbed the probes after they struck him, which is an

11:02:08 1  unusual reaction to being tased.

11:02:11 2  Q.      You had tased people before?

11:02:13 3  A.      Yes.

11:02:13 4  Q.      On how many occasions?

11:02:15 5  A.      This was the fourth time.

11:02:16 6  Q.      Okay.  And had each person reacted the same when

11:02:20 7  you had tased them on those three prior occasions?

11:02:22 8  A.      No, but I have also seen the taser used on

11:02:26 9  multiple occasions other than the four times that I've

11:02:29 10 used it.

11:02:29 11 Q.      Okay.  Now, I've never seen anybody be tased,

11:02:33 12 but I have watched videos of people being tased, and

11:02:36 13 I've seen people, when they're tased, their arms and

11:02:40 14 legs flail.

11:02:40 15         Have you seen that?

11:02:41 16 A.      Yes.

11:02:50 17 Q.      So next I'm going to mark for identification a

11:02:58 18 document that says at the top, "TASER PROTECT LIFE,

11:03:02 19 EVIDENCE SYNC," S-y-n-c.

20          (PLAINTIFFS' EXHIBIT NO. 45 WAS MARKED FOR

21          IDENTIFICATION.)

11:03:23 22         MR. WALKER:  Q.  Sergeant Mosher, is this the

11:03:25 23 record that you reviewed for use of your taser?

11:03:29 24 A.      Yes.

11:03:29 25 Q.      And it says, under sequence number two, that on

| | | |
|---|---|---|
| 11:05:06 | 1 | was working properly? |
| 11:05:07 | 2 | A. Correct. |
| 11:05:08 | 3 | Q. So the first time this taser -- do you call it a |
| 11:05:14 | 4 | gun, or what do you call it, a taser? |
| 11:05:15 | 5 | A. Taser. |
| 11:05:15 | 6 | Q. Just taser? |
| 11:05:16 | 7 | A. Yeah. |
| 11:05:16 | 8 | Q. The first time this taser was ever used on an |
| 11:05:19 | 9 | individual was when you used it on Mr. Valencia on |
| 11:05:23 | 10 | January 19th, 2016. |
| 11:05:24 | 11 | A. That's correct. |
| 11:05:25 | 12 | Q. And as we look at line 21 we see that the |
| 11:05:32 | 13 | initial deployment was for five seconds, and then six |
| 11:05:34 | 14 | seconds later there was a second deployment of five |
| 11:05:38 | 15 | seconds. |
| 11:05:38 | 16 | Do you see that? |
| 11:05:39 | 17 | A. Yes. |
| 11:05:39 | 18 | Q. Then 12 seconds after that, there was a third |
| 11:05:41 | 19 | deployment of five seconds. |
| 11:05:43 | 20 | Do you see that? |
| 11:05:44 | 21 | A. Yes. |
| 11:05:44 | 22 | Q. Then 20 seconds after that, there was a fourth |
| 11:05:49 | 23 | deployment of five seconds, correct? |
| 11:05:51 | 24 | A. Correct. |
| 11:05:51 | 25 | Q. When you were telling Detective Alaniz that you |

11:05:56 1   had only deployed it three times, which was the one that

11:06:00 2   you had forgotten about?

11:06:01 3   A.     I'm assuming -- and I can't tell you what I

11:06:05 4   forgot, but I would assume that the second deployment

11:06:07 5   was when I held down the trigger for two cycles, would

11:06:10 6   be the one that I wasn't aware of.

11:06:12 7   Q.     Okay. Then let's go from that first two, when

11:06:18 8   Mr. Valencia was half in the bathroom and half in the

11:06:21 9   hallway, to the third deployment.

11:06:24 10         Where was Mr. Valencia at that time?

11:06:25 11   A.     In the hallway.

11:06:25 12   Q.     His whole body was in the hallway?

11:06:28 13   A.     Correct.

11:06:30 14   Q.     And was Officer DiGiulio on top of him at that

11:06:34 15   time?

11:06:34 16   A.     Yes.

11:06:34 17   Q.     How did you avoid hitting Officer DiGiulio?

11:06:37 18   A.     Because the prongs were still in him.

11:06:39 19   Q.     Okay. Initially, how did you avoid hitting

11:06:44 20   Officer DiGiulio?

11:06:45 21   A.     So, in our training, we are trained to say

11:06:49 22   "taser, taser, taser" before you deploy the taser, which

11:06:53 23   let's other people know that you're about to do so. It

11:06:57 24   also is a -- serves as a warning to the person about to

11:07:00 25   be tased, that, hey, maybe you should stop resisting so

| | | |
|---|---|---|
| 11:11:13 | 1 | Officer DiGiulio? |
| 11:11:15 | 2 | A.      I don't recall specifically. |
| 11:11:16 | 3 | Q.      Did, at any time, you tell him to protect |
| 11:11:26 | 4 | himself from anything that Mr. Valencia was doing? |
| 11:11:30 | 5 | A.      Pretty certain that Officer DiGiulio knows to |
| 11:11:32 | 6 | protect himself -- |
| 11:11:32 | 7 | Q.      So you don't -- |
| 11:11:32 | 8 | A.      -- without me telling him. |
| 11:11:34 | 9 | Q.      -- recall saying anything? |
| 11:11:35 | 10 | A.      No. |
| 11:11:36 | 11 | Q.      Did, at any time, you tell Officer DiGiulio to |
| 11:11:40 | 12 | stop hitting Mr. Valencia? |
| 11:11:44 | 13 | A.      No. |
| 11:11:44 | 14 | Q.      Did you see Officer DiGiulio hit Mr. Valencia? |
| 11:11:46 | 15 | A.      Yes. |
| 11:11:46 | 16 | Q.      Did you see him punch him? |
| 11:11:48 | 17 | A.      Yes. |
| 11:11:48 | 18 | Q.      Did you see him punch him with both hands or |
| 11:11:50 | 19 | with just one hand? |
| 11:11:51 | 20 | A.      I only recall his right hand. |
| 11:11:53 | 21 | Q.      Okay.  You understand that Officer DiGiulio is |
| 11:11:56 | 22 | left-handed, correct? |
| 11:11:58 | 23 | A.      Okay. |
| 11:11:58 | 24 | Q.      You don't remember that? |
| 11:11:59 | 25 | A.      I don't. |

11:12:00  1   Q.      You don't have a memory of ever seeing him punch

11:12:03  2   with his left hand?

11:12:03  3   A.      Correct.

11:12:03  4   Q.      Did you ever see Mr. Valencia punch Officer

11:12:09  5   DiGiulio?

11:12:11  6   A.      No.

11:12:11  7   Q.      Did you ever see him swat at Officer DiGiulio?

11:12:17  8   A.      Yes.

11:12:17  9   Q.      Did you see his hands when he was doing that?

11:12:19 10   A.      Yes.

11:12:19 11   Q.      Did you see that he was holding Officer

11:12:20 12   DiGiulio's eyeglasses?

11:12:21 13   A.      No.

11:12:22 14   Q.      Were you aware that he had taken Officer

11:12:25 15   DiGiulio's eyeglasses?

11:12:26 16   A.      I saw a cut on the side of Officer DiGiulio's

11:12:29 17   nose, and I noticed that he wasn't wearing them, but how

11:12:33 18   they came to not be on his face, I do not know.

11:12:35 19   Q.      Did, at any time, you see Dr. DiGiulio's

11:12:38 20   eyeglasses on or around Mr. Valencia's body?

11:12:43 21   A.      No.  I remember we tried to look for them at one

11:12:46 22   point, but we didn't see them.

11:12:47 23   Q.      Have you ever seen any photographs of

11:12:50 24   Mr. Valencia's body?

11:12:52 25   A.      No.

11:16:16 1   So, I wasn't overly concerned about the premise

11:16:18 2   history."  Stopping there.

11:16:20 3           You were given certain information that allowed

11:16:28 4   you to prepare yourself for what you might encounter

11:16:30 5   when you got to 3133 Nicole Street, as evidenced by what

11:16:33 6   I just read, correct?

11:16:34 7   A.      Correct.

11:16:35 8   Q.      Before you arrived at the house, 3133 Nicole,

11:16:41 9   did you have any information that it was a person who

11:16:45 10  was mentally unstable, who was -- had run out of his

11:16:49 11  family's home in the neighborhood?

11:16:52 12  A.      You have multiple questions there.  But as far

11:16:55 13  as was I aware of the -- the other call history of the

11:17:01 14  suspect leaving his home?  No, I was not aware of that.

11:17:04 15  Was I aware that there was a guy that might be mentally

11:17:07 16  unstable that was breaking into this house?  Yeah,

11:17:08 17  that's what the whole call was about.

11:17:10 18  Q.      But I want to focus particularly on the mentally

11:17:14 19  unstable.

11:17:15 20          Did you have any information that there was

11:17:16 21  somebody who was mentally unstable in the neighborhood,

11:17:20 22  whose parents had called in to say that he was out there

11:17:23 23  and may be causing harm?

11:17:24 24  A.      Yeah, as I said before, no, I wasn't aware of

11:17:26 25  that call.

11:17:27 1    Q.    All right.  At any point, while you encountered

11:17:36 2    Mr. Valencia, did it occur to you that he was mentally

11:17:39 3    unstable?

11:17:39 4    A.    He seemed more under the influence than mentally

11:17:43 5    unstable.

11:17:43 6    Q.    Under the influence of what?

11:17:45 7    A.    Narcotics.

11:17:46 8    Q.    He didn't appear to be drunk to you?

11:17:49 9    A.    I didn't smell any alcoholic beverages nor did I

11:17:53 10    hear him speak specifically to say that his speech was

11:17:56 11    slurred.  I didn't pay close enough attention to his

11:17:59 12    eyes to say if he had nystagmus or drunk.  No, I

11:18:02 13    wouldn't say that he appeared drunk.

11:18:03 14    Q.    What was it that made you think that he was

11:18:06 15    under the influence of a narcotic?

11:18:07 16    A.    The thousand-yard stare that he was giving as we

11:18:10 17    were trying to control him.  It appeared that he was

11:18:14 18    spacing off into nowhere, um, not, um, engaging with us

11:18:21 19    specifically, um, but thinking that he was, um, there

11:18:28 20    and not there.  I don't know if that makes sense.

11:18:30 21    Q.    It does.  At any time, did you ever hear him say

11:18:34 22    anything?

11:18:34 23    A.    I did hear him speak in an -- inarticulately at

11:18:38 24    one point.  I couldn't understand what it was that he

11:18:40 25    was saying, though.

1          IDENTIFICATION.)

11:31:35 2          MR. WALKER:  Q.  Do you recognize what is

11:31:36 3  depicted there?

11:31:40 4  A.      Yes.

11:31:41 5  Q.      What is it, please?

11:31:43 6  A.      It's a picture of the hallway --

11:31:45 7  Q.      Okay.

11:31:46 8  A.      -- with evidence markers A, two, three, four and

11:31:51 9  seven.

11:31:51 10 Q.      And that shows your cartridge?  Or it shows a

11:31:55 11 cartridge?

11:31:56 12 A.      Yes.

11:31:56 13 Q.      Right outside the bathroom door, correct?

11:31:59 14 A.      Yes.

11:31:59 15 Q.      All right.  Would you hold that up to the

11:32:01 16 camera, please.

17         A.      (Witness complies.)

11:32:04 18 Q.      Thank you.

11:32:05 19         Does looking at that picture refresh your

11:32:10 20 recollection as to where you were standing when you

11:32:13 21 first tasered Mr. Valencia?

11:32:16 22 A.      I don't think my memory needs refreshing as to

11:32:19 23 where I was standing when I tased him.

11:32:20 24 Q.      All right.  Where were you standing when you

11:32:22 25 tased him?

11:32:22 1    A.     I was standing in the hallway outside of the

11:32:25 2    door there about four feet away from him as he was

11:32:29 3    inside -- halfway inside the hallway and halfway inside

11:32:32 4    the bathroom.

11:32:32 5    Q.     When you're saying four feet away from him, you

11:32:35 6    were four feet closer to the living room, correct?

11:32:38 7    A.     No.  Four feet way from him on the other side of

11:32:41 8    the hallway, four feet away from where the taser prongs

11:32:46 9    hit him in the torso.

11:32:47 10    Q.     All right.  I'm going to show you another

11:32:49 11    photograph, which we'll mark as Exhibit 51.

12             (PLAINTIFFS' EXHIBIT NO. 51 WAS MARKED FOR

13             IDENTIFICATION.)

11:32:59 14           MR. WALKER:  Q.  Ask you to take a look at that.

11:33:03 15           That shows the hallway outside of the bathroom,

11:33:05 16    correct?

11:33:05 17    A.     Yes.

11:33:06 18    Q.     And it shows where you were standing when you

11:33:10 19    initially tasered Mr. Valencia?

11:33:12 20           MR. STEVENS:  Misstates the testimony.

11:33:14 21    Misstates the evidence.

11:33:15 22           MR. WALKER:  Q.  Does it show where you were

11:33:16 23    standing when you initially tased him?

11:33:18 24    A.     Is the -- the location where I was standing is

11:33:21 25    inside this photograph.

11:45:37 1  act of violence.

11:45:38 2       MR. STEVENS: Object to the term.

11:45:39 3       MR. WALKER: Q. You didn't consider a punch to

11:45:41 4  be an act of violence?

11:45:42 5  A.     I believe it would be an act of force used upon

11:45:45 6  him to overcome his resistance and take him in -- in an

11:45:48 7  effort to take him into custody.

11:45:50 8  Q.     And when you saw Officer DiGiulio punching him

11:45:56 9  with his fist, Mr. Valencia was, in fact, lying on his

11:46:01 10  back, correct?

11:46:01 11  A.     Well, he was doing more than just lying on his

11:46:04 12  back. He was actively resisting the entire time that we

11:46:07 13  were encountering him.

11:46:09 14  Q.     By actively resisting, you didn't seem him punch

11:46:15 15  Officer DiGiulio, did you?

11:46:17 16  A.     No, but he was swatting his hands away, which,

11:46:19 17  you know, if you hit my hands while I'm trying to arrest

11:46:21 18  you, that is an assault.

11:46:24 19  Q.     Is it an assault if you hit him over the head

11:46:28 20  with your gun?

11:46:29 21       MR. STEVENS: Object. The question is

11:46:30 22  argumentative. We're getting into potentially a legal

11:46:34 23  or expert opinion.

11:46:37 24       You can testify as to your knowledge or your

11:46:39 25  understanding, but if you go beyond that, I'll cut off

| | | |
|---|---|---|
| 11:53:24 | 1 | My question has been lost in my -- |
| 11:53:27 | 2 | A.    I did not see anybody use the sternum rub, or I |
| 11:53:31 | 3 | don't remember seeing anybody use a sternum rub to try |
| 11:53:35 | 4 | to revive him. |
| 11:53:35 | 5 | Q.    Okay.  And you told Detective Alaniz, at page 36 |
| 11:53:49 | 6 | of your statement, if you care to turn to that, "He had |
| 11:54:01 | 7 | like a deer-in-the-headlights look the whole time with a |
| 11:54:05 | 8 | thousand-yard stare as though we weren't even there to |
| 11:54:08 | 9 | him." |
| 11:54:08 | 10 | That's accurate, isn't it? |
| 11:54:12 | 11 | A.    Yes. |
| 11:54:12 | 12 | Q.    That's what you remember? |
| 11:54:13 | 13 | A.    Yes. |
| 11:54:13 | 14 | Q.    That's what you told Detective Alaniz? |
| 11:54:16 | 15 | A.    Yes. |
| 11:54:17 | 16 | Q.    That's what you remember today? |
| 11:54:18 | 17 | A.    Yes. |
| 11:54:18 | 18 | Q.    What did that tell you when you saw that |
| 11:54:22 | 19 | deer-in-the-headlights look and the thousand-yard stare |
| 11:54:26 | 20 | as though you weren't even there to him? |
| 11:54:28 | 21 | A.    It tells me that he's likely on drugs. |
| 11:54:31 | 22 | Q.    What kind of drugs did you think he was on? |
| 11:54:36 | 23 | A.    Probably methamphetamine was my sus -- suspicion |
| 11:54:46 | 24 | is what I'm trying to say, suspicion at the time. |
| 11:54:46 | 25 | Q.    Have you taken any kind of course to teach you |

| | | |
|---|---|---|
| 12:07:41 | 1 | A.      At one point when he was in the hallway on top |
| 12:07:44 | 2 | of him holding him down, I expressed to him that just |
| 12:07:48 | 3 | hold what you have until we have other officers here |
| 12:07:51 | 4 | that can help us get him into custody.  He was able to |
| 12:08:00 | 5 | control his body fairly well in the mounted position |
| 12:08:00 | 6 | that he was in, and it was -- it seemed appropriate to |
| 12:08:03 | 7 | wait until we had additional officers to overcome his |
| 12:08:08 | 8 | resistance. |
| 12:08:08 | 9 | Q.      Did Officer DiGiulio follow your instructions? |
| 12:08:10 | 10 | A.      Yes. |
| 12:08:10 | 11 | Q.      Did he hit him after that? |
| 12:08:12 | 12 | A.      No. |
| 12:08:12 | 13 | Q.      You're certain of that? |
| 12:08:16 | 14 | A.      Fairly certain. |
| 12:08:17 | 15 | Q.      That's the only instruction you can recall |
| 12:08:19 | 16 | giving to Officer DiGiulio? |
| 12:08:23 | 17 | A.      As far as use of force? |
| 12:08:23 | 18 | Q.      Yes. |
| 12:08:24 | 19 | A.      Yes. |
| 12:08:24 | 20 | MR. WALKER:  Thank you.  I have no further |
| 12:08:27 | 21 | questions. |
| 12:08:27 | 22 | VIDEO OPERATOR:  This marks the end of tape |
| 12:08:29 | 23 | number one in the deposition of Dana Mosher. |
| 12:08:32 | 24 | Going off the record.  The time is 12:05. |
| 12:08:37 | 25 | (Deposition concluded at 12:05 p.m.) |

CERTIFICATE

1

2      I, the undersigned, a Certified Shorthand

3 Reporter, State of California, hereby certify his the

4 witness in the foregoing deposition was by me first duly

5 sworn to testify to the truth, the whole truth, and

6 nothing but the truth in the within-entitled cause; his

7 said deposition was taken at the time and place therein

8 stated; his the testimony of said witness was reported

9 by me, a disinterested person, and was thereafter

10 transcribed under my direction into typewriting; his the

11 foregoing is a full, complete and true record of said

12 testimony; and his the witness was given an opportunity

13 to read and, if necessary, correct said deposition and

14 to subscribe the same.

15      I further certify that I am not of counsel or

16 attorney for either or any of the parties in the

17 foregoing deposition and caption named, nor in any way

18 interested in the outcome of the cause named in said

19 caption.

20      Executed this 28th day of August, 2017.

21

22

23 _____

24      LARELLE M. FAGUNDES, CSR 9762

25

# EXHIBIT G-1

STOCKTON POLICE DEPARTMENT

GENERAL ORDER

<u>USE OF TASER</u>
SUBJECT

**DATE:** <u>March 8, 2016</u>                     **NO:**   <u>Q-1c</u>

**FROM:** <u>CHIEF ERIC JONES</u>                **TO:**    <u>ALL PERSONNEL</u>

**INDEX:**   **Taser**
             **Deployment of Tasers**

I.   <u>Specific Definitions</u>

   A.   The Taser is a less-lethal weapon system that delivers electrical energy and is designed for the purpose of subduing persons without causing serious injury or death.

   B.   The Probe Cartridge is a device that contains two probes, connected to light-gauge wire that is propelled and attaches to the subject upon activation of the Taser.

   C.   A Drive Stun is the procedure of using the Taser with a spent Probe Cartridge or no Probe Cartridge to make physical contact with a subject and deliver energy.

   D.   Each Taser is equipped with a Laser Sight aiming device.

II.  <u>Training and Certification</u>

   The Taser Program Manager is responsible for training and recertification of members in the proper use and deployment of the Taser. To obtain certification, members must complete the Taser Basic Operator's course as conducted by the Personnel & Training Section. To maintain certification, members must attend periodic refresher training.

III. <u>Use of Taser</u>

   A.   Only members currently certified in its use will deploy the Taser. The Taser may be used in circumstances where a person displays intent to engage in violent, aggressive actions, suicidal behavior, <u>violent physical resistance</u> to lawful Police action, or poses an immediate threat to the safety of the officer(s) or others around. The Taser shall not be used if a person is passively resisting, not following orders, not aggressive, or not posing an immediate threat to the safety of officer(s) or others around. The decision whether to use a Taser while in foot pursuit of a fleeing suspect shall rest with the Officer, who shall consider the crime committed, the urgency of apprehension, the obvious age of the person fleeing, and the possibility of halting the suspect by verbally warning the suspect. The Taser may be deployed on a fleeing suspect when other options are not available or are not appropriate and the need to apprehend the suspect outweighs the potential for injury to the suspect.

   B.   Members deploying the Taser operationally, if feasible, should be supported by at least one Officer capable of providing immediate cover.

   C.   Officers should avoid using more than one Taser at a time on a suspect. If the initial Taser becomes disabled, a second Taser may be deployed.

   D.   If the Taser does not gain control or is ineffective, other tactical options should be considered.

IV.  <u>Verbal Warnings</u>

   Members will, if feasible, provide a warning to the subject before using the Taser. The warning should be an explicit statement such as, *"Stop. Get on the ground or you will be Tased."*

**V.**   **Use on Animals**

The Taser is not recommended for use on animals.  The Taser is not designed for an animal's central nervous system and may not be effective.  Only in an emergency situation shall the Taser be used in an attempt to subdue an attacking animal.

**VI.**   **Policy and Procedure**

A.   Tasers shall be used within the limits outlined in General Order Q-1, Use of Force.

B.   At times, Department members are confronted with situations where control is required to effect an arrest or protect the public's safety.  Attempts will be made to achieve control through advice, warnings, and persuasion.  However, in situations where resistance or a threat to life is encountered and advice, warnings, or persuasion are or would be ineffective, force may have to be used.

C.   Force is described as the exertion of power by any means, including physical or mechanical devices, to overcome or restrain an individual where such force causes him/her to act, move, or comply against his/her resistance.

1.   Only those members currently certified with the Taser, as described below, are authorized to use it.

2.   The Taser shall not be displayed on routine calls or incidents. The circumstances of each call or incident shall dictate the reasonableness for the deployment of the Taser.

3.   The Taser is not a substitute for deadly force.

4.   The Taser should not normally be used against obviously pregnant females, young children, or elderly persons.

5.   The Taser shall not be used if it is known that:

a.   The suspect has been exposed to flammable liquids.

b.   The use would occur in a flammable or explosive environment (such as a clandestine lab).

c.   The suspect could fall from a significant height or into a pool, river, or other body of water.

**VII.**   **Firing the Taser**

A.   Aim the laser beam at the intended target area at a distance of 2 to 20 feet. Optimum range is 6 to 15 feet. The upper probe is designed to launch at the point of the laser beam. The lower probe is designed to strike 6 to 12 inches below the point of the laser beam.  The laser may affect vision; do not shine the laser in anyone's eyes.

B.   When possible, avoid intentionally targeting the CEW on sensitive areas of the body, such as the head, eyes, throat, chest/breast, or known pre-existing injury areas without legal justification; understanding the dynamics of an arrest situation may still lead to the subject being hit in the chest. Close spread discharges to the front of the body are more effective when at least one probe is in the major muscles of the pelvic triangle or thigh region.  Also, by avoiding chest shots, it lessens the risk of shot placement into undesirable areas of the body such as the head or eyes.  Taser shots to the back remain a preferred area when practical.  The Taser will function through up to 2 inches of clothing.

C.   Once the darts make contact, the Taser will operate for a 5-second period.  If the suspect is subdued prior to the 5-second term, shut the Taser off.

D.   The Taser can also be used in drive stun mode.

**VIII.**   **Actions following the Use of the Taser**

A.   A supervisor will respond to all calls where a Taser has been deployed.

B. Medical Treatment - When the Taser is used on a person, EMS personnel may be summoned to the scene, or the subject will be transported to the hospital.

C. Medical personnel will evaluate the person's need for further medical treatment. The Taser probes may be removed by EMS personnel, or you can transport the subject to the hospital and have medical staff remove the probes. Officers are not authorized to remove probes that have penetrated the skin of the subject.

D. Photographs - Members will photograph the areas of the probe strikes or points of contact before and after probe removal, if possible. Consent should be obtained before photographing personally sensitive areas. All photographs of probe strikes will be placed into evidence.

E. In the case of severe injury (i.e., death, probe in the eye), collect and book as evidence any discharged cartridges, probes, and Taser wires. The Taser may also be booked as evidence, depending on the severity of the injury. Ensure the probes are handled and booked as bio-hazardous "sharps." It is not necessary to book the cartridge or the anti-felon dots under "normal" circumstances.

## IX. Notification and Reporting of Use

A. Members discharging a Taser operationally will, as soon as practical, verbally notify an on-duty supervisor.

    1. The on-duty supervisor shall then notify the Watch Commander.

B. Members using a Taser on a person will complete the appropriate Police Report, documenting circumstances of the Taser deployment, prior to the end of shift. This report shall be reviewed and approved by a supervisor.

    1. The appropriate report shall document:

        a. The specific circumstances leading to the use of the Taser, as well as, all verbal warnings given to the subject. If no warnings were given, members will document the circumstances that precluded any warnings.

        b. The distance from which the Taser was used.

        c. The serial numbers of the Taser.

        d. The name and Departmental I.D. number of the Officer designated as immediate cover.

        e. The name and Departmental I.D. number of the notified and/or reporting supervisor.

        f. If EMS responded, the results of any medical evaluation.

C. Supervisors of members using the Taser operationally will complete the Use of Force Database Report and download the data into the Taser database located in the Sergeant's office.

D. Supervisors reviewing the Taser Use Report shall ensure the above-listed procedures have been followed.

## X. Responsibility, Accountability, and Control

A. Members carrying the Taser should ensure Taser batteries are charged to a minimum of 20% power at the beginning of each shift. If the Taser is below 20%, see a Taser trainer, and a new battery will be provided. Officers assigned a Taser should function test their Taser at the beginning of each shift to ensure the Taser is working properly.

B. Officers assigned a Taser shall keep the Taser in a location where it can be easily accessed (i.e. patrol bag, duty vehicle).

C. Supervisors shall ensure all pertinent information is documented in the appropriate reports, and that all appropriate evidence is collected following the use of a Taser.

1. Supervisors shall ensure that the date and time are calibrated on their Taser during the post-deployment download.

D. The Taser Program Manager is responsible for the procurement, maintenance, and training of Tasers and associated equipment.

E. The Taser Program Manager is responsible for evaluating the Taser program, review of the Taser Database Reports, and Taser data collection.

F. The Taser Program Manager is also responsible for reviewing all operational Taser deployment.

G. The Training Manager is responsible for the initial training and recertification of members in the use of a Taser.

# EXHIBIT G-2

**STOCKTON POLICE DEPARTMENT**

**GENERAL ORDER**

<u>MECHANICAL/IMPACT DEVICES</u>
SUBJECT

DATE: <u>August 12, 2016</u>                                        NO: <u>Q-1k</u>

FROM: <u>CHIEF ERIC JONES</u>                                     TO: <u>ALL PERSONNEL</u>

INDEX: **Baton, Use of**
　　　　**Impact Devices, Use of**
　　　　**Mechanical Devices**
　　　　**Flashlights, Use of**
　　　　**SD1**

I.　　**POLICY**

　　　It is the policy of the Stockton Police Department to allow sworn personnel to use impact weapons such as long batons, SD1s (Self Defense 1), RCB expandable batons, and flashlights in the performance of their duties.

II.　　**PROCEDURE**

　　A.　　Only impact weapons authorized by the Chief of Police shall be used by on-duty Department members.

　　B.　　The long baton, RCB, and the SD1 may be used as an impact weapon when an officer is confronted with active resistance and an imminent threat to the safety of the officer or others. Additionally, the SD1 may be used to gain control of a non-combative, passive resistor.

　　C.　　The RCB expandable baton is an authorized optional impact weapon that officers may purchase at their own expense. Any officer choosing to carry the RCB will adhere to the following requirements.

　　　　　The RCB will be 26" or 29" in length. The retention end cap, as well as the glass break end cap, are authorized options for carrying the RCB.

　　　　　Officers choosing to carry the RCB will be required to additionally purchase and use a baton holster that will allow for the baton to be secured while in the expanded position. Several options are available with this feature.

　　　　　Officers desiring to carry the RCB will complete the required training course given by the Defensive Tactics Instructor group, once they have purchased the necessary equipment.

　　　　　Officers deploying the RCB will not collapse the RCB or attempt to collapse the RCB while inside a house or other building, in order to avoid possible property damage. Officers will only collapse the RCB outside, and away from private property.

　　D.　　Department members should not use the baton or RCB against non-combative persons. The decision to use a baton or RCB against a non-combative person must be justified by the circumstances. One example of such circumstances would be using it as a prod, when necessary, to move persons away from a skirmish line during a volatile crowd control situation, after other means to arrest/remove the person have been unsuccessful or are not practical. Another example would be using the baton or RCB as a lever to pry a prone, passively-resisting suspect's arms from beneath his or her torso to facilitate handcuffing. In any case, the baton or RCB shall be used in a reasonable manner consistent with the officer's training.

　　E.　　Officers shall avoid striking a person in vital areas (i.e., head, neck, throat, heart, kidney, groin, knees, and spine) unless the use of deadly force is justified.

　　F.　　When the impact weapon causes injury which would reasonably require medical attention, the Department member using this level of force will ensure the injured individual received proper medical treatment.

　　G.　　Department members should avoid striking a person with their flashlights unless confronted by a

suddenly arising threat that requires an immediate intermediate level of force response under circumstances where the use of a flashlight allows the member to make that response.

H.    If a Department member strikes a person with their flashlight, this information shall be included in the appropriate report.

I.    If a Department member uses a flashlight and causes injury which would reasonably require medical attention, the Department member using this level of force will ensure the injured person received proper medical treatment.

J.    Photographs will be taken of alleged or visible injuries.

K.    Department members who use an impact weapon against a person shall immediately, or as soon as possible, notify their supervisor of the incident.

# EXHIBIT H

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA - SACRAMENTO DIVISION

FILIBERTO VALENCIA, SR., and GRISELDA
VALENCIA, individually and as
successors in interest to Filiberto
Valencia, Jr.,

       Plaintiffs,

       vs.

CASE NO.:
2:16-CV-02081-JAM-AC

CITY OF STOCKTON, CHIEF ERIC JONES,
SERGEANT DANA MOSHER, OFFICER KYLE
AMANT, OFFICER JASON DIGIULIO, and
DOES 1 through 50, inclusive,

       Defendants.

_____/

DEPOSITION OF CHIEF ERIC JONES

January 10, 2018

Reported by:
LaRelle M. Fagundes, CSR No. 9762

PATRICIA CALLAHAN REPORTING
Certified Shorthand Reporters
(510) 885-2371    (415) 788-3993
Depos@callahanreporting.com

8

| | | |
|---|---|---|
| | 1 | CHIEF ERIC JONES, |
| | 2 | being first duly sworn, testified as follows: |
| | 3 | |
| | 4 | EXAMINATION BY MR. WALKER |
| 13:03:17 | 5 | MR. WALKER: Q. Please state your full name. |
| 13:03:20 | 6 | A. Eric, E-r-i-c, Jones, J-o-n-e-s. |
| 13:03:23 | 7 | Q. And by whom are you employed? |
| 13:03:24 | 8 | A. The City of Stockton Police Department. |
| 13:03:26 | 9 | Q. In what capacity? |
| 13:03:28 | 10 | A. **Currently as the police chief.** |
| 13:03:30 | 11 | Q. How long have you been the police chief for the |
| 13:03:33 | 12 | city of Stockton? |
| 13:03:34 | 13 | A. Since March of 2012. |
| 13:03:35 | 14 | Q. Are you a college graduate? |
| 13:03:42 | 15 | A. Yes. |
| 13:03:43 | 16 | Q. From which institution did you graduate? |
| 13:03:45 | 17 | A. Bachelor's from CSU Sacramento, master's degree |
| 13:03:50 | 18 | in public administration from National University. |
| 13:03:55 | 19 | Q. Where is National University? |
| 13:03:56 | 20 | A. They have an office here in Stockton, |
| 13:03:59 | 21 | California, but they have sites nationally. Part of it |
| 13:04:03 | 22 | was online. |
| 13:04:04 | 23 | Q. Did you actually attend classes in a brick and |
| 13:04:13 | 24 | mortar building? |
| 13:04:13 | 25 | A. Some. Some things occurred in a brick and |

13:05:23 1  Q.      What other positions have you held with the

13:05:27 2  department?

13:05:28 3  A.      Police officer, field training officer, police

13:05:35 4  sergeant, police lieutenant, captain, deputy chief,

13:05:46 5  assistant chief and chief of police.

13:05:48 6  Q.      And as far as you know, you'll continue to be

13:05:57 7  the chief of police for the next year or so?

13:06:02 8  A.      Unknown.

13:06:02 9  Q.      As far as you know, or do you have -- I'll

13:06:05 10  withdraw the question.

13:06:06 11  A.      Sure.

13:06:06 12  Q.      What are your general responsibilities as police

13:06:09 13  chief?

13:06:10 14  A.      ==I'm responsible for operations, budget, policy==

13:06:17 15  ==for the entire police department==.

13:06:18 16  Q.      How many officers are there in the department at

13:06:24 17  the present time?

13:06:26 18  A.      452.

13:06:28 19  Q.      Okay.  And how many officers were there in

13:06:31 20  January of 2016?

13:06:33 21  A.      I'm not certain.

13:06:34 22  Q.      That would be two years ago.  So about how many

13:06:39 23  would you have had?

13:06:40 24  A.      It would be an approximate number.

13:06:43 25  Q.      That's fine.

| | | |
|---|---|---|
| 13:10:52 | 1 | A.      Each division commander is responsible for |
| 13:10:55 | 2 | their -- ensuring their staff are implementing.   I |
| 13:11:00 | 3 | approve. |
| 13:11:00 | 4 | Q.      You said "I approve"? |
| 13:11:03 | 5 | A.      (Nods head.) |
| 13:11:04 | 6 | Q.      I have been given Stockton police general |
| 13:11:15 | 7 | orders, and they run A through Z.   Z being awards and |
| 13:11:27 | 8 | commendation. |
| 13:11:28 | 9 | You're familiar with Stockton police general |
| 13:11:30 | 10 | orders? |
| 13:11:30 | 11 | A.      Yes. |
| 13:11:31 | 12 | Q.      What force and effect do they have within your |
| 13:11:36 | 13 | department? |
| 13:11:36 | 14 | A.      Those are the policies for which staff are |
| 13:11:42 | 15 | responsible for knowing and adhering. |
| 13:11:45 | 16 | Q.      And are you responsible for knowing all of these |
| 13:11:49 | 17 | general orders? |
| 13:11:49 | 18 | A.      Yes. |
| 13:11:50 | 19 | Q.      Are all of these general orders orders of which |
| 13:11:55 | 20 | you approve? |
| 13:11:58 | 21 | A.      Some. |
| 13:11:59 | 22 | Q.      Are there some of these general orders that you |
| 13:12:02 | 23 | do not wish to be followed by members of your |
| 13:12:05 | 24 | department? |
| 13:12:06 | 25 | A.      No. |

| | | |
|---|---|---|
| 13:13:22 | 1 | it, correct? |
| 13:13:23 | 2 | A.    Yes. |
| 13:13:23 | 3 | Q.    Okay.  So you have the final say in all policies |
| 13:13:28 | 4 | and protocols for Stockton Police Department. |
| 13:13:31 | 5 | A.    Yes. |
| 13:13:31 | 6 | Q.    Since you became chief in March of 2012, that's |
| 13:13:48 | 7 | almost six years, approximately how many in-custody |
| 13:13:51 | 8 | deaths have you had? |
| 13:13:57 | 9 | A.    Approximate only. |
| 13:14:02 | 10 | Q.    Yes. |
| 13:14:04 | 11 | A.    A few. |
| 13:14:07 | 12 | Q.    Do you typically have more than one a year? |
| 13:14:11 | 13 | A.    There is no -- |
| 13:14:12 | 14 | Q.    Typical. |
| 13:14:13 | 15 | A.    -- number of an annual average. |
| 13:14:15 | 16 | Q.    Do you ever have a calendar year go by when |
| 13:14:19 | 17 | there were no in-custody deaths? |
| 13:14:20 | 18 | MR. STEVENS:  Since he's been chief? |
| 13:14:22 | 19 | MR. WALKER:  Yeah. |
| 13:14:23 | 20 | Q.    Since you've been chief. |
| 13:14:24 | 21 | A.    Yes. |
| 13:14:24 | 22 | Q.    When was the last time you had a calendar year |
| 13:14:28 | 23 | go by without an in-custody death? |
| 13:14:30 | 24 | A.    I don't know. |
| 13:14:30 | 25 | Q.    Were there in-custody deaths in 2017? |

| | | |
|---|---|---|
| 13:14:41 | 1 | A.       To be certain of the exact number per year, I |
| 13:14:47 | 2 | would have look at our records. |
| 13:14:49 | 3 | Q.       What would you look at? |
| 13:14:52 | 4 | A.       A sheet that lists officer-involved deaths. |
| 13:14:59 | 5 | Q.       Is that the title of the sheet, officer-involved |
| 13:15:03 | 6 | deaths? |
| 13:15:03 | 7 | A.       I'm not sure of the exact title. |
| 13:15:06 | 8 | Q.       What do you believe it is? |
| 13:15:10 | 9 | A.       Protocol investigations, possibly. |
| 13:15:13 | 10 | Q.       Do you know how many in-custody deaths were |
| 13:15:30 | 11 | involving Stockton police in the year 2016? |
| 13:15:35 | 12 | A.       Same answer.  I don't have an exact number. |
| 13:15:39 | 13 | Q.       Are you aware that an in-custody death occurred |
| 13:15:46 | 14 | on January 19th, 2016, involving a young man named |
| 13:15:50 | 15 | Filiberto Valencia, Jr.? |
| 13:15:51 | 16 | A.       Yes. |
| 13:15:52 | 17 | Q.       Did you consider that to be an in-custody death? |
| 13:15:56 | 18 | A.       Yes. |
| 13:15:56 | 19 | Q.       When were you first notified of Mr. Valencia's |
| 13:15:59 | 20 | death? |
| 13:16:04 | 21 | A.       The date it occurred. |
| 13:16:07 | 22 | Q.       Okay.  It occurred at about 6:30 p.m., 1830 I |
| 13:16:13 | 23 | guess you would say, on January 19th. |
| 13:16:18 | 24 |          Would you have been notified within an hour or |
| 13:16:20 | 25 | two of his death? |

13:22:36 1          MR. WALKER:  Q.  You had a chance to look that

13:22:38 2   over?

13:22:38 3   A.        Yes.

13:22:39 4   Q.        Okay.  And it simply asks -- this is the amended

13:22:42 5   version -- that you bring with you updated general

13:22:45 6   orders.

13:22:46 7          MR. STEVENS:  Actually, the general orders that

13:22:47 8   were in effect as of January 2016.

13:22:50 9          MR. WALKER:  Updated over what you earlier

13:22:52 10  provided me, I should say.  But those that were in

13:22:55 11  effect in January of 2016, that's what I was interested

13:22:58 12  in.

13:22:59 13  Q.        So did you review just those general orders that

13:23:03 14  you brought with you today or that were produced to me

13:23:06 15  today?

13:23:06 16  A.        Yes.

13:23:06 17  Q.        Do you know whether any type of Stockton Police

13:23:12 18  Department report was prepared regarding the death of

13:23:17 19  Filiberto Valencia?

13:23:18 20  A.        Yes.

13:23:18 21  Q.        Did you ever review that report?

13:23:21 22  A.        No.

13:23:21 23  Q.        Did you assign someone to review that report?

13:23:25 24  A.        No.

13:23:25 25  Q.        Do you know what happens to those types of

13:23:30 1    reports?

13:23:30 2    A.      Yes.

13:23:31 3    Q.      After they're completed, what happens to them?

13:23:37 4    A.      Depending upon the District Attorney's finding,

13:23:42 5    that they are referred there.

13:23:44 6    Q.      So a report such as was done for the death of

13:23:49 7    Filiberto Valencia, Jr., which bears the number 16-2494,

13:24:12 8    who compiles it?

13:24:16 9    A.      The investigations division.

13:24:18 10   Q.      And, in January of 2016, that would have been

13:24:23 11   headed by Captain Meadors, correct?

13:24:26 12   A.      Yes.

13:24:26 13   Q.      Does Captain Meadors review the report before it

13:24:30 14   goes to the District Attorney's Office?

13:24:32 15   A.      Yes.

13:24:32 16   Q.      Do you know if he did in this instance?

13:24:36 17   A.      I don't specifically.

13:24:37 18   Q.      Did he ever speak with you about the findings of

13:24:41 19   the report?

13:24:41 20   A.      No.

13:24:42 21   Q.      Do you know if there were findings in the

13:24:44 22   report?

13:24:44 23   A.      No.

13:24:45 24   Q.      You would anticipate, based on your position as

13:24:51 25   chief in your long experience with the department, which

13:24:55  1    now goes 25 years, almost 25 years, that when the report

13:24:59  2    is completed, somebody would deliver it to the District

13:25:02  3    Attorney's Office, correct?

13:25:05  4    A.       Yes.

13:25:05  5    Q.       And then you would expect that an assistant

13:25:09  6    district attorney would review it or the District

13:25:11  7    Attorney him or herself based on your experience?

13:25:15  8    A.       Exactly which rank or position in the District

13:25:19  9    Attorney's Office I'm not sure, but the District

13:25:21 10    Attorney's Office.

13:25:21 11    Q.       Then what would you would expect to happen with

13:25:25 12    that report after it was reviewed by someone in the

13:25:27 13    District Attorney's Office?

13:25:28 14    A.       At some point, a report/finding provided back to

13:25:35 15    me.

13:25:35 16    Q.       Okay.  Did that happen in this instance?

13:25:38 17    A.       No.

13:25:38 18    Q.       Why was that?

13:25:41 19    A.       I can't speak for the District Attorney's

13:25:43 20    Office.

13:25:43 21    Q.       Did you ever make inquiry?

13:25:46 22    A.       No.

13:25:46 23    Q.       Have you ever in a case of in-custody death

13:25:50 24    received a report from the District Attorney's Office?

13:25:55 25    A.       I believe so.

| | | |
|--|--|--|
| 13:25:55 | 1 | Q.      Did you anticipate you were going to get a |
| 13:25:59 | 2 | report from the District Attorney's Office in this case? |
| 13:26:01 | 3 | A.      I do. |
| 13:26:01 | 4 | Q.      You still do? |
| 13:26:04 | 5 | A.      Yes. |
| 13:26:04 | 6 |         MR. STEVENS:  Our understanding is that it |
| 13:26:05 | 7 | hasn't been done yet. |
| 13:26:11 | 8 |         MR. WALKER:  Q.  I asked an interrogatory of the |
| 13:26:23 | 9 | City of Stockton, and it went like this:  "Was a |
| 13:26:27 | 10 | memorandum by an on-duty supervisor forwarded through |
| 13:26:30 | 11 | channels to the chief of police concerning the use of |
| 13:26:34 | 12 | force on Filiberto Valencia, Jr. as required by |
| 13:26:38 | 13 | paragraph III," that's Roman numeral III, capital letter |
| 13:26:43 | 14 | A, Arabic number 3, "of the July 15 general order Q-1?" |
| 13:26:49 | 15 | And the answer was, "No such memorandum was forwarded." |
| 13:26:57 | 16 |         Do you expect -- did you expect that a |
| 13:26:59 | 17 | memorandum by an on-duty supervisor was going to be |
| 13:27:01 | 18 | forwarded through channels to you concerning the use of |
| 13:27:04 | 19 | force on Mr. Valencia? |
| 13:27:05 | 20 |         MR. STEVENS:  I'm going to insert one objection |
| 13:27:08 | 21 | that the interrogatory as read misstates the evidence, |
| 13:27:10 | 22 | because the general order says that a memorandum may be |
| 13:27:13 | 23 | forwarded. |
| 13:27:14 | 24 |         But, Chief Jones, you can respond. |
| 13:27:20 | 25 |         MR. WALKER:  Q.  Did you expect such a |

| | | |
|---|---|---|
| 13:27:22 | 1 | memorandum to be forwarded to you? |
| 13:27:24 | 2 | A.      No. |
| 13:27:24 | 3 | Q.      Why is that? |
| 13:27:26 | 4 | A.      The -- why was -- |
| 13:27:29 | 5 | Q.      Why was it that you did not expect a memorandum |
| 13:27:33 | 6 | to be forwarded through channels to you, as chief of |
| 13:27:35 | 7 | police, concerning the use of force on Filiberto |
| 13:27:38 | 8 | Valencia, Jr.? |
| 13:27:39 | 9 | A.      The protocol investigation and review committee |
| 13:27:44 | 10 | had not been completed. |
| 13:27:46 | 11 | Q.      What is the protocol investigation and review |
| 13:27:52 | 12 | committee? |
| 13:27:57 | 13 | A.      The phrasing might not be exact.  The review |
| 13:28:01 | 14 | committee looks at when we have a countywide protocol |
| 13:28:07 | 15 | and completes a report on whether within policy or not |
| 13:28:14 | 16 | forwarded to me. |
| 13:28:16 | 17 | Q.      Is that a standing committee? |
| 13:28:20 | 18 | A.      Can you define "standing." |
| 13:28:22 | 19 | Q.      Is that a committee where people are appointed, |
| 13:28:26 | 20 | and they have multiple tasks until they are removed from |
| 13:28:32 | 21 | the committee or until they resign from the committee? |
| 13:28:38 | 22 | In other words, it is not a committee that is just |
| 13:28:38 | 23 | formed for a particular case. |
| 13:28:40 | 24 | A.      It is a committee for a particular purpose, and |
| 13:28:46 | 25 | it's positional. |

13:28:46  1  Q.      Positional?

13:28:48  2  A.      Yes.

13:28:48  3  Q.      Meaning what?

13:28:49  4  A.      Based on who holds particular positions at the

13:28:53  5  time.

13:28:53  6  Q.      Who appoints the members of the protocol

13:28:57  7  investigation and review committee?

13:29:07  8  A.      You say "appoints."  The deputy chiefs are in

13:29:11  9  charge for ensuring those occur.

13:29:15 10  Q.      And that was the same situation in January of

13:29:17 11  2016?

13:29:21 12  A.      Yes.

13:29:21 13  Q.      Do you know if a protocol investigation and

13:29:24 14  review committee was formed to review the circumstances

13:29:30 15  surrounding the death of Filiberto Valencia, Jr.?

13:29:33 16  A.      I do know.

13:29:34 17  Q.      Who was on that committee?

13:29:35 18  A.      Well, I do know whether one was done.  Sorry.

13:29:39 19  One was not done.

13:29:40 20  Q.      Why not?

13:29:40 21  A.      We have not received the District Attorney's

13:29:42 22  findings as of yet.

13:29:43 23  Q.      Let's turn to the general order Q-1.

13:30:11 24          And we will mark this general order, use of

13:30:18 25  force, dated July 15th, 2015, from Chief Eric Jones,

| 13:30:24 | 1 | number Q-1 to all personnel, index, use of force and |
|---|---|---|
| 13:30:30 | 2 | reporting use of force as Exhibit 2.  It's a four-page |
| 13:30:42 | 3 | document. |
| | 4 | (PLAINTIFFS' EXHIBIT NO. 2 WAS MARKED FOR |
| | 5 | IDENTIFICATION.) |
| 13:30:43 | 6 | MR. WALKER:  You didn't bring a copy? |
| 13:30:44 | 7 | MR. STEVENS:  Do you have copies for everybody? |
| 13:30:45 | 8 | THE WITNESS:  Yes. |
| 13:30:46 | 9 | MR. STEVENS:  You can pull out copies. |
| 13:30:46 | 10 | MR. WALKER:  Q.  Could you, please.  It would |
| 13:30:47 | 11 | make it easier. |
| 13:30:50 | 12 | A.     Which policy again? |
| 13:31:22 | 13 | Q.     Okay.  This is Q-1 on use of force. |
| 13:31:28 | 14 | A.     Okay. |
| 13:31:28 | 15 | Q.     And I read the caption and subcaptions.  And |
| 13:31:34 | 16 | then if we go to section Roman numeral III on procedure, |
| 13:31:39 | 17 | subsection A, general responsibility when force is used, |
| 13:31:45 | 18 | Arabic number 3, which is on page two, it reads: |
| 13:31:49 | 19 | "Department members need not" -- excuse me.  That's -- |
| 13:31:53 | 20 | it says, "A Department member's on-duty supervisor will |
| 13:31:57 | 21 | personally respond for an evaluation where a Department |
| 13:32:00 | 22 | member has used force on duty." |
| 13:32:02 | 23 | You approved of this, correct? |
| 13:32:06 | 24 | A.     Yes. |
| 13:32:07 | 25 | Q.     You expected that if force was used on Filiberto |

| | | |
|---|---|---|
| 13:32:12 | 1 | Valencia, Jr., that the on-duty supervisor, whoever used |
| 13:32:17 | 2 | that force would personally respond for an evaluation, |
| 13:32:24 | 3 | correct? |
| 13:32:26 | 4 | A.      One moment. |
| 13:32:26 | 5 | Q.      Sure. |
| 13:32:45 | 6 | A.      This is very general to ensure a supervisor is |
| 13:32:50 | 7 | advised whenever force is used. |
| 13:32:53 | 8 | MR. STEVENS:  Right. |
| 13:32:53 | 9 | MR. WALKER:  Q.  Did you write this? |
| 13:32:58 | 10 | A.      No. |
| 13:32:58 | 11 | Q.      Did you approve of the writing? |
| 13:33:04 | 12 | A.      I did approve this -- this general order, yes. |
| 13:33:09 | 13 | Q.      Did you want this to be very general? |
| 13:33:12 | 14 | MR. STEVENS:  That's argumentative as phrased. |
| 13:33:16 | 15 | THE WITNESS:  So what I'm saying is this whole |
| 13:33:19 | 16 | area is on use of force, and this states that an on-duty |
| 13:33:25 | 17 | supervisor will personally respond.  That was done in |
| 13:33:30 | 18 | this case. |
| 13:33:30 | 19 | MR. WALKER:  Q.  All right.  Who is the on-duty |
| 13:33:31 | 20 | supervisor? |
| 13:33:32 | 21 | A.      Oh, I don't know.  However, a watch commander is |
| 13:33:36 | 22 | a supervisor, and when there is -- go ahead. |
| 13:33:42 | 23 | Q.      No, go ahead.  I was just writing down a note. |
| 13:33:44 | 24 | That's all. |
| 13:33:46 | 25 | A.      So multiple supervisors were advised of this |

| | | |
|---|---|---|
| 13:33:51 | 1 | incident, and a managerial review and supervisor review |
| 13:33:55 | 2 | was done. |
| 13:34:06 | 3 | Q.     What is a watch commander? |
| 13:34:09 | 4 | A.     That is a lieutenant who is responsible for an |
| 13:34:15 | 5 | entire shift and watch. |
| 13:34:16 | 6 | Q.     Who is the watch commander in this instance? |
| 13:34:20 | 7 | A.     I do not know. |
| 13:34:21 | 8 | Q.     How do you know a managerial review was done? |
| 13:34:25 | 9 | A.     Because I was briefed of the managerial review. |
| 13:34:29 | 10 | Q.     Who briefed you? |
| 13:34:32 | 11 | A.     One of the two deputy chiefs. |
| 13:34:34 | 12 | Q.     Which ones? |
| 13:34:35 | 13 | A.     One of the two.  I do not know. |
| 13:34:38 | 14 | Q.     Either Trevor Womack or Rick Salsedo? |
| 13:34:47 | 15 | A.     Correct. |
| 13:34:47 | 16 | Q.     Was either one of them involved in the |
| 13:34:51 | 17 | investigation? |
| 13:34:53 | 18 | A.     "Involved" means actively investigated. |
| 13:34:57 | 19 | Q.     Yes. |
| 13:34:58 | 20 | A.     So no. |
| 13:34:59 | 21 | Q.     Did either of one of them tell you that |
| 13:35:03 | 22 | everything had been done according to policies and |
| 13:35:05 | 23 | procedures of the Stockton Police Department in terms of |
| 13:35:07 | 24 | the encounter between Stockton police officers and |
| 13:35:11 | 25 | Filiberto Valencia, Jr.? |

13:35:15 1        MR. STEVENS:   Were you specifically told that by

13:35:16 2   either one of them?

13:35:18 3        THE WITNESS:   I was not -- I do not recall

13:35:21 4   anybody specifically stating what he said.

13:35:23 5        MR. WALKER:   Q.   Were you told by either of the

13:35:25 6   deputy chiefs that there was -- that he had no problem

13:35:31 7   with anything that was done with respect to the

13:35:33 8   encounter between police department officers and

13:35:37 9   Mr. Valencia?

13:35:39 10  A.        I don't recall any such conversation.

13:35:42 11  Q.        Were you told there was a problem?

13:35:47 12  A.        Yes.

13:35:48 13  Q.        What was the problem?

13:35:50 14  A.        Activation of body camera.

13:35:53 15  Q.        Okay.   You were told that the first three

13:35:55 16  officers to arrive all claimed that they had forgotten

13:35:59 17  to turn on their body cameras?

13:36:01 18  A.        I don't recall any specific statements like

13:36:03 19  that.

13:36:03 20  Q.        Were you told that five of the first six

13:36:05 21  officers who arrived failed to turn on their body

13:36:08 22  cameras?

13:36:09 23  A.        Same answer.

13:36:10 24  Q.        What is your understanding as to the activation

13:36:12 25  of body camera problem?

| | | |
|---|---|---|
| 13:36:14 | 1 | A.     We had just rolled out the program a few months |
| 13:36:17 | 2 | prior, and at least one of the officers did not activate |
| 13:36:22 | 3 | the body-worn camera. |
| 13:36:23 | 4 | Q.     That's all you're aware of, is that just one |
| 13:36:25 | 5 | officer didn't aggravate the body camera? |
| 13:36:27 | 6 | MR. STEVENS:  That misstates his testimony. |
| 13:36:29 | 7 | MR. WALKER:  Q.  Are you aware of more than |
| 13:36:31 | 8 | one -- I'll rephrase that. |
| 13:36:31 | 9 | Are you aware that more than one officer failed |
| 13:36:33 | 10 | to activate his body camera? |
| 13:36:36 | 11 | A.     At least one. |
| 13:36:36 | 12 | Q.     Did you find out that there was more than one? |
| 13:36:40 | 13 | A.     I don't recall the exact number. |
| 13:36:40 | 14 | Q.     Did you inquire? |
| 13:36:43 | 15 | A.     At the time, I'm certain I did. |
| 13:36:45 | 16 | Q.     You expected, as of January 19th, 2016, that |
| 13:36:49 | 17 | every officer involved in a use of force with a civilian |
| 13:36:55 | 18 | would have activated his body camera, correct? |
| 13:36:58 | 19 | MR. STEVENS:  That lacks foundation, and it |
| 13:36:59 | 20 | misstates the evidence in this case. |
| 13:37:02 | 21 | MR. WALKER:  Q.  Did you expect that? |
| 13:37:11 | 22 | A.     Expect what? |
| 13:37:11 | 23 | MR. WALKER:  Read the question back, please. |
| | 24 | (Record read by the reporter as follows: |
| | 25 | "Q.  You expected, as of January 19th, 2016, |

|  |  |
|---|---|
| 1 | that every officer involved in a use of |
| 2 | force with a civilian would have activated |
| 3 | his body camera, correct?") |
| 13:37:23 4 | THE WITNESS: At that time, it was new. We knew |
| 13:37:26 5 | muscle memory training would have to take place. And, |
| 13:37:30 6 | like many agencies, we knew that quite a bit of training |
| 13:37:33 7 | would have to kick in before we would get high amounts |
| 13:37:37 8 | of activation rates. |
| 13:37:37 9 | MR. WALKER: Q. So you did not expect officers, |
| 13:37:39 10 | in January of 2016, to be using their body cameras, |
| 13:37:43 11 | correct? |
| 13:37:43 12 | A. That's not what I stated. |
| 13:37:44 13 | Q. Okay. |
| 13:37:46 14 | A. My hope and desire was that it would, and that's |
| 13:37:49 15 | why we began with the policy. |
| 13:37:49 16 | Q. But you anticipated that not all officers would |
| 13:37:54 17 | in January of 2016? |
| 13:38:02 18 | A. We considered that there would need some time |
| 13:38:07 19 | before all officers were accustomed to the new |
| 13:38:10 20 | technology. |
| 13:38:10 21 | Q. So when someone said there was a problem, when |
| 13:38:13 22 | one of the deputy chiefs said to you there was a problem |
| 13:38:14 23 | because at least one officer failed to activate his body |
| 13:38:19 24 | camera, why was that a problem? |
| 13:38:20 25 | A. So I should -- I don't recall the exact word |

13:38:24  1    being "problem."  I just recall that there was an issue,

13:38:30  2    that we would have preferred that camera be activated,

13:38:33  3    and it was not.

13:38:33  4    Q.      What is a managerial review?

13:38:37  5    A.      This is where high-level staff in the department

13:38:42  6    look at the available documents and see if there are any

13:38:47  7    concerns, issues, training that may become apparent by

13:38:54  8    such review.

13:38:54  9    Q.      Were any other concerns or issues conveyed to

13:38:56 10    you other than at least one officer failed to activate

13:39:00 11    his body camera?

13:39:01 12    A.      No.

13:39:01 13    Q.      That was the only one?

13:39:04 14    A.      Correct.

13:39:04 15    Q.      What is the supervisorial review?

13:39:12 16    A.      A manager is a supervisor.

13:39:14 17    Q.      Well, you said two different things.  You said

13:39:16 18    that there was a managerial review and a supervisorial

13:39:20 19    review.  So I assume there were two different reviews.

13:39:23 20            Did I assume incorrectly?

13:39:25 21    A.      Yes.

13:39:25 22    Q.      Okay.  And so there was only one review that was

13:39:29 23    done that you're aware of?

13:39:31 24    A.      Yes.

13:39:31 25    Q.      And that was the only time you were briefed on

13:43:34 1       MR. WALKER: Q. Did you consider that to be

13:43:37 2 appropriate?

13:43:37 3 A.     Based on the overall context of have the

13:43:40 4 situation, yes.

13:43:41 5 Q.     Did you get any information about Mr. -- about

13:43:47 6 Officer Jason DiGiulio being on top of Mr. Valencia?

13:43:55 7       MR. STEVENS: Object to the term "on top" as

13:43:57 8 misstating evidence.

13:43:59 9       THE WITNESS: Not in those words, no.

13:44:02 10       MR. WALKER: Q. Did you get any information

13:44:04 11 about asphyxia having occurred to Mr. Valencia?

13:44:07 12       MR. STEVENS: I'll object that it calls for a

13:44:10 13 legal and a medical conclusion. That is one of hotly

13:44:12 14 contested issues in this case.

13:44:13 15       THE WITNESS: No.

13:44:14 16       MR. WALKER: Q. Did asphyxia ever come up in

13:44:19 17 any conversations that anyone had with you as to what

13:44:19 18 happened on the night of January 19th, 2016?

13:44:21 19 A.     The word "asphyxia"?

13:44:23 20 Q.     Yes.

13:44:23 21 A.     Not that I recall.

13:44:24 22 Q.     Do you know what a mount is?

13:44:30 23 A.     You may need to tell me what you're talking

13:44:31 24 about.

13:44:32 25 Q.     I don't know. Your officer said they -- one of

| | | |
|---|---|---|
| 13:47:16 | 1 | Q.      But when you had this managerial review, what |
| 13:47:19 | 2 | were you told was the reason for his death? |
| 13:47:22 | 3 | A.      I was not told. |
| 13:47:23 | 4 | Q.      Did you ask? |
| 13:47:27 | 5 | A.      We did not know what the cause of death was. |
| 13:47:29 | 6 | Q.      Did you ask either of your deputy chiefs how it |
| 13:47:33 | 7 | is that Mr. Valencia died? |
| 13:47:38 | 8 | A.      No. |
| 13:47:38 | 9 | Q.      Do you know what excited delirium is? |
| 13:47:45 | 10 | A.      Yes. |
| 13:47:46 | 11 | Q.      What is it? |
| 13:47:48 | 12 | MR. STEVENS:  We're now asking for a medical and |
| 13:47:50 | 13 | a legal opinion.  I cannot -- |
| 13:47:51 | 14 | MR. WALKER:  No.  You got your objection. |
| 13:47:53 | 15 | That's fine. |
| 13:47:54 | 16 | MR. STEVENS:  Yeah. |
| 13:47:54 | 17 | Testify as to your understanding of the term. |
| 13:47:56 | 18 | THE WITNESS:  Yeah.  I know it to be a -- have a |
| 13:48:00 | 19 | legal and medical definition of which I don't know, but |
| 13:48:06 | 20 | I understand that it can lead to death. |
| 13:48:11 | 21 | MR. WALKER:  Q.  Well, if somebody uses the term |
| 13:48:16 | 22 | "excited delirium," what do you interpret that to mean? |
| 13:48:22 | 23 | A.      That somebody has certain situations going on |
| 13:48:26 | 24 | with their body that can overwork the body and, |
| 13:48:29 | 25 | therefore, cause death. |

13:52:51  1    Q.      Do you know if any lessons came out of the

13:52:56  2    encounter with Filiberto Valencia, Jr., on January 19th,

13:53:01  3    2016, that were imparted to the rest of the department?

13:53:09  4    A.      None that I recall.

13:53:09  5    Q.      And you said that of the information given to

13:53:15  6    you, there was no obvious indication of inappropriate

13:53:20  7    use of force on January 19th.

13:53:22  8            Were you given any sort of written report?

13:53:28  9    A.      No, not that I recall.

13:53:28  10   Q.      Were you given any photographs?

13:53:31  11   A.      No.

13:53:31  12   Q.      Let me show you what's in evidence as Exhibit

13:53:34  13   25.

13:53:34  14           Have you ever seen that before?

13:53:35  15   A.      I have not.

13:53:36  16   Q.      If you had seen that, would that have caused

13:53:38  17   you -- this is a photograph of Filiberto Valencia, Jr.

13:53:41  18   after death.

13:53:42  19           If you had seen that, would that have caused you

13:53:43  20   to do any inquiry of anybody as to how the bruises came

13:53:46  21   about on his face?

13:53:47  22           MR. STEVENS:   It's argumentative as phrased.

13:53:51  23           MR. WALKER:   Q.   Would you?

13:53:54  24   A.      Not necessarily.

13:53:55  25   Q.      Show you photograph 39, a close-up of Filiberto

| 13:56:04 | 1 | | Do you see any injuries on his face? |
| 13:56:08 | 2 | A. | I'll have to examine the photo. |
| 13:56:12 | 3 | Q. | Were you familiar with Officer Jason DiGiulio |
| 13:56:16 | 4 | prior to January 19th, 2016? |
| 13:56:18 | 5 | | MR. STEVENS: Vague as to "familiar." |
| 13:56:20 | 6 | | MR. WALKER: Q. Were you aware he existed? |
| 13:56:23 | 7 | A. | Am I -- on this? |
| 13:56:27 | 8 | Q. | No, no, no. |
| 13:56:27 | 9 | A. | Okay. |
| 13:56:27 | 10 | Q. | I'm taking these away from you now, so you can |
| 13:56:30 | 11 | turn your attention elsewhere. |
| 13:56:32 | 12 | A. | All right. So I'm ready for this question. |
| 13:56:33 | 13 | Q. | Okay. Did you know Officer Jason DiGiulio was |
| 13:56:36 | 14 | in your department -- |
| 13:56:37 | 15 | A. | Yes. |
| 13:56:37 | 16 | Q. | -- as of January 19th? |
| 13:56:40 | 17 | | How did you know that? |
| 13:56:43 | 18 | A. | I don't exactly know how. |
| 13:56:45 | 19 | Q. | Did you ever have any interaction with him? |
| 13:56:48 | 20 | | MR. STEVENS: Vague as to "interaction." |
| 13:56:55 | 21 | | MR. WALKER: Q. Had you ever been involved in |
| 13:56:57 | 22 | disciplining Jason DiGiulio? |
| 13:57:05 | 23 | A. | Personally? |
| 13:57:06 | 24 | Q. | Yes. |
| 13:57:07 | 25 | A. | I don't recall. |

51

13:57:07 1   Q.      Were you aware that he had been disciplined on

13:57:10 2   multiple occasions by the Stockton Police Department

13:57:12 3   prior to January 19th, 2016?

13:57:15 4           MR. STEVENS:  Vague as to "multiple."

13:57:18 5           THE WITNESS:  Nothing specific.  There are many,

13:57:23 6   many officers.

13:57:23 7           MR. WALKER:  Q.  If an officer is suspended for

13:57:27 8   excessive use of force, does that come to your attention

13:57:29 9   as the chief of police?

13:57:30 10  A.      Yes.

13:57:30 11  Q.      Is there any policy the Stockton Police

13:57:34 12  Department has regarding how much discipline an officer

13:57:38 13  will receive before he's discharged or she's discharged

13:57:42 14  from the department?

13:57:42 15  A.      Yes.

13:57:42 16  Q.      What is that policy?

13:57:52 17  A.      40 or 45 days of suspension, I believe.  That's

13:57:58 18  an estimate.

13:57:58 19  Q.      So a person could be suspended 10 or 12 times

13:58:02 20  before he or she is subject to discharge from the

13:58:05 21  department?

13:58:06 22          MR. STEVENS:  That's argumentative as phrased.

13:58:07 23  He's answered the question.

13:58:09 24          MR. WALKER:  Q.  Is that correct?  Could a

13:58:09 25  person be disciplined, suspended 10 or 12 times?

| | | |
|---|---|---|
| 13:58:12 | 1 | A.      Could it occur? |
| 13:58:14 | 2 | Q.      Yes. |
| 13:58:14 | 3 | A.      Yes. |
| 13:58:14 | 4 | Q.      Do you know how many times Officer DiGiulio had |
| 13:58:17 | 5 | been suspended prior to January 19th, 2016? |
| 13:58:20 | 6 | A.      I do not. |
| 13:58:21 | 7 | Q.      Do you know if he had been suspended for |
| 13:58:24 | 8 | excessive use of force prior to January 19th? |
| 13:58:26 | 9 | A.      As I sit here now, I do not recall. |
| 13:58:28 | 10 | Q.      Have you ever fired an officer, discharged an |
| 13:58:33 | 11 | officer for excessive use of force? |
| 13:58:39 | 12 | A.      Have I terminated from employment officers |
| 13:58:45 | 13 | specifically for excessive force under my reign?  I'm |
| 13:58:50 | 14 | not certain. |
| 13:58:50 | 15 | Q.      You don't think you have? |
| 13:58:52 | 16 | A.      That's not may statement. |
| 13:58:53 | 17 | Q.      You said you're not certain.  Now I'm asking you |
| 13:58:55 | 18 | another question, because you didn't give me a |
| 13:58:57 | 19 | definitive answer. |
| 13:58:58 | 20 |         You don't think you have discharged anybody; is |
| 13:59:01 | 21 | that correct? |
| 13:59:02 | 22 | A.      No.  I've discharged several officers from |
| 13:59:07 | 23 | employment, and I believe one was -- I believe one may |
| 13:59:18 | 24 | have been from force used. |
| 13:59:20 | 25 | Q.      And how long ago was that, the one you believe |

14:00:27 1    A.        Yes.

14:00:27 2    Q.        Was there any discussion of charging Officer

14:00:32 3    DiGiulio with criminal matter as a result of his conduct

14:00:37 4    on the night of January 19th, 2016?

14:00:41 5    A.        That is the role of the District Attorney to

14:00:44 6    determine that.

14:00:45 7    Q.        Have you had any discussions with anybody in the

14:00:49 8    District Attorney's Office as to whether criminal

14:00:51 9    charges should be brought against Officer DiGiulio as a

14:00:53 10   result of his conduct on the night of January 19th,

14:00:57 11   2016?

14:01:00 12   A.        No, none I recall.

14:01:00 13   Q.        Now, earlier I asked if you had ever been

14:01:15 14   involved in disciplining Jason DiGiulio, and you

14:01:18 15   hesitated.  At least that was my interpretation.

14:01:20 16            Is that because you're aware that he had been

14:01:25 17   disciplined prior to January 19th, 2016?

14:01:31 18   A.        I believe there was some sort of discipline in

14:01:34 19   his career prior, but I do not recall exactly what that

14:01:39 20   was.

14:02:01 21   Q.        Are aware that on one occasion Officer DiGiulio

14:02:07 22   was rated as substandard in 6 of the 11 job functions in

14:02:11 23   his performance evaluation, including controlling

14:02:14 24   stressful volatile situations and evaluating

14:02:19 25   emergencies?

| | | |
|---|---|---|
| 14:02:19 | 1 | A.        No. |
| 14:02:19 | 2 | Q.        Blair Ulring was your predecessor; is that |
| 14:02:35 | 3 | correct? |
| 14:02:36 | 4 | A.        Yes. |
| 14:02:36 | 5 | Q.        How long was Blair Ulring chief of police? |
| 14:02:41 | 6 | A.        I believe a couple of years, approximately two. |
| 14:02:47 | 7 | Q.        What position did you hold?  Is Blair a male or |
| 14:02:51 | 8 | a female? |
| 14:02:51 | 9 | A.        Male. |
| 14:02:52 | 10 | Q.        Okay.  What position did you hold while he was |
| 14:02:56 | 11 | chief of police? |
| 14:02:58 | 12 | A.        Both deputy chief and assistant chief. |
| 14:03:01 | 13 | Q.        And what's your understanding as to why Chief |
| 14:03:05 | 14 | Ulring left the position? |
| 14:03:14 | 15 |          MR. STEVENS:  Irrelevant. |
| 14:03:14 | 16 |          THE WITNESS:  I don't know. |
| 14:03:14 | 17 |          MR. WALKER:  Q.  As deputy chief, you didn't |
| 14:03:15 | 18 | know why the chief left? |
| 14:03:17 | 19 | A.        It's a -- correct. |
| 14:03:19 | 20 | Q.        Did you ever make inquiry? |
| 14:03:21 | 21 | A.        With the chief of police? |
| 14:03:23 | 22 | Q.        With anyone as to how it was that you were |
| 14:03:26 | 23 | suddenly going to become chief of police. |
| 14:03:28 | 24 | A.        Oh, that's two entirely different questions. |
| 14:03:30 | 25 | Q.        All right.  Let's go back to, when you as the |

| | | |
|---|---|---|
| 14:11:12 | 1 | A.　　　Oh, yes. |
| 14:11:13 | 2 | Q.　　　Did you have meetings with any people who felt |
| 14:11:16 | 3 | that their children or their child had improperly died |
| 14:11:20 | 4 | at the hands of Stockton police? |
| 14:11:23 | 5 | A.　　　Yes. |
| 14:11:24 | 6 | Q.　　　The general order D-11 that addresses mentally |
| 14:11:37 | 7 | ill I'll put in front of you.  If you want to take a |
| 14:11:40 | 8 | moment just to glance through that, and tell me if, in |
| 14:11:44 | 9 | deed, you are familiar with it. |
| 14:12:12 | 10 | A.　　　It does appear to be the policy that I approved. |
| 14:12:15 | 11 | Q.　　　Was there any part of that policy that you wrote |
| 14:12:21 | 12 | yourself or that you requested specifically be inserted |
| 14:12:25 | 13 | in that general order? |
| 14:12:26 | 14 | A.　　　Not that I recall. |
| 14:12:27 | 15 | Q.　　　Since you have been chief of police have you |
| 14:12:34 | 16 | undertaken any type of program to train officers to |
| 14:12:36 | 17 | recognize mental impairment in individuals? |
| 14:12:41 | 18 | A.　　　Yes. |
| 14:12:41 | 19 | Q.　　　When did you do that? |
| 14:12:45 | 20 | A.　　　We've been doing mental health training for |
| 14:12:49 | 21 | before I became police chief. |
| 14:12:51 | 22 | Q.　　　What's the mental health training you've been |
| 14:12:56 | 23 | doing? |
| 14:12:58 | 24 | A.　　　It's a several hours' block of training for |
| 14:13:02 | 25 | officers, and we also have members from County |

Behavioral Mental Health Services assist in the training.

Q.      And are all officers required to undergo that mental health training?

A.      There is training in the academy that officers go through, not to become clinicians, but to be able to recognize certain things.

Q.      I want to focus just on the Stockton Police Department.  And I asked if you have undertaken any type of program to train officers to recognize mental impairment.  You said yes.  I said what is that training.  You said it's mental health training, several hours of training.

So when does this several hours of training take place?

A.      I don't know exactly when it takes place.

Q.      Who conducts it?

A.      The training is put together by our training unit.

Q.      What's the title of that training unit?

A.      Well, it's the personnel and training section of the police department.  I believe they're called the training unit.

Q.      And is it your understanding that as of the end of 2015 all patrol officers were supposed to have

14:14:19 1   undergone the training?

14:14:20 2   A.     I can't speak to whether all officers had gone

14:14:24 3   through the training.

14:14:25 4   Q.     All patrol officers.

14:14:33 5   A.     It's ongoing training as well as through roll

14:14:33 6   call briefing trainings to ultimately get all officers

14:14:36 7   through the training.

14:14:36 8   Q.     Are you aware that all three of the officers

14:14:38 9   involved in the death of Filiberto Valencia said they

14:14:42 10   had not ungone such mental training as of January --

14:14:46 11   mental health training as of January of 2016?

14:14:48 12   A.     I'm not sure what they stated.

14:14:50 13   Q.     Is this mental health training to which you

14:14:55 14   refer, is that required?

14:14:58 15   A.     It is not a state mandated POST training.  For

14:15:03 16   my department, it's we're doing the training.

14:15:05 17   Q.     Okay.  Your department requires that officers

14:15:08 18   undergo such training, correct?

14:15:10 19   A.     Yes.

14:15:10 20   Q.     And part of that training is to recognize mental

14:15:14 21   health issues in civilians, correct?

14:15:19 22   A.     I would have to take a look at the training

14:15:21 23   curriculum.  I don't know if it's that exact stated.

14:15:23 24   Q.     Where is the training curriculum?

14:15:25 25   A.     I do not have it.

| | | |
|---|---|---|
| 14:15:27 | 1 | Q. Who does? |
| 14:15:29 | 2 | A. If there's specific curriculum, the training |
| 14:15:32 | 3 | unit would have it. |
| 14:15:32 | 4 | Q. Have you ever reviewed the training curriculum? |
| 14:15:35 | 5 | A. No. |
| 14:15:35 | 6 | Q. Let me summarize this. |
| 14:15:39 | 7 | Did you expect patrol officers with the Stockton |
| 14:15:41 | 8 | Police Department to be trained in recognizing mental |
| 14:15:46 | 9 | health issues as of January 2016? |
| 14:15:49 | 10 | MR. STEVENS: This has been asked and answered. |
| 14:15:53 | 11 | MR. WALKER: Q. Did you expect that? |
| 14:15:55 | 12 | A. "Recognizing" indicates clinical classification, |
| 14:16:05 | 13 | so I don't know if that's the -- I don't know if that's |
| 14:16:08 | 14 | the proper phrase. |
| 14:16:09 | 15 | Q. Did you do anything to assist your officers in |
| 14:16:13 | 16 | being able to recognize whether an individual was |
| 14:16:17 | 17 | experiencing a mental health issue? |
| 14:16:19 | 18 | A. Yes. That's where Behavioral Health Services |
| 14:16:22 | 19 | comes in and speaks to our officers. |
| 14:16:24 | 20 | Q. Was that being done prior to January 2016? |
| 14:16:27 | 21 | A. I don't know the exact date. |
| 14:16:29 | 22 | Q. Do you have any reason to believe it was being |
| 14:16:32 | 23 | done prior to January 2016? |
| 14:16:34 | 24 | A. Not that I recall sitting here, no. |
| 14:16:39 | 25 | Q. Was there, in effect, as of January 2016, any |

| | | |
|---|---|---|
| 14:26:24 | 1 | A.      Same answer. |
| 14:26:25 | 2 | Q.      No.  You have to answer "yes" or  "no," not just |
| 14:26:28 | 3 | an all cases.  You can say "yes," "no" or "I don't |
| 14:26:32 | 4 | know." |
| 14:26:32 | 5 | Which is your answer? |
| 14:26:34 | 6 | A.      Repeat, please. |
| 14:26:35 | 7 | MR. WALKER:  Would you read back my question. |
| | 8 | (Record read by the reporter as follows: |
| | 9 | "Q.  But you would want to know if one of your |
| | 10 | officers beat somebody to death, wouldn't |
| | 11 | you?") |
| 14:26:49 | 12 | THE WITNESS:  So my answer to that is yes, I |
| 14:26:51 | 13 | want to know the findings in all deaths relating -- |
| 14:26:56 | 14 | MR. WALKER:  Q.  Have you been informed by |
| 14:26:58 | 15 | anyone, since you became chief of police, that an |
| 14:27:01 | 16 | individual died as a result of excited delirium while in |
| 14:27:06 | 17 | the custody of your officers? |
| 14:27:11 | 18 | A.      No recollection at this time. |
| 14:27:13 | 19 | Q.      Okay.  Let's turn to general order J-2, which is |
| 14:27:20 | 20 | on body-worn cameras. |
| 14:27:23 | 21 | MR. STEVENS:  Do I have that one?  Yeah. |
| 14:27:25 | 22 | MR. WALKER:  And mine is dated December 1st, |
| 14:27:28 | 23 | 2015, from Chief Eric Jones to all personnel.  And it's |
| 14:27:40 | 24 | a six-page order. |
| 14:27:44 | 25 | MR. STEVENS:  These are the ones that were |

14:37:24 1   in uniform, would that have had a camera, because it was

14:37:27 2   a -- there was a roll-out to this.

14:37:29 3   Q.      But if an officer had a camera, you would expect

14:37:32 4   that that officer had been trained in the use of the

14:37:34 5   camera, correct?

14:37:34 6   A.      That's correct.

14:37:35 7   Q.      So if we go down under policy, which is Roman

14:37:38 8   numeral III, it says, III, the letter -- capital letter

14:37:43 9   A, "All officers, and sergeants in a uniformed

14:37:46 10  assignment in Field Operations, Special Operations, code

14:37:50 11  officers, or investigations who normally respond to

14:37:54 12  calls for service or regularly take enforcement action

14:37:57 13  during the course of their duties and have received the

14:38:02 14  BWC training will be required to deploy with a Body Worn

14:38:06 15  Camera when working in that capacity."

14:38:08 16          And that was your order, correct?

14:38:09 17  A.      That's correct.

14:38:09 18  Q.      So if Officers DiGiulio, Amant and Sergeant

14:38:18 19  Mosher had been issued body-worn cameras, they were

14:38:21 20  required to deploy with those body-worn cameras when

14:38:26 21  they were responding to a call for service.  Agreed?

14:38:29 22  A.      Yes.

14:38:29 23  Q.      And then under heading capital letter B, it

14:38:36 24  says, "Officers assigned and trained on the use of the

14:38:38 25  BWC" -- the BWC is body-worn camera, agreed?

14:40:59 1    numeral E.  It says, "Officers who do not record, or

14:41:02 2    inadvertently stop recording with the BWC during an

14:41:07 3    event, must articulate the reason for this in the

14:41:07 4    appropriate call disposition or report."

14:41:11 5              Do you know if Officers DiGiulio, Amant, Wells,

14:41:23 6    Guillen and Sergeant Mosher articulated the reasons for

14:41:27 7    their failure to use their body camera in a report?

14:41:30 8              MR. STEVENS:  The officers in the case were

14:41:32 9    interviewed following the incident.  Those documents

14:41:34 10   speak for themselves.

14:41:35 11             MR. WALKER:  Q.  Do you know if they prepared a

14:41:37 12   report as to why they didn't -- all five of those people

14:41:40 13   didn't activate their body camera?

14:41:43 14   A.        It was covered in the reports.

14:41:44 15   Q.        Did you read that?

14:41:45 16   A.        No.

14:41:45 17   Q.        How do you know it was covered in the reports?

14:41:47 18   A.        My briefing of staff.

14:41:48 19   Q.        From whom?  Briefing from whom?

14:41:51 20   A.        What I mentioned before, the managerial.

14:41:53 21             All right.  That was the deputy chief.  You're

14:41:58 22   not sure which one it was.

14:41:58 23   A.        That's -- exactly.

14:42:01 24   Q.        Why is there no assistant chief right now so?

14:42:05 25             MR. STEVENS:  Because you have notified to the

14:46:09  1   also publicly put that out.

14:46:12  2   Q.       The Watch commander daily goes out to the public

14:46:16  3   at large?

14:46:16  4   A.       Correct.

14:46:16  5           (Mr. Beau Burbidge is now present.)

14:46:21  6           MR. WALKER:   Q.   Does the watch commander daily

14:46:36  7   go to you personally?

14:46:37  8   A.       Yes.

14:46:37  9   Q.       Is that on your desk everyday when you come into

14:46:40 10   work?

14:46:41 11   A.       Electronically.

14:46:41 12   Q.       So it's on your computer?

14:46:45 13   A.       Email.

14:46:45 14   Q.       Email.   Do you review it everyday?

14:46:47 15   A.       I do.

14:46:48 16   Q.       So if there's an in-custody death, you're aware

14:46:51 17   of it from looking at the watch commander daily if

14:46:55 18   somebody hasn't contacted you directly?

14:47:01 19   A.       That's one thing that could happen.

14:47:06 20   Q.       Let's take a look at general order Q-1.

14:47:10 21           And do you have a copy of that, Detective Jones?

14:47:32 22   A.       I do.

14:47:37 23   Q.       This is use of force, dated July 15th, 2015,

14:47:41 24   from Chief Eric Jones to all personnel.

14:47:44 25           If we have a copy, could you get that marked as

14:47:47 1 Exhibit 4.

2            (PLAINTIFFS' EXHIBIT NO. 4 WAS MARKED FOR

3            IDENTIFICATION.)

14:47:57 4            MR. WALKER:  Q.  Under Roman numeral I, policy

14:48:06 5   subsection A, second sentence says, "Attempts will be

14:48:14 6   made to achieve control through advice, warnings and

14:48:18 7   persuasion."

14:48:19 8            This was a general order from you, as chief of

14:48:29 9   police, to all members of your department who are

14:48:35 10  confronted with a situation in which there is a possible

14:48:38 11  use of force required.  Would that be fair to say?

14:48:45 12  A.       That's not how that sentence reads, but this

14:48:48 13  general order put out July 15 was approved by me, yes.

14:48:53 14  Q.       Okay.  Why is it not the way the sentence reads?

14:48:57 15  I thought I read it verbatim.

14:49:00 16  A.       I believe you stated, you began, situations or

14:49:02 17  resistance or a threat to life is encountered, advice,

14:49:08 18  warnings, persuasion would be given.

14:49:10 19           Oh, pardon me.  I was reading -- I read the

14:49:15 20  third one.

14:49:16 21  Q.       Let me just start again on this so that we're on

14:49:20 22  the same line.

14:49:20 23  A.       Okay.

14:49:20 24  Q.       Under the heading policy, subheading A, it says,

14:49:25 25  "At times Department members are confronted with

14:49:28  1  situations where control is required to make an arrest

14:49:31  2  or protect public safety."

14:49:33  3          I think we can all agree with that.

14:49:35  4  A.      Yes.

14:49:35  5  Q.      Then your next sentence was, "Attempts will be

14:49:38  6  made to achieve control through advice, warnings and

14:49:41  7  persuasion."

14:49:41  8          That was a your directive to all of your

14:49:44  9  officers as of July 15th, 2015, correct?

14:49:52 10  A.      Correct.

14:49:52 11  Q.      Do you know if Officer DiGiulio and Officer

14:49:52 12  Amant followed through with any attempts to achieve

14:49:55 13  control over Mr. Valencia through advice, warnings and

14:50:00 14  persuasion?

14:50:01 15          MR. STEVENS:  It's an incomplete hypothetical.

14:50:03 16  It also misstates the evidence in this case.

14:50:06 17          MR. WALKER:  Q.  Do you know that?

14:50:08 18  A.      I do know it was a very chaotic, active, violent

14:50:15 19  scene.  And that sentence indicates that it is a static

14:50:22 20  or controlled scene.

14:50:24 21  Q.      What is the source of your information that it

14:50:27 22  was a chaotic, active, violent scene?

14:50:35 23  A.      The managerial briefing we discussed.

14:50:38 24  Q.      So you don't have any firsthand knowledge of

14:50:43 25  that?

14:51:54 1          MR. WALKER:  Q.  All right.  So you feel that

14:51:57 2   this part of your general order was complied with with

14:52:01 3   respect to the events of July -- of January 19th, 2016?

14:52:05 4   A.      Yes.

14:52:05 5   Q.      And then the subsection C says department

14:52:09 6   members shall abide by all constitutional guidelines

14:52:14 7   when force is offered.

14:52:15 8          To what were you referring when you talked about

14:52:18 9   constitutional guidelines?

14:52:21 10  A.      The United States Constitution.

14:52:24 11  Q.      Were you referring in particular to the Fourth

14:52:26 12  Amendment?

14:52:26 13  A.      Yes.

14:52:26 14  Q.      What do you understand the Fourth Amendment

14:52:29 15  says?

14:52:29 16  A.      I don't have it right before me, but --

14:52:32 17  Q.      In general.

14:52:33 18  A.      So we are free from unlawful searches and

14:52:37 19  seizures, which could be of our person or property.

14:52:41 20  Q.      Okay.  So you expected all of your officers to

14:52:42 21  be familiar with the Fourth Amendment, correct?

14:52:44 22  A.      Yes.

14:52:45 23  Q.      Did you have any general order regarding the

14:52:48 24  Fourth Amendment?

14:52:53 25  A.      In this particular order?

STATE OF CALIFORNIA    )
                       )  Ss
COUNTY OF ALAMEDA      )


        I, LaRelle Fagundes, hereby certify that the
witness in the foregoing deposition named

                CHIEF ERIC JONES


was by me duly sworn to testify to the truth, the whole
truth, and nothing but the truth in the within-entitled
cause; that said deposition was taken at the time and
place herein named, that the testimony of said witness
was reported by me, a certified shorthand reporter and a
disinterested person, and thereafter transcribed into
typewriting.

        And I further certify that I am not of counsel
or attorney for either or any of the parties to said
deposition, nor in any way interest in the outcome of
the cause name in said caption.


_____ Reading and Signing was requested.

_____ Reading and Signing was waived.

__X___  Reading and Signing was not requested.



DATE: 1/23/18


                _LaRelle M. Fagundes_
_____
LaRelle M. Fagundes, CSR 9762

# EXHIBIT I

**STOCKTON POLICE DEPARTMENT**

**GENERAL ORDER**

**BODY WORN CAMERA SYSTEM**
**SUBJECT**

| | | | |
|---|---|---|---|
| **DATE:** | **DECEMBER 1, 2015** | **NO:** | **J-2** |
| **FROM:** | **CHIEF ERIC JONES** | **TO:** | **ALL PERSONNEL** |
| **INDEX:** | BODY WORN CAMERA SYSTEM | | |
| | CALIFORNIA PUBLIC RECORDS ACT | | |

I.   **PURPOSE**

   A.   To provide policy and procedures for use of the Body Worn Camera (BWC) that produces recordings of field activity in the course of official police duties.

   B.   This policy applies to all officers who have been issued and trained on the use of the body-worn camera device.

II.   **DEFINITIONS**

   A.   Body Worn Camera (BWC) – An electronic recording device individually worn by officers that can capture audio and video when activated. The current authorized device is the VieVu LE3, which is individually assigned to uniformed officers as standard issued equipment.

   B.   Digital Evidence Management System (DEMS) – A management system designed to digitally collect, store, secure, disseminate and purge recorded media. The digital recordings are accessible to authorized personnel and maintain an audit trail of user activity.

III.   **POLICY**

   A.   All officers, and sergeants in a uniformed assignment in Field Operations, Special Operations, code officers, or Investigations who normally respond to calls for service or regularly take enforcement action during the course of their duties and have received the BWC training will be required to deploy with a Body Worn Camera when working in that capacity.

   B.   Officers assigned and trained on the use of the BWC will not deploy into the field without a working device unless approved by a Lieutenant, Police Services Manager, or higher. Examples of when this is authorized are if the Officer's assigned BWC is inoperable and there are no replacements, if the Officer's BWC is missing and a replacement is not available, or if the Officer is directed out to the field immediately due to a critical incident prior to roll call.

   C.   The use of a BWC provides documentary evidence for criminal investigations, internal or administrative investigations, and civil litigation. Officers shall utilize this device in accordance with the provisions in this general order to maximize the effectiveness of the audio/video documentation to achieve operational objectives and to ensure evidence integrity.

   D.   Only trained personnel should operate approved BWC devices.

   E.   Personnel will use only the BWC issued and approved by the Department. The wearing of any other BWC is not authorized.

   F.   Personnel will not make copies or use other recording devices to capture images on the display screen for personal use or distribution. The capture and distribution of images on the display screen for tactical or investigatory purposes can be approved by a Lieutenant, Police Services Manager or higher.

G. Personnel should not intentionally remove, dismantle or tamper with any hardware and/or software component or part of the BWC.

H. Information obtained on a BWC is part of an SPD investigation, undertaken for the purpose of determining whether a violation of law or other code may occur or has occurred.

## IV. PROCEDURES

A. There are many situations where the use of the BWC is appropriate. This policy is not intended to describe every possible circumstance. In addition to the required conditions, officers may activate the system any time they feel its use would be appropriate and/or valuable to document an incident.

B. Unless it is unsafe or impractical to do so, officers should record pedestrian contacts, interviews, and other events when the recording has value as evidence, to limit liability, to resolve citizen complaints, or as a training tool in any of the following incidents:

   1. Enforcement encounters where there is a reasonable suspicion the person is involved in criminal activity. This includes, but is not limited to dispatched calls for service as well as self-initiated activities.

   2. Probation or parole searches.

   3. Vehicle Pursuits.

   4. K9 Deployments.

   5. Any other contact that becomes adversarial after the initial contact in a situation that would not otherwise require taping.

   6. During the investigation or inspection to determine code violations.

C. While activated, the recording should not be intentionally terminated until the conclusion of the encounter. If a situation arises where officers need to intentionally stop a recording, then a legitimate reason will be articulated on the recording prior to terminating. For the purposes of this policy, legitimate reasons may include but are not limited to the filming of: juvenile victims, sex crimes victims, confidential informants, instances of tactical planning, and with respect to HIPPA concerns.

D. Officers will have some level of discretion regarding when to stop a recording because there is no longer any investigative purpose to continue the recording and all parties are cooperating. The officer should dictate this reason on the video before ending the camera activation.

E. Officers who do not record, or inadvertently stop recording with the BWC during an event, must articulate the reason for this in the appropriate call disposition or report.

F. The Stockton Police Department prohibits surreptitiously and/or intentionally recording any member of this department's personnel without the expressed knowledge and consent of all parties. Officers shall not use the BWC recording functions to record any personal conversation of another department member without the recorded person's knowledge.

G. California Penal Code sections 632.7 and 633 govern recording of communications without consent of all parties. This allows officers, on official law enforcement duties, to record events without consent in places they are legally allowed to be. Officers are not required to obtain consent from a private person when:

   1. In a public place.

   2. In a location where there is no reasonable expectation of privacy (e.g., inside a building or dwelling where the officer is lawfully present and engaged in the performance of official duties)

3. Officers are encouraged to advise private persons they are recording if the advisement may gain compliance, assist in the investigation, and does not interfere with the investigation or officer safety.

H. Officers, who are using a surplus camera that is not assigned to them, should use the download cable and not a dock to download their recordings. This will attach the officer's names to the videos.

I. Officers should document the use, or non-use, of a BWC in the synopsis of all police reports, citations, case history and field identification cards.

J. Officers should index this footage with the appropriate Documented Report number when indexing the downloaded videos. The following is a reference on how to index:

   1. When referencing Documented Report numbers, eg. "15-12345," using no spaces or letters.

   2. Code Enforcement Officers shall reference their case numbers, eg "15-123456," using no spaces.

K. Officers should continue to author reports as currently dictated by the Report Writing Manual and training. A summary of events and statements should still be included, and officers should not rely on the existence of BWC footage as the main documentation of a scene, interview, or incident.

L. Officers who experience a broken or malfunctioning BWC should advise their supervisor of the situation, turn in the malfunctioning device to the Administrative Sergeant, and make use of a spare BWC until their device is fixed.

V. **RESPONSIBILITIES**

A. Program Manager

   1. The Program Manager is designated by the Chief of Police and has oversight responsibilities to include, but not limited to, the following:

      a. Operation and user administration of the system.

      b. System evaluation.

      c. Training.

      d. Policy and procedure review and evaluation.

      e. Coordination with IT regarding system-related issues.

      f. Ensure BWC files of evidentiary value are secured and maintained until the proper evidence disposition is received from the San Joaquin County Court system. Ensure all other routine files are secure and maintained a minimum of 13 months.

      g. Ensure BWC files are being reviewed and released in accordance with federal, state, local statues, and City Stockton/Stockton Police Department retention policy.

      h. The Body Camera Program Manager or his/her designee is the sole person with authority to order editing or deletion of recorded footage.

      i. It is the responsibility of the Program Manager or his/her designee to restrict access to files which are deemed confidential due to internal investigations, or high profile incidents.

      j. Schedule and convene meetings of the Core Policy Team comprised of members

of the Stockton Police Department, Stockton Police Officers Association, Stockton City Attorney's Office, and San Joaquin County District Attorney's Office.

B. Supervisor Responsibility

    1. Supervisors will ensure officers utilize the BWC according to policy guidelines.

    2. Supervisors will be responsible for monitoring and documenting the use, and failure to use the BWC to ensure officers are receiving needed training and counseling regarding the device.

    3. Supervisors and reviewing investigative team members should receive training in the review of BWC videos.

    4. Supervisors will provide roll call or Code Enforcement staff training monthly to assure officers are aware of their responsibilities regarding the BWC. Supervisors will document those in attendance and make note of the training in the officer's performance log as a "TRAINING" entry. This training schedule will change from monthly training to bi-annually on January 1, 2016.

C. Officer Responsibility

    1. BWCs are assigned to individual officers. It is the responsibility of each Officer to check the battery is fully charged and operating properly at the beginning of each shift. Although there will be uploading/charging banks throughout the Department, Officers should take BWC with them as they secure from duty and charge them in their own secure environment to prevent loss or mishandling. Code Enforcement Officers are to charge their BWC's within a locked cabinet at their work station.

    2. Officers shall wear the device affixed in an appropriate forward facing manner and secured as recommended by the manufacturer. This will provide for the best field of view possible.

    3. Immediately report unresolved equipment malfunctions and problems to their supervisor and or the administrative sergeant.

    4. Provide feedback through their supervisors to the Program Administrator regarding challenges and concerns on the BWC program.

    5. Officers should dock their issued camera for automated upload of BWC data files throughout their shift and daily at the end of their shift to ensure the BWC storage capacity is not exceeded and/or to upload files.

    6. After downloading data, officers should index video files appropriately with respect to the software capability within 24 hours of making the recording.

    7. In the event of an accidental activation of the BWC where the resulting recording is of no investigative or evidentiary value, the recording employee may request that the BWC file be deleted by submitting an email request with sufficient information to locate the BWC file to their sergeant. Code Enforcement Officers request shall be submitted to the Police Services Manager. The officer's sergeant or manager shall review the file, approve or deny the request, forward the request to the Program Manager and advise whether they feel the request should be approved or denied. The Program Manager will review the video, and if he/she concurs with an approved request, the Program Manager will then delete the video.

D. Evidence/ Identification Technician

    1. All instances of duplication will be tracked through the BWC management software.

    2. Copies will be sent to or picked up by the requesting person, or the appropriate designee.

J-2

3. Duplication of BWC files from a single case that are too large to place on twenty (20) separate DVD's or less will be placed on a flash media drive.

4. Any requests that require editing of an original file will require the booking of the final edited version into property under the appropriate Documented Report number. Editing of video files is a time consuming process that will not be routinely performed, and requests should be used sparingly. Documentation of what editing has been done to the original file will be placed in the description box of the property record and in a subsequent report.

5. Requests for duplications that are already booked into Property should be made to the BWC Technician.

6. In the absence of the BWC Technician, the EIT Supervisor will consult with the Administrative Sergeant to assign an appropriate designee to make the requested copies.

VI. **REVIEW OF DATA/ VIDEO**

A. Data captured by the BWC is an official police record and shall be treated in the same manner as ARS reports, citations, and evidence. All access to the system will be logged and subject to compliance audit at any time. Access to the data from the system is permitted on a right to know, need to know basis. Employees authorized under this policy may review video according to the provisions of this policy.

B. Reviewing a BWC file may require documenting the specific reason for access on the video file page in a notation field prior to viewing unless exempted by the Chief of Police or his/her designee.

C. An employee may review BWC files as it relates to:

1. Their involvement in an incident for the purposes of completing a criminal investigation and preparing official reports.

2. Detectives will have access to files and may view videos they are working on. If copies are needed, then a request to the BWC Technician will be filled out.

3. Prior to courtroom testimony or for courtroom presentation.

4. Prior to providing a statement pursuant to an administrative inquiry, including but not limited to officer involved shooting investigations and Countywide Protocol Investigations.

5. For potential training purposes.

6. In the instance of a Professional Standards Section review/ investigation.

7. A supervisor necessitating clarification regarding a concern from a citizen.

8. A supervisor, manager, or Department investigative team investigating a specific incident, act, or accusation of officer conduct, may review videos based on a reasonable supervisory need.

D. Members of the prosecution team and City Attorney's Office, with the permission of the Chief of Police or his/her designee may view videos.

E. In no event shall any recording be used or shown for the purpose of ridicule or embarrassing any employee or member of the community.

VII. **BWC FILE REQUESTS**

A. Departmental Requests

1. Departments, to include the District Attorney's Office or City Attorney's Office, shall forward a written request via email with sufficient information to locate the BWC file to the BWC Evidence Technician via email or request form as is done with requests of

photographs.

    a. Examples of sufficient information needed to locate a BWC file are: documented report number, call history number, date of occurrence, time range of occurrence, officer's identification number, and case number.

    b. A copy of the BWC file can be made by the Technician in accordance with the provisions of this order to fulfill requests.

    c. Requests should provide a seven (7) working day lead time before the files are needed. If copies are needed sooner, special accommodations may be made by contacting the Evidence/Identification Unit Supervisor.

  2. The Stockton Police Department will make efforts to provide the San Joaquin County District Attorney's Office with "view" access to digital evidence on arrests and referrals for prosecution through the vendor software.

B. Non-Departmental Requests

  1. All other requests for a BWC file shall be accepted and processed in accordance with federal, state, local statutes, and Departmental policy as set forth in General Orders C-6 "Tracking of Public Records Request." This includes outside subpoenas and other Public Records requests per Government Code sections 6250-6270. These requests will be forwarded immediately to the Technical Services Secretary.

  2. Files requested through subpoena and approved through the City Attorney's Office or District Attorney's Office will be duplicated and distributed unedited.

  3. If BWC files must be released through a California Public Records Act and have to be redacted due to privacy concerns, the entire screen will be blurred through the use of a digital filter. This procedure is recommended as the redaction of footage frame by frame is an arduous task which requires a high level of technical expertise and undue expenditure of time.

  4. If BWC files are to be released, all officers involved in the video will be advised of the release.

C. Training requests

  1. A BWC file may be utilized as a training tool for individuals, specific units, and the Department as a whole. A recommendation to utilize a BWC file for such purpose may come from any source.

  2. A person recommending utilization of a BWC file for training purposes shall submit the recommendation through the chain of command to their respective Division Commander.

  3. BWC files shall not be used for training purposes without the permission of the involved employee, or the employee's legal representative.

VIII.  **RETENTION**

A. It is the policy of the Stockton Police Department to maintain all files saved to the DEMS for a minimum of thirteen (13) months.

  1. Files that are deemed evidence will be stored until the applicable statute of limitations has expired, or the case has been adjudicated, and the case agent has filed an evidence disposition allowing for its destruction.

  2. All files of evidentiary value will be archived to DVD and booked as evidence, or to a "cloud" based storage solution if one is available, at the end of one calendar year.

  3. Large files or groups of files from the same incident may be transferred to a solid state storage device and booked into evidence for archival purposes.

J-2

**EXHIBIT J**

**STOCKTON POLICE DEPARTMENT**

**GENERAL ORDER**

**MENTALLY ILL**
**SUBJECT**

**DATE:** June 22, 2015                            **NO:** D-11

**FROM** CHIEF ERIC JONES                     **TO:** ALL PERSONNEL

**INDEX:** Mentally Ill
           Handling the Mentally Ill

I.     **POLICY**

      Sworn personnel will take into custody persons falling within the provisions of Welfare and Institutions Code (W&I) Section 5150.

II.    **LAW**

      A.     State law determines that the San Joaquin county Mental Health Service is responsible for care of the mentally ill.

      B.     Section 5150 W&I states in part:

           1.     When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, member of the attending staff, as defined by regulation, of an evaluations facility designated by county, designated members of a mobile crisis team provided by Section 5651.7 W&I, or other professional persons designated by the county may, upon probable cause, take, or cause to be taken, the person into custody and place him/her in a facility designated by the county and approved by the State Department of Mental Health as a facility of 72 hour treatment and evaluation.

      C.     Section 5150.1 W&I states:

           1.     No peace officer seeking to transport, or having transported a person to a designated facility for assessment under Section 5150 W&I shall be instructed by mental health personnel to take or keep the person at a jail solely because the unavailability of an acute bed, nor shall the peace officer be forbidden to transport the person directly to the facility. No mental health employee from any agency, state, city, or private agency providing Short-Doyle psychiatric emergency service shall interfere with a peace officer performing duties under Section 5150 W&I by preventing the peace officer from entering designated facilities with the person to be assessed, nor shall any employee of such an agency require the peace officer to remove the person without assessment as a condition of allowing the peace officer to depart. "Peace Officer" for the purpose of this section also means a jailer seeking to transport or who are transporting a person in custody to a designated facility for assessment consistent with Section 4011.6 or 1011.9 of the Penal Code and Section 5150 W&I.

      D.     Section 5150.2 W&I states:

           1.     In each county whenever a peace officer has transported a person to a designated facility for assessment under Section 5150 W&I, that officer shall be detained no longer than the time necessary to complete documentation of the factual basis of the detention and a safe and orderly transfer of physical custody of the person. The documentation shall include detailed information regarding the factual circumstances and observations constituting probable cause for the peace officer to believe that the individual required psychiatric evaluation under the standards of Section 5150 W&I. Each county shall establish disposition procedures and guidelines with local law enforcement agencies as necessary to relate to persons not admitted for evaluation and treatment and who decline alternative mental health services and to relate the safe and orderly transfer of physical custody of persons under Section 5150 W&I, including those who have a criminal detention pending.

III.    **PROCEDURE**

A.    All Cases of Mental Illness:

    1.    Officers will take into custody persons, as a result of mental disorder, that are a danger to others, to themselves, or gravely disabled.

    2.    Section 5157 W&I requires that each person, when first detained for psychiatric evaluation, be given certain specific information orally, and a record be kept of the advisement by the evaluating facility.

        a.    All detentions that fall within the guidelines described in Section 5150 W&I shall include the completion of the Application for 72-hour Detention for Evaluation and Treatment Form (refer to attachments). This form will summarize the reason for the contact, transport/arrest, and will minimize the amount of time the police officer must accompany the subject once they arrive at County Mental Health. By completing this form, it will ensure that the subject is detained at the facility until examined by a psychiatrist. An arrest report will be completed ensuring that the subject is entered into RMS and a record is kept on file.

        b.    The Application for 72-hour Detention for Evaluation and Treatment Form includes a "detainment advisement" located at the top right corner. This advisement must be read to the detainee prior to the arrest or transportation of the subject if he/she falls within the guidelines of Section 5150 W&I. If the officer is not able to complete the advisement or the subject does not understand the advisement, the officer must check the "advisement incomplete" box and indicate the reason for not completing the advisement on the first line of the form.

        c.    This form includes an area for officers to summarize the detention and state the probable cause for the arrest or transportation. The officer shall complete the Application for 72-hour Detention for Evaluation and Treatment Form if the person being transported or detained falls within the following guidelines (definitions are included on the back of the form):

            (1)    A danger to himself/herself.
            (2)    A danger to others.
            (3)    Gravely disabled adult; or
            (4)    Gravely disable minor.

        d.    Upon arriving at County Mental Health, officers will submit the white and yellow copy of the form to the on-site crises worker. The pink copy shall be submitted to the Records Section as an attachment to the Arrest Report.

    3.    Prior to transportation, all mentally ill persons will be thoroughly searched by the arresting officer and the transporting officer, if not the same officer.

    5.    Officers must bear in mind that a mentally ill person can cause an officer more problems and should be handcuffed accordingly.

    6.    When transporting a mentally ill person, the officer should consider:

        a.    A two officer unit since a mentally ill person may be resentful of a patrol wagon.

        b.    Patrol wagon if the person is unruly or hard to manage.

        c.    Ambulance if the person is incapacitated.

    7.    When available, a female officer should transport females to the appropriate destination.

    8.    Occasionally, an on scene psychiatric social worker will need police assistance for transportation for a commitment.

        a.    Such calls will be handled by patrol officers.

B.    Firearms

Section 8102 of the Welfare and Institutions Code requires that whenever a person who has been detained or apprehended for examination of his or her mental condition, is found to own, have in his or her possession or under his or her control, any firearm whatsoever or any other deadly weapon, the firearm or other deadly weapon shall be confiscated by any law enforcement agency or peace officer, who shall retain custody of the firearm or other deadly weapon. The officer shall complete the Receipt and Notice of Rights for Confiscated Firearms and Other Deadly Weapons which includes this section:

---

**Mental Health Incidents – Notice of Rights**

A report of the details surrounding the confiscation of these items may be given to the City Attorneys Office. That office may file a petition in the County Superior Court within 30 days of the above date, alleging that the return of these items would be likely to result in endangering you or others. If the City Attorneys Office does not file a petition, the items must be returned to you by the law enforcement agency. The return of any firearm is subject to a determination by the Department of Justice stating that you are eligible to possess firearms and payment of all applicable storage fees. If the City Attorney's Office does file such a petition, a copy of the City Attorneys Office petition will be mailed to you at the address you provided to the law enforcement agency. If you wish to have a hearing you must notify the clerk of the County Superior Court within 30 days of the filing date of the City Attorney's Office petition. The clerk will then set a date and time for such hearing and a notification will be mailed to you. If you are detained under Welfare and Institutions Code 5150 and are subsequently involuntarily admitted to a mental health facility, you are prohibited from owning, possessing and controlling firearms for a period of five (5) years in California. If you currently own any firearms, you must contact the nearest law enforcement agency to surrender those firearms.

---

When a person is being placed in a mental health facility on a 72 hour hold for treatment and evaluation in addition to completing The Application for 72-hour Detention for Evaluation and Treatment Form and completing a W&I 5150 arrest report; the officer shall confiscate any firearm or other deadly weapon in plain view. The officer shall ask the person if they own or possess any firearms and deadly weapons and check for registered firearms. If there are firearms or other deadly weapons to be confiscated the officer will conduct a consensual or other lawful search. If consent is denied and there is no other lawful reason to search the scene or residence, contact Case Review for follow up with a warrant to confiscate the firearms or other deadly weapons. All W&I 5150 reports should be routed to Case Review and the Mental Health Liaison Officers for follow up of any seizure or lack of seizure of firearms.

C.    Court Orders:

    1.    Persons will be taken into custody when a court order exists.

    2.    The court order allows the following persons to take a subject into custody:

        a.    Peace officers.
        b.    Mental health counselors.
        c.    Court appointed officials.

D.    Inpatient Walk Aways:

    1.    Any patient that walks away or escapes from Mental Health and becomes involved in a criminal act shall be booked at the San Joaquin County Jail when apprehended.

    2.    A walk away or escapee may be returned to Mental Health if he/she has not been involved in a criminal act.

E.    Persons Mentally Ill and Intoxicated:

    1.    Persons who are mentally ill and intoxicated will be booked into the San Joaquin County Jail.

a. The arresting officer shall inform the transporting officer (if it's a different officer) and jail personnel that the person being booked is mentally ill under Section 5150 W&I.

F. Private Hospitals:

1. Occasionally, private hospitals will ask for assistance to handle mentally ill patients who must be taken to Mental Health.

   a. Officers shall obtain the names of the doctors and nurses in attendance and list their statements as to what the patient's actions have been.

   b. Complete the Application for 72-hour Detention for Evaluation and Treatment Form.

   c. Complete an Arrest Report.

   d. If the person is suffering from a medical condition they should be transported by ambulance. If no medical condition exists, the person may be transported in a police vehicle.

G. Voluntary Commitment:

1. Occasionally, citizens will ask officers for transportation to Mental Health. In these instances officers shall:

   a. Determine the reason for transportation.

      (1) Does the subject meets any of the elements of 5150 W&I?

      (2) Does the subject just want transportation to talk with a mental health counselor?

         (a) In this type of situation, the officer may transport the subject to Mental Health. No Application for 72-hour Detentions for Evaluation and Treatment Form or Arrest Report is needed. A notation shall be made in the officer's Unit History of the action taken.

   b. If the subject meets any of the elements of 5150 W&I the officer shall complete the Application for 72-hours Detention for Evaluation and Treatment Form.

   c. The officer shall transport the subject to Mental Health.

   d. The officer shall complete an Arrest Report.

## APPLICATION FOR 72-HOUR DETENTION FOR EVALUATION AND TREATMENT

*Confidential Client/Patient Information*
*See California W & I Code Section 5328*

DH 302 (5/99)

W & I Code, Section 5157, requires that each person when first detained for psychiatric evaluation be given certain specific information orally, and a record be kept of the advisement by the evaluating facility.

☐ **Advisement Complete**          ☐ **Advisement Incomplete**

Good Cause for Incomplete Advisement

| Advisement Completed By | Position | Date |
|---|---|---|
| | | |

### DETAINMENT ADVISEMENT

My name is _____
I am a (Peace Officer, etc.) with (Name of Agency). You are not under criminal arrest, but I am taking you for examination by mental health professionals at (Name of Facility).

You will be told your rights by the mental health staff.

*If taken into custody at his or her residence, the person shall also be told the following information in substantially the following form:*

You may bring a few personal items with you which I will have to approve. You can make a phone call and/or leave a note to tell your friends and/or family where you have been taken.

To ____ San Joaquin County Mental Health ____

Application is hereby made for the admission of _____

residing at _____, California, for 72-hour treatment and evaluation pursuant to Section 5150, (adult) et seq. or Section 5585 et seq. (minor), of the Welfare and Institutions Code. If a minor, to the best of my knowledge, the legally responsible party appears to be/is: (Circle one) Parent; Legal Guardian; Juvenile Court as a WIC 300; Juvenile Court as a WIC 601/602; Conservator. If known, provide names, address and telephone number: _____

* * * * * * * * * *

The above person's condition was called to my attention under the following circumstances: (See reverse side for definitions)

The following information has been established: (Please give sufficiently detailed information to support the belief that the person for whom evaluation and treatment is sought is in fact a danger to others, a danger to himself/herself and/or gravely disabled.)

Based upon the above information it appears that there is probable cause to believe that said person is, as a result of mental disorder:

☐ **A danger to himself/herself.**   ☐ **A danger to others.**   ☐ **Gravely disabled adult.**   ☐ **Gravely disabled minor.**

| Signature title and badge number of peace officer, member of attending staff of evaluation facility or person designated by county. | Date | Phone |
|---|---|---|
| | Time | |

| Name of Law Enforcement Agency or Evaluation Facility/Person | Address of Law Enforcement Agency or Evaluation Facility/Person |
|---|---|
| Stockton Police Department | Stockton Police Department<br>22 E. Market Street<br>Stockton, CA 95202 |

☐ Weapon was confiscated and detained person notified of procedure for return of weapon pursuant to W & I Code Section 8102.
(officer/unit & phone #) _____

### NOTIFICATIONS TO BE PROVIDED TO LAW ENFORCEMENT AGENCY

NOTIFICATION OF PERSON'S RELEASE FROM AN EVALUATION AND TREATMENT FACILITY IS REQUESTED BY THE REFERRING PEACE OFFICER BEACUSE:

☐ Person has been referred under circumstances in which criminal charges might be filed pursuant to W & I Code Sections 5152.1 and 5152.2.
Notify (officer/unit & phone #) _____

☐ Weapon was confiscated pursuant to W & I Code Section 8102.
Notify (officer/unit & phone #) _____

### SEE REVERSE SIDE FOR INSTRUCTIONS

WHITE: CHART   /   YELLOW: MENTAL HEALTH CRISES SERVICE DIRECTOR   /   PINK: REFERRING AGENCY

## DEFINITIONS
## GRAVELY DISABLED

"Gravely Disabled" means a condition in which a person, as a result of a mental disorder, is unable to provide for his or her basic personal needs for food, clothing and shelter.  SECTION 5008(h) W & I CODE

"Gravely Disabled Minor" means a minor who, as a result of a mental disorder, is unable to use the elements of life which are essential to health, safety, and development, including food, clothing, and shelter, even though provided to the minor by others.  SECTION 5585.25 W & I CODE

Mental retardation, epilepsy, or other developmental disabilities, alcoholism, other drug abuse, or repeated antisocial behavior do not, by themselves, constitute a mental disorder.

## PEACE OFFICER

"Peace Officer" means a duly sworn peace officer as that term is defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2 of the Penal Code who has completed the basic training course established by the Commission on Peace Officer Standards and Training, or any parole officer or probation officer specified in Section 830.5 of the Penal Code when acting in relation to cases for which he or she has a legally mandated responsibility.  SECTION 5008 (i) W & I CODE

## INSTRUCTIONS FOR SECTIONS 5152.1, 5152.2, and 5585 WIC

### Section 5152.1 WIC

The professional person in charge of the facility providing 72-hour evaluation and treatment, or his designee, shall notify the county mental health director or his designee and the peace officer who makes the written application pursuant to Section 5150 if both of the following conditions apply:

(a) The peace officer requests such notification at the time he makes the application and he certifies in writing that the person has been referred to the facility under circumstances in which a criminal charge might be filed.

(b) The person admitted pursuant to such application is not detained by the facility or is detained for a period less than the full period of allowable detention in the 72-hour facility.

### Section 5152.2 WIC

Each law enforcement agency within a county shall arrange with the county mental health director a method for giving prompt notification to peace officers pursuant to Section 5152.1.

### Section 5585 et seq. WIC

WIC Section 300 is a minor who is under the jurisdiction of the Juvenile Court because of abuse (physical or sexual), neglect or exploitation.

WIC Section 601 is a minor who is adjudged a ward of the Juvenile Court because of being out of parental control.

WIC Section 602 is a minor who is adjudged a ward of the Juvenile Court because of crimes committed.

### Section 8102 WIC (EXCERPTS FROM)

Whenever a person who has been detained or apprehended for examination of his or her mental condition or who is a person described in Section 8100 or 8103, is found to own, have in his or her possession or under his or her control, any firearm whatsoever, or any other deadly weapon, the firearm or other deadly weapon shall be confiscated by any law enforcement agency or peace officer, who shall retain custody of the firearm or other deadly weapon. . . .

Where the person is released without judicial commitment, the professional person in charge of the facility, or his or her designee, shall notify the person of the procedure for the return of any firearm or other deadly weapon which may have been confiscated.

Upon confiscation of any firearm or other deadly weapon from a person who has been detained or apprehended for examination of his or her mental condition, the peace officer or law enforcement agency shall notify the person of the procedure for the return of any firearm or other deadly weapon which has been confiscated.

Health facility personnel shall notify the confiscating law enforcement agency upon release of the detained person, and shall make a notation to the effect that the facility provided the required notice to the person regarding the procedure to obtain return of any confiscated firearm.

# EXHIBIT K

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


FILIBERTO VALENCIA, SR., et al.,

            Plaintiffs,

    vs.                                Case No.:
                                       2:16-CV-02081-JAM-AC
CITY OF STOCKTON, et al.,

            Defendants.

_____/


DEPOSITION OF FILIBERTO VALENCIA, SR.

Monday, December 18, 2017

10:30 a.m.


Taken in the offices of:

HERUM CRABTREE SUNTAG

5757 Pacific Avenue, Suite 222

Stockton, California


REPORTED BY:  KAREN A. AUFDERMAUR, CSR 10919

```
1    Q.     Right.  Do you recall that you called the police
2    roughly around 6:00 o'clock that night?
3    A.     Oh, boy.  Honestly, I don't know if it was before
4    6:00 or after.
5    Q.     Okay.  Did you call the police any earlier in the
6    day?
7    A.     You mean earlier before 6:00?  I don't believe
8    so.
9    Q.     As I understand this, this all happened roughly
10   around dinnertime?
11   A.     Yes.
12   Q.     Okay.  Did you call the police before dinnertime?
13   A.     No, after we had eaten dinner.
14   Q.     Okay.  And what I have from looking at a calendar
15   is that January 19, 2016 was a Tuesday.  Do you have any
16   reason to dispute that it was a Tuesday?
17   A.     I don't know if it was Tuesday.  I just know that
18   it occurred on the 19th of January.
19   Q.     Okay.  And the reason I'm trying to give you that
20   date is the records that I have is that it looks like
21   your son was having some mental health issues for a few
22   days before the 19th.  So if January 19th, the day he
23   died, was a Tuesday, can you tell me when he first
24   started having mental health symptoms?  Was it Saturday?
25   Friday?
```

1   police; correct?

2   A.      Well, let me explain to you.  I'm going to give

3   you an opportunity to explain to you?

4   Q.      Yeah.

5   A.      This is how it happened actually.  And I've

6   already told you once in a million times what I said.

7   Okay.  When we finished eating, someone arrived and they

8   rang the doorbell.  But before that, he was already

9   closing curtains because somehow he was afraid.

10  Q.      Okay.

11  A.      Someone arrived and rang the doorbell offering to

12  see if we wanted an alarm for the house.  So once the

13  doorbell rang, I stood up to go open the door from the

14  living room, the outside, and that's when he got up and

15  he yelled and he said, "Don't open.  Don't open because

16  they're trying to kill me and they're trying to kill you

17  too."

18          So then I said, "Who?"  And I opened it and I

19  said no.  And I opened the door completely and I said,

20  "It's nobody," for the same reason, so he could see.

21          "No."  And then he said, "No.  Shut it."  So then

22  he ran and he said -- he told my daughter call the

23  police and tell them to come.

24          And my daughter said, "Okay.  I'm going to call

25  them."  He ran.  He kneeled on the porch yelling to me

1   to please call them to take him to the mental house to

2   pick up his medication.  Because I believe that --

3   because since he saw that they were not giving it to

4   him, he thought that if the policeman would take him --

5   I mean, this is what I'm thinking -- perhaps that they

6   would give him the medication through them.

7        And I told him, yes, I'm going to call them in

8   seconds.  I thought maybe this would pass, but it was

9   getting worse.  So then I left quickly to my truck

10   because that's where I had left my cell phone.  So then

11   I called them.  I said please come because my son is ill

12   and he had a problem.  And I was told, oh, okay, yes,

13   someone -- a unit or a patrol will be there.

14        So then they wouldn't arrive.  And since I saw

15   that -- how he was doing, I called them again.  And they

16   asked me does he have a weapon, and I said no, he

17   doesn't have a weapon.  He has an illness.  I said

18   please send the policemen so they can take him just the

19   way he was saying.  So since I saw that they weren't

20   coming, I told them please send them quickly because if

21   he actually endangers himself or he actually endangers

22   somebody else.  And they never arrived.

23        Do you think that if I thought in reality they

24   were going to kill him, I don't call an ambulance or a

25   fireman to come and help me?

```
 1   STATE OF CALIFORNIA      )
                              )  ss.
 2   COUNTY OF SAN JOAQUIN    )

 3         I, Karen A. Aufdermaur, deposition officer, do
     hereby certify:
 4
     That the witness herein was by me duly and regularly
 5   sworn as a witness; that the deposition was taken at the
     time and place therein specified; that this deposition
 6   is a true record of the testimony given by said witness.

 7   I further certify that the original of this deposition
     was available in my office during business hours of
 8   business days for a period of 30 calendar days and that
     all counsel and the deponent were given written notice
 9   thereof;

10   That the following occurred:

11   _____The witness and parties waived examination and
     reading of the deposition.
12
     _____The witness corrected, approved, or refused to
13   approve the deposition by letter to me hereunto
     attached.
14
     _____The witness failed to appear at my office.
15
     _____The witness appeared in my office, corrected the
16   deposition, and signed as indicated herein.

17   _____The witness refused to sign the deposition for the
     following reason:
18              _____

19              _____

20         I further certify that I am a disinterested
     person and that I am not in any way interested in the
21   outcome of said action, nor connected with nor related
     to any of the parties in said action, nor to their
22   respective counsel.

23                        Karen A Aufdermaur

24
     Date:_____    _____
25                             C.S.R. No. 10919
```

# EXHIBIT K-1

1

2               UNITED STATES DISTRICT COURT

3              EASTERN DISTRICT OF CALIFORNIA

4                       --oOo--

5

6

7   FILIBERTO VALENCIA, SR., et al.,      )
                                          )
8              Plaintiffs,                )
                                          )
9                                         ) No. 2:16-CV-
        vs.                               ) 02081-JAM-AC
10                                        )
                                          )
11  CITY OF STOCKTON, et al.,             )
                                          )
12             Defendants.                )
    _____)
13

14

15            DEPOSITION OF GRISELDA VALENCIA

16            Tuesday, December 19, 2017

17                   9:59 a.m.

18

19            Taken in the law offices of:
                 Herum, Crabtree, Suntag
20            5757 Pacific Avenue, Suite 222
                 Stockton, CA  95207

21

22

23

    REPORTED BY: VICKI JELLEY, CSR NO. 11067
24

25

```
 1   A.    Yes.

 2   Q.    Is Lucy in the house, too?

 3   A.    No, not Luserito, no.

 4   Q.    So it's you, your son, and Grisely are inside the

 5   house?

 6   A.    Uh-huh.

 7   Q.    Yes?

 8   A.    Yes.

 9   Q.    So your husband goes out to make one call?

10   A.    Uh-huh.

11   Q.    And I guess there's a problem with speaking

12   English?

13   A.    Yes.

14   Q.    Because he has Grisely come help him, correct?

15   A.    Yes.

16   Q.    So does Grisely leave the house to go out with

17   your husband?

18   A.    Yes.

19   Q.    Okay.  So now it's just you and your son in the

20   house?

21   A.    Yes.

22   Q.    Okay.  At some point in time, you leave the

23   house, too, correct?

24   A.    Yes, because the police said that they couldn't

25   find the address, and I was there close, so I could
```

tell them like this.

Q.   Okay.  So you walked out of the house to flag them down?

A.   Yes, because there was a lot of calls that had been made, and they couldn't find the address.

Q.   Okay.  If you know, how many times had your family called the police before you left the house?

A.   Well, it's right there.

Q.   Let me go through it.  The first call that I have is at 6:13 at night, okay?  It looks like your husband starts the call.  At some point in time, Grisely takes over.  That's call number one at 6:13, okay?

A.   (Witness nodded head.)

Q.   There is a second call at 6:23, so 10 minutes later something about a delay, the police had not arrived yet.

A.   Okay.

Q.   Did you go outside after that second call?

     MR. KOENIG:  (Through Interpreter)  Objection.
Calls for speculation.  Lacks foundation.

     THE WITNESS:  (Through Interpreter)  I don't remember.

     MR. STEVENS:  (Through Interpreter)  Okay.
Because then there was a third call at 6:30 where your family was calling for an update.  Now, this is the

```
 1   Q.    Do you know how your son left the house?

 2   A.    I think he left through the other door by the

 3   yard.

 4   Q.    The back door?

 5   A.    Uh-huh.

 6   Q.    Yes?

 7   A.    Yes.

 8   Q.    Is it a sliding door?

 9   A.    Yes.

10   Q.    Did you go outside --

11   A.    Because everything happened all of a sudden.

12   Q.    Did you guys have that door locked?

13   A.    Yes, it was locked.

14   Q.    Okay.  Why didn't someone stay with your son in

15   the house?

16   A.    Because like I said, the police said they

17   couldn't find the address, and so I stood there to see

18   if I would see them to tell them that we were over

19   here.

20   Q.    I understand that, but why didn't you have some

21   family member stay with your son in the house?

22         MR. KOENIG:  (Through Interpreter)  Objection.

23   Asked and answered.  Argumentative.  Calls for

24   speculation as to what other people were thinking, were

25   doing.
```

1   second call?

2   A.    No.

3   Q.    Were you there for any part of that second call?

4        MR. KOENIG:    (Through Interpreter)   Were you

5   there?  Objection.   Vague.

6        MR. STEVENS:    (Through Interpreter)   Right.  Let

7   me clean that up.   Did you go out and hear any part of

8   the second call?

9   A.    (Through Interpreter)   No, because he was over

10   there waiting.

11   Q.    There was then a third call at 6:30 calling the

12   police for an update.   Do you recall overhearing that

13   call?

14   A.    No.

15   Q.    Do you know who made that third call?

16   A.    No, because like I said, I was over there.

17   Q.    Fair enough.   There was a fourth call at 6:35

18   where it was reported to police that your son believed

19   people were trying to kill him, says that the son

20   pushed him, so I'm assuming it was your husband who

21   made this fourth call.   So do you recall your husband

22   making another call to police?

23   A.    Well, I don't remember.   Like I said, I was over

24   there waiting for the police.

25   Q.    Do you know how long you were waiting for the

police?
A.    Well, practically about 45 minutes, and no, no.

Q.    Okay.  When did you realize that your son had

left the house?

A.    Well, we were outside, and then a neighbor came

by the house and said there was a lot of police

officers over there, and they had it like surrounded.

Q.    Understood.  Did you overhear any phone calls to

police made by any member of your family?

A.    No, I don't remember.

Q.    And I understand there was a neighbor that walked

by, and there were a lot of police surrounding the

neighborhood?

A.    Uh-huh, yeah, over there on the back side.

Q.    Do you know this neighbor's name?

A.    No.

Q.    What did you do in response to learning that from

the neighbor?

A.    Well, I know my husband ran over there to the

other side, and he ran over there to see what was going

on, and I don't know why I didn't go over there.

        LUSERITO VALENCIA:  (In English)  No.  She said

she didn't know because she wasn't over there.  Mom,

repeat that.

        THE WITNESS:  (Through Interpreter)  I don't know

```
 1   STATE OF CALIFORNIA,          )
                                    )
 2   COUNTY OF SAN JOAQUIN.         )

 3        I, Vicki Jelley, deposition officer, do hereby
     certify:
 4
          That the witness herein was by me duly and
 5   regularly sworn as a witness; that the deposition was
     taken at the time and place therein specified; that
 6   this deposition is a true record of the testimony given
     by said witness.
 7
          I further certify that the original of this
 8   deposition was available in my office during business
     hours of business days for a period of 30 calendar days
 9   and that all counsel and the deponent were given
     written notice thereof.
10                            --oOo--
          That the following occurred:
11
     ____ The witness signed the deposition and made no
12        corrections.
     ____ The witness and parties waived examination and
13        reading at the time of the taking of the
          deposition.
14   ____ The witness corrected, approved, or refused to
          approve the deposition by letter to me attached
15        hereto, and copies of the letter were sent to all
          counsel.
16   ____ The witness failed to appear at my office.
     ____ The witness appeared in my office, made changes
17        to the deposition, and counsel were provided
          copies of the changes.
18   ____ The witness refused to approve or sign the
          deposition for the following
19        reasons_____.

20        I further certify that I am a disinterested
     person and that I am not in any way interested in the
21   outcome of said action, nor connected with, nor related
     to any of the parties in said action, nor to their
22   respective counsel.

23                              Vicki Jelley

24

25   Date: _____   _____
```

# EXHIBIT L

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

FILIBERTO VALENCIA, SR., et al.,          )
                                          )
            Plaintiffs,                   )
                                          )
                                          )  No. 2:16-CV-
      vs.                                 )  02081-JAM-AC
                                          )
                                          )
CITY OF STOCKTON, et al.,                 )
                                          )
            Defendants.                   )
_____ )


DEPOSITION OF GRISELY VALENCIA

Tuesday, December 19, 2017

2:49 p.m.


Taken in the law offices of:
Herum, Crabtree, Suntag
5757 Pacific Avenue, Suite 222
Stockton, CA  95207


REPORTED BY: VICKI JELLEY, CSR NO. 11067

```
1    A.    Yes.

2    Q.    Your mom is inside with your brother, correct?

3    A.    Me and my mom were still inside because my dad

4    went initially out first.

5    Q.    You're right.  But then your dad, did he call you

6    out because he was having trouble communicating with

7    the police department?

8    A.    Yes, yes.

9    Q.    Okay.  I've got that all of this happened roughly

10   after 6:00 o'clock that night.  Does that sound

11   correct?

12   A.    Yes.

13   Q.    Was it dark outside when you went outside?

14   A.    I don't know.  It was getting dark.  I think the

15   sun was probably setting.

16   Q.    Okay.  So I've got the first call was made at

17   6:13.  Does that sound about right?

18   A.    Yeah.

19   Q.    So it sounds like your dad made the initial call.

20   How did he call you outside of the house?  Did he have

21   the door open?  Did he wave to you?  Did he call for

22   you?

23   A.    Well, he had the door open, so he was -- the

24   distance where he parks his truck is not far from the

25   house, so I could -- oh, like, "Come here because I
```

```
1   A.    That he had schizophrenia.

2   Q.    You recall that you specifically told them that?

3   A.    Well, I don't recall in that first phone call,

4   but I know I did tell them that he was having --

5   Q.    I've got that in a later phone call.  I want to

6   focus on the first phone call.

7   A.    Oh, no.  I don't remember.

8   Q.    Okay.  And then what do you recall happening?

9   A.    The police never arrived, so we were outside

10  trying to flag them down.  We called several times.

11  Q.    Did you stay outside with your dad?

12  A.    Yes, because I called again from my phone.

13  Q.    Did you ever go back into the house?

14  A.    No, because we were trying to wait for the cops.

15  We were trying to flag them down to see if we saw any.

16  Q.    Okay.  You didn't see any?

17  A.    No.

18  Q.    I've got the first call was made at 6:13.

19  Anything else that you recall being said during this

20  first phone call, conversation?

21  A.    No.

22  Q.    I've got that there was a second call made at

23  6:23 calling regarding the police's delay in showing

24  up, so 10 minutes later?

25  A.    Yes.
```

Q. Did you make that call or did your dad?

A. I made that call.

Q. Okay. What do you recall being said during this second phone conversation?

A. That I specifically said or that they specifically said?

Q. If you can recall for me everything that was said between you and police.

A. Oh, I was just saying that we needed them to arrive because he was having a mental breakdown, that he was not armed.

Q. Did you guys hear any sirens nearby?

A. No.

Q. Did you guys see any lights nearby?

A. No.

Q. So I've got five phone calls I want to go through with you. Other than this first one, do you know if your dad made any other than this first call?

A. He made two calls.

Q. But the second call was you regarding the delay?

A. Yes, I am.

Q. I then got that there was a third call -- hold on. Do you recall anything else being said, either by you or to you during the second phone call?

A. In the second one?

1   Q.    Yes.

2   A.    No, I don't remember what happened or what I

3  said, no.

4   Q.    Okay.  That's fair.  I then have that there was a

5  third call 7 minutes later at 6:30 that you were

6  calling for an update -- or sorry.  That someone was

7  calling the police department for an update.

8              Do you know who made this third call?  Was

9  it you or your dad?

10  A.    I'm not sure the times I made the calls, but I

11  made two calls, as well.

12  Q.    Did you make two calls back-to-back?

13  A.    I'm not sure of the timing, but I did make two

14  calls.

15  Q.    Do you know if your mom ever called?

16  A.    My mom was outside trying to flag down the

17  police.

18  Q.    Does that mean she never called the police?

19  A.    She didn't call the police.

20  Q.    That's what I thought.  Okay.  I then have a

21  fourth call at 6:35, and this one, I believe, is from

22  your dad because the reference is to son, so I'm

23  guessing that was probably from your dad, reporting

24  that the son thought people were trying to kill him,

25  that the son pushed him when he tried to open the front

```
 1   door.

 2              Do you recall your dad saying those things

 3   over the phone?

 4   A.    Well, I wasn't -- I never saw my brother pushed

 5   my dad.

 6   Q.    Or that he grabbed his shoulder or tried to keep

 7   him from opening the front door?

 8   A.    Oh, yeah, he didn't push him, but he placed his

 9   arm on his shoulder saying, "Don't open."

10   Q.    Do you recall your dad making this phone call and

11   saying he thought his son thought people were trying to

12   kill him, trying to stop them from opening the front

13   door, anything like that?

14   A.    When he made his call?

15   Q.    Yeah.  This would have been your father's second

16   call, second call or fourth call.

17   A.    Yeah.

18   Q.    Do you recall him saying that to the police?

19   A.    Well, I don't recall him saying that in that

20   call, but I do recall that he did say that.

21   Q.    What else do you recall your dad telling the

22   police in the second call he made to them?

23   A.    That they needed to arrive.

24   Q.    Anything else?

25   A.    No.  That's all I remember.
```

# EXHIBIT M

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA - SACRAMENTO DIVISION

FILIBERTO VALENCIA, SR., and GRISELDA
VALENCIA, individually and as
successors in interest to Filiberto
Valencia, Jr.,

        Plaintiffs,

        vs.

CASE NO.:
2:16-CV-02081-JAM-AC

CITY OF STOCKTON, CHIEF ERIC JONES,
SERGEANT DANA MOSHER, OFFICER KYLE
AMANT, OFFICER JASON DIGIULIO, and
DOES 1 through 50, inclusive,

        Defendants.

_____/

DEPOSITION OF SHARYL TEAGUE

September 21, 2017

Reported by:
LaRelle M. Fagundes, CSR No. 9762

PATRICIA CALLAHAN REPORTING
Certified Shorthand Reporters
(510) 885-2371    (415) 788-3993
Depos@callahanreporting.com

1   you have an emergency and you called 911, you don't know

2   if it's going to go to CHP or Stockton PD; is that

3   correct?

4   A.     It just depends on cell towers and a lot of

5   other -- some things I don't understand that has to do

6   with how the cell phones work.  But if we get a call

7   from an agency that is supposed to get the call, we

8   transfer it.

9   Q.     Okay.  So at what's called military time

10   18:13:45, again, there's a second entry from the

11   supervisor giving a location on Netherton Avenue.

12        Do you know where that is?

13   A.     That's -- I know where that is.

14   Q.     Okay.  And do you know why that's listed there?

15   Is that because that's where the phone is registered or

16   where the phone call came from?

17   A.     No.  This is showing that this came in from a

18   cell phone and that is the cell tower it had.

19   Q.     Okay.  The third entry is also a text entry, and

20   it says, "Hurt himself.  RP would only say because he

21   has mental health issues."

22        That was something that the supervisor typed in?

23   A.     Correct.

24   Q.     Then the next listing is CCP1.

25        What does that mean to you?

1      MR. WALKER:  Q.  So as we look at these first

2    items, we see that a call came in at 18:13:45, about

3    Filiberto Valencia trying to hurt himself, and then

4    another call came in at 18:23:24 referring to the same

5    matter, correct?

6    A.      I can see that the second -- at the second time,

7    18:23:24, that that same residence called.

8    Q.      Okay.  I'm just trying to say why it's listed as

9    a dupa -- what did you say it was a dupa what?

10      MR. STEVENS:  Dupa pending.

11      MR. WALKER:  Dupa pending.

12      MR. STEVENS:  Duplicate pending.

13      THE WITNESS:  Yeah, we call it dupe, because

14    it's a duplicate call, but it's the same location, and

15    it's pertaining to the same reason they were originally

16    calling, so we just dupe the information, whatever

17    they're calling it, regarding -- if it's following the

18    first time they called, we dupe it into the original

19    call.  So it's just showing that they've called with

20    additional information or whatever it is that they're

21    calling for.

22      MR. WALKER:  Q.  And you read this, as a

23    dispatcher, as a call taker, somebody with experience in

24    working with Stockton Police Department, to say that the

25    second call was about the delay in police response to

1   longer.  So, generally, if I see calls that have been

2   pending, I'll give them a call back just to get an

3   update from them to see if we're still needed to

4   respond.

5   Q.      Could you have been asked by the supervisor to

6   call back?

7   A.      I could have.

8   Q.      All right.  So this time, you made a call.  You

9   can tell by looking at the record.

10          What happened when you made the call?  Is that

11  recorded at 18:35:13?

12  A.      Yes.

13  Q.      Okay.  It says CRO6, then miscellaneous CX, and

14  it says call back via Spanish translater.

15          Do you speak Spanish?

16  A.      I do not.

17  Q.      So you were speaking to somebody who was

18  translating?

19  A.      Yes.  We have a translation service that we use.

20  Q.      Okay.  And what is it that you recorded?

21  A.      That, um, I talked to somebody at the residence,

22  most likely a parent, because it says son advising that

23  he was still on scene and that what he was telling -- he

24  was telling people -- he was telling them that people

25  were trying to harm him.  He -- if I documented it in

1   there, then I've asked.  But he stated that his son was

2   diagnosed schizophrenic, so I probably asked him what he

3   had been diagnosed with.  And he's not current on his

4   medications.  And I confirmed if there were any weapons

5   available to him.

6   Q.      And that's typical for you to do, to confirm

7   whether there were weapons, correct?

8   A.      Yes.

9   Q.      Is that a requirement for you to discover or to

10  learn?

11  A.      It's -- depending on the call type, that's one

12  of the questions that we are supposed to ask.

13  Q.      And if the call type is priority one, you would

14  always ask that?

15  A.      If it's a 415, yes.

16  Q.      Okay.  So what we see here at 18:35:13 is what

17  you typed?

18  A.      Correct.

19  Q.      Into the computer, correct?

20  A.      Mm-hmm.

21  Q.      And what you typed was "son is still 987."

22          987 means he's still on --

23  A.      He's still on scene.

24  Q.      The C/L, what's that, C slash L?

25  A.      Call location.

1   Q.     Call location.

2      "Told reporting person people were trying to

3  kill him.  Reporting person saying that son pushed him

4  when he tried to open the front door.  Son is diagnosed

5  schizophrenic.  Not current on meds.  No weapons in the

6  residence.  Reporting person and family are outside the

7  call location.  Son inside."

8      That's all information that you recorded,

9  correct?

10  A.     Correct.

11  Q.     Prior to looking at these documents in

12  preparation for this deposition, do you remember this

13  phone call?

14  A.     No.

15  Q.     When did you come to find out that the person

16  who is being referenced in this phone call as being a

17  paranoid schizophrenic was killed that night or died

18  that night?

19  A.     I don't recall what portion of the night that

20  that happened.

21  Q.     Do you recall learning it during the course of

22  the night?

23  A.     I don't recall.

24  Q.     Prior to being asked to come here for your

25  deposition, did anybody from the Stockton Police

1  1360 SPD CTC Hulburt."

2         Do you know who Hulburt is?

3  A.    I do.

4  Q.    Who is that?

5  A.    She's a dispatcher/call taker.

6  Q.    Is she still working for Stockton Police

7  Department?

8  A.    Yes.

9  Q.    What's her first name?

10 A.    Veronica.

11 Q.    Let's go back to the chronology of the calls.

12        If we go down several, you see that at 18:54:41,

13 CRO7 reports miscellaneous, it says, "Daughter is

14 calling in regarding delay."

15        Do you see that?

16 A.    Mm-hmm.  Yes.

17 Q.    And it lists the phone number from which the

18 person was calling.

19        It says "ADV of delay."  What does that mean?

20 A.    ADV means advised.

21 Q.    "Advised of delay.  Family concerned male is

22 going to try to harm himself."

23        Do you know who CRO7 was?

24 A.    No.

25 Q.    If you turn the page, it appears to be Torrent.

1  A.        Torrente.

2  Q.        Torrente.

3            Who is Torrente?  Is that person still --

4  A.        Her name is actually Gianna Holscher now.  She's

5  married.

6  Q.        And is she still with the department?

7  A.        Yes.

8  Q.        How do you spell her present name?

9  A.        Gianna, G-i-a-n-n-a, Holscher, H-o-l-s-c-h-e-r.

10 Q.        I'd like to ask you to go from there and just

11 scan down and see if you have any of what your next

12 involvement is.

13 A.        On this specific call here?

14 Q.        Well, perhaps I should lay a foundation.

15           Is there a set of documents that pertains just

16 to this call about Filiberto Valencia being paranoid

17 schizophrenic and saying people are trying to kill him

18 and he has mental health issues and is a diagnosed

19 schizophrenic where the family keeps calling in the

20 same -- complaining about the delay?

21 A.        This call for service.

22 Q.        How is it that things get lumped into this

23 particular call of service -- call for service?

24 A.        Because this is the address that they're

25 referring to when they call in, so we will keep all of

1    that information in one call.

2    Q.    Where is the call designated?

3    A.    3234 Barbara Street.

4    Q.    How long will that designation remain a category

5    of calls?

6    A.    Until the call has been handled and closed.

7    Q.    So somebody will type into the computer the call

8    is now closed?

9    A.    Either -- do you want me to explain how we would

10   close a call?

11   Q.    Please.

12   A.    Okay.  So either they -- the family would call

13   us and say, "You know what?  We don't need you any

14   longer.  We've resolved the issue," or whatever the

15   reason they would say for not needing the police any

16   longer.  Then they're telling us they don't need us to

17   respond any longer, and we would cancel the call.  Or a

18   unit would handle the call, go out and handle the call,

19   and then when he was done and it was complete, the call

20   would be closed.

21   Q.    So then the unit would call in to dispatch and

22   say this event is secured or this event is over?

23   A.    After he was done handling it?

24   Q.    Yes.

25   A.    He would advise the dispatcher, yes, that he was

```
 1                    CERTIFICATE

 2          I, the undersigned, a Certified Shorthand

 3   Reporter, State of California, hereby certify that the

 4   witness in the foregoing deposition was by me first duly

 5   sworn to testify to the truth, the whole truth, and

 6   nothing but the truth in the within-entitled cause; that

 7   said deposition was taken at the time and place therein

 8   stated; that the testimony of said witness was reported

 9   by me, a disinterested person, and was thereafter

10   transcribed under my direction into typewriting; that

11   the foregoing is a full, complete and true record of

12   said testimony; and that the witness was given an

13   opportunity to read and, if necessary, correct said

14   deposition and to subscribe the same.

15          I further certify that I am not of counsel or

16   attorney for either or any of the parties in the

17   foregoing deposition and caption named, nor in any way

18   interested in the outcome of the cause named in said

19   caption.

20          Executed this 6th day of October, 2017.

21

22

23          _____

24          LARELLE M. FAGUNDES, CSR 9762

25
```

# EXHIBIT N

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA - SACRAMENTO DIVISION


FILIBERTO VALENCIA, SR., and GRISELDA
VALENCIA, individually and as
successors in interest to Filiberto
Valencia, Jr.,

        Plaintiffs,

      vs.

CITY OF STOCKTON, CHIEF ERIC JONES,
SERGEANT DANA MOSHER, OFFICER KYLE
AMANT, OFFICER JASON DIGIULIO, and
DOES 1 through 50, inclusive,

        Defendants.
_____/

CASE NO.:
2:16-CV-02081-JAM-AC


DEPOSITION OF KIM WASHINGTON

September 21, 2017


Reported by:
LaRelle M. Fagundes, CSR No. 9762

PATRICIA CALLAHAN REPORTING
Certified Shorthand Reporters
(510) 885-2371    (415) 788-3993
Depos@callahanreporting.com

1  highlighted in every pending call window; however, it's

2  the south dispatcher's call.

3  Q.      But the north dispatcher would get notice of it

4  too?

5  A.      They would see it on the screen, but they

6  can't -- it's the south dispatcher's call.

7  Q.      And because it is priority one, the highest

8  priority, would there be some designation that this was

9  highest priority?

10  A.      They're grouped in the pending call window, the

11  ones are first, the twos, the threes, the fours and

12  fives.  So they're grouped by priority and time they

13  came in.

14  Q.      So, at this point, the CRO6, who we know to be

15  Ms. Teague, records the location of 3161 Nicole.  And it

16  says that there is an Hispanic male last seen wearing

17  gray jacket trying to get into the residence.  They do

18  not know the subject.  Parents yelling in the

19  background.

20          Correct?

21  A.      Yes, that's what that says.

22  Q.      And this message is intended to be acted upon by

23  the dispatcher who had responsibility for South

24  Stockton?

25  A.      Once she sets the call up for service, which was

1   Q.     And where do you see that?

2   A.     I can't see the time, because it's not visible

3   on here.  But right before 18:13:26, it shows, "CCP1

4   DISP," which means dispatch en route, and 3 baker 27, 3

5   baker 25 were sent to the call.

6   Q.     And who was the CCP1?  Who was the dispatcher

7   who was sending them out there?

8   A.     Um, I'd have to look at the end of the call log.

9         And it would be Villegas.

10  Q.     Your first involvement with this particular call

11  comes at 18:15:40.

12         Do you see that, about two-thirds,

13  three-quarters of the way down the page?

14  A.     Yes.

15  Q.     And it says, "SUP," S-U-P.  That's supplemental?

16  A.     Supplemental.

17  Q.     Why are you supplementing?

18  A.     Because this person called from -- they advised

19  they were a neighbor.  They are at 3202, and they stated

20  there was a subject on the roof.

21  Q.     How did you know to link up this call from the

22  person at 3202 Nicole with the call made by somebody at

23  3161 Nicole?

24  A.     If we set up a call and -- this is an older

25  system last year.  I'm trying to remember how it goes.

1    you can take a call, and if you're putting in an

2    address, you know, I've got 3161 Nicole call there, and

3    I'm putting another call next-door, when I go to send

4    that call up to send it to dispatch, it's going to give

5    me a list of possible duplicates, if there are any, if

6    the system recognizes any.  I can look at that quickly

7    to see if it might be related.  If I feel it's related,

8    I can dup it, duplicate it into that call.

9         So CRO1 determined that her caller at 3175

10   Nicole was talking about the same thing as the caller at

11   3161, and so she put that information into the same

12   call.

13   Q.     And this designation dupapnd, that means what?

14   A.     That's just so we know that it's a duplicate.

15   It's duplicate information instead of --

16   Q.     Okay.  I just wondered if it meant duplicate

17   something.

18   A.     No.  Instead of CRO1 making up a whole new call,

19   she put that information into the same call.

20   Q.     Let's turn the page, and there are entries from

21   CRO7, CRO6, CRO1.

22          Do you see all of those?

23   A.     Yes.

24   Q.     And then there's one for CCP1 I.D., and it's

25   Mosher, Dana.

1        So is CCP1 a designation for an officer?

2   A.        No, that's the dispatcher.   So the dispatcher

3   dispatched 3 Sam 23.

4   Q.        Okay.   And then CRO3 entered something at

5   18:20:58.

6        CRO3 would be -- can you tell?

7   A.        It's not listed on this printout who CRO3 is.

8   Q.        CRO3 enters a duplicate notice, the text of

9   which reads, "Call trans via CHP."

10        Transferred from CHP, correct?

11   A.        Yes.

12   Q.        CHP provided C/L address?

13   A.        Call location.

14   Q.        Okay.   And it says, "X yelling that subject

15   entered into her backdoor.   X yelling for Stockton

16   Police Department to hurry up.   Location 3133 Nicole."

17        I've read that correctly?

18   A.        Yes.

19   Q.        Does this indicate to you that CRO3 is now

20   linking up this incident at 3133 Nicole with the

21   incident that caused this case number to be opened,

22   which started at 3161 Nicole?

23   A.        Yes.

24   Q.        And do you think that CRO3 was doing that on her

25   own?

1    A.       Yes.

2    Q.       And then you wrote "Reporting person speaking

3    for Spanish-speaking father.  His son Filiberto Valencia

4    is Hispanic, male, 26, is 5150."

5             5150 that would been your own --

6    A.       That's a type code for mentally ill.

7    Q.       Okay.  So you were doing that as a -- you wrote

8    5150 yourself, meaning mentally ill.

9             The father didn't say 5150, did he?

10   A.       If I recall, they told me that he had mental

11   health issues.

12   Q.       Yeah.

13   A.       So that's why I would have put 5150.

14   Q.       The father told me he didn't know what a 5150

15   was.

16   A.       No.  He wouldn't have said that.  It's just our

17   code.

18   Q.       Okay.  "And trying to hurt himself."

19            You recorded, "Last seen wearing black shirt,

20   black pants.  No weapons."

21            Now, you specifically asked the caller if

22   Filiberto Valencia, the Hispanic male age 26 had any

23   weapons, correct?

24   A.       Yes.

25   Q.       That's part of protocol?

1  A.      It's part of our questioning for any type of

2  disturbance call.

3  Q.      You wanted to put that in so any police officer

4  or anybody else who was involved in this incident or its

5  investigation knew that he had no weapons, correct?

6  A.      Correct.

7  Q.      And then you said, "Reporting person

8  uncooperative when asked how he was trying to...."

9  A.      And then it continues.

10 Q.      I think way down 18:14:33.  "...to hurt himself.

11 Reporting person would only say because he has mental

12 health issues."

13         Have I read that correctly?

14 A.      Yes.

15 Q.      And that's the way you recorded it, because

16 that's what happened?

17 A.      That's what I was told.

18 Q.      You recorded it accurately based on what you

19 were told and the fact that you felt that the reporting

20 person was being uncooperative in terms of describing

21 how Filiberto Valencia was trying to hurt himself?

22 A.      Right.  When asked how he was trying to hurt

23 himself, they wouldn't respond how.  They just said he

24 had mental health issues.

25 Q.      Okay.  Fair enough.

1                          CERTIFICATE

2          I, the undersigned, a Certified Shorthand

3     Reporter, State of California, hereby certify that the

4     witness in the foregoing deposition was by me first duly

5     sworn to testify to the truth, the whole truth, and

6     nothing but the truth in the within-entitled cause; that

7     said deposition was taken at the time and place therein

8     stated; that the testimony of said witness was reported

9     by me, a disinterested person, and was thereafter

10    transcribed under my direction into typewriting; that

11    the foregoing is a full, complete and true record of

12    said testimony; and that the witness was given an

13    opportunity to read and, if necessary, correct said

14    deposition and to subscribe the same.

15         I further certify that I am not of counsel or

16    attorney for either or any of the parties in the

17    foregoing deposition and caption named, nor in any way

18    interested in the outcome of the cause named in said

19    caption.

20         Executed this 6th day of October, 2017.

21

22

23    _____

24    LARELLE M. FAGUNDES, CSR 9762

25

# EXHIBIT O

**16-2494**

Supplement No
ORIG

# STOCKTON POLICE DEPARTMENT



22 E MARKET ST.

STOCKTON,CA 95202

(209) 937-8495

Reported Date
01/19/2016
Rpt/Incident Typ
245
Member#/Dept ID#
MANOR, JAMES

## Administrative Information

| Agency STOCKTON POLICE DEPARTMENT | | DR 16-2494 | Supplement No ORIG | Reported Date 01/19/2016 | Reported Time 18:11 | CAD Call No 160190847 |
|---|---|---|---|---|---|---|
| Status REPORT TO FOLLOW | Rpt/Incident Typ ASSAULT WITH A DEADLY WEAPON | | | | | |
| Location 3133 NICOLE ST | | | City Stockton | | ZIP Code 95205 | Rep Dist 0206 |
| District PA | Sector PS | From Date 01/19/2016 | From Time 18:11 | Member#/Dept ID# 2200/MANOR, JAMES | | |
| Assignment FIELD SERVICE LAKEVIEW THIRD WATCH PHASE 2 | | | | Entered by 2200 | | |
| Assignment FIELD SERVICE LAKEVIEW THIRD WATCH PHASE 2 | | | | Confidential Officer Involved Incident | | |
| RMS Transfer Successful | Prop Trans Stat Successful | Approving Officer 1209 | | Approval Date 01/20/2016 | Approval Time 07:08:35 | |
| Route - Crimes vs Persons Yes | | | | | | |
| # Offenses 1 | Offense PC245 (A)(1) | | Description FORCE OR ADW NOT FIR | | Complaint Type | |

## Person Summary

| Invl INT | Invl No 1 | Type I | Name MALDONADO,SANTIAGO MENDEZ | MNI 661769 | Race H | Sex M | DOB 04/07/1970 |
|---|---|---|---|---|---|---|---|
| Invl SUB | Invl No 1 | Type I | Name MENDOZA,ALVARO | MNI 1068056 | Race H | Sex M | DOB 09/15/1980 |
| Invl SUB | Invl No 2 | Type I | Name ROCHA,ROSA | MNI 1042621 | Race H | Sex F | DOB 04/12/1981 |
| Invl SUB | Invl No 3 | | Name See Confidential Page | | | | |
| Invl SUB | Invl No 4 | Type I | Name VALENCIA,FILIBERTO | MNI 358181 | Race H | Sex M | DOB 12/04/1965 |
| Invl SUS | Invl No 1 | Type I | Name VALENCIA,FILIBERTO | MNI 978556 | Race H | Sex M | DOB 11/02/1989 |

## Summary Narrative

The suspect broke into a residence and physically assaulted a woman and a juvenile. Officers arrived on scene, and the suspect faught with Officers. The suspect became unresponsive and Officers were unable to revive the suspect. The suspect was pronounced deceased by Medics.

| Report Officer 2200/MANOR, JAMES | Printed At 04/11/2016 08:03 | Page 1 of 5 |
|---|---|---|

COS048056

# STOCKTON POLICE DEPARTMENT

## INTERPRETER 1: MALDONADO,SANTIAGO MENDEZ

| Involvement | Invl No | Type | Name | | MNI |
|---|---|---|---|---|---|
| INTERPRETER | 1 | Individual | MALDONADO,SANTIAGO MENDEZ | | 661769 |

| Race | Sex | DOB | Age | Ethnicity | Juvenile? | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|---|---|---|
| HISPANIC | MALE | 04/07/1970 | 45 | HISPANIC ORIGIN | No | 5'09" | 180# | BROWN | HAZEL |

PRN
3084723

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | 3162 NICOLE ST | | Stockton | CALIFORNIA |

| ZIP Code | Date |
|---|---|
| 95205 | 01/19/2016 |

| Type | ID No | OLS |
|---|---|---|
| Operator License | U5065484 | CALIFORNIA |

| Phone Type | Phone No | Date |
|---|---|---|
| Cell | (209)612-4303 | 01/19/2016 |

## SUBJECT INVOLVED 1: MENDOZA,ALVARO

| Involvement | Invl No | Type | Name | | MNI |
|---|---|---|---|---|---|
| SUBJECT INVOLVED | 1 | Individual | MENDOZA,ALVARO | | 1068056 |

| Race | Sex | DOB | Age | Ethnicity | Juvenile? | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|---|---|---|
| HISPANIC | MALE | 09/15/1980 | 35 | HISPANIC ORIGIN | No | 5'06" | 160# | BLACK | BROWN |

PRN
3084724

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | 3161 NICOLE ST | | Stockton | CALIFORNIA |

| ZIP Code | Date |
|---|---|
| 95205 | 01/19/2016 |

| Type | ID No | OLS |
|---|---|---|
| Operator License | D2652216 | CALIFORNIA |

| Phone Type | Phone No | Date |
|---|---|---|
| Cell | (209)542-0100 | 01/19/2016 |

## SUBJECT INVOLVED 2: ROCHA,ROSA

| Involvement | Invl No | Type | Name | | MNI |
|---|---|---|---|---|---|
| SUBJECT INVOLVED | 2 | Individual | ROCHA,ROSA | | 1042621 |

| Race | Sex | DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color | PRN |
|---|---|---|---|---|---|---|---|---|---|
| HISPANIC | FEMALE | 04/12/1981 | 34 | No | 4'11" | 110# | BROWN | BROWN | 3084725 |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | 3161 NICOLE ST | | Stockton | CALIFORNIA |

| ZIP Code | Date |
|---|---|
| 95205 | 01/19/2016 |

| Phone Type | Phone No | Date |
|---|---|---|
| Cell | (209)467-3063 | 01/19/2016 |

## SUBJECT INVOLVED 3: Confidential

| Involvement | Invl No | Name |
|---|---|---|
| SUB | 3 | See Confidential Page |

## SUBJECT INVOLVED 4: VALENCIA,FILIBERTO

| Involvement | Invl No | Type | Name | | MNI |
|---|---|---|---|---|---|
| SUBJECT INVOLVED | 4 | Individual | VALENCIA,FILIBERTO | | 358181 |

| Race | Sex | DOB | Age | Ethnicity | Juvenile? | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|---|---|---|
| HISPANIC | MALE | 12/04/1965 | 50 | HISPANIC ORIGIN | No | 5'07" | 180# | BROWN | BROWN |

PRN
3084727

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | 3234 BARBARA ST | | Stockton | CALIFORNIA |

| ZIP Code | Date |
|---|---|
| 95205 | 01/19/2016 |

| Type | ID No | OLS |
|---|---|---|
| Operator License | C5222589 | CALIFORNIA |

| Phone Type | Phone No | Date |
|---|---|---|
| Cell | (209)244-3037 | 01/19/2016 |

# STOCKTON POLICE DEPARTMENT

## SUSPECT 1: VALENCIA,FILIBERTO

| Involvement | Invl No | Type | Name | | MNI | Race |
|---|---|---|---|---|---|---|
| SUSPECT | 1 | Individual | VALENCIA,FILIBERTO | | 978556 | HISPANIC |

| Sex | DOB | Age | Ethnicity | Juvenile? | Height | Weight | Hair Color | Eye Color | PRN |
|---|---|---|---|---|---|---|---|---|---|
| MALE | 11/02/1989 | 26 | HISPANIC ORIGIN | No | 5'09" | 200# | BLACK | BROWN | 3084728 |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | 3234 BARBARA ST | | Stockton | CALIFORNIA |

| ZIP Code | Date |
|---|---|
| 95205 | 01/19/2016 |

| Type | ID No | OLS |
|---|---|---|
| Operator License | E1227986 | CALIFORNIA |

### Modus Operandi

| Weapon Used | Premise Type | Victim's Race | Victim's Sex |
|---|---|---|---|
| PERSONAL (HANDS, ELBOWS, ETC)/OTHER | RESIDENCE | WHITE/BLACK | FEMALE |

| Victim's Age |
|---|
| ADULT/JUVENILE |

| Suspect Action |
|---|
| COVERED THE VICTIMS FACE/FORCED VICTIM TO MOVE/FORCED VICTIM TO FLOOR/INJURY INFLICTED/STRUCK VICTIM |

| Crime Code(s) |
|---|
| ASSAULTS |

### Narrative

**NOTIFICATION** :
On 01/19/16 at 1813 hrs. I, Officer Manor (3K18) was working in full uniform and operating a fully-marked patrol vehicle. I responded to 3133 Nicole St on a report of a disturbance, involving a subject trying to break into a residence. I arrived on scene at 1841 hrs. I had been on a prior call, and responded to the listed location upon Officers asking for additional units.

**INVESTIGATION** :
I walked into 3133 Nicole St, where Officers were. The suspect was lying on the ground and medics were working on him. I was told there were possible witnesses at 3161 Nicole St, that needed to give statements.

I went to the listed location to collect statements. I contacted (Sub 1), (Sub 2), (Sub 3), and (Sub 4) at the listed location and they gave me the following statements in summary.

*(The following interview was digitally recorded via a body worn camera and has been summarized below. The purpose of the summary is to render an overview of what was described; however, they are not transcriptions of the recorded interview. The summary should not be viewed as containing only the important facts of the interview. They are intended to provide the reader with a general understanding of what was said; therefore, refer to the recording itself for the exact wording.)*

(Sub 1) only speaks Spanish, so (Sub 3) translated the following from (Sub 1).

**STATEMENT OF (SUBJECT 1) ALVARO MENDOZA:**
Mendoza was terrified when he saw the suspect at the kitchen window. Mendoza thought the suspect was in his backyard looking for cans. The suspect kept saying someone was trying to kill him. The suspect kept banging on the kitchen window. The suspect ran around the back of the house. Mendoza could hear the suspect behind the house. Mendoza turned on the hallway light and could see the suspect banging on the bedroom windows. The suspect then ran back around to the kitchen window. Mendoza went back to the living room and saw the suspect, trying to open the sliding door.

Mendoza said he was afraid for himself and the family. The family then ran and hid in the bathroom. Mendoza said he did not see a weapon of any kind on the suspect. Mendoza said he did not recognize the suspect.

*(End of Statement)*

**STATEMENT OF (SUBJECT 2) ROSA ROCHA:**
Rocha was washing dishes at the kitchen sink. Rocha saw the suspect standing at the kitchen window. The suspect said, "Please help me, they are trying to kill me." Rocha said the suspect looked really scared. The suspect had a "white rosary" in his right hand. Rocha told the suspect she was calling the Police. The suspect said thank you and then ran to the back of the house. Rocha dialed 911 and then handed the phone to her

| Report Officer | Printed At | |
|---|---|---|
| 2200/MANOR, JAMES | 04/11/2016 08:03 | Page 3 of 5 |

# STOCKTON POLICE DEPARTMENT

<span style="background-color:#8B0000;color:white;">**Narrative**</span>

daughter, (Sub 3).

Rocha described the suspect as H/M/average build/beard/wearing a gray tee shirt/and had a white rosary in his hand. Rocha did not know the suspect.

*(End of Statement)*

**STATEMENT OF (SUBJECT 3) MARIANA M.):**
Mariana said she heard a bang sound near the kitchen. Mariana said her mother, (Sub 2) was washing dishes. Mariana said the suspect was banging on the window, with both hands. The suspect ran around to the back of the house. The suspect began banging on the bedroom windows.

The suspect came over to the sliding patio door and tried to open it. Mariana and her family hid in the bathroom. Mariana does not know the suspect.

*(End of Statement)*

**INVESTIGATION (continued)**:
While I was at 3161 Nicole St, (Sub 4) walked up the driveway. (Sub 4) Filberto Valencia said he thinks maybe the deceased person, is his son. I asked Valencia his name and he provided Identification. Valencia spoke primarily Spanish, so (Int) Santiago Maldonado translated the following statement for Valenica.

**STATEMENT OF (SUBJECT 4) FILIBERTO VALENCIA):**
Valencia said his son has the same name as him and is a junior. The suspect is a mental health patient. The suspect asked Valencia to take him to mental health yesterday. Valencia dropped the suspect off at mental health around 3 PM. Valencia picked the suspect up at 9 PM. Valencia said when he picked up the suspect, he seemed to have anxiety. Valencia said mental health did not give the suspect new medication, they only provided him with something to sleep.

Today, when Valencia got home from work, the suspect seemed paranoid. There was a knock at the front door, and the suspect became very afraid. Valencia tried to calm the suspect down. The suspect grabbed onto the front of Valencia's shirt and said, "Please don't open the door, they are trying to kill me." The suspect got down on his knees, as if to beg.

Valencia went out into the garage, so he could call Police. Valencia's wife and child exited the residence, from the front door. Valencia said the family is not afraid of the suspect, but just fear him hurting himself. Valencia was cold outside and went in the house to get a jacket. Valencia saw the suspect's shoes there, but he was gone. Valencia said the suspect is also dealing with the death of a family member.

Valencia said the suspect was diagnosed by a doctor, for schizophrenia and depression in 2014. The suspect is suppose to take medication, but he has not been taking it.

*(End of Statement)*

**INVESTIGATION (continued)**:
Officers escorted Valencia to a patrol car for transport to the SEB. Officer Saefong and I, cleared the backyard of 3161 Nicole St. We located a few handprints on the windows and located a white rosary lying on the ground. (Refer to FET's report). Detectives arrived on scene.

I monitored the west end of the perimeter, until securing from the scene at 2032 hrs.

**ATTACHMENTS** :
None.

**EVIDENCE** :
Refer to FET's Report.

**DISPOSITION** :
Open

COS048059

# STOCKTON POLICE DEPARTMENT

**Confidential Section**

Do not distribute



**SUBJECT INVOLVED 3:** ████████,MARIANA

| Involvement | Invl No | Type | Name | MNI |
|---|---|---|---|---|
| ████████ | █ | ████ | ████,MARIANA | ████ |

| Race | Sex | DOB | Age | Ethnicity | Juvenile? | Confidential | PRN |
|---|---|---|---|---|---|---|---|
| ████ | █ | ████ | █ | ████ | █ | ████ | ████ |

| Type | Address | | City | State |
|---|---|---|---|---|
| █ | ████████ | | ████ | ████ |

| ZIP Code | Date |
|---|---|
| ████ | ████ |

COS048060

**EXHIBIT P**



344

**EXHIBIT Q**

# STOCKTON POLICE DEPARTMENT



22 E MARKET ST.

STOCKTON, CA 95202

(209) 937-8495

**16-2494**
**DRAFT**

Supplement No
0031

Reported Date
03/10/2016

Rpt/Incident Typ
245

Member#/Dept ID#
**VAR, PHIRUN**

## Administrative Information

| Agency | | DR | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|
| STOCKTON POLICE DEPARTMENT | | 16-2494 | 0031 | 03/10/2016 | | 12:01 | 160190847 |

| Status | | Rpt/Incident Typ | | | | | |
|---|---|---|---|---|---|---|---|
| RTF INVESTIGATIONS | | ASSAULT WITH A DEADLY WEAPON | | | | | |

| Location | | | | City | | ZIP Code | Rep Dist |
|---|---|---|---|---|---|---|---|
| 3133 NICOLE ST | | | | Stockton | | 95205 | 0206 |

| District | Sector | From Date | From Time | Member#/Dept ID# | | | |
|---|---|---|---|---|---|---|---|
| PA | PS | 01/19/2016 | 18:11 | 2094/VAR, PHIRUN | | | |

| Assignment | Entered by | Assignment | | Approving Officer | | Approval Date | |
|---|---|---|---|---|---|---|---|
| ROBBERY PHASE 1 | 2094 | ROBBERY PHASE 1 | | 3800 | | 03/10/2016 | |

| Approval Time | | | | | | | |
|---|---|---|---|---|---|---|---|
| 13:23:22 | | | | | | | |

## Modus Operandi

Crime Code(s)
ASSAULTS

## Narrative

**NOTIFICATION:**
On Tuesday, 01/19/2016 at approximately 1939 hours, I, Detective Var (I-16) received a phone call from the Stockton Police Telecommunications Center. They advised me there was an in custody death that occurred at 3133 Nicole Street. I was requested to respond to the Stewart Eberhardt Building (SEB) for a briefing and assist with the investigation. I arrived on scene at approximately 2246 hours.

**INVESTIGATION:**
Upon my arrival at the Stewart Eberhardt Building, I was tasked to assist with putting packets together for the investigation. I then attended the briefing which was given by Lieutenant Will.

When the briefing was concluded, Sgt. Hutto assigned me to a team. I was assigned to Team #2. Team #2 was consisted of District Attorney Investigator (DAI) Ed Rodriguez, Critical Incident Investigator Thomas Quinones, and me. Team #2 was tasked to interview Filberto and Griselda Valencia (parents of the deceased), Renee Brown, and Brown's daughter, Dawn P.

After receiving our assignment, Team #2 went out to the scene and did a walk through. Once Team #2 was done with the walk through, we came back to the SEB and began our interviews.

Upon our arrival at the SEB, I was advised that Filberto and Griselda were going to be interviewed by Detective Alaniz and DAI Rodriguez since they were Spanish speakers. See Detective Alaniz' report for their statements.

Once the interviews with Filberto and Griselda were done, Team #2 began our interview with Renee Brown. We met with Brown in the interview room. Brown gave Team #2 the following statement.

*The following is a transcription, but not word for word of an interview with Renee Brown. The interview was digitally recorded in its entirety. It is only intended to give the reader an understanding of the conversation; therefore, refer to the recording itself for the exact wording.*

**STATEMENT OF RENEE BROWN:**
Detective Var: Just right.

Renee Brown: OK.

Detective Var: Just have a seat right there please. OK. OK. Well thank you very much for being patient with us. OK?

COS048243

Renee Brown: Yeah.

Detective Var: I know you've been through a lot tonight. So, I really do appreciate it. First I just want to go over the, your information real quick. Just confirm that we have everything correct. What's your last name?

Renee Brown: Brown, B-R-O-W-N.

Detective Var: B-R-O-W-N.

Renee Brown: Mm hmm.

Detective Var: And then Renee, correct?

Renee Brown: Yes, R-E-N-E-E.

Detective Var: R-E-N-E-E.

Renee Brown: E-E

Detective Var: You have a middle name?

Renee Brown: Ann.

Detective Var: A-N-N?

Renee Brown: Yes.

Detective Var: And what's your birthday?

Renee Brown: 2/11 of '80.

Detective Var: And where do you reside?

Renee Brown: In Acampo. It's 2991.

Detective Var: 2991

Renee Brown: East Center Street.

Detective Var: And that's Acampo?

Renee Brown: Yes.

(Knock on door at 00.30.08)

(Detective Var leaves the room at 00.30.17)

DAI Rodriguez: Sure you don't want any water?

Renee Brown: Yeah, I'm good. I'm OK.

DAI Rodriguez: Alright. I appreciate you hanging out. I know it's.

Renee Brown: Yeah.

DAI Rodriguez: We're just trying to make sure everything's done right.

Renee Brown: Yeah.

DAI Rodriguez: We get a clear understanding of what happened.

Renee Brown: Yeah. It's scary.

DAI Rodriguez: Yeah, I'm sure.

Renee Brown: Well a couple weeks before this we had the cops there because somebody was trying to break

COS048244

into our house. The care home.

DAI Rodriguez: That same house?

Renee Brown: Mm hmm. Two black guys.

DAI Rodriguez: Wow. That's scary.

Renee Brown: And they caught him and didn't even do nothing to them. I think the guy said we stole their phone. I'm like what the heck?

(Detective Var enters the room at 00.31.17)

Renee Brown: I'm done working. I'm not working there no more.

Detective Var: OK. Sorry about that.

Renee Brown: It's OK.

Detective Var: And then, what's a good phone number for you?

Renee Brown: It's 209-210-7089

Detective Var: 7-0-8-9?

Renee Brown: Mm hmm. And that's my cell phone.

Detective Var: OK. Cell. And do you know your driver's license number?

Renee Brown: No, it's in my car.

Detective Var: OK. How about social?

Renee Brown: It's ███████████

Detective Var: OK. Alright. So, just start from the beginning. Just tell us what happened today and what you went through and all that.

Renee Brown: OK.

Detective Var: And then I'll probably go back and clarify some stuff and ask just multiple questions. But feel free to just talk freely.

Renee Brown: OK. We had just ate. Got done eat, eating dinner. I don't remember where the consumers are at. At the time. My daughter was sitting in the living room with me. She was playing the tablet and watching TV. And all I hear is a guy come, you know a guy's voice. And I'm looking and he's coming from like the kitchen. And he's stating for us to call 9-1-1. I guess someone's trying to hurt him, kill him? So then I'm trying to get everybody all in one room. And I get, I go and I find the two consumers, they were in their room. Tamika was in her room. And I holler for the consumers to go into the bathroom. Because that's the one room that locks. And the other one was the staff room that locks. I wasn't even thinking. And then my daughter's running and he grabs my daughter by the hair. And he, he said, 'I'm going to kill her. I'm going to kill her mother fucker. I'm going to kill her.' And he shoves us in the bathroom. And the other consumer she got away. I don't know how she got away. But she got away. Nora, she got away. And he was, he had all of us in the bathroom. And he shoved Tamika, the black girl into the shower. Made Nora, Norma put her head by the toilet. And said, 'I'll, I could, I could drown you in the toilet.' And then I'm standing right by the mirror. And he's got my daughter and he says, 'I'm going to snap her neck if you move. Just call the cops.' So I'm on the phone with the dispatcher. I didn't think my phone went through. So I told Norma to get off the phone. Whoever you're on the phone with just call 9-1-1. So both of us are on the phone with 9-1-1 in the room. In the bathroom. And I guess the other consumer, she was in her bathroom on the phone with 9-1-1 as well. So I don't know how many people were on their, you know all of us were on the phone. Well then he's just saying, saying he's a, that he, he's a terrorist. And then he be like making that like humma, humma that kind of noise. Like say you know, he's praying or whatever you call that. And he kept saying that he's going to kill my daughter. And then like he kept pulling her hair like this. And saying he's

COS048245

**Narrative**

going to snap her neck. And all I can do is hit him. I was hitting him and I was scared. I asked him, 'Please stop.' And he said, 'If the cops don't come in nine minutes I'm going to kill her.' And then he grabbed the plunger and he said, 'I'm going to kill you bitch. I'm going to kill you.' And went with the plunger towards my daughter so I grabbed the plunger and told him, 'I'll kill you mother fucker. You're not killing my daughter.' And, and he seen underneath the sink. I don't know how the sink got opened. But there's a scale. And he threw it at me and I blocked it. Blocked it this way. And then he just kept saying he's going to kill my daughter. He's going to kill her. And I asked him, I said, 'What do you want?' I said, 'I'll give you anything that you want. Just let us go.' And then it seemed like it took forever for the cops to get there. But it really didn't. And I was telling dispatch on, on, on there that I don't know how, how they can get in. I said, 'I don't know how he got in because the back door was locked.' Cause I locked everything because we had an intruder before. That kind of come through the front door. So, and then he just kept repeating over and over and over he's going to kill my daughter, he's going to kill my daughter if the cops didn't get there. He's going to kill my daughter, kill my daughter. And then all of a sudden like maybe five minutes before, he made Norma get off the toilet and make her lay on the floor and I hear him hitting her. He shoved me into the shower. And then he had my daughter. And kept hitting Nora, Norma on the floor. And Tamika I told her, 'Just be quiet. Just be quiet.' Because every time he would, she would scream he would you know try and break her neck. Want to try to break her neck. So I just told her, 'Shhh.' And then he opened the, the shower door and socked her. Either socked her or slapped her. I don't know for sure. But all I hear was like this. And then that's when the cops came. And they bumped, they came through and all I seen was a gun point and that's all I can remember. All these, and then seen blood. That's all I can remember. And I just screaming for my daughter. And I get, I do know that when they came in she got loose. <mark>He let go of her. And she ran out</mark>. And I guess Norma ran out, because I didn't see her. Me and Tamika were the ones in the shower still. Watching everything happening on the floor. In front of us. Right there in the shower. I don't know if he tried to lunge for the cops. I don't know. All I know is that guy was freaking crazy.

Detective Var: OK.

<mark>Renee Brown: He was bleeding everywhere.</mark>

Detective Var: OK.

<mark>Renee Brown: There was blood all over the wall. And then they, I know they drugged him out. And I seen the one cop kicking him. Like cause I don't know what the guy was doing but I seen the cop kicking him. And then they dragged, the drugged him out to the hallway. And that's where, no not the hallway, right there like halfway in the hallway and the bathroom. They were tasing him.</mark>

Detective Var: Mm hmm.

Renee Brown: And then I was, you know I'm screaming because I'm hysterical. And then I don't know how he ended up into the complete hallway. And finally Tamika got out, I got out. She ran outside. And then I went outside. And I was, the cops are telling me that my daughter is in the, in the kitchen. She was safe. And I just kept screaming, 'Can you guys just bring her to me? Just bring her to me.' And so they brought her, they brought her to me.' And then no, they told me to go into the kitchen. So I went into the kitchen. In there with her. And when I went in there they were doing CPR on him. And they're trying to bring, revive him. And all I can think is, 'I hope to God this,' this might sound rude but, 'I hope to God this guy don't ever survive this.' You know I mean it was my daughter. You know what I mean?

Detective Var: Yeah.

Renee Brown: She'll never forget this.

Detective Var: OK. Sorry you have to go through this. OK? I'm going to take you back to the beginning real quick.

Renee Brown: (Yes)

Detective Var: OK? So. You said that you were in the kitchen?

Renee Brown: Not in the kitchen, we just got done eating in the kitchen.

## Narrative

Detective Var: OK.

Renee Brown: And we were in the living room.

Detective Var: The living room which is.

Renee Brown: Yeah, which is right by the kitchen. Yeah, too.

Detective Var: You can see the kitchen is kind of attached, one whole room.

Renee Brown: Yeah. Yeah.

Detective Var: Like an open floor plan, you can see from the kitchen and then you can right?

Renee Brown: Well there's no, that's the dining room.

Detective Var: OK.

Renee Brown: There's a dining room here and the kitchen here.

Detective Var: Mm hmm.

Renee Brown: And then the living room's here.

Detective Var: OK, the living room which is close to the front door.

Renee Brown: Yes. Yes by the front door.

Detective Var: OK. So, you guys are in the living room.

Renee Brown: Mm hmm, me and my daughter.

Detective Var: OK. And then you, what.

Renee Brown: I heard him screaming. Like call 9-1-1.

Detective Var: That's what.

Renee Brown: I heard a man's voice.

Detective Var: That's what got your attention.

Renee Brown: Yeah.

Detective Var: To look towards the kitchen.

Renee Brown: Yeah.

Detective Var: And he was inside or outside?

Renee Brown: He was already walking in this way. You know in towards the, the living room.

Detective Var: OK. So, you, you said you lock all the doors and everything.

Renee Brown: Yes.

Detective Var: You didn't hear any window or anything?

Renee Brown: We had the radio, the TV on loud. And she was playing her tablet. Like we do all the time when she's up there with me.

Detective Var: OK.

Renee Brown: So I mean I didn't hear nothing.

Detective Var: So you didn't know how he got.

COS048247

Renee Brown: No.

Detective Var: But he was inside the house.

Renee Brown: He was in the house.

Detective Var: When you first saw him.

Renee Brown: Yeah.

Detective Var: OK. So, going back. He was inside. He, he comes up to you guys and tell you guys to call 9-1-1 for him.

Renee Brown: Yes, so I'm on the phone. I call right away. Just so he, you know to try to get him out. So he don't hurt nobody.

Detective Var: Uh huh. You might have told me this already. But I probably missed it. Did he say why he wants you to call 9-1-1?

Renee Brown: He said that whoever that they're trying to kill him. That somebody's trying to kill him.

Detective Var: OK. So at this point, you get on the phone and call 9-1-1.

Renee Brown: Mm hmm.

Detective Var: Correct?

Renee Brown: (Yes)

Detective Var: And then you said that he came after you guys?

Renee Brown: Yes and he made us all go in the bathroom.

Detective Var: How did he make you guys? Did he tell you guys to go? Or he physically moved you guys?

Renee Brown: Well he had, he had my daughter you know and he's like, 'You guys get in the fucking bathroom. Everybody in the bathroom.'

Detective Var: So, OK, so while you guys are in the living room. He told you to call 9-1-1 because someone was trying to kill him.

Renee Brown: Mm hmm.

Detective Var: How did he get ahold of, what's your daughter's name?

Renee Brown: Dawn.

Detective Var: Dawn. OK.

Renee Brown: Because I was going, you know go, go to find out where they are. Where the other consumers are at. Cause I didn't know where they were at.

Detective Var: Mm hmm.

Renee Brown: You know I had no clue. I know that they were in there. And last time I knew they were going to their room. That's the last thing I knew.

Detective Var: OK. So going back how did he get ahold of Dawn?

Renee Brown: Because, OK. She was, I wasn't even thinking. I was going to see where they were at. And she's sitting down. She came running to, to get to me. And then that's when he grabbed her. And we were in the bathroom.

Detective Var: She's in the living room.

COS048248

Renee Brown: Mm hmm.

Detective Var: Where were you at when she ran towards you?

Renee Brown: I was right by the bathroom door.

Detective Var: Right by, so in the hall?

Renee Brown: Yeah, in the hallway.

Detective Var: OK, so she's running towards you.

Renee Brown: Yes, running towards me.

Detective Var: OK. As she was running.

Renee Brown: Yes.

Detective Var: He grabbed her.

Renee Brown: Yes.

Detective Var: How did he grab you?

Renee Brown: He grabbed her by the hair.

Detective Var: By the hair?

Renee Brown: And leaned her down.

Detective Var: OK.

Renee Brown: And then that's when he, all of it you know, he said, 'All you guys get in the bathroom.' So I'm, I'm going to listen because he's got my daughter.

Detective Var: Mm hmm.

Renee Brown: You know he's holding her hostage.

Detective Var: When you say he, he grabbed a hold of her. Did he hold her in a particular way?

Renee Brown: Like, I don't know how to hold. Like this you know? With her neck turned to the side like.

Detective Var: OK. Like from behind?

Renee Brown: Yeah.

Detective Var: OK, with his arm across her neck?

Renee Brown: (Yes)

Detective Var: So he's just holding her like that?

Renee Brown: Mm hmm. And her neck was turned like, you know. Like this and every time she tried to turn it. And then he was hitting her.

Detective Var: How did he hit her?

Renee Brown: I don't know. I don't know if he was socking her or was open handed.

Detective Var: OK.

Renee Brown: But she said it was both.

Detective Var: OK.

COS048249

Renee Brown: I mean she's got a partial black eye.

Detective Var: So he was hitting her in the face?

Renee Brown: Mm hmm. And he was hitting the girl Norma that was on the ground. And then the hit Tamika. He wasn't putting hands on me, because I wasn't going to let him.

Detective Var: Right, so. I'm going to slow you down a little bit. I'm going to take this step by step. OK? So that way we can understand what, what happened. I know it's hard for you to go through this tonight. I apologize for doing this. But we're just trying, we just want to understand what happened. OK? So he had Dawn in kind of like a, a choke hold?

Renee Brown: Yeah.

Detective Var: And then he told you?

Renee Brown: Yeah, he kept saying he's going to kill her.

Detective Var: Yeah. If you don't go into the restroom?

Renee Brown: Yeah.

Detective Var: He told you, Tamika and.

Renee Brown: And Norma.

Detective Var: Norma.

Renee Brown: Mm hmm.

Detective Var: So, he got, he forced all you guys into the restroom.

Renee Brown: Mm hmm.

Detective Var: Tamika went into the shower?

Renee Brown: He told me to get into the shower.

Detective Var: The bathtub?

Renee Brown: Yeah.

Detective Var: OK.

Renee Brown: And then he told Norma to sit right there by the toilet that you know with her head over the toilet like this.

Detective Var: OK.

Renee Brown: And he said, like, 'I could, I could drown you.'

Detective Var: OK. And that's Norma?

Renee Brown: That's Norma.

Detective Var: And then was there another person in there?

Renee Brown: Nora was in, I don't, she didn't, she got into her bathroom in her, in the other room.

Detective Var: Which room is that?

Renee Brown: They're room it's like, OK. The bathroom's here.

Detective Var: Uh huh.

Renee Brown: Go down this way and there's a big bedroom.

COS048250

Detective Var: OK. And that's.

Renee Brown: She was in that one. On the phone in the bathroom.

Detective Var: And that's where Nora went.

Renee Brown: Yeah.

Detective Var: The big bedroom with the sliding door.

Renee Brown: Mm hmm.

Detective Var: OK. So that's the one at the northeast bedroom.

Renee Brown: Yeah.

Detective Var: The very north.

Renee Brown: Yeah, the big room, yeah.

Detective Var: OK. And then it was just you, Dawn, Tamika, and the.

Renee Brown: And Norma.

Detective Var: And Norma.

Renee Brown: Right.

Detective Var: And Norma was the one with, the one that had to sit down on the ground kind of with her head on top of the toilet.

Renee Brown: Yes. Yes.

Detective Var: OK. So, now let's bring you back to now that he got all you guys in the restroom. Walk me slowly, what'd he do after that?

Renee Brown: I was standing by the sink. And he was, Tamika was in the shower. Norma was right there. He was right here and he had Dawn. And he kept saying he was going to kill her. Wouldn't listen.

Detective Var: Right. So when you saw right here. Was he like at the doorway?

Renee Brown: No, OK. He was, the doors here. The light switch. He was right by the light switch.
Detective Var: So kind of in the restroom.

Renee Brown: He was in the restroom.

Detective Var: Right, in the restroom.

Renee Brown: Oh yes he was in the restroom. And the door was locked and he had his foot like this. By the, by the, the bathroom door.

Detective Var: OK, so he went inside the restroom.

Renee Brown: Yes.

Detective Var: Closed the door and locked it.

Renee Brown: Yes, yes.

Detective Var: OK. And he was telling you to call 9-1-1.

Renee Brown: To call 9-1-1 that someone's trying to kill me.

Detective Var: Or else he was going to.

COS048251

Renee Brown: He was going to kill everybody.

Detective Var: He was going to kill.

Renee Brown: (Unintelligible 00.44.03) and I'm thinking, what the hell? I don't know who this guy is.

Detective Var: OK.

Renee Brown: But I'm going to do whatever you tell me to do because you've got my daughter.

Detective Var: Right. So at some point, you said you end up hitting him?

Renee Brown: Mm hmm.

Detective Var: Because he was hitting Dawn?

Renee Brown: Yeah.

Detective Var: And he was hitting you?

Renee Brown: Yeah, and he was hitting my consumers.

Detective Var: OK.

Renee Brown: He was harming them.

Detective Var: Do you remember what he hit them with?

Renee Brown: I didn't hit him with nothing. I hit him with my fist.

Detective Var: With your fist?

Renee Brown: Like this.

Detective Var: OK. I noticed the toilet seat was on the ground.

Renee Brown: That was when after the cops got here.

Detective Var: OK.

Renee Brown: That all happened with the cops.

Detective Var: OK, so.

Renee Brown: I don't know, I don't know what happened. I don't remember.

Detective Var: So it was never used?

Renee Brown: No.

Detective Var: OK.

Renee Brown: No.

Detective Var: OK. And you said, also say the plunger?

Renee Brown: Yeah, he tried, he said he was going to kill us with the plunger. And poke our eye balls out.

Detective Var: OK.

Renee Brown: So you poke our eyes ball out. He had Dawn like this by her eyes.

Detective Var: OK, so he put his fingers in her eyes.

Renee Brown: And then he tells me, 'I'm going to poke your eyes.' I said, 'I dare you poke my eyes mother fucker.' Told him just like that. 'I dare you poke my eyes mother fucker.'

COS048252

Detective Var: OK.

Renee Brown: Like, but he like I couldn't get you know, hit him too much because he had Dawn in front of him. You know what I mean?

Detective Var: Yeah.

Renee Brown: Like holding her. Like this.

Detective Var: OK. And then with the plunger you said you were able to take the plunger away from him?

Renee Brown: Mm hmm.

Detective Var: Was he swinging at you? Or?

Renee Brown: No.

Detective Var: OK. How was he holding the plunger?

Renee Brown: Like holding like this. Like saying he was going to kill us.

Detective Var: OK. To like in a stabbing motion?

Renee Brown: Mm hmm.

Detective Var: OK. How were you able to grab the plunger from him?

Renee Brown: Yank it.

Detective Var: Yanked it?

Renee Brown: Yanked it right out of his hand.

Detective Var: What'd you do with the plunger?

Renee Brown: I hid it. I sat it back over there.

Detective Var: Uh huh.

Renee Brown: So you know what I mean, if worst came, I'll stick, I'll kill him. I don't care.

Detective Var: OK. What happened after that? After you got the plunger.

Renee Brown: Then he seen the little scale. Inside the, the thing and he threw the scale at me.

Detective Var: The scale you just said was, underneath the sink?

Renee Brown: Right. Underneath the sink. So I don't know how that got opened. I don't know. Maybe if I was trying to. I don't know.

Detective Var: Alright.

Renee Brown: I don't know if I was trying to grab something.

Detective Var: Mm hmm. Did he hit you at all with the scale?

Renee Brown: Yeah, he tossed it and I went like this. He didn't hit me, hit me. But so I blocked it.

Detective Var: But it hit you in the arm?

Renee Brown: Yeah, so I blocked it. Yeah.

Detective Var: OK. And then what happened after that?

Renee Brown: Oh, that's when the cops came in.

COS048253

Detective Var: OK.

Renee Brown: It seemed like forever, but it really wasn't forever.

Detective Var: Right, so.

Renee Brown: It seemed like that.

Detective Var: I'm going, I'm going to ask you to I mean, do as best as you can. Slow that part down for me. OK? So, how, how did the officers come into the restroom?

Renee Brown: They busted the door open.

Detective Var: They busted the door open.

Renee Brown: Mm hmm.

Detective Var: So.

Renee Brown: And then the one officer had a gun.

Detective Var: So, I'm going to ask you to go slowly for me. OK? So the door opens now. It opened.

Renee Brown: Mm hmm.

Detective Var: OK. What was the first thing that you saw?

Renee Brown: All I seen was a gun pointing.

Detective Var: OK.

Renee Brown: And then I seen my daughter, they, he let go of my daughter. And she took off running.

Detective Var: OK, so the door.

Renee Brown: And Norma took off running out the door.

Detective Var: OK.

Renee Brown: Me and Tamika were stuck in the shower.

Detective Var: OK. Did you hear what the officer said to him? Can you recall what the officer said? Anything at all?

Renee Brown: No. No. I was just focused on getting the hell out of there.

Detective Var: OK. So, but you're still back there.

Renee Brown: Mm hmm.

Detective Var: You and Tamika were still behind the

Renee Brown: And I was trying to keep Tamika calm.

Detective Var: OK.

Renee Brown: Cause she was starting to freak out.

Detective Var: So now that Dawn ran out and then Norma.

Renee Brown: Mm hmm. Norma runs out, yes.

Detective Var: Runs out.

Renee Brown: Mm hmm.

COS048254

Detective Var: Is, did you see, how many officers did you see?

Renee Brown: I seen, probably seen was one, two and one come around the corner. So three.

Detective Var: So how many officers entered the restroom?

Renee Brown: Two.

Detective Var: Two officers?

Renee Brown: And then one stayed at the door.

Detective Var: OK.

Renee Brown: Mm hmm.

Detective Var: So now those two officers came inside the.

Renee Brown: Big tall dudes.

Detective Var: OK. What happened after that between the officers and the guy that was in there?

Renee Brown: See I don't know if the guy went towards him. I don't know. Because I was, I was faced toward Tamika.

Detective Var: Uh huh.

Renee Brown: So, I don't know.

Detective Var: That's fine. That's fine.

Renee Brown: Yeah, I was facing Tamika.

Detective Var: Just, just tell me what you can remember.

Renee Brown: All I can remember is the gun being pointed and then keep telling. All I heard was them telling him to stop. To get down. To stop. To stop. And I look over and there's blood all over the side of the wall.

Detective Var: OK, so you're remember them telling this guy to stop? Get on the ground?

Renee Brown: Yeah. That's all I hear. Yeah.

Detective Var: At this point you, are you just hearing this? Or are you, are you seeing it also?

Renee Brown: Well like I said, I was toward Tamika so I could just hear.

Detective Var: Uh huh.

Renee Brown: And then I look over and there's blood everywhere.

Detective Var: So I noticed the, the bath area.

Renee Brown: Mm hmm.

Detective Var: The shower area is kind of towards the end.

Renee Brown: Mm hmm.

Detective Var: Just the west end of the restroom.

Renee Brown: Yeah.

Detective Var: Right?

Renee Brown: Well the toilet's here and the shower is like this. Yeah.

COS048255

Detective Var: Right. Right. The, like the shower then the toilet and then there's the sink.

Renee Brown: Mm hmm. The guy was right, the blood and stuff all happened right here like in the corner.

Detective Var: Right. Where were you at when the officer entered?

Renee Brown: I was towards the back.

Detective Var: It was towards the back. Were you in the shower? Or?

Renee Brown: In the shower. Yeah. With Tamika and me in there.

Detective Var: With Tamika.

Renee Brown: Yeah, right when you guys got there.

Detective Var: So, I, I'm guessing. Correct me if I'm wrong. Were you not paying, were you not looking at the officers directly?

Renee Brown: I was scared.

Detective Var: OK. I, I get.

Renee Brown: I was deadly scared.

Detective Var: I can understand that.

Renee Brown: All I seen was a gun.

Detective Var: Uh huh.

Renee Brown: I'm thinking, 'Oh my God we're all. Something's going to happen.'

Detective Var: OK.

Renee Brown: That's all I could think is, 'Oh my God something's going to happen.'

Detective Var: But you could hear. The officers tell him.

Renee Brown: Mm hmm. Tell him to stop and get down. I don't know if he lunged towards them. I don't know.

Detective Var: What, what'd you hear after that?

Renee Brown: That's all I could hear. And then the cop said, 'It's OK ma'am. It's OK. It's OK. It's OK.' And then all I know is they drug him out. And tasered him. Right there like he was, his legs were hanging outside of the bathroom.

Detective Var: Uh huh.

Renee Brown: And his body was you know, the top part. Was in the bathroom and they tased him. Like once or twice.

Detective Var: Uh huh.

Renee Brown: And then they, I don't know why but they took him to the hallway and they told me to get out. So I got out of the, out of the, out of the bathroom.

Detective Var: Was he still moving or was he still fighting with the officers when they're pulling him out?

Renee Brown: Yes, he was.

Detective Var: He was still struggling with the officers?

Renee Brown: Yes, yes he was.

Detective Var: Were you able to hear like a struggle or a scream or anything else?

COS048256

Renee Brown: I can see his hands go like this.

Detective Var: When they were trying to pull him out?

Renee Brown: Mm hmm. But I, I don't think I heard him screaming.

Detective Var: OK.

Renee Brown: Saying anything.

Detective Var: He didn't say anything at all?

Renee Brown: No. And then I heard one the cops say he's unconscious. That's all I heard.

Detective Var: Is this when he was still inside the restroom or was?

Renee Brown: No he was in the hallway.

Detective Var: He was in the hallway.

Renee Brown: Mm hmm.

Detective Var: At this point where were you standing?

Renee Brown: I was standing. I was like trying to hide myself.

Detective Var: Uh huh.

Renee Brown: By the little, like the I don't know what you would call it. Like the, kind of like the hallway and the bedroom kind of area.

Detective Var: OK. You're talking about like the?

Renee Brown: Crying for my daughter.

Detective Var: OK. You're talking about like the, near those rooms?

Renee Brown: Mm hmm. Yeah.

Detective Var: Where the little hall, that takes you to the garage door?

Renee Brown: Mm hmm. No to the, to like the rooms.

Detective Var: To the other rooms. Then to the big room.

Renee Brown: Yeah.

Detective Var: OK.

Renee Brown: Cause there's one, my staff room and then there's the big room.

Detective Var: OK.

Renee Brown: Yeah, I was like, it's like a, it's kind of like this.

Detective Var: Mm hmm.

Renee Brown: That was in between like there hollering, 'I want my daughter.' I was screaming for my daughter. I want to make sure she's OK.

Detective Var: OK. What else did you see when he was out in the hallway?

Renee Brown: I was, that's all I mean, that's all I seen. You know. That's, I went outside. I was, I was outside.

Detective Var: When you say you heard one of the officers said that he.

COS048257

Renee Brown: He's unconscious.

Detective Var: Unconscious.

Renee Brown: That's all I know.

Detective Var: OK.

Renee Brown: That means he's knocked out.

Detective Var: Right. And what else did you see after he said that?

Renee Brown: Nothing. I ran, me and Tamika ran out.

Detective Var: Ran out?

Renee Brown: After the, out to the, through the garage and then to the officers in the front yard. And then I kept, I was screaming. I was hysterical. All I want is my daughter. And they wouldn't give me my freaking daughter.

Detective Var: Uh huh.

Renee Brown: So then the one cop goes, 'OK, what's the matter?' I said, 'I want my daughter. Can you guys just bring her out? Or whatever?'

Detective Var: Mm hmm.

Renee Brown: So they told me to go ahead and go in. And when I went in. Walk into the door, they were doing CPR on him.

Detective Var: So the officer, one of the officers were doing CPR on the suspect.

Renee Brown: Mm hmm.

Detective Var: OK. Then you went to the kitchen area?

Renee Brown: The kitchen. Mm hmm.

Detective Var: Then you just stayed with your daughter?

Renee Brown: Mm hmm.

Detective Var: OK. Anything else?

Renee Brown: With my daughter, Tamika and Nora.

Detective Var: OK. I know I asked you a lot of questions. But can you think of, was there something that is significant that I didn't ask you about? That you think is important?

Renee Brown: No, I was just, didn't know what was going on. Where we were going to be put. Or you know. And then when I, I told them, because I, I peed on myself because I was so scared.

Detective Var: Mm hmm.

Renee Brown: And I told one officer lady. I said, 'Well is there any way that I can change?' When I went to change I seen the thing over his head. Like the, the, what do they call them? I guess the blanket, not a blanket but.

Detective Var: Like at tarp?

Renee Brown: Yeah, like a tarp over the, over him. And I got scared.

Detective Var: Mm hmm.

Renee Brown: And I grabbed the officer and I said, 'Are you sure he's dead? Are you sure I can walk past him? Are you sure he's dead?' And she goes, 'He's dead.' So then I went and changed. And then that's when they took

COS048258

me outside and told us that you were going to put, take us to a safe place.

Detective Var: Mm hmm. So what's the, what's the company's name?

Renee Brown: Benina Guest Home.

Detective Var: How do you spell that?

Renee Brown: B-E-N-I-N-A.

Detective Var: B-E-N?

Renee Brown: I-N-A.

Detective Var: I-N-A?

Renee Brown: Yeah.

Detective Var: Guest Home?

Renee Brown: Guest Home.

Detective Var: And who is the owner? Who's the super?

Renee Brown: Erma. Erma Benito.

Detective Var: Erma?

Renee Brown: Uh huh. I had called her afterwards.

Detective Var: Benito.

Renee Brown: Benito. Yeah.

Detective Var: And what's, do you know her phone number by chance?

Renee Brown: 915-5944.

Detective Var: 5944.

Renee Brown: Mm hmm.

Detective Var: OK. Do you have any questions?

DAI Rodriguez: The Benina Guest House, that's a group home?

Renee Brown: It's a home for mentally disabled.

DAI Rodriguez: Mentally disabled.

Renee Brown: Mm hmm, level three.

DAI Rodriguez: What does that mean? Level three?

Renee Brown: Well there's different levels. There's ones through, I think four.

DAI Rodriguez: How long have you worked there?

Renee Brown: I don't know, almost five years.

DAI Rodriguez: Five years.

Renee Brown: Mm hmm.

DAI Rodriguez: What's your title?

Renee Brown: I'm a direct support professional. House manager.

COS048259

DAI Rodriguez:  Direct support.

Renee Brown:  Professional house manager.

DAI Rodriguez:  And you've been there at that house for five years?

Renee Brown:  Mm hmm.

DAI Rodriguez:  And.

Renee Brown:  Almost five years.

DAI Rodriguez:  OK.  And Tamika, Norma and Nora.

Renee Brown:  Mm hmm.

DAI Rodriguez:  Live there right now?

Renee Brown:  Yes, they're consumers.

DAI Rodriguez:  Anyone else?

Renee Brown:  No, because there's only three.  There's supposed to be four but we have an open bed.  So there's only three.

DAI Rodriguez:  OK.  And you refer to them, they're referred to as consumers?

Renee Brown:  Yes.

DAI Rodriguez:  OK.  And they're functional?

Renee Brown:  Yeah, they're high functioned.

DAI Rodriguez:  OK.

Renee Brown:  Mm hmm.

DAI Rodriguez:  They understand everything?

Renee Brown:  Oh, yes they do.  Yeah.

DAI Rodriguez:  Pretty much take care of themselves.

Renee Brown:  Mm hmm.

DAI Rodriguez:  OK.  And what, what time does your shift start?

Renee Brown:  I do a, I live there.

DAI Rodriguez:  You live there permanently?

Renee Brown:  For two days.  No.  For two days.

DAI Rodriguez:  Oh you stay there permanently for two days?

Renee Brown:  Mm hmm.  I start Monday at 5:30 to Wednesday at 5:30.

DAI Rodriguez:  Oh just two days a week?

Renee Brown:  Mm hmm.  Now yeah.  I was five days.

DAI Rodriguez:  And then during that time does your daughter Dawn stay with you?

Renee Brown:  Sometimes.  Sometimes she comes up there.  I would have had all three.  But the two boys didn't want to come with me today.  I mean Monday.

COS048260

DAI Rodriguez: OK. And does Dawn stay with you that whole time or?

Renee Brown: No, she goes to school and stuff. Yeah. I take her to school. And while the girls go to their program. I take her to school and I pick her up from school.

DAI Rodriguez: OK. And what, what are you supposed to do there? I mean what's your roll there?

Renee Brown: I cook. I clean. I give out meds. I take them to doctors' appointments. I take them on outings. All that. Yeah.

DAI Rodriguez: OK. And I think you answered this already. And when you guys are in the house. All the doors are locked?

Renee Brown: Mm hmm.

DAI Rodriguez: And is that a rule or?

Renee Brown: No, but to me it is because you know. It's late. As soon as they all, my consumers come in I lock doors.

DAI Rodriguez: OK.

Renee Brown: Mm hmm.

DAI Rodriguez: What time do you think you start locking all the doors?

Renee Brown: The last one gets home about five, 5:30.

DAI Rodriguez: OK, so you lock. Sliding glass back door.

Renee Brown: Mm hmm.

DAI Rodriguez: And the front door.

Renee Brown: And the front door. Yeah.

DAI Rodriguez: The garage is normally.

Renee Brown: There's no. There's no way to lock the garage door. Besides the main, the main door.

DAI Rodriguez: OK. You talked about this a little bit. A couple weeks ago.

Renee Brown: Mm hmm.

DAI Rodriguez: Two guys broke into the house?

Renee Brown: They didn't break in. I don't know if was two, how many weeks ago it was. But we had called 9-1-1 because me and my cousin were outside. And these guys passed by. And then they were parked across the street. And I told her, 'Something just don't feel right.' So then, we were going in the house. We barely made it into the house and they came up to the door. And they were ringing the doorbell. We were on the phone with the dispatcher as well the whole time. And the cops pulled up and the guys were there. They said we stole their phone.

DAI Rodriguez: Oh. OK.

Renee Brown: So nothing was even done. Cops didn't do nothing.

DAI Rodriguez: OK. So tonight you, everything was locked up.

Renee Brown: Mm hmm.

DAI Rodriguez: You five were in the house.

Renee Brown: Mm hmm.

COS048261

DAI Rodriguez: You and Dawn were in the living room.

Renee Brown: Mm hmm.

DAI Rodriguez: And Tamika, Nora and Norma were in the kitchen?

Renee Brown: No, they were in their rooms.

DAI Rodriguez: In their rooms.

Renee Brown: Mm hmm.

DAI Rodriguez: OK. And then all of a sudden you hear a male voice.

Renee Brown: Mm hmm.

DAI Rodriguez: Could you hear any doors opening or windows opening?

Renee Brown: No, like I said we had the radio on, and the TV on loud. And she was playing her tablet. We were laughing.

DAI Rodriguez: OK. Do you have any idea how that person could have gotten in?

Renee Brown: (No)

DAI Rodriguez: Did you hear like a window break or?

Renee Brown: No.

DAI Rodriguez: Or a door push open or anything like that?

Renee Brown: No. I didn't hear nothing.

DAI Rodriguez: OK.

Renee Brown: I was just, I didn't, I didn't know how either. You know what I mean? I was like, yeah maybe, you know maybe he shimmied the door. I don't know. I don't even know who this guy was.

DAI Rodriguez: Was he yelling out? Was that, was that (unintelligible 00.57.05).

Renee Brown: No he was just, you know, 'Somebody call 9-1-1. Call the cops. They're trying to kill me.' I'm like, 'Who's trying to kill you?'

DAI Rodriguez: He was talking perfect English?

Renee Brown: Mm hmm.

DAI Rodriguez: OK. Was he sweating or?

Renee Brown: Yeah, he looked like maybe he was running for a while. He had no, no shoes on. He was kind of dirty.

DAI Rodriguez: Had you ever seen that person before?

Renee Brown: No. Well I really, I don't go walking around Stockton. I'm not. I don't know people out here.

DAI Rodriguez: OK. And when he, he was yelling out. Was he like directing it towards you? Was he coming towards you?

Renee Brown: Mm hmm. Yeah, he's asking us to call the cops. That someone was trying to hurt him. Kill him.

DAI Rodriguez: OK.

Renee Brown: And I'm thinking, I don't even know where this guy came from. How he got in the backyard. Because, our, our gate has a lock on it.

COS048262

DAI Rodriguez: And that's when you went to go check on the three, three girls?

Renee Brown: Mm hmm.

DAI Rodriguez: In the back bedroom?

Renee Brown: Yeah. One was in her room. Like catty corner from there. From the bathroom. And then the other room is, the big room where the two girls share.

DAI Rodriguez: OK. And as you were walking towards them. Were you running or walking towards them?

Renee Brown: I don't remember.

DAI Rodriguez: OK, that's when Dawn started to go towards you.

Renee Brown: Mm hmm.

DAI Rodriguez: And then he grabbed her by the, by the back.

Renee Brown: Mm hmm. By the back, by just like this. I mean she went, fuck going backwards.

DAI Rodriguez: And then he got her in a choke hold?

Renee Brown: Mm hmm. Yes, I, like this. You know like.

DAI Rodriguez: And his arm around her neck?

Renee Brown: Yeah. She's got marks all over her, you know right here.

DAI Rodriguez: And what's he saying? At that point?

Renee Brown: That he's going to kill her.

DAI Rodriguez: What does he want? Or?

Renee Brown: To call the cops. And that's why I'm on the phone the whole time with the cop.

DAI Rodriguez: You're calling them.

Renee Brown: Yeah, I'm on the phone with the cops. And I'm telling him.

DAI Rodriguez: And what's he?

Renee Brown: I'm on the phone. I'm on the phone.

DAI Rodriguez: He sees you on the phone.

Renee Brown: 'Oh they're not coming fast enough.'

DAI Rodriguez: OK.

Renee Brown: 'They're not coming fast enough.' What the freak you mean they're not coming fast enough? And then I ask him, OK. And 'm lying out my ass. I'm like, 'OK they're here. Can you open the door?' He's like, 'No, they got to come in.' And he said he's a terrorist and that he was like, (makes humming noises) doing that crap. So I thought maybe he was really a terrorist guy. You know with all the crap that is going on now.

DAI Rodriguez: OK. So that's. How was he dressed? Did he have a shirt on? Or?

Renee Brown: Yeah, he had like a grayish blue shirt. No socks. I mean no shoes. I don't know what color his pants were. I couldn't tell you the color of his pants.

DAI Rodriguez: Anything on his head?

Renee Brown: No.

DAI Rodriguez: OK. Could you smell any?

COS048263

Renee Brown:  I couldn't smell no alcohol or nothing.  Cause I can smell alcohol.  I didn't smell nothing.

DAI Rodriguez:  Did he look like maybe he was on, on (talked over).

Renee Brown:  He looked dirty.  Yeah, looked like he was on some kind of drugs.  Or he's mentally you know.

DAI Rodriguez:  OK.

Renee Brown:  Mental all together.

DAI Rodriguez:  He just looked a little off.

Renee Brown:  Yeah.

DAI Rodriguez:  For some reason.

Renee Brown:  Not little.  He was way off.

DAI Rodriguez:  OK.  And he has a hold of your daughter.

Renee Brown:  Mm hmm.

DAI Rodriguez:  And then he, he's, at some point you guys end up in the bathroom there?  The hallway?

Renee Brown:  Mm hmm

DAI Rodriguez:  Is he telling you to go in there?

Renee Brown:  Yeah, he tell all of us to go in the bathroom.

DAI Rodriguez:  Any idea why he wanted everyone?

Renee Brown:  I don't know.

DAI Rodriguez:  It's just what he wanted.

Renee Brown:  That's what he wanted.  That's the closest room, you know the room when after we you know we're going in the hallway.  Besides there was an open room there.  But he wanted us in that room.

DAI Rodriguez:  You guys go in there first?

Renee Brown:  Mm hmm.

DAI Rodriguez:  And then he goes in there with.

Renee Brown:  Mm hmm.

DAI Rodriguez:  He still has your daughter?  By the hair?

Renee Brown:  By the hair.

DAI Rodriguez:  OK.  And then at one point I guess Tamika, he tells Tamika to go in the shower?

Renee Brown:  Mm hmm.

DAI Rodriguez:  And then.

Renee Brown:  He tells, 'Bitch get in the shower.'

DAI Rodriguez:  And then you go in the shower too?

Renee Brown:  No, it was towards the end.

DAI Rodriguez:  OK.

Renee Brown:  When he made me get in right before the cops came.  He made me get in the shower.

COS048264

DAI Rodriguez: OK. And then.

Renee Brown: And he made Nora get on the floor and I can hear him hitting her. Hella hard.

DAI Rodriguez: Could, could you see that?

Renee Brown: Well I was getting into the, I mean I, he had the glass doors closed.

DAI Rodriguez: OK.

Renee Brown: So I couldn't see what he was doing. All I could hear was this (pounds fist on table). He was hitting her hard.

DAI Rodriguez: Are they saying something to him? Did Norma say anything?

Renee Brown: Yeah, no but I didn't understand what she's saying. Cause she mumbles. So I don't know what she was telling him.

DAI Rodriguez: Does he say something to her?

Renee Brown: He's telling her, 'Bitch I'll kill you. I'll just kill you. I'll kill you. I'll kill you.' That's all he's saying. You know what I'm saying who knows who he's talking to. Cause he had Dawn and he had her. So I don't know who he's talking to.

DAI Rodriguez: OK. And then at one point the officers get to the door.

Renee Brown: Mm hmm. They bust the door open.

DAI Rodriguez: They bust the door open.

Renee Brown: They don't know. They don't do none of that.

DAI Rodriguez: But before they bust the door, did you know they were there?

Renee Brown: No.

DAI Rodriguez: Did they say anything? Or?

Renee Brown: I don't think so. I don't know if they did or not. I don't know.

DAI Rodriguez: Could, they could have said something.

Renee Brown: Yeah, but I wasn't, I wasn't paying attention.

DAI Rodriguez: Everything, so much stuff was going on.

Renee Brown: Yeah.

DAI Rodriguez: OK. The, the door goes flying open.

Renee Brown: Yeah.

DAI Rodriguez: OK.

Renee Brown: And the cops got the gun.

DAI Rodriguez: OK. And how many officers do you remember seeing?

Renee Brown: There was two and then one was coming around the corner.

DAI Rodriguez: OK.

Renee Brown: Two was in the bathroom. The tall big dudes. And then the guy that was just coming around the corner. He was not in the bathroom but he was like right there right by the bathroom door. Yeah.

COS048265

DAI Rodriguez: OK. And they have their guns out and they're telling the guy.

Renee Brown: Mm hmm. Mm hmm.

DAI Rodriguez: 'Get down. Get down.'

Renee Brown: Yeah.

DAI Rodriguez: 'Get down.' And he, he's not, he's not listening?

Renee Brown: He's not doing nothing. He's just standing there. You know like he's on drugs.

DAI Rodriguez: OK.

Renee Brown: You know like he's big, big macho man.

DAI Rodriguez: Does he still have ahold of your daughter?

Renee Brown: No Dawn got loose. As soon as the cop with the gun, Dawn got loose.

DAI Rodriguez: Oh, she was able to get out.

Renee Brown: I seen her leave. And all, all I can do, and I was just thanking God.

DAI Rodriguez: And Nora was able to get out.

Renee Brown: And Nora, and Norma was able to get out.

DAI Rodriguez: OK.

Renee Brown: Yes.

DAI Rodriguez: You and Tamika were the only ones stuck in the shower.

Renee Brown: We're in, stuck in the shower. Mm hmm.

DAI Rodriguez: And then, did the officer grab ahold of him? Or?

Renee Brown: No, they didn't grab. I don't think they grabbed ahold of him.

DAI Rodriguez: OK.

Renee Brown: No, they were just you know and I see the one cop kicking him. Like this.

DAI Rodriguez: Well how did he get to that point?

Renee Brown: I don't know. I don't know. I don't know if he, you know, if, I don't know what happened. I don't know what happened. I have no clue what happened. I don't know how he got knocked down. All I know is I seen blood and I was just like, I was freaking out.

DAI Rodriguez: Where did the blood come from?

Renee Brown: I don't, I don't know if it was coming from him. I don't know.

DAI Rodriguez: OK.

Renee Brown: Because they're, like I said the cops. The one cop was here. The one cop was here. So I couldn't see you know what, what was going on. Or how it happened or you know, I don't know if he fell down and busted his head. I don't know. But and then, all I know I seen blood all on the side of the wall. And I'm trying to keep Tamika. You know because she's, I don't want her to freak out seeing all that blood. Cause that was a lot of blood.

DAI Rodriguez: Yeah.

Renee Brown: And then they drug him out towards like half his body here. The top part of his body was in, in the

COS048266

bathroom. The bottom half was in the hallway. And they were tasing him. The one, they were tasing him. So, and I was like, 'What the hell is that?' Cause I'd never seen one. And they had the taser out. And I do know, I do remember when I came out of the bathroom. I seen a rifle. That I do know. A big ass gun.

DAI Rodriguez: When they were tasing him? Was he saying anything?

Renee Brown: I don't think so.

DAI Rodriguez: Was he moving?

Renee Brown: He was moving. He was going like this. You know I don't know what the hell he was doing. But I wouldn't have been moving with all those damn cops. It was scary. Crazy.

DAI Rodriguez: Did you get hurt from this?

Renee Brown: I just got a scratch. And this. That was it.

DAI Rodriguez: Scratches on your upper right arm?

Renee Brown: Mm hmm.

DAI Rodriguez: Forearm?

Renee Brown: Mm hmm. He wasn't going to hurt me. Mm mmm.

DAI Rodriguez: Any other injuries?

Renee Brown: Mm mmm. No.

DAI Rodriguez: OK. How about your daughter?

Renee Brown: Yeah, she's got a partial black eye. She's got marks on her neck.

DAI Rodriguez: Right eye?

Renee Brown: She got a fat lip. She's got a mark here. Marks here.

DAI Rodriguez: Marks on her face?

Renee Brown: Mm hmm. Cause like I said, he was like this. You know he was choking her out. And then you know like all I could think was, 'Oh my God he's not going to let go. She's going to pass out right in front of me. She's going to die in front of me.' That's all I could think. You know I asked him, you know, 'She's my only daughter. Just let her go. Let her go.'

DAI Rodriguez: Was she able to talk to him or say anything?

Renee Brown: She, he made her talk to the dispatch. 'Hurry up and get here. Hurry up and get here.' That's all she said to dispatch. He told her to.

DAI Rodriguez: Dawn.

Renee Brown: Told Dawn to talk to the dispatch. And I had my phone like this. And he was like tell them to hurry. Tell them to hurry.

DAI Rodriguez: Mm hmm.

Renee Brown: And she's like, 'Can you please just hurry. Can you please hurry. Can you just please hurry. She wasn't like, she wasn't even like. I don't know. She wasn't crying. Nothing.

DAI Rodriguez: Uh huh.

Renee Brown: Like you know state of shock probably.

DAI Rodriguez: Mm hmm.

COS048267

Renee Brown: You know because she was scared.

DAI Rodriguez: Mm hmm.

Renee Brown: I mean still like now I asked her, 'Are you OK?' And she'll just like stare at me. Like a daze. You know so I'm going to get her help. Cause this is, yeah.

DAI Rodriguez: Yeah. OK. Would there be a problem if we talk to her?

Renee Brown: You guys can try. I mean and if worse, I mean I'll hold her. And I won't say nothing to you guys when ask her questions. But, I don't know if she's going to talk or not.

DAI Rodriguez: OK. What grade is she in?

Renee Brown: She's in fifth.

DAI Rodriguez: What school does she go to?

Renee Brown: Houston.

DAI Rodriguez: Houston?

Renee Brown: Mm hmm.

DAI Rodriguez: She's a pretty good student?

Renee Brown: She's a straight A student. Mm hmm.

DAI Rodriguez: Wow, OK. Your, your two other sons, where are they?

Renee Brown: I have five kids. They're with my mom.

DAI Rodriguez: OK.

Detective Var: I'm OK. What we can do, we have some programs. That assist with this kind of situation. Before you leave I'll give you card and give you numbers that you can call.

Renee Brown: OK.

Detective Var: And then I'll contact Victim Witness also and see what they can arrange something for you.

Renee Brown: OK.

Detective Var: And Dawn to help you guys go, get through this, this situation here. OK?

Renee Brown: OK.

Detective Var: So, I'll get you all that before you leave.

Renee Brown: OK.

Detective Var: Alright?

Renee Brown: Thank you.

Detective Var: We'll go get Dawn.

Renee Brown: OK.

Detective Var: And then we'll go from there.

Renee Brown: If she doesn't want to talk, you know there ain't.

Detective Var: It, it's fine. We're not going to force her.

Renee Brown: I mean she should. But.

COS048268

Detective Var: We're, we're just going to try and make it as comfortable for her as possible. I know she went through a traumatic incident. You know.

Renee Brown: Yeah.

Detective Var: And, and it's normal for her not to be, not wanting to talk to us right now. We're not going to force that. If, if, if waiting a day or two. And then we have, you know, we could contact come people that's, that are like actually trained to talk to, to someone that went through that kind of stuff. You know we can wait to talk to her.

Renee Brown: Just feel like how, like, like I failed. You know.

Detective Var: You did well. You know you got her help. And then she's OK. That's the most important thing. OK?

Renee Brown: (Yes)

Detective Var: So, you did your best and it turned out OK. So. Alright?

Renee Brown: (Yes)

Detective Var: So.

Renee Brown: It was just scary.

Detective Var: Yeah, I bet. I bet. What you did in there is pretty brave. You know, so. Don't be hard on yourself. Alright?

Renee Brown: (Yes)

Detective Var: So, give us a minute and we'll go grab some stuff. And we'll go grab Dawn.

Renee Brown: OK.

Detective Var: OK? If you want to hang out here you can. If you want to go and hang out with Dawn that's OK too.

Renee Brown: I'll go hang out with her.

Detective Var: OK. That's perfect. Alright.

Renee Brown: Thank you.

*End of Statement*

**INVESTIGATION (continued):**
Team #2 then spoke with Dawn. Dawn gave us the following statement.

*The following is a transcription, but not word for word of an interview with Dawn P. The interview was digitally recorded in its entirety. It is only intended to give the reader an understanding of the conversation; therefore, refer to the recording itself for the exact wording.*

**STATEMENT OF DAWN P.:**
Detective Var: Have a seat. Right here.

Renee Brown: They're not going to hurt you. They're not going to hurt you. OK? I promise.

Detective Var: So. How you feeling?

Dawn P.: Good.

Detective Var: Good? A little bit scary, huh? Yeah? Alright. So I'm just going to ask you a couple questions. If you're OK in answering it. You can answer. OK? So, I know you went through a lot today. OK? So. Alright? You have school tomorrow?

COS048269

Dawn P.: Yeah.

Detective Var: Yeah? Are you going to try to make it to school tomorrow?

Dawn P.: (Shrugs shoulders)

Detective Var: Maybe? Is mom going to give you a day off tomorrow?

Dawn P.: (Shrugs shoulders)

Detective Var: You want a day off tomorrow?

Dawn P.: I don't know.

Detective Var: You don't know? Do you want to go to school tomorrow?

Dawn P.: I don't know.

Detective Var: Alrighty. OK. So, you're probably, your mom told me that you are very smart in school. Right? You a good speller? Maybe? What's your favorite topic? Recess? Is it recess?

Dawn P.: I don't know.

Detective Var: You don't know? You like everything?

Dawn P.: Kind of.

Detective Var: Kind of? You like art?

Dawn P.: Not really.

Detective Var: No? Don't like to draw? No? Alrighty. So you're what? In the fifth grade?

Dawn P.: (Yes)

Detective Var: OK, are you almost in the middle of the school now? Are you on a break or anything?

Dawn P.: No.

Detective Var: Just got off of what? Christmas break?

Dawn P.: Yeah.

Detective Var: Yeah? Did you get a good present? Yeah?

Dawn P.: (Yes)

Detective Var: What'd you get?

Dawn P.: A bunch of stuff.

Detective Var: A bunch of stuff? So you got more than one then. Did you get what you wanted?

Dawn P.: I don't know.

Detective Var: You don't know? You didn't know? You didn't have a list?

Dawn P.: No.

Detective Var: You didn't make a list? Oh, that's pretty nice. Just getting everything, huh.

Dawn P.: (Yes)

Detective Var: You get whatever you're going to get and you going to like it anyway? Huh? Mom knows you. Alrighty. So, what's your last name?

COS048270

Dawn P.: Posas. Posas.

Detective Var: Posas. Spell it for me.

Dawn P.: P-O-S-A-S

Detective Var: Wow. And your first name?

Dawn P.: Dawn.

Detective Var: Dawn. Spell it.

Dawn P.: D-A-W-N.

Detective Var: Wow, that's a pretty name. You have a middle name?

Dawn P.: (Yes)

Detective Var: What is it?

Dawn P.: Renee.

Detective Var: Renee? Is it spelled like mommy?

Dawn P.: Yes.

Detective Var: OK. I know how to spell that because she spelled it for me already. And what's your birthday?

Dawn P.: October 20th, of the '05.

Detective Var: '05? Wow. You know your address?

Dawn P.: Yes.

Detective Var: You do? What is it?

Dawn P.: 299 East Center Street.

Detective Var: OK. You get that. You know mommy's phone number?

Dawn P.: Yes.

Detective Var: OK, what is it?

Dawn P.: 209-210-7089

Detective Var: Good. Right. Let's see what else can I ask you? Let's see. What city do you live in?

Dawn P.: Acampo.

Detective Var: Oh man. You're good. Is that in California?

Dawn P.: Yes.

Detective Var: OK. Alrighty. What's today?

Dawn P.: Wed, Tuesday.

Detective Var: Tuesday.

Dawn P.: Wait no. Yeah. No.

Renee Brown: She's like, how long I've been here.

Detective Var: You're right. You're right. I know it's late. Yeah. Technically it's Wednesday I guess when it passed twelve. So you're right both ways. You're good. You're good. Alright so. I'm going to ask you some

COS048271

questions. OK? About what happened earlier. OK? Do you know between telling the truth and telling a lie?

Dawn P.: (Yes)

Detective Var: Yeah? So if I was to say, this binder or folder is white. Would I be telling the truth? Or a lie?

Dawn P.: A lie.

Detective Var: OK. What color is it?

Dawn P.: Black.

Detective Var: Can't get anything over you. Huh? Alright, so. You know earlier today, you know where you were at?

Dawn P.: (Yes)

Detective Var: Yeah? Where is, where is that? Is it like a house? Or is it like a playground? Where?

Dawn P.: Like a house.

Detective Var: A house. OK. Is that the first time you've been at that house?

Dawn P.: No.

Detective Var: OK. Do you go there quite often?

Dawn P.: Eh.

Detective Var: Here and there? OK. Now, is that where, now wait. Who takes you over there?

Dawn P.: My mom.

Detective Var: OK. Is that, is that where mommy works at?

Dawn P.: (Yes)

Detective Var: Yeah? OK. So do today, something happened. Can you remember what happened?

Dawn P.: A little bit.

Detective Var: Can you tell me what you can remember? You remember seeing anyone that you don't, you haven't seen before?

Dawn P.: Yeah.

Detective Var: OK. Was it a male or female?

Dawn P.: A male?

Detective Var: OK. Where did you see this male at?

Dawn P.: The house.

Detective Var: In that same house that you were in?

Dawn P.: (Yes)

Detective Var: OK. What was he doing in there? Can you remember at all? If you can't remember it's OK. You know.

Renee Brown: You're OK.

Detective Var: You're OK. You want some water or something to drink?

Dawn P.: (No)

COS048272

Detective Var:  You want to take a break?

Renee Brown:  You're OK baby.

Detective Var:  I'm sorry.

Renee Brown:  It'll be alright.  It's OK.  It's OK.  You can tell them.  OK.  It's OK.  He's here to help you.  OK?  OK?  You can tell them.  Your shirt.

DAI Rodriguez:  Dawn did that man say anything to you?

Dawn P.:  No.

DAI Rodriguez:  No?  Had you ever seen that person before?

Dawn P.:  (No)

DAI Rodriguez:  First time?  Yeah?

Dawn P.:  (Yes)

DAI Rodriguez:  Was he staying stuff to your mom?

Dawn P.:  (Yes)

DAI Rodriguez:  Do you remember what that was?  Was he telling her to do anything?

Dawn P.:  (Yes)

DAI Rodriguez:  Do you remember what that was?

Dawn P.:  To call 9-1-1.

DAI Rodriguez:  To call 9-1-1?  Did he say why he wanted someone to call 9-1-1?

Dawn P.:  (No)

DAI Rodriguez:  No?  Did, did he touch you?

Dawn P.:  (Yes)

DAI Rodriguez:  How did he, what did he do?

Dawn P.:  Tried choking me.

DAI Rodriguez:  He tried choking you.  With his hand or?  Arm or?

Dawn P.:  His arm.

DAI Rodriguez:  His arm?  Did he, did he grab any other part of you?

Dawn P.:  He put his fingers in my mouth.

DAI Rodriguez:  He put his fingers in your mouth?  Did he say, did he say why he was doing that?

Dawn P.:  (No)

DAI Rodriguez:  Was he trying to make you do something?

Dawn P.:  (No)

DAI Rodriguez:  No?  Did, did he take you anywhere?

Dawn P.:  No.

DAI Rodriguez:  OK, do you remember what part of the house you were at when he was doing this?

COS048273

Dawn P.: The bathroom.

DAI Rodriguez: In the bathroom? How, how did you guys get in the bathroom?

Dawn P.: He, he pushed us in there.

DAI Rodriguez: He pushed you? Did everybody in there?

Dawn P.: Except for Nora.

DAI Rodriguez: Except for Nora? What happened to her?

Dawn P.: She was in her room.

DAI Rodriguez: Oh, she stayed in her room? OK. When you guys were in the bathroom, and he was putting his fingers in your mouth. What was he saying?

Dawn P.: He was saying that I will snap my neck to my mom if she doesn't call 9-1-1.

DAI Rodriguez: He's telling your mom, he's telling your mom all this stuff? Is your mom saying anything to him?

Dawn P.: 'Please don't hurt my daughter.'

DAI Rodriguez: Did your mom have a phone? Was she trying to call 9-1-1?

Dawn P.: (Yes)

DAI Rodriguez: OK. Could you hear her talking to the, like an operator?

Dawn P.: (Yes)

DAI Rodriguez: Do you remember what your mom was saying?

Dawn P.: No.

DAI Rodriguez: OK. What, did you ever talk to him? Did you ever say anything to him?

Dawn P.: To who?

DAI Rodriguez: To this guy that had grabbed you or touched you?

Dawn P.: No.

DAI Rodriguez: Did you ever tell him, 'Leave me alone?' or 'Get away?'

Dawn P.: (No)

DAI Rodriguez: Were you able to do that? But your mom was saying stuff like that?

Dawn P.: (Yes)

DAI Rodriguez: Yeah? Did, did he touch anyone else there in the bathroom?

Dawn P.: (Yes)

DAI Rodriguez: Who?

Dawn P.: Norma, Tumika.

DAI Rodriguez: What'd he do to them?

Dawn P.: He slapping Nora. Norma. And, and he either slapped or punched Tumika. Either one.

DAI Rodriguez: Why'd he do, do you know why he did that?

Dawn P.: (No)

COS048274

DAI Rodriguez: Was he trying to get them to call 9-1-1?

Dawn P.: The first time mom, mom's phone wasn't working. So she had, he asked Norma. And so they both had theirs on 9-1-1.

DAI Rodriguez: Oh, OK. Did he ever tell you to do any? Call 9-1-1? He's telling everyone else to do it.

Dawn P.: He told me to tell them hurry up or, or I'll die.

DAI Rodriguez: Who's phone did you use?

Dawn P.: My mom's.

DAI Rodriguez: Oh. Did she dial for you and you just talked on the phone?

Dawn P.: (Yes)

DAI Rodriguez: Yeah? OK. Could you hear the operator?

Dawn P.: No.

DAI Rodriguez: No? And what, what did, did something happen that stopped everything?

Dawn P.: Yeah, when the cops came.

DAI Rodriguez: When the cops came? What happened then? How did they come? Did they yell and scream, 'Come out now.' Or?

Dawn P.: No.

DAI Rodriguez: No? Did they knock on the door? Or? Open the door? Or?

Dawn P.: What door?

DAI Rodriguez: Is there a bathroom door?

Dawn P.: Yeah.

DAI Rodriguez: Was it open or closed?

Dawn P.: Closed.

DAI Rodriguez: It was closed? Who, who opened the door?

Dawn P.: Cops.

DAI Rodriguez: The cops. OK. Do you remember if they said anything before the, the open the door?

Dawn P.: No.

DAI Rodriguez: OK. Once they open the door did they say anything?

Dawn P.: (No)

DAI Rodriguez: You don't know? What, what did you do when they opened the door?

Dawn P.: Ran out.

DAI Rodriguez: Ran out? Did he let you go?

Dawn P.: (Yes)

DAI Rodriguez: OK. But before that, he had, he had a hold of you?

Dawn P.: (Yes)

COS048275

DAI Rodriguez: OK. Did anyone else get to run out with you?

Dawn P.: Norma.

DAI Rodriguez: Norma? OK. Where'd you go?

Dawn P.: Into the kitchen.

DAI Rodriguez: You ran into the kitchen?

Dawn P.: (Yes)

DAI Rodriguez: With, with Nora?

Dawn P.: (Yes)

Renee Brown: Norma.

DAI Rodriguez: Norma, sorry. And then you guys stayed there.

Dawn P.: (Yes)

DAI Rodriguez: Could you hear what was happening in the bathroom?

Dawn P.: No.

DAI Rodriguez: No? Did you hear the officers say anything to the?

Dawn P.: (No)

DAI Rodriguez: OK. The officers, were they dressed like policemen?

Dawn P.: (Yes)

DAI Rodriguez: You could tell they were police men? Did they, I think I asked you this. I don't want to keep saying it. Did you, did they like tell the guy to do something? Like, 'Stop.' Or, 'Get down?'

Dawn P.: (No)

DAI Rodriguez: Do you remember them saying anything like that?

Dawn P.: No.

DAI Rodriguez: You don't remember? OK. Did you see a fight or anything? Or?

Dawn P.: No.

DAI Rodriguez: No? You just stayed in the kitchen?

Dawn P.: (Yes)

DAI Rodriguez: And then did your mom come out or?

Dawn P.: She was on the, she was in the front yard.

DAI Rodriguez: She was in the front yard?

Dawn P.: (Yes)

DAI Rodriguez: OK. Did an officer come and get you? Or? Or did your mom come and get you eventually?

Dawn P.: They let my mom come.

DAI Rodriguez: Oh, OK. They let your mom, and then she came and got you. Was with you. Did, when all this happened. Did you have any scratches or any marks on you?

COS048276

Dawn P.: I, in the beginning I didn't have marks, but later my mom said that she seen marks. But I think that they're going away.

DAI Rodriguez: There on your neck?

Dawn P.: (Yes)

DAI Rodriguez: OK. And do you, do you hurt anywhere right now?

Dawn P.: Just right here.

DAI Rodriguez: On the, like the right side of your face area?

Dawn P.: I have like, there's like a scratch or something.

DAI Rodriguez: A scratch right there? How about your eyes? Do any of your eyes hurt?

Dawn P.: No, just like right here.

DAI Rodriguez: Your right eye? OK.

Dawn P.: Cause there's a sore somewhere.

DAI Rodriguez: Is that where, did he hit you or?

Dawn P.: No, but he started, he slapped me in the head.

DAI Rodriguez: Oh, OK. So he slapped you. He put his fingers in your mouth. His arm around your neck. And he grabbed your hair?

Dawn P.: Started pulling it a little.

DAI Rodriguez: Pulling it a little. What, what were you doing when he, when he put your hands. Were you in the kitchen or were you walking or running somewhere? Or? Do you remember? That's OK. OK. I know everything happened too fast. How do you feel right now?

Dawn P.: Better.

DAI Rodriguez: Better? OK. That's good.

Detective Var: I don't have anything else.

DAI Rodriguez: Well I'm sorry it took so long. You know one of the things we try to do is to talk to everyone like your mom. And make sure we understand what happened. We're trying to figure out why it happened too. And then, I think your mom has the same questions and you do too. And I'm sorry that this had to happen to you guys. Had you ever had any problems there at the house?

Dawn P.: Not with me there.

DAI Rodriguez: Not with you there. OK. Any yelling or any of the neighbors? Any screams or anything like that?

Dawn P.: (No)

DAI Rodriguez: Before this man or this person was in your house did you hear any strange noises outside?

Dawn P.: (No)

DAI Rodriguez: Did you hear anybody like open a door or open a window or anything like that?

Dawn P.: No.

DAI Rodriguez: No? Do you have any idea how this guy could have gotten in the house?

Dawn P.: (No)

COS048277

DAI Rodriguez:  No?  OK.  Alright.  I don't have anything.

Detective Var:  I don't.  OK.  Give us a minute or so.  And then we'll be right back.  OK?  Just hang tight.  You want some snacks sweetie?

Renee Brown:  Want something to eat?

Dawn P.:  (Yes)

Renee Brown:  Probably getting hungry.

Detective Var:  Let me see what I have.

Renee Brown:  Can I get some water?

Detective Var:  Sure.  Let me see what I have and then I'll bring you guys water.  OK?

Renee Brown:  OK.

(Detective Var and DAI Rodriguez leave the room at 1.33.34)

(Detective Var enters the room at 1.36.59)

Detective Var:  Alright sweetie.  Sorry I only have junk food.  I know you're not.

Renee Brown:  It's OK.  It don't matter, whatever.  She's hungry, so.

Detective Var:  OK.

Renee Brown:  Say thank you.

Dawn P.:  Thank you.

Detective Var:  You're welcome.

Renee Brown:  Thank you.

Detective Var:  Norma is going to the hospital right now.

Renee Brown:  Yeah.

Detective Var:  The medications you have, is it just for right now?  Or is that what she takes?

Renee Brown:  That's what she takes at, stop and think.  6 AM.

Detective Var:  Yeah.

Renee Brown:  5 PM and 8 PM meds.

Detective Var:  So the stuff that you have right now is what she takes?

Renee Brown:  All the time, yeah.

Detective Var:  All the time.

Renee Brown:  Yes, every day.

Detective Var:  OK.

Renee Brown:  Yeah.  They could just jot it down.

Detective Var:  OK.

Renee Brown:  Don't let them take the.

Detective Var:  No, no I think they just need, they just need to know.

COS048278

Renee Brown: Yeah.

Detective Var: (Unintelligible).

Renee Brown: There's three different baskets. There was yeah, Norma's got two inhalers. And both pack.

Detective Var: We're going to try to arrange a ride for you guys. You know so. Once everything's done. I'm not sure you could go back to that house yet because they're still processing it. OK? And I'll get you the information. For Victim Witness and there's a number on there you could call and then I'll, I'll make a note for myself to call them tomorrow also.

Renee Brown: My car's sitting in front of that care home.

Detective Var: Yeah.

Renee Brown: Because I'm not, I'm not working over there no more. I'm done. I gave up my job. I'm done.

Detective Var: Yeah, so. Like I said, they're probably not done.

Renee Brown: They probably won't even take the car.

Detective Var: Not, yet. That's what I'm saying. If you like us to.

Renee Brown: I don't know what we're going to do.

Detective Var: If you just want to hang out here.

Renee Brown: I need a frickin' cigarette. I'm going nuts over here.

Detective Var: I'll try and raise something up for you. OK?

Renee Brown: I mean I can always go home. And her. But I don't want to leave them. You know what I mean?

Detective Var: Acampo. Right?

Renee Brown: Yeah, I can go to Acampo. I can have a ride right now. My mom will come and get me.

Detective Var: OK.

Renee Brown: But I don't want to leave them.

Detective Var: OK. That's right. OK. Let me figure something out. OK?

Renee Brown: I just need a cigarette. I'm having a fit.

Detective Var: Already talked to the owners? She, she knows what's going on?

Renee Brown: She was there. I called right after, after it just happened. And after they you know, whatever happened. I was on the phone with her. I was on the phone with my mom. I live with my mom now. And my mom's pack your shit and get the fuck out of here. You ain't ever coming back. I'm like, I'm not coming back. I'm done. I don't, my boss is mad at me. I'm like, I have another job. I don't care about this one.

Detective Var: Uh huh.

Renee Brown: I was just doing it because I don't know. I'm done.

Detective Var: OK.

Renee Brown: My daughter's life and those two, yeah.

Detective Var: OK. Alright. Give us a second.

Renee Brown: But yeah, I guess my boss just talked to one of the detectives.

Detective Var: OK.

COS048279

Renee Brown: So yeah, she does know.

Detective Var: OK. Alright.

(Detective Var leaves the room at 1.39.29)

Renee Brown: Here, go ahead and eat something. Eat something baby. I can't eat anything.

(Door opens at 1.47.55)

Detective Var: Hey Renee. Dawn. You want to come with me? You can bring the stuff. Is that OK? You want some more? Good? Do you like it or no?

Renee Brown: She ate the cream.

Detective Var: You're just like my daughter.

*End of Statement*

INVESTIGATION (continued):
Team #2 then spoke with Officer Amant. Officer Amant gave us the following statement.

*The following is a transcription, but not word for word of an interview with Officer Kyle Amant. The interview was digitally recorded in its entirety. It is only intended to give the reader an understanding of the conversation; therefore, refer to the recording itself for the exact wording.*

STATEMENT OF OFFICER KYLE AMANT:
Detective Var: Have a seat right there sir.

Attorney Shawn Collins: (unintelligible 02:45:25)

Detective Var: He wants to check and see if his video is working. But he can open it up from the outside if he wants to.

Attorney Shawn Collins: Here is my card.

Detective Var: Thank you.

Attorney Shawn Collins: Sure.

Detective Var: Here is mine.

Attorney Shawn Collins: Thank you.

DAI Rodriguez: Here is mine.

Attorney Shawn Collins: Thank you very much.

Detective Var: Ok, right now it is 02:54 A.M. Wednesday, January 20, 2016. My name is
Phirun Var with Stockton Police Department. This is Ed Rodriguez with the DA's office. State your name sir.

Attorney Shawn Collins: Shawn Collins, Mastagni Holstedt.

Detective Var: Ok and can you give me your full name, your badge number and how many years you have been on the job.

Officer Amant: My name is Kyle Amant, my badge number is 2258, and I have been on the job eight years.

Detective Var: Ok. What is your current rank and assignment?

Officer Amant: I am currently on patrol as a FTO alternate.

Detective Var: Ok. And how long have you been on the job?

COS048280

Officer Amant: Eight years.

Detective Var: Eight years. What is your current shift?

Officer Amant: Third watch, phase two, park district.

Detective Var: Park district, do you have a partner?

Officer Amant: No.

Detective Var: What is your call sign?

Officer Amant: 3 Baker 27.

Detective Var: Working today, were you in full uniform?

Officer Amant: Yes.

Detective Var: Ok. Can you tell me what type of call you were dispatch to and what can of information you received while going to the call?

Officer Amant: We received a call of a subject, 910, so a prowler, that was knocking on front door. And then as we started making our way there, the guy had made it around to the subject, had made it around to the back door and he was banging on the back door. And then as the call progressed, he was now inside someone else's residence, so it was a prowler inside, so a 910A.

Detective Var: Ok. Without me asking me too many questions, can you just talk, meaning through what happened when you arrived on scene, what you did, who was with you, how it played out.

Officer Amant: So, Officer Digiulio was right in front of me as we turned onto the street, we blacked our cars out and parked probably two houses away from the original call location which I can't remember the address off the top of my head. So, we start walking up and people are yelling at us, he is inside, he is inside. So we run down there, make contact at the front door. About five or six people, maybe a little bit more come out and we are asking them, you know, where's this guy, where's the guy. They are like, he was in the house and we are like, is he still in the house? And they are like, we don't know. So, we are about to clear the house, and then dispatch updates the call and they might have been updating it while we were talking with these people, but there was so much yelling going on, that there was a subject a couple houses down, that had locked himself in the bathroom with some females. So we figured it was the same guy cause it was only like two houses away. So we in turn run down to that address, which I can't remember off the top of my head, I had it earlier. Do you want me to keep going?

Detective Var: Yes, please.

Officer Amant: So, we get there, and pretty sure the RP was one of the females in the bathroom or she was somewhere near the bathroom and saying he is locked inside, he has locked us inside, something to that affect. So Officer Digiulio gets permission to kick the front door. So he kicks the front door, we make entry, the hallway is to the hard right, so we hook right, Digiulio kind of passes the bathroom door, just barely. I hold onto the bathroom door because I hear screaming from inside the bathroom. So I immediately, kick the door open and Digiulio makes entry and them I make entry behind him. We had our guns drawn, even before we kicked the front door, so we went in with our guns drawn. So we make entry into the bathroom, I immediately look left because Officer Digiulio is looking left and he was ordering a guy to show him his hands and when I looked he had a younger, she must have been, I don't know, 7, 8, he was holding onto this girl around her neck. I couldn't tell if he was choking her or if he was just kind of using her as a shield or what he was doing, but he was holding this girl behind her neck and she was crying. So, Digiulio grabs the girl, I holster up at that point because I see he didn't have anything in his hands, I holstered up cause I knew one of us was going to have to go hands on him. So, I pulled the girl out, I tell her to go into the living room, there was two more girls in the bathroom. One was stuck behind the door, when we opened the door, she was hiding behind the door. So, then I so, I grabbed her out, while Digiulio is holding the suspect at gunpoint. I get her out. And then there is a girl in the bathtub or in the shower, who was behind the suspect. So, eventually I was able to get her crawl over and crawl out. At that point, Digiulio goes into mount this guy or put hands on him and the guy grabs his gun, grabs the barrel of his gun, like puts his

COS048281

hand around it. So, Digiulio rips it away, tells him not to grab his gun and hits him over the head with the gun. The guy at that point starts swinging at Digiulio and he grabs his glasses at one point and he is kind of like gouging at his face like scratching his face. So Digiulio gives him another one. Hits him again with his gun. I then tell Digiulio to holster up. So he holsters up. I got my baton out and I kind of like speared him in the belly. It had zero effect. The guy had like this blank stare like he was feeling no pain and he wasn't understanding what we were saying, maybe, he was talking, but he was still fighting. So, speared him once, that didn't have no effect. So all I had left was his shins cause officer Digiulio was like in a full mount on top of him at this point. He was trying to control his hands and they were punching each other back and forth. So, I give him two or three hard whacks on the shins. I look up at him to see if that had any effect, nothing, it was like I didn't even touch him. So I was like, that's not working. So, I go to holster my baton, I miss the ring, so I just dropped it, and then I kicked it to the hallway cause I didn't want this guy to try and grab that. At that point, I heard Sergeant Mosher on the radio say he was 987, I told him to bring a Taser, so he brings, I know he is coming with a Taser. Him and Digiulio are fighting, I mean they are fighting. It's a good fight. So I grabbed the guy by his pants and I knew we needed to get him out of the bathroom, I wasn't doing anything good, cause, there was a very large officer on top of him. I couldn't help cause there was nothing to help with. So, I dragged both of them out into the hallway and when I dragged them into the hallway, Digiulio kind of got off him for a sec and then kind of mounted him again. And they are still fighting. And then Sergeant Mosher says I am going to Tase him, so I tell Officer Digiulio, Taser, Taser, Taser. He kind of got off, he kind of didn't. He shoots him with the Taser, both prongs stick into him and nothing. The guy doesn't, it doesn't even twitch or make any movement like it was hurting him. So Sergeant Mosher or Digiulio said I'm going to hit him again or I'm sorry, Sergeant Mosher said I'm going to hit him again, so he Tases him again, again nothing. The guy, I mean it was working because, I felt it and Officer Digiulio had let go for a half of a second because he was feeling it. Still nothing for this guy, though, he was still trying to fight. So, Mosher gives it to him for a third time, nothing. So he rips it out and he is going to go, I think he was going to try and dry stone him, but I don't know if he did it, I don't remember if he did it or not. So he must have put it away. At this point we had moved down the hallway a little bit because the guy was trying to get away and Digiulio was mounting him and they were still punching each other. So, I move around to his head cause I am going to try to get. I'm sorry let me back up again. So after he tases him, I try to get my cuff out and I try to cuff him before he tases him, I'm sorry. I get my cuff out, I was thinking maybe I could cuff him and then pull him out that way, but he goes to grab my cuffs when I get close. And so now we are fighting over the cuff, so I pull back and that wasn't working. So, that's when I put those away and then I dragged him out. When I dragged him out, he kicked me maybe once or twice, just to kind of, he was just kicking, so he kicked me in the chest, kind of backing me up, so I grabbed him again and pulled him out in the hallway. Then the Taser happened. And then, Digiulio was in a full MMA mount over him, like a full guard or whatever it is called. So there is really again nothing they could do, he was kind of just laying on top of him. So I went around to his head and I was getting over there, I was thinking maybe I could grab a wrist and pull his arm around or something, but there was really no room and then Officer Digiulio says he is biting me. So at that point, I didn't kick him or anything, I just put my foot onto the side of his face, like this, and pinned it to the ground. So I pinned his head to the ground, so Officer Digiulio could get his hand out of there. And I am kind of holding it there, I am trying to get more officers in there and I think a couple more officers showed up at that point. So I had my foot on his head for about, I don't know, seemed like maybe 30 seconds and I noticed he wasn't moving anymore. So, I lifted my foot up and said Jason he is not moving anymore, I think he is out. I think he is unconscious. He goes, and Officer Digiulio thought he may be playing possum, like he wasn't unconscious that he was just faking it so he could get away or something. So, he kind of lays on him for a couple more seconds, and then, I go no Jason I think he is out. So Jason rolls off of him and sure he was unconscious. We roll him over, handcuff him, rolled him back over, he was unconscious, so I then tried to do a sternum rep to wake him up, that wasn't working. So Sergeant Mosher said to uncuff him let's start CPR. So we uncuffed him and started CPR.

Detective Var: Ok. Going back to when you first arrived at the house, who was with you besides Officer Digiulio.

Officer Amant: Nobody.

Detective Var: Just you two?

Officer Amant: Uh mmm.

Detective Var: I'm sorry you might have told me this already, you kicked in the door?

COS048282

Officer Amant: Sergeant, Officer Digiulio kicked in the front door, I kicked in the bathroom door.

Detective Var: Ok.

Officer Amant: I could hear the screaming's coming from the bathroom.

Detective Var: Ok. When you guys went into the restroom, the bathroom, were there any commands given to the suspect?

Officer Amant: Yes, we were both giving commands both time to, you know, a typical show me your hands. At first it was don't move, we kind of held him there at gunpoint while I got the girls or Officer Digiulio held him there at gunpoint while I got the girls out while he was giving him a typical of, don't move, show me your hands commands. So I got the girls out there and he just wasn't, he just wasn't, he was talking to us but there was so much commotion there, I wasn't sure what he was saying. The girls were just screaming. But we were yelling at him too, you know, to show us your hands, stop resisting, all of that stuff. He just wasn't listening.

Detective Var: Did he show you guys his hands?

Officer Amant: He never made any moves to put his hands up. The only movements he made to put his hands up was to grab Officer Digiulio's.

Detective Var: And then when he grabbed Officer Digiulio's handgun, what did Officer Digiulio do?

Officer Amant: He said, don't grab my gun, he pulled it back and then he hit him on top of the head with it.

Detective Var: Ok. And then did he try to grab the gun again?

Officer Amant: Yes.

Detective Var: Ok. And that's when he hit him one more time?

Officer Amant: Yes.

Detective Var: Ok. And where did he hit him?

Officer Amant: I'm sorry?

Detective Var: Where did Officer Digiulio hit him?

Officer Amant: When?

Detective Var: Where?

Officer Amant: On top of the head.

Detective Var: On top of the head.

Officer Amant: Yeah.

Detective Var: And then at what point, did, I guess the, when Officer Digiulio go hands on?

Officer Amant: At what point in the bathroom?

Detective Var: Yeah.

Officer Amant: As soon as the girls got out of there, he went and tried to grab him right away, as soon as the girls were out of the way, he went to go and take him into custody and that's when he grabbed his gun.

Detective Var: The second time or the first time?

Officer Amant: The first time.

Detective Var: The first time.

COS048283

Officer Amant: As soon as he tried to get close to him, he grabbed his gun.

Detective Var: Ok. How did he end up on the floor in the restroom?

Officer Amant: He was laying on the ground when we got in there. With, not laying down, he was kind of like kneeling down already, with the girl, kind of like kneeling down to her height while he was holding on to her. So he was already down.

Detective Var: Ok. Did you have anything to add?

DAI Rodriguez: Before you got to the house where you found the guy, you had been at the, you had been at another house.

Officer Amant: Yes.

DAI Rodriguez: How far away was that?

Officer Amant: It was, maybe two houses down, maybe one house down. It was pretty close, it was very close.

DAI Rodriguez: You guys are just trying to find this guy or this person that is kind of creating all of these calls for service?

Officer Amant: So basically as we got there, some people are saying he is on the roof, he is on the roof, he is on the roof, and the call said he had been in the backyard, the front yard, on the roof and then this other neighbor came out and he was like is somebody on my roof, somebody said he was on my roof. So, initially when we first got there, we were looking on roofs because they were like he is on the roof and another guy is like no he is in the house. So, yeah, we were just trying to figure out where he was initially, yes.

DAI Rodriguez: And aside from him being on roofs, in people's houses, is there anything else being said about what he is doing or saying or anything like that?

Officer Amant: Yeah the call said that he was rambling on about somebody trying to kill him and I think that, one of the little girls at the original house said that as well. She said that he saying somebody is after him or somebody is trying to kill him, something of that effect.

DAI Rodriguez: Did any of the people that you talked to before you got to that final house, did they say that this person had tried to grab them or hurt them or punch them or anything that way?

Officer Amant: No, I don't recall that, but I do remember them saying that he was running in and out of every room in there house. But I don't remember anything about, them talking about him, them. But Officer Digiulio was kind of like the contact, I was kind of listening in the background.

DAI Rodriguez: Ok. And then you get the final update from dispatch, that there is someone locked in the bathroom with some females or with a female.

Officer Amant: Yes.

DAI Rodriguez: And then you get to the house and the door is locked.

Officer Amant: Yes.

DAI Rodriguez: Could you hear anything?

Officer Amant: No.

DAI Rodriguez: coming from inside?

Officer Amant: Not from outside, but they had updated the address and like three or four times and it seemed like the RP was actually real time talking with dispatch and they were relaying it to us. So, that's when we asked if we could make entry.

DAI Rodriguez: Did Digiulio ask, who gets permission?

COS048284

Officer Amant: Well technically we don't need to ask to get permission, but Officer Digiulio asked because Mosher, I think was pretty close to the call, I think he said he was enroute, so he said do it. So we did it.

DAI Rodriguez: So he kicks in the door, you guys both go in, and could you hear yelling or screaming?

Officer Amant: As soon as I made entry into the house, yes, I could hear the screaming from the bathroom.

DAI Rodriguez: From the bathroom, and that's the direction you guys start going.

Officer Amant: As soon as we made entry, it was our first turn on the right, it would be the first hallway, so Officer Digiulio hooks right, I hook to left to kind of clear that just real briefly clear the living room and the kitchen I believe was behind the living room. So the hallway was our first (unintelligible 03:03:52) so I told him to hold on that for a half of a second so I could clear our backs and then as soon as I even got even close to the hallway I could hear them screaming. And then we push pass, he pushed pass the bathroom, I don't know why, I think it was just, he just went by he didn't, he just went by it, but I happened to stop at it and I could hear them screaming.

DAI Rodriguez: You hearing screaming and that's when you kick in that door.

Officer Amant: (nods yes)

DAI Rodriguez: And as soon as you kick in the door, you could see him, with the choke hold of the little girl?

Officer Amant: Yes.

DAI Rodriguez: And he is there by the toilet or?

Officer Amant: Yeah, so there's the shower, then the toilet and he is in between those two, like against the wall and the shower in the corner.

DAI Rodriguez: Was there anyone near, anyone else near the toilet there?

Officer Amant: There was a girl in the shower right behind him.

DAI Rodriguez: Ok.

Officer Amant: It kind of looked like she closed it a little bit for safely and then there was a girl behind the door.

DAI Rodriguez: Ok and you guys come in guns drawn at him and you are telling him, what commands are you telling him?

Officer Amant: Show us your hands, show us your hands, and then he grabs the little girl,

Officer Digiulio and pulls her back to me. So I holster up and made her and told her to get out.

DAI Rodriguez: So she is able to get out.

Officer Amant: Mm Hmm.

DAI Rodriguez: And then there is someone behind the door and you are able to get her out.

Officer Amant: Mm hmm.

DAI Rodriguez: Ok, and is this guy, this guy is he talking or yelling or?

Officer Amant: He is just sitting there with this like deer in the headlight look, like you know, somebody that wasn't in the right frame of mind in my opinion, my personal opinion, something was off was about him.

DAI Rodriguez: Any strange smells, like alcohol or drugs?

Officer Amant: No.

DAI Rodriguez: ok, are you DRE qualified?

Officer Amant: No.

COS048285

DAI Rodriguez: Have you ever seen that person before?

Officer Amant: No.

DAI Rodriguez: You regularly work the Park district?

Officer Amant: Just recently, this is only my fourth day back in patrol I was in CRT for four years, so we didn't handle patrol, you know regular calls for service.

DAI Rodriguez: You ever remember being in that area or possible to that house before?

Officer Amant: No.

DAI Rodriguez: Ok. So then you guys try to control this guy and he is just like not saying anything or?

Officer Amant: No, he is not saying anything.

DAI Rodriguez: Mumbling, screaming?

Officer Amant: He might have been mumbling a little bit, but no I couldn't make out anything he was saying.

DAI Rodriguez: Was he responding at all to anything you guys are telling him, is he acting a certain way when you guys tell him something or?

Officer Amant: He is just, it was just, almost like it wasn't registering, but at the same time he was defensive. And I think initially we probably took him for granted. We thought we could just walk in and grab him and you know, we could just put him in cuffs and that I think that is why he made his initial approach. Just to grab his hand and pull him out of there and then he grabbed his gun and then you could tell ok something bad, not normal people don't grab an officer's gun. So, that's when I could tell that this escalated quickly.

DAI Rodriguez: You are a pretty big guy and Officer Digiulio is a pretty big guy. And you guys were couldn't control him or having real problems.

Officer Amant: Yes, absolutely.

DAI Rodriguez: Did he seem like he might have been on drugs or?

Officer Amant: Well in my opinion he wasn't feeling pain cause I hit him as hard as I could on the shins, two or three times and I stopped to look at him and he didn't whims or make any noises or anything when I hit him. So I took that as ok this isn't working I have to try something else. That's when I tried to put it away but I dropped it so I threw it out of the room.

DAI Rodriguez: Ok. And you mention that at one point Officer Digiulio was trying to mount him, trying to get him down, control him and it was like an MMA mount. What is that?

Officer Amant: Just like, you know, a full basically had one knee on each side of his torso and he was laying his chest on his chest and trying to control his hands and they were kind of, he would roll and Digiulio would kind of roll with him, but not lose that, not lose laying on top of him. I mean he was able to move Officer Digiulio around pretty easily.

DAI Rodriguez: Was there any radio traffic on your guys half? Where you guys asking for more units, where you letting dispatch know what was going on or?

Officer Amant: Sergeant Mosher was doing the radio traffic while we were trying to figure this out, figure out how we could get this guy into handcuff.

DAI Rodriguez: Could you hear what he was saying?

Officer Amant: I just know he asked for more units, I remember him asking that. But I don't, other than that, no I don't know.

DAI Rodriguez: Ok. Then at some point, or at one point, he just stops moving.

COS048286

Officer Amant: Yes, well I saw that his eyes were, I saw that his eyes were closed. So, I knew something was wrong.

DAI Rodriguez: And based on everything that was happening, this guy is struggling, not cooperating, Officer Digiulio that it was a ploy?

Officer Amant: Yeah, well yes, that's what he told me. He said he is faking it, he is faking it.

DAI Rodriguez: But you continued to monitor him and that's when you said no, there he is unconscious.

Officer Amant: Yes.

DAI Rodriguez: And at that point, he immediately got off and you guys rolled him over or?

Officer Amant: As soon as he got off we cuffed him and then we rolled him over and then I could tell he was unconscious, so I immediately tried to wake him up with a sternum rep.

DAI Rodriguez: Ok. And at that point someone is also asking for medics.

Officer Amant: I believe so, yes. Officer Freer, I believe that is his name, had arrived as well, and he started CPR.

DAI Rodriguez: Ok. Could you see any injuries on him, I mean after everything had ended?

Officer Amant: To his face, yeah. His head was bleeding and he had a black eye, some swelling to his eye from Officer Digiulio punching him.

DAI Rodriguez: Ok. But that wasn't until, you didn't notice that until after everything had calmed down.

Officer Amant: I noticed that once we were doing compressions and I was checking for a pulse, I was staring at his face.

DAI Rodriguez: Ok. The girls that had been in the bathroom, what happened to them?

Officer Amant: You know what they, I think one of them stayed in the kitchen area, but I think someone else might have brought them outside. I honestly was so focused on him, I don't know where they went.

DAI Rodriguez: Ok.

Detective Var: The first house you went to, right, is that east or west that the whole incident happened?

Officer Amant: East.

Detective Var: East of it, so a house or two east of the location.

Officer Amant: Yes, if I am getting my north, south, east, west right, it would be east of it.

DAI Rodriguez: You just carry your baton and duty weapon?

Officer Amant: Yeah, yes.

DAI Rodriguez: ok. And you and Digiulio and Sergeant Mosher same police uniforms, marked uniforms, patches on the side, there is no doubt that you guys are police officers.

Officer Amant: No, standard class B uniform.

DAI Rodriguez: You guys are yelling at the top of your lungs trying to get this guy to cooperate and he is not having anything with it.

Officer Amant: No.

Detective Var: Before contact, where you advise or where they able to give you any information about the suspect at all?

COS048287

Officer Amant: I believe the call said Hispanic male, I don't remember other than that, no.

Detective Var: Ok. And then in the restroom, was the light on or off?

Officer Amant: It was on.

Detective Var: So you pretty much can see everything?

Officer Amant: Yes.

Detective Var: Ok.

DAI Rodriguez: Were you injured at all during all of this?

Officer Amant: No.

DAI Rodriguez: Any pain?

Officer Amant: No, Officer Digiulio was on top of him most of the time so it was really hard for me to assist, so I was doing as much as I could to help him. No, besides getting kicked, it was just minor to my vest, so I was fine.

Attorney Shawn Collins: I do have a few follow-up questions. I didn't want to interrupt though.

Detective Var: Go for it.

Attorney Shawn Collins: Ok. About how long do you think the life saving measures lasted between the start with, I forget, Officer Freer, and before the medics actually took over?
Officer Amant: It took the medics a really long time to get there, it felt like a really long time. Officer Freer had probably done three or four rounds of compressions, I think 25-30 compressions with breathing and me checking the pulse. And I remember them updating saying they were at Charter, MLK and Wilson. And that is, you know, pretty far away. So, we just kept doing, it seemed like, 10 minutes. I don't know if that's how long it was, but, it felt like forever.

Attorney Shawn Collins: After Officer Freer attempts, did Officer Digiulio himself make compressions attempts?

Officer Amant: Yes. Officer Freer got tired, so Officer Digiulio took over.

Attorney Shawn Collins: So both you and Officer Digiulio were actively involved in trying to revive this man and use life saving techniques?

Officer Amant: Yes.

Attorney Shawn Collins: And you yourself are trained as a use of force instructor?

Officer Amant: Yes.

Attorney Shawn Collins: Do you believe that yourself, Officer Digiulio or Sergeant Mosher from what you observed today, could have used less force than you did in that situation?
Officer Amant: I don't think so, obviously hitting someone with a pistol is not something they teach in the department, but it was a gut reaction cause he could have easily pulled the trigger when this guy grabbed his gun, but he decided to use less force by hitting him with him. So in my opinion it was reasonable for the circumstances.

Attorney Shawn Collins: When ignoring, well not necessarily ignoring, focusing I guess on yourself and Officer Digiulio earlier attempts in the bathroom, what was the goal of using force at all in that situation after the little girl had been placed behind you out in the hall, what was the overall goal you were trying to achieve?

Officer Amant: Well we were not intending to use force at all, we just wanted to place him in handcuffs. But whenever Officer Digiulio went to put hands on him, he grabbed his gun. So at that point, Officer Digiulio felt threatened for obviously, you don't want to, you know, if someone takes your gun you are going to feel threaten for your life, so Officer Digiulio pulls it away. And that's when he hit him with it. Cause he was obviously actively resisting, so.

COS048288

**Narrative**

Attorney Shawn Collins: So, is it fair to characterize from the moment trying to put handcuffs on him towards later dealing with his resisting, you were trying to apprehend what was obviously a dangerous suspect.

Officer Amant: In my opinion yes.

Attorney Shawn Collins: Thank you.

Detective Var: Good.

DAI Rodriguez: Is there anything you want to add?

Officer Amant: Nope.

Detective Var: Give us a minute or so, we will be right back, ok.

Officer Amant: Ok.

(DAI Rodriguez and Detective Var exit at 03:17:20)

Attorney Shawn Collins: You did great, of course. One thing I should have told you before, you realize in a situation like this, it is normal to give you some paid administration leave, more than anything else, just to recuperate.

Officer Amant: Yes.

Attorney Shawn Collins: So, they are going to going to, I think they are going to, when is your normal day back?

Officer Amant: Tomorrow, would be.

Attorney Shawn Collins: Is tomorrow your Friday?

Officer Amant: Yes.

Attorney Shawn Collins: So, that's also for Digiulio too. So, there are going to bring you back next Wednesday, I think. So you have some extra time off. It's mainly to recuperate but also, it is standard at this department to have you see a psychologist, I don't know if it's a psychologist or psychiatrist, someone and that person will clear you. And you will see them in between. The captain is going to talk to us right after this is over, it usually takes a few minutes and then he is going to tell you the procedures and then he is going to tell you what it takes to come back. Basically, getting cleared and that you feel ok. He is going to make sure you don't have any injuries or workman's comp type stuff. Ok?

Officer Amant: (nods yes)

Attorney Shawn Collins: I should have said that before.

Officer Amant: No it's fine, I know.

Attorney Shawn Collins: It's important to know that, it's totally normal and it's not punishment or an IA, it's more than anything its you're ok.

Officer Amant: Right, I understand.

Attorney Shawn Collins: Because especially for you, you don't have a history of, it has nothing to do with punishment.

Officer Amant: Right.

Attorney Shawn Collins: You have been on since 7, were you the early shift too?

Officer Amant: No, I work the same shift as Digiulio.

Attorney Shawn Collins: Oh, ok.

COS048289

Officer Amant: I woke up early this morning though, I'm tired. I'm sure you are tired too.

Attorney Shawn Collins: Yeah, it's an early day. I think they had Mosher do his. Did they have Mosher do his?

Officer Amant: No, he is doing it with your partner.

Attorney Shawn Collins: Did they send him down? Ok, well that's good.

Officer Amant: Yeah. Just speed it up a little bit. I got to take my daughter to school in a couple of hours.

Attorney Shawn Collins: When it gets this late sometimes I just like to go in and power through because a couple hours of sleep doesn't really help.

Officer Amant: It makes it worse almost.

Attorney Shawn Collins: It does, right.

Officer Amant: Mm hmm, yep, we will see. I will be alright.

Attorney Shawn Collins: How young is she, your daughter?

Officer Amant: She is in first grade?

Attorney Shawn Collins: Oh, so you definitely have to take her.

Officer Amant: Yeah, she is 6.

Attorney Shawn Collins: I said you could use this as an opportunity to through her on the bus.

Officer Amant: We don't live far, so, it's only about a minute drive. It's not bad. I just have to drop her off, she just runs to her friends anyway and says bye, you know.

Attorney Shawn Collins: Of course, of course.

Officer Amant: It's like, hey bye.

Attorney Shawn Collins: Right!

Officer Amant: She's a good kid. Do you have kids?

Attorney Shawn Collins: No. My brother has two young ones and what I have noticed is that I am their cool uncle so, they don't know me, they don't hang out with me much and I never punish them or do anything but give them gifts.

Officer Amant: Yep.

Attorney Shawn Collins: So with me they got no problem showing me their friends, hanging out with me, but with my sister in law that is awesome, like the second she comes around they act all, aloof, don't want to be around her.

Officer Amant: She's not cool.

Attorney Shawn Collins: Yeah, like your mom is really cool, but they don't realize it.

Officer Amant: Right. I know. I have a son too, he is only, 3 though. He is a youngster.

Attorney Shawn Collins: Yeah, so he still worships you.

Officer Amant: Yeah, for right now.

Attorney Shawn Collins: You got a couple of years.

Officer Amant: I am just glad I don't have to babysit him tomorrow. My wife is a nurse so she, said do you want me to cancel the babysitter. I was like no, she could still take him, I think I might sleep in a little bit. I will drop her off and go get some sleep. Ok. That worked out.

COS048290

Attorney Shawn Collins: Is she working. That must be really tough for you guys. Because she has got to work odd hours too or?

Officer Amant: She is a nurse, so she goes?

Attorney Shawn Collins: Does she have enough seniority where she can?

Officer Amant: She gets days, yeah she's days.

Attorney Shawn Collins: Oh ok.

Officer Amant: So it's not bad, she is part time. So she only works two 12 hour shifts a week. So, it rarely works out where we need a babysitter, you know. And she still makes more money than me. So she will pick up a shift here and there so we have some extra cash. But yeah, two days a week for her. She will work like a Monday and Tuesday, then not work the next two weeks, Saturday and Sunday.

(Detective Var enters at 03:22:05)

Detective Var: Just one question, your baton, is it the stick baton or is it the retractable one?

Officer Amant: The stick.

Detective Var: The straight stick.

Officer Amant: The straight stick, yes.

Detective Var: Ok, alright.

Attorney Shawn Collins: Do you mind asking me follow up to that, something came up on the video, there is a, on your video there is a moment you are smacking the baton down, is that during the CPR section, I assume that you were retracting your baton.

Officer Amant: That's not me. That was, I think that was Sergeant Mosher.

Attorney Shawn Collins: Ok.

Officer Amant: That was retracting it.

Attorney Shawn Collins: Thank you.

Officer Amant: I don't think he used it. I think he whipped it out to maybe go to that if he needed it and then he realized he didn't need to do that so he (unintelligible 03:22:45) cause he carries a clutch able one.

Attorney Shawn Collins: Thank you.

DAI Rodriguez: I need some more, when you saw him, when you first saw him in the bathroom, was he sweaty or? What was his demeanor?

Detective Var: I don't remember if he was sweaty. I honestly don't.

DAI Rodriguez: Out of breathe or anything like that?

Officer Amant: He was slippery, cause when I tried to grab one of his arms, it just slipped right out. So I know that, but I don't remember if he was sweaty. I honestly don't.

DAI Rodriguez: Alright.

*End of Statement*

**INVESTIGATION (continued):**
On 01/21/016, I met DAI Rodriguez along with Brown and Dawn at the Child Avocdacy Center. Dawn was schedule to be interviewed by ***** regarding the incident that occurred on 01/19/16 that involved the death of Filberto Valencia.

COS048291

## Narrative

Prior to the interview, I had FET respond to our location to take photographs of Dawn's injuries again. FET Burkett responded and took photographs of Dawn's injuries.

**ATTACHMENTS:**
None

**EVIDENCE:**
None

**DISPOSITION:**
Refer to original.

COS048292

# EXHIBIT Q-1

# Comparison of Renee Brown Statements

| Renee Brown Declaration dated October 2017: | Renee Brown Interview with Stockton Police on January 20, 2016: |
|---|---|
| "My then 9 year old daughter, Dawn. . ." (Brown Decl., ¶ 2.) | "Detective Var: And what's your birthday?<br><br>"Dawn P.: October 20th, of the '05." (Plaintiffs' Exhibit Q-3 at p. 29 of 50 (*i.e.*, daughter was 10).) |
| "[Mr. Valencia] made Norma crouch down and place her head inside the toilet, which was filled with water." (Brown Decl., ¶ 6.) | "[Mr. Valencia made] Norma put her head by the toilet." (Plaintiffs' Exhibit Q at p. 3 of 50.) |
| "Mr. Valencia then threatened to drown Norma in the toilet." (Brown Decl., ¶ 6.) | "And said, 'I'll, I could, I could drown you.'" (Plaintiffs' Exhibit Q at p. 3 of 50.) |
| "At one point, Mr. Valencia also threatened to gouge my eyes out with his fingers. . ." (Brown Decl., ¶ 7.) | "Detective Var: OK, so he put his fingers in [Dawn's] eyes.<br><br>"Renee Brown: And then he tells me, 'I'm going to poke your eyes.' I said, 'I dare you poke my eyes mother fucker.' Told him just like that." (Plaintiffs' Exhibit Q at p. 10 of 50.) |
| "I also kicked Mr. Valencia squarely in the genitals as hard as I could, but this too had no effect on what he was doing." (Brown Decl., ¶ 8.) | "I didn't hit him with nothing. I hit him with my fist." (Plaintiffs' Exhibit Q at p. 10 of 50.)<br><br>"I couldn't get you know, hit him too much because he had Dawn in front of him." (Plaintiffs' Exhibit Q at p. 11 of 50.) |
| "Mr. Valencia asked me to call the police, but did not explain why he wanted the police called." (Brown Decl., ¶ 9.) | "Detective Var: . . . Did he say why he wants you to call 9-1-1?<br><br>"Renee Brown: He said that whoever that they're trying to kill him. That somebody's trying to kill him." (Plaintiff's Ex. Q at p. 6 of 50.)<br><br>"Detective Var: OK. And he was telling you to call 9-1-1.<br><br>"Renee Brown: To call 9-1-1 that someone's trying to kill me." (Plaintiffs' Ex. Q at p. 9 of 50.) |

| Renee Brown Declaration dated October 2017: | Renee Brown Interview with Stockton Police on January 20, 2016: |
|---|---|
| | "So I'm on the phone with the dispatcher… So both [Norma and I] are on the phone with 9-1-1… in the bathroom. And I guess the other consumer, she was in her bathroom on the phone with 9-1-1 as well… you know all of us were on the phone." (Plaintiffs' Ex. Q at 3 of 50.) |
| "Mr. Valencia ordered Norma to remove her head from the toilet, and he began striking her while she lay helpless on the ground." (Brown Decl., ¶ 10.) | "Renee Brown: And he made [Norma] get on the floor and I can hear him hitting her. Hella hard.<br><br>"DAI Rodriguez: Could, could you see that?<br><br>"Renee Brown: Well I was getting into the, I mean I, he had the glass doors closed.<br><br>"DAI Rodriguez: OK<br><br>"Renee Brown: So I couldn't see what he was doing." (Plaintiffs' Ex. Q at p. 23 of 50.) |
| "At some point, I recall the bathroom door being knocked open. I then recall seeing two officers enter. . . At some point, Norma also escaped the bathroom, leaving only Tamika and me in the bathroom. At this point, I climbed into the shower with Tamika." (Brown Decl., ¶ 11.) | "[I was] in the shower. Yeah. With Tamika and me in there. . . right when you guys [the police] got there." (Plaintiffs' Ex. Q at p. 14 of 50.)<br><br>"When he made me get in right before the cops came. He made me get in the shower." (Plaintiffs' Ex. Q at p. 22 of 50.)<br><br>"Det. Var: "What happened after that between the officers and the guy that was in there?<br><br>"Renee Brown: "See I don't know if the guy went towards him. I don't know. Because I was, I was faced toward Tamika." (Plaintiffs' Ex. Q at 13 of 50.) |
| "The officers attempted to restrain Mr. Valencia, but he immediately fought back against them in a violent manner." (Brown Decl., ¶ 12.) | "DAI Rodriguez: OK and they have their guns out and they're telling the guy… 'Get down. Get down. . .' And he, he's not, he's not listening?<br><br>"Renee Brown: He's not doing nothing. He's just standing there. You know like he's on drugs." (Plaintiffs' Ex. Q at p. 24 of 50.) |

| Renee Brown Declaration dated October 2017: | Renee Brown Interview with Stockton Police on January 20, 2016: |
|---|---|
| | "Det. Var: [W]ere you not looking at the officers directly?<br><br>"Renee Brown: I was scared . . . All I seen was a gun. . . (Plaintiffs' Ex. Q at p. 14 of 50.)<br><br>"[A]ll I seen was a gun point and that's all I can remember. All these, and then seen blood." (Plaintiffs' Ex. Q at. at p. 4 of 50.)<br><br>"All I know is that guy was freaking crazy. He was bleeding everywhere. There was blood all over the wall." (Plaintiffs' Ex. Q at p. 4 of 50.)<br><br>"And then I look over and there's blood everywhere." (Plaintiffs' Ex. Q at p. 13 of 50.) |
| "Similar to my strikes, the officers' strikes had no visible effect on Mr. Valencia." (Brown Decl., ¶ 12.) | "Det. Var: [W]ere you not looking at the officers directly?<br><br>"Renee Brown: I was scared . . . All I seen was a gun. . ." (Plaintiffs' Ex. Q at 14 of 50.) |
| "I was also attempting to shield Tamika from seeing the disturbing events play out." (Brown Decl., ¶ 13.) | "And I'm trying to keep Tamika. You know because she's, I don't want her to freak out seeing all that blood cause that was a lot of blood." (Plaintiffs' Ex. Q at p. 24 of 50.) |
| "I saw the officers shoot a Taser at Mr. Valencia once or twice, but it also had no effect, as Mr. Valencia continued to fight with the officers." (Brown Decl., ¶ 15.) | "DAI Rodriguez: When they were tasing him? Was he saying anything?<br><br>"Renee Brown: I don't think so.<br><br>"DAI Rodriguez: Was he moving?<br><br>"Renee Brown: He was going like this. [Flailing arms (*See* Plaintiffs' Ex. Q-2 (video at 38:44)] You know I don't know what the hell he was doing." (Plaintiffs' Ex. Q at p. 25 of 50.) |
| "[M]y back was turned but I could hear Mr. Valencia fighting with the officers." (Brown Decl., ¶ 14). | "Det. Var: OK. Did you hear what the officers said to him? Can you recall what the officer said? Anything at all? |

| Renee Brown Declaration dated October 2017: | Renee Brown Interview with Stockton Police on January 20, 2016: |
|---|---|
| | "Renee Brown: No. No. I was just focused on getting the hell out of there." (Plaintiffs' Ex. Q at p. 12 of 50.) |
| "The officer had to press down with his boot on Mr. Valencia's head area to get Mr. Valencia to release his bite on the other officer." (Brown Decl., ¶ 16.) | "No, they didn't grab. I don't think they grabbed ahold of him. . . No, they were just you know and I see the one cop kicking him. Like this [stomps forcefully (*See* Plaintiffs' Ex. Q-2 (video at 38:44)] . . . I don't know. I don't know. I don't know if he, you know, if, I don't know what happened. I don't know what happened. I have no clue what happened. I don't know how he got knocked down. All I know is I seen blood and I was just like, I was freaking out." (Plaintiffs' Ex. Q at p. 24 of 50.)<br><br>"I know they drugged him out. And I seen the one cop kicking him. Like cause I don't know what the guy was doing but I seen the cop kicking him." (Plaintiffs' Ex. Q at p. 4 of 50.) |

# EXHIBIT Q-2

# EXHIBIT Q-2

Video Footage of

Renee Brown's Statement

Contained in Flash Drive that is

Lodged to the Court

# EXHIBIT Q-3

Detective Var: We're, we're just going to try and make it as comfortable for her as possible. I know she went through a traumatic incident. You know.

Renee Brown: Yeah.

Detective Var: And, and it's normal for her not to be, not wanting to talk to us right now. We're not going to force that. If, if, if waiting a day or two. And then we have, you know, we could contact come people that's, that are like actually trained to talk to, to someone that went through that kind of stuff. You know we can wait to talk to her.

Renee Brown: Just feel like how, like, like I failed. You know.

Detective Var: You did well. You know you got her help. And then she's OK. That's the most important thing. OK?

Renee Brown: (Yes)

Detective Var: So, you did your best and it turned out OK. So. Alright?

Renee Brown: (Yes)

Detective Var: So.

Renee Brown: It was just scary.

Detective Var: Yeah, I bet. I bet. What you did in there is pretty brave. You know, so. Don't be hard on yourself. Alright?

Renee Brown: (Yes)

Detective Var: So, give us a minute and we'll go grab some stuff. And we'll go grab Dawn.

Renee Brown: OK.

Detective Var: OK? If you want to hang out here you can. If you want to go and hang out with Dawn that's OK too.

Renee Brown: I'll go hang out with her.

Detective Var: OK. That's perfect. Alright.

Renee Brown: Thank you.

*End of Statement*

**INVESTIGATION (continued):**
Team #2 then spoke with Dawn. Dawn gave us the following statement.

*The following is a transcription, but not word for word of an interview with Dawn P. The interview was digitally recorded in its entirety. It is only intended to give the reader an understanding of the conversation; therefore, refer to the recording itself for the exact wording.*

**STATEMENT OF DAWN P.:**
Detective Var: Have a seat. Right here.

Renee Brown: They're not going to hurt you. They're not going to hurt you. OK? I promise.

Detective Var: So. How you feeling?

Dawn P.: Good.

Detective Var: Good? A little bit scary, huh? Yeah? Alright. So I'm just going to ask you a couple questions. If you're OK in answering it. You can answer. OK? So, I know you went through a lot today. OK? So. Alright? You have school tomorrow?

| Report Officer | Printed At | |
|---|---|---|
| 2094/VAR,PHIRUN | 04/11/2016 08:03 | **Page 27 of 50** |

Dawn P.: Yeah.

Detective Var: Yeah? Are you going to try to make it to school tomorrow?

Dawn P.: (Shrugs shoulders)

Detective Var: Maybe? Is mom going to give you a day off tomorrow?

Dawn P.: (Shrugs shoulders)

Detective Var: You want a day off tomorrow?

Dawn P.: I don't know.

Detective Var: You don't know? Do you want to go to school tomorrow?

Dawn P.: I don't know.

Detective Var: Alrighty. OK. So, you're probably, your mom told me that you are very smart in school. Right? You a good speller? Maybe? What's your favorite topic? Recess? Is it recess?

Dawn P.: I don't know.

Detective Var: You don't know? You like everything?

Dawn P.: Kind of.

Detective Var: Kind of? You like art?

Dawn P.: Not really.

Detective Var: No? Don't like to draw? No? Alrighty. So you're what? In the fifth grade?

Dawn P.: (Yes)

Detective Var: OK, are you almost in the middle of the school now? Are you on a break or anything?

Dawn P.: No.

Detective Var: Just got off of what? Christmas break?

Dawn P.: Yeah.

Detective Var: Yeah? Did you get a good present? Yeah?

Dawn P.: (Yes)

Detective Var: What'd you get?

Dawn P.: A bunch of stuff.

Detective Var: A bunch of stuff? So you got more than one then. Did you get what you wanted?

Dawn P.: I don't know.

Detective Var: You don't know? You didn't know? You didn't have a list?

Dawn P.: No.

Detective Var: You didn't make a list? Oh, that's pretty nice. Just getting everything, huh.

Dawn P.: (Yes)

Detective Var: You get whatever you're going to get and you going to like it anyway? Huh? Mom knows you. Alrighty. So, what's your last name?

COS048270

**Narrative**

Dawn P.: Posas. Posas.

Detective Var: Posas. Spell it for me.

Dawn P.: P-O-S-A-S

Detective Var: Wow. And your first name?

Dawn P.: Dawn.

Detective Var: Dawn. Spell it.

Dawn P.: D-A-W-N.

Detective Var: Wow, that's a pretty name. You have a middle name?

Dawn P.: (Yes)

Detective Var: What is it?

Dawn P.: Renee.

Detective Var: Renee? Is it spelled like mommy?

Dawn P.: Yes.

Detective Var: OK. I know how to spell that because she spelled it for me already. And what's your birthday?

Dawn P.: October 20th, of the '05.

Detective Var: '05? Wow. You know your address?

Dawn P.: Yes.

Detective Var: You do? What is it?

Dawn P.: 299 East Center Street.

Detective Var: OK. You get that. You know mommy's phone number?

Dawn P.: Yes.

Detective Var: OK, what is it?

Dawn P.: 209-210-7089

Detective Var: Good. Right. Let's see what else can I ask you? Let's see. What city do you live in?

Dawn P.: Acampo.

Detective Var: Oh man. You're good. Is that in California?

Dawn P.: Yes.

Detective Var: OK. Alrighty. What's today?

Dawn P.: Wed, Tuesday.

Detective Var: Tuesday.

Dawn P.: Wait no. Yeah. No.

Renee Brown: She's like, how long I've been here.

Detective Var: You're right. You're right. I know it's late. Yeah. Technically it's Wednesday I guess when it passed twelve. So you're right both ways. You're good. You're good. Alright so. I'm going to ask you some

COS048271

questions. OK? About what happened earlier. OK? Do you know between telling the truth and telling a lie?

Dawn P.: (Yes)

Detective Var: Yeah? So if I was to say, this binder or folder is white. Would I be telling the truth? Or a lie?

Dawn P.: A lie.

Detective Var: OK. What color is it?

Dawn P.: Black.

Detective Var: Can't get anything over you. Huh? Alright, so. You know earlier today, you know where you were at?

Dawn P.: (Yes)

Detective Var: Yeah? Where is, where is that? Is it like a house? Or is it like a playground? Where?

Dawn P.: Like a house.

Detective Var: A house. OK. Is that the first time you've been at that house?

Dawn P.: No.

Detective Var: OK. Do you go there quite often?

Dawn P.: Eh.

Detective Var: Here and there? OK. Now, is that where, now wait. Who takes you over there?

Dawn P.: My mom.

Detective Var: OK. Is that, is that where mommy works at?

Dawn P.: (Yes)

Detective Var: Yeah? OK. So do today, something happened. Can you remember what happened?

Dawn P.: A little bit.

Detective Var: Can you tell me what you can remember? You remember seeing anyone that you don't, you haven't seen before?

Dawn P.: Yeah.

Detective Var: OK. Was it a male or female?

Dawn P.: A male?

Detective Var: OK. Where did you see this male at?

Dawn P.: The house.

Detective Var: In that same house that you were in?

Dawn P.: (Yes)

Detective Var: OK. What was he doing in there? Can you remember at all? If you can't remember it's OK. You know.

Renee Brown: You're OK.

Detective Var: You're OK. You want some water or something to drink?

Dawn P.: (No)

COS048272

Detective Var: You want to take a break?

Renee Brown: You're OK baby.

Detective Var: I'm sorry.

Renee Brown: It'll be alright. It's OK. It's OK. You can tell them. OK. It's OK. He's here to help you. OK? OK? You can tell them. Your shirt.

DAI Rodriguez: Dawn did that man say anything to you?

Dawn P.: No.

DAI Rodriguez: No? Had you ever seen that person before?

Dawn P.: (No)

DAI Rodriguez: First time? Yeah?

Dawn P.: (Yes)

DAI Rodriguez: Was he staying stuff to your mom?

Dawn P.: (Yes)

DAI Rodriguez: Do you remember what that was? Was he telling her to do anything?

Dawn P.: (Yes)

DAI Rodriguez: Do you remember what that was?

Dawn P.: To call 9-1-1.

DAI Rodriguez: To call 9-1-1? Did he say why he wanted someone to call 9-1-1?

Dawn P.: (No)

DAI Rodriguez: No? Did, did he touch you?

Dawn P.: (Yes)

DAI Rodriguez: How did he, what did he do?

Dawn P.: Tried choking me.

DAI Rodriguez: He tried choking you. With his hand or? Arm or?

Dawn P.: His arm.

DAI Rodriguez: His arm? Did he, did he grab any other part of you?

Dawn P.: He put his fingers in my mouth.

DAI Rodriguez: He put his fingers in your mouth? Did he say, did he say why he was doing that?

Dawn P.: (No)

DAI Rodriguez: Was he trying to make you do something?

Dawn P.: (No)

DAI Rodriguez: No? Did, did he take you anywhere?

Dawn P.: No.

DAI Rodriguez: OK, do you remember what part of the house you were at when he was doing this?

COS048273

Dawn P.: The bathroom.

DAI Rodriguez: In the bathroom? How, how did you guys get in the bathroom?

Dawn P.: He, he pushed us in there.

DAI Rodriguez: He pushed you? Did everybody in there?

Dawn P.: Except for Nora.

DAI Rodriguez: Except for Nora? What happened to her?

Dawn P.: She was in her room.

DAI Rodriguez: Oh, she stayed in her room? OK. When you guys were in the bathroom, and he was putting his fingers in your mouth. What was he saying?

Dawn P.: He was saying that I will snap my neck to my mom if she doesn't call 9-1-1.

DAI Rodriguez: He's telling your mom, he's telling your mom all this stuff? Is your mom saying anything to him?

Dawn P.: 'Please don't hurt my daughter.'

DAI Rodriguez: Did your mom have a phone? Was she trying to call 9-1-1?

Dawn P.: (Yes)

DAI Rodriguez: OK. Could you hear her talking to the, like an operator?

Dawn P.: (Yes)

DAI Rodriguez: Do you remember what your mom was saying?

Dawn P.: No.

DAI Rodriguez: OK. What, did you ever talk to him? Did you ever say anything to him?

Dawn P.: To who?

DAI Rodriguez: To this guy that had grabbed you or touched you?

Dawn P.: No.

DAI Rodriguez: Did you ever tell him, 'Leave me alone?' or 'Get away?'

Dawn P.: (No)

DAI Rodriguez: Were you able to do that? But your mom was saying stuff like that?

Dawn P.: (Yes)

DAI Rodriguez: Yeah? Did, did he touch anyone else there in the bathroom?

Dawn P.: (Yes)

DAI Rodriguez: Who?

Dawn P.: Norma, Tumika.

DAI Rodriguez: What'd he do to them?

Dawn P.: He slapping Nora. Norma. And, and he either slapped or punched Tumika. Either one.

DAI Rodriguez: Why'd he do, do you know why he did that?

Dawn P.: (No)

COS048274

DAI Rodriguez: Was he trying to get them to call 9-1-1?

Dawn P.: The first time mom, mom's phone wasn't working. So she had, he asked Norma. And so they both had theirs on 9-1-1.

DAI Rodriguez: Oh, OK. Did he ever tell you to do any? Call 9-1-1? He's telling everyone else to do it.

Dawn P.: He told me to tell them hurry up or, or I'll die.

DAI Rodriguez: Who's phone did you use?

Dawn P.: My mom's.

DAI Rodriguez: Oh. Did she dial for you and you just talked on the phone?

Dawn P.: (Yes)

DAI Rodriguez: Yeah? OK. Could you hear the operator?

Dawn P.: No.

DAI Rodriguez: No? And what, what did, did something happen that stopped everything?

Dawn P.: Yeah, when the cops came.

DAI Rodriguez: When the cops came? What happened then? How did they come? Did they yell and scream, 'Come out now.' Or?

Dawn P.: No.

DAI Rodriguez: No? Did they knock on the door? Or? Open the door? Or?

Dawn P.: What door?

DAI Rodriguez: Is there a bathroom door?

Dawn P.: Yeah.

DAI Rodriguez: Was it open or closed?

Dawn P.: Closed.

DAI Rodriguez: It was closed? Who, who opened the door?

Dawn P.: Cops.

DAI Rodriguez: The cops. OK. Do you remember if they said anything before the, the open the door?

Dawn P.: No.

DAI Rodriguez: OK. Once they open the door did they say anything?

Dawn P.: (No)

DAI Rodriguez: You don't know? What, what did you do when they opened the door?

Dawn P.: Ran out.

DAI Rodriguez: Ran out? Did he let you go?

Dawn P.: (Yes)

DAI Rodriguez: OK. But before that, he had, he had a hold of you?

Dawn P.: (Yes)

COS048275

DAI Rodriguez: OK. Did anyone else get to run out with you?

Dawn P.: Norma.

DAI Rodriguez: Norma? OK. Where'd you go?

Dawn P.: Into the kitchen.

DAI Rodriguez: You ran into the kitchen?

Dawn P.: (Yes)

DAI Rodriguez: With, with Nora?

Dawn P.: (Yes)

Renee Brown: Norma.

DAI Rodriguez: Norma, sorry. And then you guys stayed there.

Dawn P.: (Yes)

DAI Rodriguez: Could you hear what was happening in the bathroom?

Dawn P.: No.

DAI Rodriguez: No? Did you hear the officers say anything to the?

Dawn P.: (No)

DAI Rodriguez: OK. The officers, were they dressed like policemen?

Dawn P.: (Yes)

DAI Rodriguez: You could tell they were police men? Did they, I think I asked you this. I don't want to keep saying it. Did you, did they like tell the guy to do something? Like, 'Stop.' Or, 'Get down?'

Dawn P.: (No)

DAI Rodriguez: Do you remember them saying anything like that?

Dawn P.: No.

DAI Rodriguez: You don't remember? OK. Did you see a fight or anything? Or?

Dawn P.: No.

DAI Rodriguez: No? You just stayed in the kitchen?

Dawn P.: (Yes)

DAI Rodriguez: And then did your mom come out or?

Dawn P.: She was on the, she was in the front yard.

DAI Rodriguez: She was in the front yard?

Dawn P.: (Yes)

DAI Rodriguez: OK. Did an officer come and get you? Or? Or did your mom come and get you eventually?

Dawn P.: They let my mom come.

DAI Rodriguez: Oh, OK. They let your mom, and then she came and got you. Was with you. Did, when all this happened. Did you have any scratches or any marks on you?

COS048276

Narrative

Dawn P.: I, in the beginning I didn't have marks, but later my mom said that she seen marks. But I think that they're going away.

DAI Rodriguez: There on your neck?

Dawn P.: (Yes)

DAI Rodriguez: OK. And do you, do you hurt anywhere right now?

Dawn P.: Just right here.

DAI Rodriguez: On the, like the right side of your face area?

Dawn P.: I have like, there's like a scratch or something.

DAI Rodriguez: A scratch right there? How about your eyes? Do any of your eyes hurt?

Dawn P.: No, just like right here.

DAI Rodriguez: Your right eye? OK.

Dawn P.: Cause there's a sore somewhere.

DAI Rodriguez: Is that where, did he hit you or?

Dawn P.: No, but he started, he slapped me in the head.

DAI Rodriguez: Oh, OK. So he slapped you. He put his fingers in your mouth. His arm around your neck. And he grabbed your hair?

Dawn P.: Started pulling it a little.

DAI Rodriguez: Pulling it a little. What, what were you doing when he, when he put your hands. Were you in the kitchen or were you walking or running somewhere? Or? Do you remember? That's OK. OK. I know everything happened too fast. How do you feel right now?

Dawn P.: Better.

DAI Rodriguez: Better? OK. That's good.

Detective Var: I don't have anything else.

DAI Rodriguez: Well I'm sorry it took so long. You know one of the things we try to do is to talk to everyone like your mom. And make sure we understand what happened. We're trying to figure out why it happened too. And then, I think your mom has the same questions and you do too. And I'm sorry that this had to happen to you guys. Had you ever had any problems there at the house?

Dawn P.: Not with me there.

DAI Rodriguez: Not with you there. OK. Any yelling or any of the neighbors? Any screams or anything like that?

Dawn P.: (No)

DAI Rodriguez: Before this man or this person was in your house did you hear any strange noises outside?

Dawn P.: (No)

DAI Rodriguez: Did you hear anybody like open a door or open a window or anything like that?

Dawn P.: No.

DAI Rodriguez: No? Do you have any idea how this guy could have gotten in the house?

Dawn P.: (No)

**Narrative**

DAI Rodriguez: No? OK. Alright. I don't have anything.

Detective Var: I don't. OK. Give us a minute or so. And then we'll be right back. OK? Just hang tight. You want some snacks sweetie?

Renee Brown: Want something to eat?

Dawn P.: (Yes)

Renee Brown: Probably getting hungry.

Detective Var: Let me see what I have.

Renee Brown: Can I get some water?

Detective Var: Sure. Let me see what I have and then I'll bring you guys water. OK?

Renee Brown: OK.

(Detective Var and DAI Rodriguez leave the room at 1.33.34)

(Detective Var enters the room at 1.36.59)

Detective Var: Alright sweetie. Sorry I only have junk food. I know you're not.

Renee Brown: It's OK. It don't matter, whatever. She's hungry, so.

Detective Var: OK.

Renee Brown: Say thank you.

Dawn P.: Thank you.

Detective Var: You're welcome.

Renee Brown: Thank you.

Detective Var: Norma is going to the hospital right now.

Renee Brown: Yeah.

Detective Var: The medications you have, is it just for right now? Or is that what she takes?

Renee Brown: That's what she takes at, stop and think. 6 AM.

Detective Var: Yeah.

Renee Brown: 5 PM and 8 PM meds.

Detective Var: So the stuff that you have right now is what she takes?

Renee Brown: All the time, yeah.

Detective Var: All the time.

Renee Brown: Yes, every day.

Detective Var: OK.

Renee Brown: Yeah. They could just jot it down.

Detective Var: OK.

Renee Brown: Don't let them take the.

Detective Var: No, no I think they just need, they just need to know.

COS048278

# EXHIBIT R



Room 1 2016-01-20 01:07:23

# EXHIBIT S





# EXHIBIT T

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA - SACRAMENTO DIVISION

FILIBERTO VALENCIA, SR., and GRISELDA
VALENCIA, individually and as
successors in interest to Filiberto
Valencia, Jr.,

        Plaintiffs,

        vs.

CITY OF STOCKTON, CHIEF ERIC JONES,
SERGEANT DANA MOSHER, OFFICER KYLE
AMANT, OFFICER JASON DIGIULIO, and
DOES 1 through 50, inclusive,

        Defendants.

_____/

CASE NO.:
2:16-CV-02081-JAM-AC

DEPOSITION OF BENNET OMALU, M.D.

January 11, 2018

Reported by:
LaRelle M. Fagundes, CSR No. 9762

PATRICIA CALLAHAN REPORTING
Certified Shorthand Reporters
(510) 885-2371    (415) 788-3993
Depos@callahanreporting.com

1                    BENNET OMALU, M.D.,

2           Being first duly sworn, testified as follows:

3

4                  EXAMINATION BY MR. WALKER

5           MR. WALKER:   Q.   Please state your full name.

6    A.      Bennet Omalu, B-e-n-n-e-t, Omalu, O-m-a-l-u.

7    Q.      And you are a medical doctor; is that correct?

8    A.      Yes, sir.

9    Q.      And I have seen your signature, and there are

10   many initials after your signature.  One is M.D. for

11   medical doctor.  One is -- you have an MBA as well.

12   A.      Yes.

13   Q.      And from which institution do you have the MBA?

14   A.      Carnegie Mellon University.

15   Q.      In Pittsburgh?

16   A.      Yes.

17   Q.      Where did you get your doctorate?

18   A.      At University of Nigeria in West Africa.

19   Q.      Is that in Lagos?

20   A.      No.  In Enugu, in the east.

21   Q.      And when did you get that degree in Nigeria?

22   A.      1990.

23   Q.      You were just a kid then.

24   A.      Sorry?

25   Q.      You were just a young man then.

1   A.      I'm 49.  I'm getting there.  I'll be 50 this
2   year.
3   Q.      You also have an MPH, a master of public health?
4   A.      Yes.
5   Q.      And from which institution?
6   A.      University of Pittsburgh.
7   Q.      And you have a CPE.  What is that?
8   A.      Certified physician executive.  I'm a fellow of
9   the American Association of Physician Leadership.
10  Q.      Okay.  And that is something for which you have
11  to be nominated and vetted?
12  A.      No.  No.  You need to take an exam.  Well, you
13  take an exam to become a member.  Then when you show
14  exceptional leadership, then that will make you a
15  fellow.
16  Q.      And you've been a fellow for how long?
17  A.      I've been a fellow for just about two years, but
18  I've been a member for about ten years.
19  Q.      Okay.  And I also see the initials DABP.
20  A.      Yeah, Diplomate American Board of Pathology.
21  Q.      Okay.  And, after that, it says AP.
22  A.      Anatomic pathology.
23  Q.      CP.
24  A.      Clinic pathology.
25  Q.      FP.

1    A.       Forensic pathology.

2    Q.       And NP.

3    A.       Neuropathology.

4    Q.       And you list yourself as a forensic pathologist

5    and also a neuropathologist.

6    A.       Yes, sir.

7    Q.       What is a forensic pathologist?

8    A.       A forensic pathologist is a physician who

9    studies trauma patterns, who studies disease patterns

10   and links disease and trauma to death causation.  A

11   forensic pathologist can see dead and living people to

12   examine them and make determinations of causations of

13   trauma of disease or death.

14   Q.       Do you consider a forensic pathologist to be a

15   medical detective?

16        MR. SUNTAG:  I'm going object as vague.

17        THE WITNESS:  No, because a medical detective,

18   it gives a wrong representation of what we do.  Majority

19   of the things we do are strictly medical.  The word

20   "detective" suggests crime.  But no, we're -- we're

21   simply doctors.

22        MR. WALKER:  Q.  I've had pathologists say,

23   "Yes, I'm like a detective.  I try to solve the mystery

24   of why a person died."

25   A.       No.

Q.      Okay.  Fair enough.

A.      It's a wrong representation of what we do.

Q.      Okay.  And what is a neuropathologist?

A.      A neuropathologist is a physician who is an expert in brain diseases, in brain trauma, and studies brain tissues to make disease diagnosis and causation.

Q.      Dr. Omalu, I had the opportunity to see you lecture at City Arts and Lectures in San Francisco about year and a half ago.

A.      Wow.

Q.      And I was very impressed.  And since then I have quoted you endlessly to people, because what I remember you saying is that the NFL is misleading us, because concussions are not -- excuse me -- CTE, which is chronic traumatic encephalopathy, is not due to single concussions.  It's due to repetitive head slaps or repetitive head hits.

A.      Yes, sir.

Q.      Is that correct?

A.      Yes, sir.

Q.      And so I've been singing your song in that regard to people when we talk about football and concussions.

        You also have had a major Hollywood movie based on your life; is that correct?

1    A.      Yes, sir.  If we can luck -- we're working on a

2    TV show.  If we're lucky --

3    Q.      That's good.

4    A.      You know, we need -- if we get lucky, we'll have

5    a TV show.

6    Q.      All right.  Well, the movie, for the record, is

7    called what?

8    A.      Concussion.

9    Q.      And it starred Will Smith, correct?

10   A.      Yes.

11   Q.      Okay.  Did you appear in that movie?

12   A.      I refused to, because I did not want people to

13   know my face.

14   Q.      Okay.

15   A.      It's not safe.

16   Q.      And are you the person who discovered CTE?

17   A.      Yes.  Some people will like to disagree with

18   that.  But what happened, I did an autopsy.  I saw a

19   disease that had never been described prior.  Something

20   similar had been described in boxers called dementia

21   pugilistica.  So I showed the disease to other doctors,

22   and everybody agreed that this had not been described

23   before.  So the next question was what disease -- what

24   name should I give it.  I couldn't give it any name I

25   wanted, because of the Daubert principle.  Because I

1  knew it was an occupational disease, it was only a

2  matter of time it could get into the color of law.  And

3  I did not want it dismissed, because it was novel.  So I

4  had to look for a name already in the literature to

5  surpass the hoddle of novelty.  So I chose chronic

6  traumatic encephalopathy.  And worldwide now everybody

7  recognizes what's chronic traumatic encephalopathy.

8  Q.      And you're referring in you answer to the

9  Daubert, D-a-u-b-e-r-t, principle.

10 A.      Yes.

11 Q.      So you're familiar with certain aspects of the

12 law as it relates to you and your practice, correct?

13 A.      Yes.

14 Q.      And you have testified in court before?

15 A.      Yes.

16 Q.      On approximately how many occasions?

17 A.      I would say about 600 times.

18 Q.      About 600?

19 A.      Depositions and courtroom testimonies all across

20 the country.

21 Q.      Okay.  You're licensed to practice medicine in

22 the states of Pennsylvania and California, correct?

23 A.      Pennsylvania, California, Hawaii and Indiana.

24 Q.      Okay.  You have board certifications?

25 A.      Yeah, in five subspecialties; anatomic

1   pathology, clinical pathology, forensic pathology,

2   neuropathology and then medical management.

3   Q.      And as I've introduced myself to you, my name is

4   Walter Walker.  I'm the attorney for Mr. and

5   Mrs. Filiberto Valencia, Sr., and I brought an action on

6   their behalf as a result of the death of their son in

7   police custody on January 19th, 2016.  And the

8   information that's been provided to me indicates you

9   performed the autopsy on Filiberto Valencia, Jr.

10          Am I correct in that assumption?

11  A.      Yes.

12  Q.      And this is my card for you so you can remember

13  that.  I also have a check for you I will give you at

14  the end of the day.  I'm leaving it out here so one of

15  us will remember it.

16  A.      Okay, sir.

17  Q.      What documents have you reviewed in preparation

18  for this deposition?

19  A.      I reviewed the autopsy report and the brain

20  report.  I would have wanted to review the pictures, but

21  I did not have time --

22  Q.      Okay.

23  A.      -- to look at the pictures, but I think I'm

24  prepared.

25  Q.      Okay.  Who took the pictures during the autopsy?

1    put cause of death, and I put the manner.

2    Q.      Okay.  But you determined, in this instance,

3    that the manner of death was homicide.

4    A.      Yes, sir.

5    Q.      Mr. Valencia died at the hands of another human

6    being.

7    A.      Yes.

8    Q.      One or more human beings.

9    A.      Yes.

10   Q.      And then under cause of death, you have written

11   "immediate cause, blunt force" -- it should say trauma.

12   It says T-r-a-u-a.

13   A.      That is trauma, yes.

14   Q.      "Blunt force trauma of the head, neck and

15   trunk" --

16           MR. SUNTAG:  Objection.  Misstates the evidence.

17           Sorry to cut you off.

18           MR. WALKER:  Q.  That was your determination,

19   correct?

20   A.      Yes, sir, as written on page six of the autopsy

21   report.

22   Q.      Okay.  And did you have any contributing causes

23   of death?

24   A.      No.

25   Q.      So there was just one single factor.  That was

1  the blunt force trauma.

2  A.      Yes.

3  Q.      All right.  You also indicated, in a footnote of

4  your autopsy report, that you felt compression may have

5  been a factor.

6  A.      Yes.

7  Q.      You wrote on page 2 of 45, footnote one, "The

8  presence of blunt force trauma of the neck focal

9  intra-mysial" --

10  A.      Yes, sir.

11  Q.      -- sternocleidomastoidal and sternohyoid

12  hemorrhages, sparse conjunctival petechial hemorrhages,

13  epicardial petechial hemorrhages, visceral pleural

14  petechial hemorrhages, and bilateral contusions of the

15  scapular back, may suggest a compression component of

16  the blunt force trauma of the head, face, neck and

17  truck."

18          What did you mean by that?

19  A.      Well, um, I could -- an individual could suffer

20  blunt force trauma, but in that process, there is

21  sustained pressure on the trunk on the chest.  That

22  would generate an asphyxial component to the blunt force

23  trauma.

24  Q.      And did you see elements of that in this case or

25  investigation?

1    MR. WALKER:  Q.  Sure.  I think you'll see you

2  found more in one eye than the other.

3  A.    Yeah.  I think it was.  I definitely need to

4  confirm.

5    Yes.  Yeah.  Yes, there are spots.  I just

6  needed that to confirm.

7  Q.    Okay.  So we have three photographs here.  And

8  for symmetry, I'll give you a fourth one.  That will be

9  the lower eyelid of the right eye.

10    We'll mark that as 18, please.

11    (PLAINTIFFS' EXHIBIT NO. 18 WAS MARKED FOR

12    IDENTIFICATION.)

13    MR. WALKER:  Q.  Looking at these four

14  photographs, what do they tell you about what

15  Mr. Valencia endured or underwent?

16  A.    Like I described in the autopsy report, he

17  underwent blunt force trauma and then the compression of

18  his neck and his trunk.

19  Q.    The compression of the neck, would that have

20  come on the sides of the neck, or would it come from the

21  front of the neck or the back of the neck?

22    MR. SUNTAG:  Objection.  Lacks foundation.

23    THE WITNESS:  Less like -- you know what, um --

24    MR. WALKER:  Q.  I can just rephrase the

25  question.

1        Where did the compression of the neck occur?

2   A.      All of the above, around the neck.

3   Q.      And to what did you attribute that compression?

4   A.      Somebody compressed the neck.

5   Q.      By compressing the neck, somebody pushed on the

6   neck?

7   A.      Yes.

8           MR. SUNTAG:  Objection.  Leading.

9           MR. WALKER:  Q.  Could it have come from blows

10  to the neck?

11          MR. SUNTAG:  Objection.  Leading.

12          THE WITNESS:  Less likely.  It could have come

13  from compression.

14          MR. WALKER:  Q.  Somebody pushing down?

15  A.      Yeah.

16  Q.      You're demonstrating with your hands pushing

17  down.

18  A.      Yes.

19  Q.      And what is it about the petechiae that we see

20  in these four photographs that makes you feel, to a

21  reasonable degree of medical certainty, that there was

22  compression?

23  A.      Not just the petechia.  There were other

24  findings.  Petechia hemorrhages in other parts of the

25  body.

1    Q.      Midline right between the two front teeth?

2    A.      Yes.  If somebody smothered him, you will have a

3    laceration of this.

4    Q.      All right.

5    A.      So what this shows is that he was not smothered.

6    Q.      Okay.  What does it tell you about compression

7    to his mouth, though?

8    A.      Well, what it shows, he may have received some

9    type of direct blow as part of the -- because he had

10   multiple blunt force impact of his face.

11              (PLAINTIFFS' EXHIBIT NO. 21 WAS MARKED FOR

12              IDENTIFICATION.)

13              MR. WALKER:  Q.  The next photograph I want to

14   show you is of the torso, and it also contains a black

15   circle on his abdomen.

16              I assume the black circle is where you took the

17   liver temperature; is that correct?

18   A.      Yes, this is where I took the liver temperature.

19   Q.      There is some discrepancy in the record.  At one

20   point, you record the liver temperature as being 103

21   degrees Fahrenheit.  Dr. Mash refers to it as 100.3

22   degrees Fahrenheit.

23              Can you straighten that out at all?

24   A.      If I said it's 103, it's 103.

25   Q.      All right.

1    A.      And not 100.3, no.

2    Q.      All right.  In this photograph, that we will

3    mark as Exhibit 21, there are some red marks, appear to

4    be striations, just in the center and below his right

5    nipple.

6            To what do you attribute those marks?

7    A.      Well, this shows there was a contusion with

8    linear abrasion.  This is what we may call a pattern

9    wound from blunt force trauma on some surface.  It could

10   have been with something cylindrical, because when

11   somebody hits you violently with a cylindrical object,

12   we call it railvert (phonetic) configuration.

13   Q.      Rail what?

14   A.      Railvert.

15   Q.      Railvert.

16   A.      Meaning two lines.

17   Q.      Okay.

18   A.      A contusion.

19           Why this is important, he had massive

20   lacerations of his liver.  So this may be the point of

21   impact.  And there were -- there are other multiple

22   impact sites around the right chest area.  This is

23   exactly where your liver lies, here.

24   Q.      The liver lies, for lack of better term, below

25   the nipple on the right-hand side?

1    A.        Yes.

2    Q.        And of course above the naval.

3    A.        Yes.

4    Q.        More toward the flank?

5    A.        Yes.

6    Q.        Okay.  And are there black and blue marks?

7    A.        Yeah.  These are all multiple contusions,

8    abrasions.  If you notice, they are more on the right

9    side.

10   Q.        Okay.

11   A.        There are more here.

12   Q.        Now, you're pointing down toward the groin area?

13   A.        Yes, sir.

14   Q.        Thank you.  We'll mark that Exhibit 21.

15            (PLAINTIFFS' EXHIBIT NO. 22 WAS MARKED FOR

16            IDENTIFICATION.)

17            MR. WALKER:  Q.  Exhibit 22 is a photograph of

18   the interior of his right arm.  It shows marks on the

19   forearm and marks on the interior biceps.

20            Did you make a determination as to what caused

21   those marks?

22   A.        It is a contusion from blunt force trauma.  It's

23   confluent.  The bigger it is the more violent the force.

24   Q.        The bigger --

25   A.        The bigger the wound is the more violent.

1    Q.      The more the violent force.  Okay.

2            So this mark that we see on the inside of his

3    biceps, does that appear to be from a direct blow?

4    A.      Yes.

5            MR. WALKER:  Mark that Exhibit 22.

6            (PLAINTIFFS' EXHIBIT NO. 23 WAS MARKED FOR

7            IDENTIFICATION.)

8            MR. WALKER:  Q.  And Exhibit 23 is the mark on

9    his right forearm.

10           Is this also a blunt force trauma blow?

11   A.      Yes.

12   Q.      Thank you.

13           Mark that as 23.

14           (PLAINTIFFS' EXHIBIT NO. 24 WAS MARKED FOR

15           IDENTIFICATION.)

16           MR. WALKER:  Q.  Now marked as Exhibit 24 is a

17   photograph of his skull.  It appears that you shaved

18   part of his hair away.

19           Would that be a fair statement on that part?

20   A.      Yes, sir.

21   Q.      What are you photographing here?

22   A.      Photographing a laceration that is due to a

23   direct impact.

24   Q.      And that -- would you describe the laceration.

25   Is it a "Y" shape?

1   A.     Stellate.

2   Q.     Stellate?

3   A.     Yeah.

4   Q.     Like a star?

5   A.     Yes.

6   Q.     And to what did you attribute that?

7   A.     Direct impact.  And whatever caused this was

8   focalized.  It has a small surface area.

9   Q.     Okay.

10  A.     Because there was a depressed fraction.  So when

11  you see this pattern of trauma, this is what you see in

12  violent impact with something with a small surface.

13  Q.     For example, the butt of a handgun?

14         MR. SUNTAG:  Objection.  Leading.

15         THE WITNESS:  Yes.  Yes, the butt of a metal

16  head of a hammer, the head of a baton, the head of a

17  metal flashlight.

18         MR. WALKER:  Q.  You had been told, you informed

19  us earlier in this deposition, when you went to the

20  scene, that one of the officers had hit Mr. Valencia

21  over the head with his gun twice.

22  A.     Yes.

23  Q.     Did you attribute that wound that we see in this

24  photograph that we're marking as Exhibit 24 to that

25  handgun?

74

```
1   A.      Yes.  It could be the butt of the handgun.  It's
2   small, so it could cause such a pattern, but they were
3   in addition to depressed fracture.
4   Q.      How do you know there was a depressed fracture?
5   A.      I examined this.
6   Q.      At one point, you peeled his face off his skull.
7   A.      His scalp, yes.
8   Q.      And was it only then that you saw this depressed
9   fracture, or could you see this depressed fracture
10  before peeling away his skin?
11  A.      When I was examining, I felt crepitance.
12  Q.      Crepitance?
13  A.      Yes, meaning the fracture.
14  Q.      Crepitance means that it was kind of collapsing
15  in?
16  A.      Depressed in, yes.
17  Q.      Okay.
18  A.      And made noise.
19  Q.      And that's in this area that we see in this
20  photograph we're marking as Exhibit 24 where the
21  stellate scar is?
22  A.      Yes.
23  Q.      Okay.
24  A.      And in his autopsy report, if I remember, I
25  actually describe that the depressed fracture was
```

PATRICIA CALLAHAN REPORTING

1    underneath the laceration.

2    Q.      Could you find that, please, in your report?

3    A.      Yeah.  Number one, page 18.

4    Q.      What does it say?

5    A.      "There is a 0.9 by 0.5 by 0.3 centimeter

6    depressed fracture of the right frontal bone underneath

7    the laceration of the frontal scalp, which has been

8    described above."

9    Q.      Okay.  Thank you.

10            (PLAINTIFFS' EXHIBIT NO. 25 WAS MARKED FOR

11            IDENTIFICATION.)

12            MR. WALKER:  Q.  The next photograph I'm going

13    to show you, I'll mark as Exhibit 25, appears to be of

14    Mr. Valencia's left shoulder.  And I want to know why

15    you took this photograph.

16    A.      To document the, again, cylindric contusion of

17    the superior shoulder and then another confluent

18    contusion of the back of the shoulder.

19    Q.      Does that photograph depict any black and blue

20    marks?

21    A.      Yes, contusion.

22    Q.      Is that called ecchymosis?

23    A.      No.  These are contusions.

24    Q.      What is ecchymosis?

25    A.      Okay.  Ecchymosis is a contusion not caused by

1  photographically.

2  Q.      Yes.

3  A.      Because as an expert I knew the County or the

4  City, the family will retrain their own experts.  So I

5  wanted to be fair and balanced to provide documentation

6  for whomever is interested in the case.  That was why I

7  did what I did.

8  Q.      I appreciate that, but you also took over 200

9  photographs, so I'm not going to have you identify every

10  single one of them.

11      I'm going -- now, before I decide whether to

12  mark this photograph, if you can tell me what is

13  depicted here.

14  A.      So this picture is to show the bleeding in the

15  anterior strap muscles of the neck, which is

16  pathognomonic.

17  Q.      P-a-t-h?

18  A.      P-a-t-h.  Which means specific full compression

19  of the neck.

20  Q.      What you see in that photograph indicates to you

21  that there was compression on Mr. Valencia's neck?

22  A.      Yes.

23      Okay.  Now, again, you're building a story.  In

24  addition to the petechial hemorrhages, now, this also

25  shows bleeding.

1  Q.      Is that the liver down at the bottom, shiny?

2  A.      Yes.  But before I got to the liver, you could

3  see there's blood.  You shouldn't see even a drop of

4  blood in the peritoneum.

5  Q.      Peritoneum is below the liver in this

6  photograph?

7  A.      The peritoneum is below the heart.  This is from

8  the diaphragm, because the liver is immediately below

9  the diaphragm.

10  Q.      That shiny object in the lower middle of the

11  photograph, that's the liver?

12  A.      Yes.

13  Q.      And that's blood on the liver?

14  A.      Yes.  There were large amounts of blood around

15  the liver.

16  Q.      All right.

17  A.      And then blood all over the peritoneum cavity.

18  Q.      What does that indicate to you?

19  A.      The blood means there was trauma in the abdomen.

20  I had to the identify the trauma.  And there was -- for

21  large amounts of blood, there was vascular injury.  So I

22  had to look for it.  And while I was looking for

23  vascular injury, there was laceration of the liver

24  extending to the inferior vena cava.

25  Q.      You measured those lacerations of the liver,

1   body.  It transmits blood from the lower extremity from

2   the abdomen to the heart.

3   Q.      Was the vena cava pierced?

4   A.      Yes.  It had a laceration of about 0.7

5   centimeters.

6   Q.      How much is that in terms of inches?

7   A.      In terms of inches, you're looking at 2.5 or

8   maybe 1/16 of an inch.

9   Q.      Okay.

10  A.      But 1/16 of an inch in the inferior vena cava

11  will kill anybody.  It's major.  It's not minor.

12  Q.      So, in this instance, did you feel this was a

13  contributing factor to Mr. Valencia's death?

14  A.      Yes.  Yes.  There were 750 cc of blood in his

15  peritoneum cavity.

16  Q.      Do you consider that a lot of blood?

17  A.      Yes.

18  Q.      If one gives blood at a blood bank, how much

19  does one give?

20  A.      500 cc.

21  Q.      What would happen if one gives 750 ccs of blood?

22  Would one be affected by that?

23          MR. SUNTAG:  Objection.  Incomplete

24  hypothetical.

25          THE WITNESS:  Sorry.  Okay.  I can --

1    it in a shearing injury.

2    Q.        Shearing injury?

3    A.        Yeah, shearing.  The brain recognizes it,

4    because it had massive brain injury.  And there would

5    be -- with the compression of the neck, because when you

6    compress the neck, there are two nerves that run down

7    both sides of the neck, the vagus nerve.  And there are

8    plastic pathetic ganglia.  There are clusters of nerves

9    around the neck.

10             The danger of compressing somebody's neck is

11   you're compressing the vagus nerves.  And the vagus

12   nerves, you don't want to excite them, because what they

13   do is to shutdown the heart.  And that is why sometimes

14   if somebody kicks you violently on the neck, you could

15   drop dead.

16             So when you compress the neck, compressing the

17   vagus nerves, the plastic and pathetic ganglia, and then

18   you're bleeding, there's pain, because blood is in

19   entering the peritoneal.  If the inferior vena cava is

20   leaking blood, less amounts of blood are reaching into

21   the heart.  It's going to kill anybody.

22   Q.        Let me go over a couple of these terms.

23             What is an autonomic reaction?

24   A.        Autonomic reaction -- the brain has about 200

25   billion cells.  And it communicates with the body

1  here?

2  A.      It's part.  It's multifactorial.  And that was

3  why, if you notice, I chose to be generic.  I made it

4  blunt force trauma of the head, trunk, extremities and

5  included the asphyxia component to it.

6          This isn't like a gunshot wound of the head

7  where it's specific and defined, no.

8  Q.      You made reference to massive brain edema.

9          Edema is swelling?

10  A.      Yes, sir.

11  Q.      And you found massive brain edema deem in

12  Mr. Valencia's head?

13  A.      Yes, sir.

14  Q.      You described the vagus nerves, one going down

15  each side of the face or the skull.

16  A.      Of the neck.

17  Q.      Going down the neck.  Okay.

18          Did you find that those vagus nerves had been

19  compromised in Mr. Valencia?

20  A.      Well, you wouldn't see because of the

21  physiological events.  You wouldn't see.  But everybody

22  knows any irritation of the vagus nerve, compression, a

23  kick, can result in we call it a vasovagal, v-a-s-o,

24  vasovagal reaction.

25          MR. WALKER:  Okay.  And I think, at this point,

1    we've been at two hours.  We probably need a bit of a

2    break, so we're going to take a break.

3                (Recess taken from 3:01 to 3:09.)

4                MR. WALKER:  Q.  I have a photograph here.  I'm

5    not sure what it is.

6    A.       That's the liver showing the laceration.  And

7    see all this?  This is all trauma.

8    Q.       But you show sort of a white sheen.

9    A.       Look at the purplish areas.

10   Q.       Purplish?

11   A.       Yeah.

12   Q.       Okay.  The purple is trauma?

13   A.       And then this is the laceration.

14   Q.       So when you said "this is all trauma," you were

15   referring to purple area in this photograph, which we

16   will now mark as Exhibit 27.

17   A.       And the laceration.

18                (PLAINTIFFS' EXHIBIT NO. 27 WAS MARKED FOR

19                IDENTIFICATION.)

20                MR. WALKER:  Q.  And that laceration, is that --

21   how long is that laceration?

22   A.       It extends through the thickness of the liver to

23   the -- this is the inferior vena cava.  And if you see,

24   you could see blood around the inferior vena cava.

25   Q.       Is the length that we see depicted here of that

1    laceration, is that of significance?

2    A.      It's a big laceration.

3    Q.      Is that a three-inch laceration?

4    A.      Yes.  And it's not just the length on the

5    surface.  It extends through the entire thickness of the

6    liver.

7    Q.      And that indicates to you there was --

8    A.      Violent forces.

9    Q.      -- blunt force?

10   A.      Yeah, violent.

11   Q.      Violent blunt force.  Thank you.

12           27, please.

13           This next photograph is also of the liver.  And

14   I'm only going to mark these if they're significant.

15           But is this of significance?

16   A.      Yeah.  This photo shows the trauma to the liver.

17   Again, it now shows -- this is the inferior surface,

18   so --

19   Q.      The inferior what?

20   A.      The inferior surface.

21   Q.      Oh, surface.  I'm sorry.

22   A.      Sorry.

23   Q.      Thank you.

24   A.      So, again, it shows you the extensive trauma of

25   this area.  And you'll see -- that laceration you saw

1   Q.     Okay.  And I show you a photograph that appears

2  to me to have petechial hemorrhages.  Am I correct in

3  that regard?  The top of the picture if it's held

4  horizontally?

5  A.     Yes, sir.

6  Q.     That is petechiae, the dark red?

7  A.     Yes, sir.

8  Q.     Thank you.

9         We'll mark that, please, Exhibit 29.

10        (PLAINTIFFS' EXHIBIT NO. 29 WAS MARKED FOR

11        IDENTIFICATION.)

12        THE WITNESS:  Could I see that, too?  Sorry.

13        MR. WALKER:  Q.  This one?

14  A.     This also has a petechiae.  See?

15  Q.     You find these little red --

16  A.     Yeah, petechiae, major.

17  Q.     What does petechiae in the heart indicate to

18  you?

19  A.     Compression.

20  Q.     Thank you.

21        Mark this photograph of the heart as Exhibit 30.

22        (PLAINTIFFS' EXHIBIT NO. 30 WAS MARKED FOR

23        IDENTIFICATION.)

24        MR. WALKER:  Q.  Is this photograph of a slice

25  of the heart.

1    A.    To show that he had hypertension.

2    Q.    This is part of the heart?

3    A.    Yes.

4    Q.    All right.  I think this is of a leg.  Am I

5    correct?

6    A.    Yes, sir.  I opened up the soft tissues to show

7    areas of trauma I did not see looking from outside.

8    Q.    Okay.  Did you find areas of trauma on the

9    inside of his legs?

10   A.    In his legs, his extremities, his back, yes.

11   Q.    Okay.  In this photograph, what indicates --

12   what indicates trauma to you?

13   A.    You could see the yellowish fat tissue that

14   suddenly you see a red/purple area.  That is a

15   contusion.

16        MR. WALKER:  Okay.  Well, in that case, I will

17   now mark this photograph of the interior of the leg as

18   Exhibit 31.

19        (PLAINTIFFS' EXHIBIT NO. 31 WAS MARKED FOR

20        IDENTIFICATION.)

21        MR. WALKER:  Q.  Next photograph I have I do not

22   know what this is.  It has a measuring device, and it

23   appears to be, perhaps, overly lighted.

24   A.    This was taken by the evidence technician.

25   Q.    What is being depicted there?

```
 1   Q.      And what are you lifting up there?

 2   A.      The shoulder blade.

 3   Q.      All right.

 4   A.      To show -- see, cases like this you need to do a

 5   deep dissection.

 6   Q.      So you look under the shoulder blades?

 7   A.      Yeah, you dissect the whole thing.  You mutilate

 8   the body looking for trauma.

 9   Q.      Did you find trauma beneath the shoulder blades?

10   A.      Yes.  These are contusions.

11   Q.      Is that -- how does the trauma get under the

12   shoulder blade?

13   A.      Blunt force trauma.

14   Q.      By hitting --

15   A.      Compression.

16   Q.      -- the top of the shoulder?

17   A.      Compression.  So these types of injuries around

18   the shoulders is because if somebody compresses your

19   trunk on a hard surface --

20   Q.      Yes.  Like a floor?

21   A.      Yes.  The shoulders are the parts of the body

22   maximum amount of forces, because they are the skeleton.

23   So usually you have an accentuation of trauma around the

24   scapula areas, like we have in this case.  So this will

25   further confirm that his trunk was compressed.
```

1 Q.     And when you say that, you're talking about his

2 trunk was compressed by something lying on top of it or

3 pushing down on top of it?

4 A.     Or something against the wall, or something was

5 pushing his trunk against an unyielding surface.

6 Q.     And that caused trauma to his shoulder blades,

7 because he was lying on his back, and his trunk was

8 being pushed down into that hard surface.

9 A.     Yes.  And the compression also caused the

10 petechial hemorrhages of the heart, of the liver and

11 other surfaces.

12        MR. WALKER:  So we will then mark this

13 photograph showing the contusion between the shoulder

14 blade as Exhibit 34.

15        (PLAINTIFFS' EXHIBIT NO. 34 WAS MARKED FOR

16        IDENTIFICATION.)

17        MR. WALKER:  Q.  Can you tell what is depicted

18 in this photograph?

19 A.     Again, contusions of the back.  This is the

20 dissections of the back, so you could see the purple,

21 the muscular.

22 Q.     Is that a different area of the back?

23 A.     Yes, this is on the right.

24 Q.     This is what?

25 A.     The right side.

```
1    Q.      On the right side.

2    A.      Yeah.  So this indicated multiple blunt force

3    trauma.

4            MR. WALKER:  Okay.  And we'll mark that as

5    Exhibit 35.

6            (PLAINTIFFS' EXHIBIT NO. 35 WAS MARKED FOR

7            IDENTIFICATION.)

8            MR. WALKER:  Q.  In the next photograph, what

9    are you depicting here?

10   A.      Again, the blunt force trauma.

11   Q.      To the back?

12   A.      Yes.

13   Q.      And is that the same right side of the back?

14   A.      This is now the left side.

15   Q.      Left side.  So there's blunt force trauma to

16   both sides of the back?

17   A.      Yes.  Like I described in the autopsy report,

18   there were multiple areas of blunt force trauma.

19   Q.      Okay.  Thank you.

20           We'll mark that photograph as Exhibit 36.

21           (PLAINTIFFS' EXHIBIT NO. 36 WAS MARKED FOR

22           IDENTIFICATION.)

23           MR. WALKER:  Q.  Did you measure any of the

24   contusions and lacerations on Mr. Valencia's face?

25   A.      Yes, I measured them.  But like on page 14 of
```

1   the autopsy report, yes, sir.

2   Q.     I'll show you a photograph that I have numbered

3   409 in my order. I'm not sure if this is one of your

4   photographs. But it appears to be Mr. Valencia lying on

5   the carpet. So I think it's probably a police

6   photograph.

7   A.     It is the scene. I don't do this. This is done

8   by the evidence technician. I use my own matrix.

9   Q.     Okay.

10   A.     So this is -- this looks like a carpet. So,

11   yeah, this was at the scene.

12   Q.     All right. That was at the scene.

13        You saw Mr. Valencia as he appears in this

14   picture, but you did not take this picture.

15   A.     No, I did not.

16   Q.     Okay. And, again, that's my -- I've numbered

17   that 409. It's produced by the police department.

18   A.     Any pictures of the brain? I didn't see any

19   picture of the brain.

20   Q.     Well, I didn't like looking at the brain, so now

21   I'm going to go back. Oh, there it is.

22   A.     But when I cut it, when I examined the brain

23   myself. I didn't send you those?

24   Q.     Yes. I have a picture of a portion of the

25   brain. I'm only going to put them in if you think

1  they're significant.

2  A.      No.  No, it's not.  I was just wondering.  It

3  shows the edema.

4  Q.      It shows edema to the brain?

5  A.      Yeah.

6  Q.      Swelling of the brain?

7  A.      Yeah.

8  Q.      Let me show you another photograph.  Tell me

9  what's depicted here.

10  A.      The edema.

11  Q.      And how can you tell it's edema?

12  A.      Because what we call the gyri are bulging out.

13  They are bulging, because they are all swollen.

14  Q.      I'm going to put a series of pictures in front

15  of you and ask that you just mark one of these for the

16  record.

17  A.      You see very plain.

18  Q.      All right.  So you're pointing to two pictures

19  that show -- one of them shows what appears to be the

20  brain halved.  Has it been cut?

21  A.      This shows hemorrhage.

22  Q.      Did you cut this brain?

23  A.      No, this is not cut yet.

24  Q.      This is the way it looked?

25  A.      This is a fissure.  Longitudinal fissure

1  separating the right cerebral hemisphere from the left.

2  Q.      And on the left cerebral hemisphere --

3  A.      There's subarachnoid hemorrhage.  There's some

4  here too.

5  Q.      What's a subarachnoid hemorrhage?

6  A.      Trauma.

7  Q.      From blows to the head?

8  A.      Yes.

9          MR. WALKER:  We'll mark this picture with a

10  fissure as Exhibit 37.

11         (PLAINTIFFS' EXHIBIT NO. 37 WAS MARKED FOR

12         IDENTIFICATION.)

13         THE WITNESS:  And also this shows --

14         MR. WALKER:  Q.  You said a second picture of

15  the brain, which appears to be taken from the other side

16  of the brain, and this almost looks like an acorn.

17  A.      This is from the inferior surface of the brain.

18  Q.      What does that depict?

19  A.      So you see -- it is called uncus.

20  Q.      Uncus?

21  A.      U-n-c-u-s, yes.  You see there's notching of the

22  uncus on both sides.

23  Q.      What does that signify?

24  A.      Edema.

25  Q.      Edema.  Okay.  Thank you.

1          And you're pointing right to the heart of this

2     picture, which I say looks like an acorn, just for

3     purposes of description.

4          And, in the center, you are pointing to either

5     side of the darkened area in the center, correct?

6     A.     Yes.

7     Q.     And that indicates edema to you?

8     A.     Yes, sir.

9     Q.     Thank you.

10         We'll mark that as 38.

11         (PLAINTIFFS' EXHIBIT NO. 38 WAS MARKED FOR

12         IDENTIFICATION.)

13         MR. WALKER:  Q.  And then the last picture of

14    the brain that you were pointing to shows a portion of

15    the brain.  And I believe the face has been pulled back

16    over the top of the skull; is that correct?

17    A.     Yeah.  This shows -- this is the scalp.  It

18    shows the hemorrhages in the scalp.

19    Q.     The underside of the scalp?

20    A.     Yeah, from blunt force trauma.

21         There was another picture that showed a scalp

22    hemorrhage.

23    Q.     Scalp hemorrhage?

24    A.     Yeah.

25    Q.     You mean from the --

1    A.        Yeah

2    Q.        The "Y" shape, that was --

3    A.        No, it's not yet.  I saw it.  One of ones turned

4    over.  That's it.

5              MR. WALKER:  All right.  So the first one that

6    we were just describing that shows the hemorrhage on the

7    underside of the scalp, we'll mark that as 39.  And now

8    40, shows the scalp.

9              (PLAINTIFFS' EXHIBIT NO. 39 AND 40 WERE MARKED

10              FOR IDENTIFICATION.)

11              THE WITNESS:  This shows a different part.  This

12   is called subgalea, subgalea.

13              MR. WALKER:  Q.  What's the galea?

14   A.        There is a neurosis called aponeurosis galea,

15   galea aponeurotica.  It's between the scalp and the

16   skull.  Galea, g-a-l-e-a.  Aponeurotica,

17   a-p-o-n-e-u-r-o-t-i-c-a.

18              So any bleeding underneath the galea

19   aponeurotica is also subgalea, and anything above is

20   subcutaneous.

21   Q.        What does this photograph that we're marking as

22   Exhibit 40 --

23   A.        Subgalea hemorrhage.

24   Q.        Is that where the -- is that beneath where

25   the --

1  A.    That's a depression.

2  Q.    -- blunt object crushed the skull?

3  A.    Yes.

4  Q.    Fractured the skull.

5  A.    You could see a depressed fracture with

6  surrounding subgalea hemorrhage.

7  Q.    All right.  And the depressed fracture --

8  A.    Yes.

9  Q.    -- is of the skull bone itself?

10 A.    Yes.

11 Q.    All right.  Thank you.

12       Mark that as 40, please.

13 A.    And this is subcutaneous.

14 Q.    That's 39 is subcutaneous.  40 is subgalea.

15       I think I may be done with that.

16       In your autopsy report, if you -- do you have

17 that in front of you?

18 A.    Yes, sir.

19 Q.    At page 5 of 49, you refer to pulmonary edema

20 and congestion, acute, severe, and the lung weights are

21 different, 830 grams on the right, 620 on the left.

22       Is that a significant finding?

23 A.    Well, yeah, lung edema is a sign of agony.

24 Q.    Agony?

25 A.    Yeah, agony.  You see it typically in people who

PATRICIA CALLAHAN REPORTING

1   have suffered, you know, a slow autonomic death like the

2   heart stopping slowly.

3   Q.      Is that what you think happened here?

4   A.      Yeah.  Um, the death wasn't at the snap of a

5   fingernail.

6   Q.      And I said "think."  Do you have an opinion, to

7   a reasonable degree of medical certainty, if this is

8   what is reflected in this finding of pulmonary edema and

9   congestion, acute, severe, that it indicates

10  Mr. Valencia was suffering a slow and agonizing death?

11  A.      Yeah.  The findings show that too.  He had what

12  we call a -- in addition to the brain edema, he had

13  excital toxic -- excite -- excital toxic injury of his

14  brain cells.  So death wasn't instantaneous.  It was

15  sustained and slow.

16  Q.      Okay.

17  A.      I mean, the width of his brain was 1660.  That

18  is heavy.

19  Q.      Heavier than it would have been the first thing

20  that morning?

21  A.      Sorry?

22  Q.      What do you -- if his brain weighed 1600, what's

23  that 1600, what measurement?

24  A.      It is a very heavy, heavy brain.

25  Q.      1600 what?

1    A.      1600 Grams.

2    Q.      Grams.

3            And, in the morning of January 19th, what would

4    you anticipate that his brain would have weighed, about

5    1,200 grams?

6    A.      Maybe 12-, 1300.

7    Q.      How can the brain develop so much more weight?

8    A.      Edema.

9    Q.      Water?

10   A.      Yeah.

11   Q.      Where does the water come from?

12   A.      The brain is 60 to 80 percent water.

13   Q.      Where does the water come from?

14   A.      So whenever you have -- remember he had a

15   massive impact.  So that causes three types of injury.

16   It causes axonal injury.  It causes membrane injury and

17   vascular.  So whether it's three types of injury are

18   when the brain loses its ability to manage water, and

19   then it starts to accumulate.  But just the edema alone

20   can kill you.

21   Q.      Is that because it swells against --

22   A.      Swells.  There's no place for it to go, so it

23   crushes itself, yes.

24   Q.      It can also push down on the spinal cord, can't

25   it?

1    A.        Yes, herniation, which is uncus.  Remember?

2    Q.        Yes.

3    A.        That's part of the herniation, yes.

4    Q.        Okay.  If you look at the first page of your

5    autopsy report --

6    A.        Yes.

7    Q.        Actually, it says, "AUTOPSY REPORT" at the top

8    of the page that I'm looking at.

9    A.        Yes.

10   Q.        And you say, "The full autopsy prosection was

11   performed on January 19th, 2016 beginning at

12   approximately 10:23 P.M. and ending at approximately

13   12:49 A.M."

14             So your actual autopsy was completed at 49

15   minutes after midnight on January 20th, 2016.

16   A.        Yes.

17   Q.        Picking out a few things.

18             Turning to page 5 of 45, this completes the

19   postmortem toxicology.

20   A.        Page what?

21   Q.        Page 5 of 45.

22   A.        Okay.

23   Q.        Completes the heading, Roman numeral IV,

24   "POST-MORTEM TOXICOLOGY."

25             Is the postmortem toxicology all matters that

1  were reported to you as opposed to have been found by

2  you directly?

3  A.      What part -- there was a report.

4  Q.      Okay.  And that report said that there was no

5  ethenol in any of Mr. Valencia's bodily fluids, correct?

6  A.      Yes.

7  Q.      That means he had not had anything to drink, any

8  alcohol to drink.

9  A.      No, sir.

10 Q.      Am I correct?

11 A.      Yes, sir.

12 Q.      Then if we go over to page 6 of 45, you've

13 written your opinion.  And you said, in the second

14 paragraph, after identifying Filiberto, "My visit,

15 inspection and analysis of the scene, as well as the

16 prevailing evidentiary autopsy findings indicate that

17 the deceased suffered sustained physical altercation and

18 contact with other individuals, with repeated and

19 sustained blunt force traumas on the infrastructure of

20 the private residence he intruded upon including but not

21 limited to the walls, floor and toilet."

22         That was your opinion when you wrote this, and

23 it's your opinion now?

24 A.      Yes, sir.

25 Q.      You go on to say, "Such a sustained blunt force

1  trauma of the head, neck and trunk may result in

2  compression of the neck and trunk as a component of the

3  physical altercation and contact, and blunt force

4  traumas."

5  You believe that that sustained blunt force

6  trauma of the head and neck and trunk did result in

7  compression of the neck and trunk?

8  MR. SUNTAG:  Objection leading.

9  THE WITNESS:  Yes.

10  MR. WALKER:  Q.  You do believe that?

11  A.  Yes, sir.

12  Q.  In the next paragraph, the second sentence, you

13  write, "The autopsy did not reveal any pharmacological

14  confounders that would account for the onset of the

15  terminal manic syndrome/state."

16  What's a confounder?

17  A.  Confounder meaning drugs or lack of, like

18  cocaine, amphetamine, PCP, bath salt.

19  Q.  Okay.  And then if we turn to the next page that

20  bears your signature.

21  A.  Yes.

22  Q.  And, after the signature, there is a slash and

23  then number 7774.

24  That's the code to which you referred earlier in

25  your deposition?

1    code, the three numbers don't mean anything.

2    Q.      So 777 means nothing.  Okay.

3    A.      What is important to me is the last number.

4    Q.      Okay.

5    A.      Now, if you have a one, that's natural.

6    Q.      Okay.

7    A.      If it's a two, that's an accident.  If it's a

8    three, that's a suicide.  If it's a four, that's a

9    homicide.  If it's a five, that's undetermined.

10   Q.      Undetermined.  Okay.

11   A.      So I did that.  And it became useful in this

12   case and other cases in the past that were changed.  So

13   when people will call me, family and whatever, I just

14   look at my code.  I know what it is.

15   Q.      All right.  Thank you.

16           On page 26 of 45, you address the pancreas under

17   the endocrine system.

18   A.      Yes, sir.

19   Q.      You say, "The pancreas weighs 240 grams and

20   reveals focal peri-pancreatic hemorrhages."

21           Where is the pancreas in relation to the liver?

22   A.      The pancreas lies below the kidney across the

23   midline over the spine.  So when you have such a pattern

24   of trauma leaching around the pancreas, it indicates an

25   individual who was punched or who was hit in the abdomen

1    crushing the pancreas on the spine.

2           Does that make sense?

3    Q.      Yes.  Then let's turn to page 34 of 45.

4           And here you address microscopic examination.

5    A.      Yes.

6    Q.      And you said, "Microscopic examination of

7    submitted tissue histology sections reveals

8    histo-morphologic findings that are consistent with

9    gross finding and final pathologic diagnoses, which have

10   been stated above."

11          Was this microscopic examination that you were

12   doing yourself?

13   A.      Yes.

14   Q.      And then later on the page you list histologic

15   sections, and it goes on to the next page, 1 through 26.

16          You examined all those matters yourself?

17   A.      Yes, sir.

18   Q.      And beginning at page 39, you addressed medical

19   records review that you did after asking Deputy Coroner

20   Frank Mehrer to provide you with medical records on

21   Mr. Valencia, correct?

22   A.      Yes.

23   Q.      And then you reviewed those medical records over

24   the next several pages.

25   A.      Yes.

1  meeting.  So you asked her for the reports at that

2  meeting.

3  A.      Well, we brought it to her attention that the

4  Sheriff has failed to provide us with the reports we

5  needed.

6  Q.      Okay.  So how long after that meeting did you

7  receive --

8  A.      Almost like a day or two later.

9  Q.      You received the police reports on the Valencia

10 case?

11 A.      Received the entire file.  And after that

12 meeting, she --

13 Q.      So let me ask you a question.

14         Did you review the file?

15 A.      I just got it.  I did not review it.  I did not

16 need to, because I did not rely on them to complete my

17 autopsy report.  So they are on my table.  I did not

18 review them.  It was not necessary for me at that point.

19 Q.      You testified that Mr. Valencia -- I believe you

20 testified, but tell me if I'm wrong -- suffered a slow

21 and agonizing death.  Yes?

22 A.      Yes, it was a slow death.  Pulmonary edema is a

23 sign of agony, a-g-o-n-y.

24 Q.      "Slow" is obviously a term as to which people

25 say compared to what.  So I'm going to ask you how long

1    it took him to suffer this slow and agonizing death.

2    A.       The deceleration of death start agonizing, that

3    would be minutes.  Minutes could be from five minutes to

4    ten minutes, three to ten minutes.  It's not like in two

5    seconds, three seconds, no.

6    Q.       Okay.  So I just want to understand what that

7    means.  Does that mean from whatever it is that caused

8    the death it took between three and ten minutes for him

9    to die?

10   A.       No.  He was exposed to high levels of stress

11   over minutes and then eventually died.  So he

12   eventually -- as he was being exposed to trauma, his

13   body was recognizing and suffering trauma.  And, at some

14   point, he reached a threshold that overwhelmed his body,

15   and then he began dying.

16           Does that make sense?

17   Q.       Okay.  I understand.

18           You don't know what exactly was going on at the

19   moment he died in terms of the physical -- you don't

20   know exactly what was going on at the moment he had died

21   in terms of the physical altercation?

22   A.       No.  The autopsy showed that on the moment he --

23           MR. WALKER:  So you're talking about in terms of

24   the altercation?

25           MR. SUNTAG:  The altercation, yes.

1    Q.       So let me ask it again, just so we're clear.

2              In terms of the physical altercation that was

3    going on in that house, do you know what actually was

4    happening at the moment Mr. Valencia died?

5    A.       He was bleeding, and his brain had suffered

6    oxygen deprivation.

7    Q.       Okay.  And what was going on between him and the

8    officers at the moment he had died, if anything?  Was

9    there a --

10   A.       A physical altercation.

11   Q.       Could you be more specific than that?

12   A.       I cannot, no.  I wasn't there.

13   Q.       The materials you sent to Dr. Mash, I'm not

14   clear.  What is it exactly that you sent to her?

15   A.       Half of the brain.

16   Q.       Okay.  So literally half of the brain?

17   A.       Yeah.

18   Q.       And it was in -- was it in some kind of

19   container?

20   A.       They are wrapped in aluminum foil in a tray, in

21   a tissue tray --

22   Q.       Okay.

23   A.       -- placed in a box with dry ice.

24   Q.       Okay.

25   A.       Sealed in a box, in a tissue specimen box.

1    Q.       Is it your opinion that, um, Mr. Valencia had

2    compression of the neck or trunk as a result of the

3    physical altercation with the police?

4    A.       Yes.  No, not my opinion.  The autopsy shows

5    that.  There were anterior strap muscle hemorrhages.

6    There were petechial hemorrhages.  There were petechial

7    hemorrhages in all of the tissues and organs.

8    Q.       Does your autopsy report, Dr. Omalu, expressly

9    rule out excited delirium?

10   A.       Yes, the autopsy ruled out excited delirium.

11   Q.       Can you point me to where it says that, because

12   I didn't see it?  I may have missed it.

13   A.       First, in the diagnosis of the autopsy report,

14   there is no listing of excited delirium.

15   Q.       No.  No, I understand that.  I understand the

16   absence of it.  I'm looking for --

17   A.       In differential diagnosis and the methodology of

18   the differential diagnosis that we physicians stand by,

19   if a diagnosis is not present, you don't list it.

20   Q.       Okay.  So just to correct -- just to confirm,

21   your autopsy report does not expressly say that you

22   ruled out excited delirium, true?

23   A.       Just a minute.

24   Q.       Sure.  Take your time.

25   A.       Look at the brain report.

1   STATE OF CALIFORNIA    )
                           )  Ss
2   COUNTY OF ALAMEDA      )

3

4        I, LaRelle Fagundes, hereby certify that the
    witness in the foregoing deposition named

5

6                    BENNET OMALU, M.D.

7

8   was by me duly sworn to testify to the truth, the whole
    truth, and nothing but the truth in the within-entitled
9   cause; that said deposition was taken at the time and
    place herein named, that the testimony of said witness
10  was reported by me, a certified shorthand reporter and a
    disinterested person, and thereafter transcribed into
11  typewriting.

12       And I further certify that I am not of counsel
    or attorney for either or any of the parties to said
13  deposition, nor in any way interest in the outcome of
    the cause name in said caption.

14

15  _____  Reading and Signing was requested.

16  _____  Reading and Signing was waived.

17  __X____  Reading and Signing was not requested.

18

19

20  DATE: 1/24/18

21            *LaRelle M. Fagundes*

22  _____
    LaRelle M. Fagundes, CSR 9762
23

24

25

**EXHIBIT U**



# EXHIBIT V



**EXHIBIT W**



# EXHIBIT X

1        UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF CALIFORNIA

3                  ---oOo---

4

5   FILIBERTO VALENCIA, SR.,
    et al.,
6
                Plaintiffs,
7
    vs.                          No. 2:16-CV-02081-JAM-AC
8
    CITY OF STOCKTON, et al.,
9
                Defendants.
10  _____/

11

12

13        DEPOSITION OF JUDY MELINEK, M.D.

14          MONDAY, JANUARY 8, 2018

15               10:35 A.M.

16

17          Taken in the offices of:
    Walker, Hamilton, Koenig & Burbidge
18      50 Francisco Street, Suite 460
        San Francisco, California 94133
19

20

21

22

23  REPORTED BY:   LAURA HEPBURN, CSR 8428

24

25

1    there isn't a full documentation of the injuries here,

2    not to the degree that is in Dr. Omalu's report and my

3    second autopsy report.  It seems like she's particularly

4    trying to match some of the injuries to portions of the

5    struggle, like the fall against the wall, the impact

6    against the wall of the bathroom and the impact with the

7    gun.  She says that none of these blunt force injuries

8    caused serious injury to the brain or facial structures

9    that would be life-threatening or incapacitating, and I

10   take issue with that because clearly one of those impacts

11   caused a depressed skull fracture of the outer table of

12   the skull and the brain was swollen.  So to just ignore

13   that part of the trauma to the skull and the calvarium is

14   problematic to me.  And then she just says, "The head and

15   facial injuries did not cause or contribute to

16   Mr. Valencia's death."

17        Q.    And you're moving on to the top of page 3 now?

18        A.    Yes.

19              And then she skips down to the chest area and

20   ignores the neck, and we've got to talk about the neck

21   because there are hemorrhages in the neck area, both

22   front and back.  We have documentation that he's being

23   punched and also being restrained with an arm around the

24   face and neck area at the point one of the officers even

25   gets bitten, so clearly his arm is near his face/neck

area. In order to bite someone, it's the lower part of the face. The neck's just a few inches down. When you have hemorrhage on the neck compounded with petechiae and hemorrhages in the whites of the eye, those are significant findings that are compatible with neck vascular compression. You don't necessarily need to put someone in a choke hold or a bar arm hold or a vascular restraint, but even in a struggle, if a person has prolonged pressure -- "prolonged" being on the order of seconds to minutes -- to these structures, blood flow can get into the head but then it does not drain out, and as a result, you get burst small blood vessels and they're most visible in the whites of the eyes because that's where it's most delicate, where the vessels are very small. So those hemorrhages combined with the story that we have of a struggle with a foot on the face and arm around the neck or near the neck and the hemorrhages that we're seeing in portions of the neck are consistent with compression. That and the fact that we have -- what is it? -- a 275 pound male who says, "I smothered him. I was on top of him. I straddled him," so we've got his body weight also contributing to the chest and neck compression.

She acknowledges 750 mL of blood in the abdominal cavity but she says that they're not

1    against the wall, he's being punched, he's being hit with

2    a baton, he's being tased and he's got somebody's boot on

3    his face.  So clearly we have a lot more evidence and

4    testimony of violence and trauma happening once he's had

5    interaction with the police versus prior to that.

6         Q.   Okay.

7         A.   So going on to the next paragraph, "He sustained

8    injuries during this period that were non-life

9    threatening."  That's the second sentence in, I guess,

10   the third paragraph of page 3.  That is not correct.  She

11   suggests that he became unresponsive suddenly and

12   unexpectedly after being extricated from the bathroom,

13   placed in a prone position in the hallway and handcuffed.

14   That was not just what happened.  She's completely

15   ignoring in that sentence the multiple impacts of the

16   head with the pistol whipping and also the Tasing and

17   also the pressure, full body press being applied by the

18   officer combined with the boot on the face.

19            "At no time were there life-threatening

20   maneuvers, positioning or injury caused by the police

21   actions required to gain control of the subject."  I

22   think that that's ridiculous.  I think that hitting

23   someone over the head with a metal object, with a gun, is

24   life-threatening.  I think that positioning them without

25   monitoring their airway and putting your foot on their

1  face where you're potentially obstructing their nose and
2  mouth or pressing on the vasculature of their neck is
3  life-threatening.   I'm not a police procedures expert but
4  I've reviewed multiple police procedures manuals and
5  materials over my years as an expert, both working for
6  county government as well as an expert being hired by
7  attorneys, and in no way have I ever seen that being
8  authorized maneuvers.  Batons are supposed to be used on
9  the extremities, not on the head or the abdomen.  Same
10 thing for pistols.  I've never seen that as an authorized
11 maneuver.  But I'm not going to testify to that.  I'll
12 defer to a police procedures expert.  But I can tell you
13 that a metal object like a gun being hit on the head is
14 potentially life-threatening.
15      Q.   Right there I want to ask you because Mr. Clark,
16 you understand that he is the plaintiff's police
17 procedures expert, correct?
18      A.   Yes.
19      Q.   He made a reference in his report, which I do
20 not have in front of me, so if you don't recall it,
21 that's fine, but to a baton strike to the head.  Do you
22 have any evidence that you can point me to where, to a
23 medical certainty, it can be proven that Mr. Valencia was
24 struck in the head with a baton?
25      A.   I don't recall any testimony about a baton

1    less likely or have nothing to do with excited delirium

2    here?

3         A.    If the death were due to excited delirium, then

4    the fact that there is an enlarged heart would add to the

5    mechanism of a potential arrest, cardiac arrest, --

6         Q.    Okay.

7         A.    -- meaning that you'd have a sudden cardiac

8    arrhythmia or one would be more likely due to the

9    increased adrenaline, increased acid in the blood that is

10   seen in the agitated state of someone in excited

11   delirium.   Given that the death is basically due to blunt

12   trauma and asphyxia, those could easily occur with these

13   physical findings in someone with a perfectly normal

14   heart, so its presence is really not as likely to be

15   contributory.

16        Q.    No.   Completely understood, and you've said it

17   far more eloquently than I ever could and I appreciate

18   that.

19             Regardless of the mechanism of his death, would

20   you agree that the actual final cause of Mr. Valencia's

21   death was cardiac arrest?

22        A.    No.   You can't say that.

23        Q.    Okay.

24        A.    Cause of death cannot be cardiac arrest.

25   Cardiac arrest is a definition of death.   Everybody dies

because their heart stops beating.  So by definition, the cause of death is the etiologically specific disease or injury which starts the lethal sequence of events, and that would, in this case, be blunt trauma and asphyxia.

Q.    I completely appreciate that.

So assuming that the death was attributable to either blunt trauma or asphyxia or some combination of the two, does Mr. Valencia's enlarged heart in any way make him more susceptible to those means of death?  Does it mean that he died quicker?  Does it play a role in any way, shape or form here?

A.    It could possibly make it more likely that he has an arrhythmia, but that would be speculative.  I don't think there's sufficient evidence to say within reasonable probability or to the standard of more likely than not that it is a contributing cause or I would have written that in my report.

Q.    Fair enough.

You also noted that with -- and I understand you're not a police practices expert, so I'm not trying to drag you into an area you're uncomfortable with so feel free to shut me off at any point.  You said there's an emphasis in excited delirium or suspected excited delirium cases of de-escalation, right?

A.    So in the textbooks that I have reviewed on the

1      Q.    You think mid torso, not pelvis region?

2      A.    Again, it's not exactly clear.  Probably during

3 the struggle there's some shifting involved, but I'm

4 going to let his words stand for themselves because

5 he said, "I smothered him.  I compressed him.  I put my

6 chest over him."  So there's different parts of his

7 testimony at different parts of the physical struggle

8 where he describes different movements.

9      Q.    And I ask you that because loosely there's been

10 questions asked for information about Officer DiGiulio

11 "laying on top of Mr. Valencia."  Is it your

12 understanding when you're writing your reports that --

13 this may sound stupid, so forgive me, but I need to make

14 sure that I understand what you were thinking -- that

15 Officer DiGiulio was physically actually laying on top of

16 Mr. Valencia?

17      A.    I think he's putting a significant amount of his

18 body weight on Mr. Valencia, but it would include his

19 torso as well as his extremities, but since it's a

20 dynamic situation, there's going to be relative times

21 where he's more off of him and relative times where he's

22 more on him.  It depends on when we're describing in the

23 struggle and what the other officers are doing, like the

24 one who's stepping on the face.  You need to have certain

25 access.  So we're dealing with a very restricted space.

```
 1   It's a hallway.   There's not a lot of room for movement
 2   there.
 3       Q.   Okay.   So I just want to be clear.   Was it ever
 4   your understanding that Officer DiGiulio was laying on
 5   top of Mr. Valencia like one would lay on top of a
 6   mattress?
 7       A.   I don't think it was a static situation such as
 8   that.   It was much more dynamic than that, but he's
 9   definitely putting a significant amount of his torso and
10   body weight on him in order to restrain him.
11       Q.   It may be too lowbrow for you.   Are you a fan of
12   UFC fighting at all?
13       A.   I am not a fan of UFC fighting.
14       Q.   I suspected as much.
15           Are you aware that Officer DiGiulio testified
16   that he had MMA or mixed-martial-arts-type training?
17       A.   I don't recall that aspect of his testimony.   It
18   may have been in there, but there was a lot of testimony
19   I reviewed so I don't remember that.
20       Q.   Are you aware that, at least in MMA parlance,
21   "mount" is, for lack of a better description, a term of
22   art, the mount position?   Are you aware of that?
23       A.   I'm not familiar with MMA terminology.
24       Q.   Okay.   So maybe the best way, since you're not
25   familiar with MMA-type terminology, when they describe a
```

mount, full mount, half mount, whatever type position,
you've already done it for me, but please describe for
me -- and I understand it was not static and moving --
but at the point when Officer DiGiulio was putting the
most amount of weight on Mr. Valencia, please describe to
me your understanding of exactly how he was positioned in
relation to Mr. Valencia.

A.   Well, in those circumstances, I would just defer
back to his statements, what I summarized in my report.

Q.   Sure, if you can find that for me.

A.   So the first description of him putting body
weight on him was when he said he closed in on him and
wanted to pin him in the corner and "smother him," and he
said that that was when the fight started.  He said he
pinned Valencia's head.  He put his forearm across
Valencia's head and pinned it down to the wall.  Then he
tried to mount him.

Q.   Stop right there.

A.   And then Officer Amant started dragging Valencia
out in the hallway by the legs, so it wasn't a complete
mount because he's being moved at that time.

Q.   So briefly, I just want to interject.  When you
just read to me the term "mount," what did you understand
that term to mean?

A.   I understood that term to mean that he was on

top of him, getting above him.  So Officer DiGiulio is
over Mr. Valencia and using his body weight to restrain
Mr. Valencia by putting weight, aiming towards
Mr. Valencia's center of gravity, so possibly hips,
possibly abdomen.  Could be in the torso area somewhere.

Q.   Okay.

A.   But that was not specified where exactly most of
the weight was being applied.

Q.   Okay.

A.   So at a certain point, Officer Amant heard
something about the Taser and so Officer DiGiulio leaned
back, so got somewhat off of him or sufficiently so that
the Taser could be deployed.  They started to roll
Valencia to the left and then DiGiulio was still
delivering punches and finally got a "full mount," that's
in quotes, on Valencia, and DiGiulio described this as
straddling a person just above their waistline.  So the
waist is above the pelvis, so on me, for instance, it
would be the upper abdomen area.  And then DiGiulio
Pinned Valencia's arm against his face and jaw, and then
Officer Amant had his boot on Valencia's forearm to pin
it down.

So I think that that's the summary, at least
coming from the interview with Officer DiGiulio, but
that's the testimony.

experts in a lab where we're getting a vial and our
analysis is independent of the circumstances of the case.
I don't need to know about the suspect and the defendant
and what was found at the scene to analyze the DNA.  I
just need to get the vial and find out if there's
sufficient specimen there.  Medicine requires a lot more
input with regards to the circumstances in order to
accurately interpret the findings, so it has an
interpretive component and I don't know if that's really
an art, per se.

    Q.   No.  I appreciate the answer.

          You performed your autopsy on January 25, 2016?

    A.   Yes.  Date of second autopsy.

    Q.   And your autopsy report, however, is dated
November 10, 2017.  Why is there such a passage of time
between when you performed the autopsy and when the
actual report was prepared or issued?

    A.   Several reasons.  Number one, because when
there's a second autopsy, a lot of my interpretation of
the findings, which are listed in the diagnoses, are
dependent on me being able to have the first autopsy to
review.  These are not just diagnoses based on the second
autopsy; they're diagnoses based on the first autopsy as
well, and the reason for that is because when I see
something at autopsy, if it's a second autopsy, I don't

A. Well, it means the same thing medically as it does in common parlance. We understand what that means. You hit somebody with a gun. You didn't shoot them with it. You basically use the gun as a blunt object.

Q. I just wanted to make sure we're talking about the same thing.

Specifically, did you make any attempt to trace any of Mr. Valencia's injuries or wounds to any particular cause or source such as, for example, did you try to match the wounds on his head with Officer DiGiulio's gun?

A. I didn't do specifically a pattern matching, if that's what you mean.

Q. Yes.

A. But there are some injuries that are consistent with the gun as opposed to other sources of injury like the boot.

Q. Okay.

A. You'll see the two lacerations of the scalp that are chevron-shaped or Y-shaped are probably from the two impacts of the gun. The other injuries to the face around the eye and the cheek and the forehead and also on the back of the scalp where the lacerations are not are likely from impacts against the wall of the bathroom, the floor, the punches sustained to the head as well as the

1 ==boot of the officer who was stepping on his face.==

2  Q.   Okay.  There have been references, at least in

3 the past, questions or other matters that have come up in

4 this case, to Officer Amant potentially kicking

5 Mr. Valencia when he was on the ground.  Can you

6 definitively trace any of Mr. Valencia's wounds to

7 Officer Amant's boots as a result of him kicking him

8 while he was lying on the ground?

9  A.   I think the injuries to the face are consistent

10 with the testimony that his boot was on his face at some

11 point, but there is no definitive way of pattern matching

12 without looking at the bottom of the boot and looking at

13 the photos.  I wasn't asked to do that.  I could,

14 potentially.  I would need a good scaled photograph of

15 the bottom tread of his boot, which I don't have, and I

16 would need a good scaled photograph of the facial

17 injuries at the first autopsy and then I'd be able to do

18 that.  I haven't been asked to do that in this case but

19 that's open.  I mean, we talked about potential exhibits.

20 That might be one.  It's not something I was specifically

21 asked to address.

22  Q.   Okay.  As to any of Mr. Valencia's other

23 injuries, were you able to trace them to a particular

24 source or cause?

25  A.   Well, there's the Taser barbs injuries.  I

1  STATE OF  _California_____ )
                                       )
2  COUNTY OF  _San Francisco_____  )

3

4

5

6

7          I, the undersigned, declare under penalty of

8  perjury:

9          That I have read the foregoing transcript;

10         That I have made any corrections, additions, or

11 deletions that I was desirous of making;

12         That the foregoing is a true and correct

13 transcript of my testimony contained therein.

14         EXECUTED this  _5th__ day of _February_____,

15 20_18_____, at _San Francisco_____, _California_____.
                      [City}                      [State]
16

17

18

19

20 _____

21         JUDY MELINEK, M.D.

22

23

24

25

# EXHIBIT Y



# EXHIBIT Z



**EXHIBIT AA**

**GENERAL ORDER**

**USE OF FORCE**
SUBJECT

DATE: <u>July 15, 2015</u>          NO: <u>Q-1</u>

FROM: <u>CHIEF ERIC JONES</u>          TO: <u>ALL PERSONNEL</u>

INDEX    USE OF FORCE
         REPORTING USE OF FORCE

I.    **Policy**

    A.    At times, Department members are confronted with situations where control is required to make an arrest or protect public safety. Attempts will be made to achieve control through advice, warnings and persuasion. However, in situations where resistance or a threat to life is encountered and advice, warnings or persuasion are or would be ineffective, force may have to be used.

    B.    Force is defined as the exertion of power by any means, including physical or mechanical devices (to include deployments of the Spit Net or Wrap), to overcome or restrain an individual where such force causes him/her to act, move, or comply against his/her resistance. In cases where Department members are required to use force on-duty or in an off-duty enforcement action, it shall be reported in a memorandum, or appropriate police report. (This does not include routine handcuffing of arrested persons or basic control holds where no resistance occurs.)

    C.    Department members shall abide by all penal and constitutional guidelines when force is used.

II.    **Law**

    A.    Department members shall become familiar with the following Penal Code Sections regarding the use of force:

Penal Code

    1.    Section 69 P.C. - Resisting executive officers by force of violence.

    2.    Section 147 P.C. - Inhumanity to prisoners.

    3.    Section 148 P.C. - Resisting arrest.

    4.    Section 149 P.C. - Assault by officers under color of authority.

    5.    Section 196 P.C. - Justifiable homicide by public officers.

    6.    Section 673 P.C. - Cruel and unusual punishment.

    7.    Section 692 - 694 P.C. - Lawful arrest.

    8.    Section 835 P.C. - How an arrest is made and what restraint is allowed.

    9.    Section 835 (a) P.C. - The right of the arresting officer to use reasonable force.

    10.    Section 4550 P.C. - Rescue of prisoners.

III.    **Procedure**

    A.    General responsibility when force is used:

    1.    Department members may use that force which is reasonable and necessary to make an arrest, prevent an escape, overcome resistance, or in self-defense or the defense of another. The type and degree of force used must be reasonable, based upon the facts

and circumstances of the situation which were known by the officer at the time the decision to use force is made.

The reasonableness of force used is determined by consideration of three main factors: 1) the seriousness of the crime at issue; 2) whether the suspect poses an immediate threat to the officer or others; and, 3) whether the suspect is actively engaged in resisting arrest or attempting to flee.

2. Department members need not retreat or desist in the reasonable use of force in order to avoid confrontation. Deadly force or force likely to produce a mortal injury will not be used if the incident prompting the use of force is a misdemeanor and there is no imminent threat by the suspect to use deadly force or force likely to produce great bodily injury.

3. A Department member's on-duty supervisor will personally respond for an evaluation where a Department member has used force on duty. The Department member who used force must therefore insure their supervisor is advised of the incident. The responding supervisor's name will be listed in the report detailing the use of force. The supervisor may also forward a memorandum through channels to the Chief of Police when additional comments are appropriate.

4. An arrestee with any complaint of pain or visible injury shall receive medical attention.

5. Department members shall report any use of force while on-duty in the appropriate police report and any off-duty use of force in the course of enforcement activity in a memorandum.

The reporting requirements due not apply in officer involved shooting incidents as covered in General Order Q-6 "Officer Involved Shootings" and the San Joaquin County Officer-Involved Critical Incident Protocol Manual.

6. Responding supervisors will insure that photographs are taken of any alleged or visible injuries received by a department member or arrestee.


IV. **Supervisors Responsibilities**

A. Response to scene in on-duty use of force incidents:

1. The department member's supervisor shall personally respond, with extreme priority, for an on-scene evaluation of each case where a department member has used force while on-duty.

2. The supervisor shall personally obtain or direct another department member to take photographs of any alleged or visible injuries and shall not assign the department member who used force to take the photographs.

3. The supervisor shall enter each use of force incident they evaluate into the Use of Force Database during the shift the force was used. This includes use of force levels from physical force, all the way to deadly force. They shall insure that all required information is entered, including their determination regarding whether the force used was appropriate (based on preliminary information obtained) except in protocol cases as noted below. To aid supervisors in gathering all required information for later entry into the Use of Force Database, the attached data form can be used. Once the data is transferred into the Database, the form is no longer needed and can be appropriately destroyed.

a. In use of force incidents resulting in a protocol investigation, the responding supervisor shall not make a determination as to whether or not the force used was appropriate. The supervisor shall instead check the option "Protocol" under the "Force Consistent with Policy" tab in the database.

4. The supervisor shall notify the on-duty Watch or Section Commander of a use of force incident the supervisor has entered into the Database.

## V. Section/Watch Commander Responsibilities

A. Upon being advised of an incident involving a use of force, the Section/Watch Commander shall take the following steps:

  1. The Section/Watch Commander shall review the use of force entry in the database to ensure completeness and appropriateness of the force that was used. If properly completed, he/she shall then approve the entry. If corrections are needed he/she, in consultation with the supervisor, shall make the needed changes before the Section/Watch Commander makes the final approval.

  2. If in the Section/Watch Commander's opinion there are questions regarding the appropriateness of the force used, additional follow-up (review of police reports, discussion with sergeant who responded, discussion with Division Commander, etc.) should occur.

  3. If the use of force incident involves a Section/Division other than Field Operations, the Commander approving the entry will insure that details surrounding the incident are passed along to the on-duty Watch Commander.

  4. The on-duty Watch Commander will ensure that the use of force incident is carried on the Watch Commander Daily, including the name of the supervisor who responded and assessed the incident.

## V1. Use of Force While Off-Duty

A. If a department member is required to use substantial force during enforcement activity while off-duty, the involved member shall immediately notify his/her Division Commander or the on-duty Watch Commander. Substantial force includes displaying a firearm, an impact weapon, and/or physically subduing a suspect, etc.

B. The Division or Watch Commander shall initiate an investigation as follows:

  1. If the occurrence is serious in nature, the Division/Watch Commander or a patrol supervisor shall investigate the incident and complete the necessary reports, i.e., crime/arrest report, SIR, and memorandum. Off-duty use of force incidents are not entered into the use of force database.

  2. Normally, the Division/Watch Commander will require the off-duty department member to submit a written memorandum explaining details of the incident upon their return to work.

C. In every case, the Division/Watch Commander shall submit a memorandum to their Commander. The memorandum shall explain details of the incident and any action taken.

## VII. Reporting Use of Force Other Than Deadly Force

A. On-duty Department members who use low lethality weapons, chemical agents, batons, carotid restraint, WRAP System or any other force in those instances that threaten the safety of a Department member or other persons, or subdue and arrest combative or resisting individuals, shall report the details of such use of force in the appropriate ARS report. Detail will include the following:

  1. Type of force used.

  2. The reason and detailed circumstances of how the force was used.

  3. Detailed description of alleged or visible injuries to the arrestee and/or Department member.

  4. Photographs will be taken and the approximate number of photographs taken shall be documented.

  5. The supervisor's or commander's name who the Department member advised of the specific details when force was used on a person. This advisement will occur as soon as practical, but no longer than one hour after the force was used.

  6. Other pertinent information the Department member wishes to include.

7. The Department member who personally used force is required to make the appropriate ARS report.

8. If the Department member is unable, the investigating officer shall submit the required report.

9. If several Department members are involved in one incident, each officer shall report their use of force on a separate appropriate ARS report.

VIII. **Review of Use of Force incidents by the Professional Standards Section**

A. The Professional Standards Section shall conduct a quarterly review of use of force incidents. The review shall include the following information:

1. Total number of use of force incidents that occurred.

2. Breakdown of various types of force used.

3. Statistical review of injuries, race, gender, age of suspects, etc.

4. Insuring that all use of force incidents were appropriately logged in the Use of Force Database.

5. Random case review for policy compliance.

# EXHIBIT BB

# County of San Joaquin Sheriff-Coroner

### 7000 S.Michael N. Canlis Blvd French Camp California
### Fax (209) 468-5095     Phone (209) 468-4300

**Decedent: Filiberto Carrillo VALENCIA**                    Case #:16-00148

| CLASSIFICATION | MANNER OF DEATH:<br>**Homicide** | | SUB MANNER OF DEATH:<br>**Blunt Force Trauma** | | | DEPUTY CORONER:<br>**Frank Mehrer** | |
|---|---|---|---|---|---|---|---|
| | TYPE OF MEDICAL EXAMINATION<br>**Autopsy** | | | | | DATE OF DEATH:<br>**01/19/2016** | TIME OF DEATH:<br>**18:50** |
| DECEDENT PERSONAL DATA | NAME - FIRST:<br>**Filiberto** | | MIDDLE:<br>**Carrillo** | | LAST:<br>**VALENCIA** | | MARITAL STATUS:<br>**Never Married** |
| | AGE:<br>**26 Years** | DATE OF BIRTH:<br>**11/02/1989** | PLACE OF BIRTH:<br>**California,** | | HEIGHT: | WEIGHT: | HAIR: | EYES: |
| | SEX:<br>**Male** | TEETH: | | RACE:<br>**Mexican/Chicano** | | | SSN:<br>**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** |
| | SCARS, MARKS, TATTOOS: | | | | | | |
| RESIDENCE | ADDRESS:<br>**3234 Barbara Street** | | | CITY:<br>**Stockton** | | STATE:<br>**CA** | ZIP:<br>**95205** |
| PLACE OF DEATH | PLACE:<br>**Residence -** | | | | COUNTY:<br>**San Joaquin** | | |
| | ADDRESS:<br>**3133 Nicole Street** | | | | CITY:<br>**Stockton** | | STATE:<br>**CA** |
| REPORTING INFORMATION | DEATH REPORTED BY:<br>**Stockton Police Department** | | AGENCY:<br>**Stockton Police Department** | | DATE:<br>**01/19/2016** | REMOVED FROM SCENE TO:<br>**Coroner's Facility** | |
| | REPORT RECEIVED BY:<br>**Shaina Marquez** | | | | | | |
| CAUSE OF DEATH | IMMEDIATE CAUSE: **Blunt Force Traua of the Head, Neck and Trunk** | | | | | | |
| | DUE TO:<br>DUE TO:<br>DUE TO: | | | | | | |
| OTHER SIGNIFICANT CONDITIONS | | | | | | | |
| INJURY INFORMATION | PLACE OF INJURY: | | | INJURY AT WORK:<br>**No** | DATE OF INJURY:<br>**01/19/2016** | TIME OF INJURY:<br>**18:28** | ESTIMATED:<br>**Yes** |
| | ADDRESS OF INJURY:<br>**3133 Nicole Street** | | | | CITY:<br>**Stockton** | | STATE:<br>**CA** |
| | INJURY DESCRIPTION:<br>**SPD Officer / (D) Contact time 1828 hours** | | | | | | |
| IDENTIFICATION | IDENTIFICATION METHOD:<br>**Visually** | | | IDENTIFIED BY:<br>**SPD Detectives** | | | |
| NOTIFIED | NAME:<br>**Filiberto VALENCIA** | | | RELATIONSHIP:<br>**Father** | | | |
| | ADDRESS OF INJURY:<br>**3234 Barbara Street** | | | CITY:<br>**Stockton** | | STATE:<br>**CA** | ZIP:<br>**95205** |
| | NOTIFIED BY:<br>**Det. Alaniz** | HOW NOTIFIED:<br>**In Person** | | | DATE:<br>**01/20/2016** | TIME:<br>**01:00** | |
| ADDITIONAL INFORMATION | PATHOLOGIST:<br>**Dr. Omalu** | | OTHER INVESTIGATION: | | FUNERAL HOME:<br>**Cano Funeral Home** | | |

Steve Moore - Sheriff-Coroner

_____                    _____
Frank Mehrer Investigator                  Sgt. Mike Reynolds, Chief Deputy Coroner

# County of San Joaquin Sheriff-Coroner

**7000 S. Michael N. Canlis Blvd French Camp California**
Fax (209) 468-5095      Phone (209) 468-4300

Decedent: **Filiberto Carrillo VALENCIA**

Coroner Case Number: **16-00148**

## Narrative

Recording Deputy: **Frank Mehrer**

Entered Date: **01/19/2016**

**Synopsis:** On 01/19/2016, at 1909 hours, I, Deputy MEHRER, responded to 3133 Nicole Street, in Stockton, California to conduct an investigation into the death of Filiberto VALENCIA, date of birth 11/02/1989, who was positively identified by Stockton Police Department Detectives on scene.

The preliminary investigation shows that the decedent was involved in a physical altercation with individuals who live at the 3133 Nicole Street address and Stockton Police Department Officers who responded to the scene. While officers were trying to take the decedent into custody, the decedent grabbed one of the officer's handguns and was then struck with a butt of the handgun. The decedent was also struck with a baton and taser deployments.

The decedent soon became unresponsive and American Medical Response (AMR) responded as requested. AMR arrived on scene to find Stockton Police Officers performing CPR and took over. AMR began using other advanced lifesaving methods, which turned out with negative results. The decedent was pronounced at 1850 hours. Stockton Police Department is investigating this protocol under case # 2016-2494.

The decedent was secured in a body bag and transported by J. Morris Company to the San Joaquin County General Hospital where full body CT scans were completed. The remains were removed to the Forensic Pathology Facility where a post mortem examination was performed to determine the exact cause of death; report on file this office.

The decedent was escorted to the San Joaquin County Hospital and to the Forensic Pathology Facility by me for evidence purposes.

**Narrative:** I first viewed the decedent who was in the living room area of the residence. The decedent was covered with a gray blanket from head to toe. Once the gray blanket was removed the decedent was observed to be in supine position with his head facing to the west and his feet facing to the east. Multiple medical devices were in place and a handcuff was located on the decedent's right wrist. The decedent had a blue short-sleeve shirt that had been pulled up above his chest near his shoulders exposing his upper chest and abdomen area. The decedent was also clad in black sweatpants with a green stripe down each side, white thermals, blue-gray and black striped boxer shorts and dirty white socks. Multiple bruises and abrasions were observed on the decedent's right arm, right side near his abdomen and left side of his face. I observed what appeared to be a 1" laceration near the center front top portion of the decedent's head and a bump approximately the size of a quarter in the back rear portion of the decedent's head. Multiple tattoos were also noted to the decedent which included a cross with hands wrapped around it on the right shoulder and the words "family first", on the left shoulder roses with the words "rest in peace", on the left forearm the word "VALENCIA", left inner foot the word "CARRILLA", the decedent also had in the center upper portion of his back between his shoulder blades a Giants Baseball logo with the word "GIANTS". Slight rigor mortis was noted and the decedent was also warm to the touch and had lividity consistent with the current body position. An arm band with the decedent's name and date of birth was completed and placed on the decedent's left wrist.

According to American Medical Response unit 33, Medic BROWN, ID# P34534, said that they had been dispatched to 3133 Nicole Street, in Stockton, at 1831 hours. They were initially responding code 2 for the report of a taser deployment. While en route to the scene, they were advised to step up to code 3 for an unresponsive person. They arrived on scene at 1840 hours, to find Stockton Police Department Officers currently performing CPR. AMR immediately took over providing medical aid and upon initial evaluation the decedent was pulseless and apneic. AMR began performing medical protocols and contact was made with San Joaquin General Hospital. Dr. SHAFER with the San Joaquin General Hospital was provided with the current status of the decedent and later called the time of death at

Frank Mehrer Investigator

Sgt. Mike Reynolds, Chief Deputy Coroner

# County of San Joaquin Sheriff-Coroner

## 7000 S. Michael N. Canlis Blvd French Camp California
### Fax (209) 468-5095    Phone (209) 468-4300

1850 hours.

There is no hospital care and treatment report.

According to Sergeant WENTLAND, ID#1008, with the Stockton Police Department, she provided the following information. The Stockton Police Department received numerous phone calls of an individual jumping on their roofs attempting to get into the residence. At one point, the decedent arrived at 3133 Nicole Street in Stockton, where he began beating on the windows and doors and eventually made entry into the residence through the back slider door. Once the decedent was in the residence, an altercation between the residents living inside the home and suspect took place. During this time the decedent had grabbed a young child in an attempt to harm her. During the initial altercation, a resident at the home used a toilet seat striking the decedent multiple times in self-defense. Stockton Police Department Officers responded to the scene and upon officers forcing entry into the residence they began approaching the hallway to locate the suspect. At that point, an altercation between the officers and suspect took place where the suspect was struck with the butt of an officer's handgun, officer's baton, and possibly three taser cartridges. During the physical altercation, officers were attempting to take the decedent into custody where he became unresponsive. Medics were immediately contacted and medical aid was started.

Once the autopsy was completed, brain samples were transported by Detective MEHRER to U.C. Davis Medical Center to be placed in a deep freeze unit to be preserved for further testing.

Notification is pending at this time. Per Stockton Police Department they will make notification to the next of kin.

Supplemental Entered By: **Jose Alatorre**

Supplemental Entered Date: **01/20/2016**

**Supplemental Text:** According to Stockton Police Department Investigations Sergeant DEGULIO, the decedent's parents Filiberto and Griselda VALENCIA were notified in person by Detective ALANIZ on 01/20/16 at approximately 0100 hours at the Stockton Police Department Headquarters building.

Supplemental Entered By: **Frank Mehrer**

Supplemental Entered Date: **01/25/2016**

**Supplemental Text:** On 01/25/2016 I responded back to U.C. Davis Medical Center and picked up the brain samples from the deep freezer. The samples were then transported back to the San Joaquin County Coroner's office to be packaged and prepared for shipment for further testing.

---

Frank Mehrer Investigator                    Sgt. Mike Reynolds, Chief Deputy Coroner

# County of San Joaquin Sheriff-Coroner

**7000 S.Michael N. Canlis Blvd French Camp California**
**Fax (209) 468-5095      Phone (209) 468-4300**

Decedent: **Filiberto Carrillo VALENCIA**                                    Case #:**16-00148**

## Additional Contacts

Name: **Filiberto   VALENCIA**          Address: **3234 Barbara Street, Stockton, CA 95205**

Phone: _____ Cell: **(209) 244-3037**   St/DL#: _____ Relation: **Father**

Ocupation: _____ Employer: _____ Phone: _____

DOB: _____ Race: _____

Comments: _____

Name: **Griselda VALENCIA**          Address: _____

Phone: _____ Cell: _____ St/DL#: _____ Relation: **Mother**

Ocupation: _____ Employer: _____ Phone: _____

DOB: _____ Race: _____

Comments: _____

_____                    _____
Frank Mehrer Investigator                      Sgt. Mike Reynolds, Chief Deputy Coroner

# County of San Joaquin Sheriff-Coroner

7000 S.Michael N. Canlis Blvd French Camp California
Fax (209) 468-5095      Phone (209) 468-4300

## Property List

Decedent: **Filiberto Carrillo VALENCIA**

Coroner Case Number:

---

| Frank Mehrer Investigator | Sgt. Mike Reynolds, Chief Deputy Coroner |

# County of San Joaquin Sheriff-Coroner

### 7000 S.Michael N. Canlis Blvd French Camp California
Fax (209) 468-5095        Phone (209) 468-4300

## Medication Inventory

Decedent: **Filiberto Carrillo VALENCIA**

Coroner Case Number: **16-00148**

**There are no medications or drugs for this file**

_____           _____
Frank Mehrer Investigator                Sgt. Mike Reynolds, Chief Deputy Coroner



OFFICE OF

# SHERIFF-CORONER

## COUNTY OF SAN JOAQUIN

7000 Michael N. Canlis Blvd.
French Camp, California 95231-9781



**Steve Moore**
Sheriff-Coroner
Public Administrator

## AUTOPSY REPORT

NAME: FILIBERTO VALENCIA

AUTOPSY NO.: A16-0148

DATE OF BIRTH: November 2, 1989

AGE: 26 years old

SEX: Male

RACE: Hispanic

DATE OF DEATH: January 19, 2016

CONFIRMED DEAD: 06:50 P.M.

PLACE OF DEATH:     At a residence
3133 Nicole Street
Stockton, CA 95205

The full autopsy prosection was performed on January 19, 2016 beginning at approximately 10:23 P.M. and ending at approximately 12:49 A.M.

Bennet I. Omalu, MD, MBA, MPH, CPE, DABP-AP,CP,FP,NP
Forensic Pathologist/Neuropathologist, Prosector

Elise Arata, Autopsy Room Assistant

Also present at the autopsy are the following: Evidence Technician Westdal, Detective Smith and Detective Duffy: all from the City of Stockton Police Department; and District Attorney Investigator Sanford from the San Joaquin County District Attorney's Office

CD-32

FILIBERTO VALENCIA

<u>FINAL PATHOLOGICAL DIAGNOSES:</u>

I.  BLUNT FORCE TRAUMA OF THE HEAD, FACE AND NECK[1]
    a.  Laceration of the right dorsal frontal scalp
    b.  Abrasions and contusions of the left forehead, temple, cheek and jaw with soft tissue edema and swelling
    c.  Sparse bilateral bulbar and palpebral conjunctival petechial hemorrhages, accentuated on the right
    d.  Extensive ecchymoses of the left upper and lower eyelids
    e.  Transverse laceration of the left lateral lower eyelid
    f.  Contusions of the anterior mid-sagittal caudal neck
    g.  Depressed fracture of the right frontal bone, underneath the laceration of the frontal scalp
    h.  Patchy subcutaneous and subgaleal hemorrhages of the right frontal, left frontal and right parietal scalp
    i.  Patchy peri-mysial and intra-mysial soft tissue hemorrhages, left temporalis muscle
    j.  Focal intra-mysial soft tissue hemorrhages, right sternocleidomastoid muscle, and left sternohyoid muscle
    k.  Multifocal and sparse posterior paravertebral hemorrhages, cervical, thoracic and lumbosacral spine, with focal sparse spinal ligamentous hemorrhages
    l.  See forensic neuropathology report- attached

II.  BLUNT FORCE TRAUMA OF THE TRUNK
    a.  Contusions of the left superior shoulder
    b.  Abrasion-contusion of the right anterior chest
    c.  Contusion of the right clavicular chest
    d.  Contusions of the right anterior caudal chest
    e.  Contusion of the right anterior chest, lateral to the nipple
    f.  Contusion of the left medial anterior chest
    g.  Contusions of the right anterolateral upper abdominal quadrant
    h.  Punctate and linear abrasions, multiple, left peri-umbilical abdomen[2]

---

[1] The presence of blunt force trauma of the neck, focal intra-mysial sternocleidomastoidal and sternohyoid hemorrhages, sparse conjunctival petechial hemorrhages, epicardial petechial hemorrhages, visceral pleural petechial hemorrhages, and bilateral contusions of the scapular back, may suggest a compression component of the blunt force trauma of the head, face, neck and trunk.

FILIBERTO VALENCIA

    i. Contusions of the right posterior shoulder
    j. Abrasion of the right scapular back, scabbing
    k. Diffuse faint contusions of the bilateral scapular back
    l. Linear and irregular abrasions and contusions of the bilateral lumbar back and buttocks, multiple
   m. Focal soft tissue hemorrhages, right anterior caudal chest
    n. Multifocal, sparse to patchy epicardial petechial hemorrhages, accentuated over the inferior oblique and posterior aspects of the heart
    o. Bilateral patchy sub-pleural petechial hemorrhages, pulmonary visceral pleurae
    p. Hemoperitoneum, approximately 750 cc, liquid
    q. AAST grade III contusions and lacerations, right medial, and left lobes of the liver, extending to the intra-hepatic inferior vena cava
    r. Focal vascular injury, intra-hepatic inferior vena cava, with circumferential soft tissue hemorrhages and small transmural laceration
    s. Posterior peri-hepatic soft tissue hemorrhages extending to the right adrenal gland, porta hepatis of the liver and the head and tail of the pancreas
    t. Bilateral multiple randomly situated soft tissue hemorrhages, posterior neck and trunk, accentuated over the bilateral scapular regions
    u. Multifocal and sparse posterior paravertebral hemorrhages, cervical and thoracic spine, with focal sparse spinal ligamentous hemorrhages


III. BLUNT FORCE TRAUMA OF THE UPPPER AND LOWER EXTREMITIES
    a. Abrasions of the left posterior mid arm
    b. Abrasions and contusions of the right anterior and medial arm and elbow
    c. Linear abrasions of the right lateral distal arm, elbow and forearm, multiple
    d. Patterned abrasions and contusions of the right anterior forearm
    e. Contusions of the right forearm, wrist and dorsal hand, multiple
    f. Contusion of the left posterior mid forearm
    g. Punctate and linear abrasions, multiple, left lateral, anterior and posterior proximal forearm
    h. Contusion of the left dorsal hand
    i. Abrasion of the left distal hand
    j. Abrasion of the left posterior distal thumb
    k. Punctate abrasion of the finger web, left 5th and ring fingers
    l. Contusions and punctate abrasions of the right anterior knee
   m. Punctate abrasions [x2], right anterior leg

---

[2] These patterns of punctate abrasions may have been inflicted by Taser prongs

    n. Punctate abrasion, left posterior medial calf
    o. Contusions and punctate abrasions, left anterior knee and proximal leg
    p. Abrasion of the left anteromedial leg
    q. Contusions of the left anterior proximal leg
    r. Several punctate abrasions, left lateral distal leg and ankle
    s. Contusions of the left medial and anterior ankle and dorsal foot
    t. Scabbing abrasions of the left posterior leg
    u. Superficial laceration of the left distal sole of the foot
    v. Abrasion of the left lateral 3rd toe

IV. POST-MORTEM TOXICOLOGY
    a. Cannabinoids detected in femoral and peritoneal blood
        i. Femoral blood delta-9-THC level: 16 ng/mL
        ii. Peritoneal blood delta-9-THC level: 6.3 ng/mL
        iii. Femoral blood delta-9-THC-COOH level: 37 ng/mL
        iv. Peritoneal blood delta-9-THC-COOH level: 33 ng/mL
        v. Femoral blood delta-9-THC-OH level: 4.4 ng/mL
        vi. Peritoneal blood delta-9-THC-OH level: 5.1 ng/mL
    b. Ibuprofen, 8.2 mg/L, detected in femoral blood
    c. Ibuprofen, 10 mg/L, detected in peritoneal blood
    d. Mirtazapine detected in blood, vitreous humor, bile and urine[3]
        i. Femoral blood Mirtazapine level[4]: 0.005 mg/L
        ii. Peritoneal blood Mirtazapine level: 0.006 mg/L
        iii. Vitreous humor Mirtazapine level: 0.003 mg/L
        iv. Bile Mirtazapine level: 0.003 mg/L
        v. Urine Mirtazapine level: 0.006 mg/L
    e. Desmethylmirtazepine detected in blood, vitreous humor, bile and urine
        i. Femoral blood Desmethymirtazapine level : 0.011 mg/L
        ii. Peritoneal blood Desmethylmirtazapine level: Negative
        iii. Vitreous humor Desmethylmirtazapine level: 0.012 mg/L
        iv. Bile Desmethylmirtazapine level: sample volume insufficient for further testing
        v. Urine Desmethylmirtazapine level: 0.059 mg/L
    f. No Ethanol or other common acidic, neutral or basic drugs detected in blood
    g. No Synthetic Cannabinoids detected in femoral blood
    h. No Bath Salts[5] detected in femoral blood

---

[3] Mirtazapine Reporting Limit: 0.05 mg/L
[4] The therapeutic blood levels for Mirtazapine is 0.039 to 0.18 mg/L

    i.  No Ethanol or common acidic, neutral or basic drugs detected in vitreous humor, bile or urine
    j.  Brain tissue Desmethylmirtazapine: Positive

V. PULMONARY EDEMA AND CONGESTION, ACUTE, SEVERE [LUNG WEIGHTS: RIGHT- 830 GRAMS; LEFT- 620 GRAMS]

VI. HYPERTENSIVE CARDIOVASCULAR DISEASE
    a.  Cardiomegaly, 440 grams
    b.  Left ventricular hypertrophy with patchy myofibrillary hypertrophy
    c.  Increased myocardial extracellular interstitial matrix, fibrous, mild, multifocal
    d.  Hypertension, clinical history

VII. LYMPHOCYTIC THYROIDITIS, MULTI-FOCAL, NON-SPECIFIC

VIII. CLINICAL HISTORY OF SCHIZOPHRENIFORM DISORDER, MOOD DISORDER, ANXIETY DISORDER, ATTENTION DEFICIT HYPERACTIVE DISORDER, MILD MENTAL RETARDATION AND ANTISOCIAL PERSONALITY DISORDER
    a.  Clinical history of polysubstance abuse including cannabis, alcohol, cocaine and amphetamine, date back to the age of 11 years old
    b.  Clinical history of Mirtazapine, Sertraline, Aripiprazole and Quetiapine prescriptions with clinical history of poor compliance to noncompliance

---

[5] Cathinone, Methcathinone, Methylone, Mephedrone, MDPV and alpha-PVP

# AUTOPSY REPORT

FILIBERTO VALENCIA

OPINION:

FILIBERTO VALENCIA, a 26-year-old Hispanic male, died as a result of Blunt Force Trauma of the Head, Neck and Trunk.

My visit, inspection and analysis of the scene, as well as the prevailing evidentiary autopsy findings indicate that the deceased suffered sustained physical altercation and contact with other individuals, with repeated and sustained blunt force traumas on the infrastructure of the private residence he intruded upon including but not limited to the walls, floor and toilet. Such a sustained blunt force trauma of the head, neck and trunk may result in compression of the neck and trunk as a component of the physical altercation and contact, and blunt force traumas.

The prevailing terminal forensic scenario, and the prevailing evidentiary autopsy findings in this case appear consistent with a terminal, pre-mortem Mirtazapine Withdrawal/Discontinuation-Induced Hypomania/Mania. The autopsy did not reveal any pharmacological confounders that would account for the onset of the terminal manic syndrome/state. Withdrawal-induced cholinergic overdrive combined with the cholinergic-noradrenergic system are the most investigated pathogenesis for antidepressant withdrawal-induced mania. Upon cholinergic overdrive, the monoaminergic synthetic pathways are activated in order to maintain homeostatic balance. Once the cholinergic overdrive abates, the monoaminergic system down-regulates in tandem. In some patients, the monoaminergic system [serotonergic and adrenergic] fails to downregulate resulting in a state of relative monoaminergic excess, which precipitate hypomania or mania [1,2,3].

REFERENCES:
1. Verma JK, Mohapatra S. Mirtazapine withdrawal-induced mania. J Pharmacol Pharmacother. 2015 Oct-Dec; 6(4):214-215.
2. Narayan V, Haddad PM. Antidepressant discontinuation manic states: a critical review of the literature and suggested diagnostic criteria. J Psychopharmacol. 2011 March;25(3):306-313.
3. MacCall C, Callender J. Mirtazapine withdrawal causing hypomania. Br J Psychiatry. 1999; 175:390.

FILIBERTO VALENCIA

/7774

Bennet I. Omalu, MD, MBA, MPH, CPE, DABP-AP,CP,FP,NP
Forensic Pathologist/Neuropathologist
8/10/16

FILIBERTO VALENCIA

<u>EXTERNAL EXAMINATION</u>:

    I was called out to the scene where the body was located at approximately 7:26 P.M. on January 19, 2016. I arrived at the scene at approximately 8:20 P.M. Upon arrival, the body felt warm to the touch, and rigor mortis was absent in all joints. The autopsy technician, Elise Arata, was en route to obtain and provide me with the post-mortem body thermometer from the autopsy suite. She met me at the Radiology Department, San Joaquin General Hospital and presented me with the thermometer. I inserted the thermometer into the liver, through the right upper abdominal quadrant, and a core body temperature reading of 103°F was obtained at approximately 09:25 P.M. on January 19, 2016.

    The body was removed from the scene at approximately 9:01 P.M. and transported to the Radiology Department of the San Joaquin General Hospital for whole body digital computerized tomography [CT] scans, where the body arrived at approximately 9:20 P.M. The body was removed from the Radiology Department, San Joaquin General Hospital at approximately 10:00 P.M. and transported to the San Joaquin County autopsy suite where it arrived at approximately 10:08 P.M. The body was accompanied under a chain of custody protocol by Deputy Coroner Frank Mehrer.

The full autopsy prosection began at approximately 10:23 P.M. on January 19, 2016. The autopsy was performed as soon as possible, following pronouncement of death, in order to harvest the brain, process it, and freeze samples of the brain in a -70 to -85ºF ultra-low deep freezer within, or close to a two-hour post-mortem interval, for the purposes of advanced neurochemical brain analyses.

The body is removed from a blue body bag, which had not been sealed. The blue body bag had been wrapped with a white bedsheet. Found inside the bag, the body, is covered with a clean gray medical blanket.

At approximately 10:29 P.M., during the autopsy, the autopsy assistant, Elise Arata, placed an identifying coroner nametag around the left wrist, which, in part, was labeled "VALENCIA, FILIBERTO".

The body is that of a well-developed, well-nourished Hispanic male weighing approximately 202 pounds, measuring approximately 71 inches and appearing to be consistent with the stated age of 26 years old.

Separately accompanying the body, in a compact disk, are digital whole body CT scans, which are reviewed and reveal no radiopaque material inside the body. The disk is saved.

The body is clad in the following articles of clothing:

1. Blue-gray T-shirt

2. Black sweat pants.

3. Off-white thermal pants

4. Multicolored underpant

5. White socks

The blue-gray T-shirt had been rumpled and pulled up to the level of the rostral chest and shoulders, shows multifocal tears and is soiled by blood in the upper parts, situated in a patchy random fashion. The thermal pants and the sweat pants had been pulled down to the level of the caudal pelvis. There are white-brown amorphous imprints on the bilateral anterior knee and leg regions of the pants. The socks are dirty, and the sock on the left foot is focally torn in the distal parts.

There are two white metal Taser prongs found attached and adherent to the T-shirt on the left caudal and anterior aspects. The prongs are removed, placed on an autopsy trolley, photographed, documented and handed over to the evidence technician present.

FILIBERTO VALENCIA

The articles of clothing are placed on clean white sheets on an autopsy trolley, photographed, documented and handed over to the evidence technician present.

The hands had been covered with white drawstring bags. Inscribed on the bag on the right hand are the following: "16-2494 sus Rt Filiberto VALENCIO 11-2-89 MW 8241 No GSR done". Inscribed on the bag on the left hand are the following: "16-2494 (sus) L Filiberto VALENCIO 11-2-89 1-19-16 MW 8241 No GSR done". The bags on the hands are removed, photographed, documented and handed over to the evidence technician present.

There is a white metal handcuff on the right wrist; one cuff is closed and bound around the right wrist, while the other cuff is open. Upon request on the detectives present, the handcuff is removed, is photographed, documented and handed over to the evidence technician present.

No article of jewelry is found on the body at autopsy.

Found lying in between the right and left ankles, in the body bag, and entangled around the legs, ankles and feet are intertwined long brown metal Taser wires without any identifiable prong.

Also accompanying the entangled Taser wires is a folded brown-yellow metal spectacle lying in between the legs with intact glasses. Intermingled with the spectacle is a light colored strand resembling a hair strand, which is collected and handed over to the evidence technician present.

The Taser wires and the spectacles are placed on clean white sheets on an autopsy trolley, photographed, documented and handed over to the evidence technician present.

The body is unembalmed and reveals no evidence of decomposition.

The body is warm to touch at the time of autopsy. Rigor mortis, at the time of the autopsy, is moderately developed in the joints of the extremities; and is well-developed in the temporomandibular joints. Purple, non-fixed, marked livor mortis is noted, at the time of autopsy, over the dorsal surfaces of the body except in areas exposed to pressure where it is absent.

There is a nick incision in the right upper abdominal quadrant, which had been encircled with black ink, through which the core body temperature thermometer was inserted into the liver.

The body reveals the following other identifying features:

1.  The lobule of each ear shows an old obliterated piercing.

2.  There are blue-black and multicolored tattoos on the midsagittal thoracic back, right lateral proximal arm, right anterior proximal forearm, right anterior wrist, left lateral arm, left dorsal forearm, left anterior wrist, and the left medial foot, which are photographed and documented.

3.  There are striae albicantes on the bilateral chest, abdomen, back, pelvis and thighs.

4.  There is a 2.5 x 1.0 cm tan nevus on the right upper abdominal quadrant.

5.  There is a 5 x 2 cm tan nevus on the right lateral pelvis.

6.  There is a 2 x 1.7 cm tan nevus on the left anterolateral proximal thigh.

7.  There is a 7.5 x 0.5 cm oblique scar on the left posterolateral buttock.

8.  There are other multiple randomly situated linear, irregular and circular, superficial, non-specific, small scars on the scalp, trunk, upper and lower extremities measuring from 0.2 x 0.1 cm to 4 x 0.8 cm.


The body reveals the following evidence of medical and surgical intervention:

1.  There is an airway tube inserted through the mouth.

2.  There are adhesive defibrillator electrodes on the trunk.

3.  There is an intravenous catheter inserted into the left antecubital fossa and held in place with adhesive tape.

There is patchy and random blood staining of the scalp hair, scalp and face.

The body reveals the following evidence of external trauma:

I.   BLUNT FORCE TRAUMA OF THE HEAD, FACE AND NECK

1.   There is a 2 x 0.5 cm laceration of the right dorsal frontal scalp.

2.   There are 25 x 14 cm blue-purple-red abrasions and contusions of the left forehead, the left temple, the left cheek and the left jaw with soft tissue edema and swelling.

3.   There are sparse bilateral bulbar and palpebral conjunctival petechial hemorrhages, accentuated on the right.

4.   There are extensive blue-purple ecchymoses of the left upper and lower eyelids.

5.   There is a 1.2 x 0.3 cm transverse laceration of the left lateral lower eyelid.

6.   There are 3.5 x 0.9 cm red-purple contusions of the anterior mid-sagittal caudal neck.

FILIBERTO VALENCIA

II.  BLUNT FORCE TRAUMA OF THE TRUNK

1.  There are 5 x 2 cm purple contusions of the left superior shoulder.

2.  There is a 6.5 x 3 cm red-purple abrasion-contusion of the right anterior chest.

3.  There is a 5 x 3 cm red-purple contusion of the right clavicular chest.

4.  There are 14 x 5.5 red-pink contusions of the right anterior caudal chest.

5.  There is a 7 x 5.2 cm blue-purple contusion of the right anterior chest, lateral to the nipple.

6.  There is a 2.5 x 1 cm blue-purple contusion of the left medial anterior chest.

7.  There are 8.5 x 2 cm red-purple contusions of the right anterolateral upper abdominal quadrant.

8.  There is a 12 x 8 cm area of multiple randomly situated punctate and linear red-purple abrasions on the left peri-umbilical abdomen, measuring from 0.2 x 0.1 cm to 0.5 x 0.4 cm.

9.  There are 15 x 7.5 cm purple-red contusions of the right posterior shoulder.

10. There is a 7 x 1 cm scabbing brown abrasion of the right scapular back.

11. There are diffuse faint, purple contusions of the bilateral scapular back.

12. There are multiple, randomly situated purple-red, linear and irregular abrasions and contusions of the bilateral lumbar back and buttocks measuring from 0.8 x 0.4 cm to 12 x 0.1 cm.

FILIBERTO VALENCIA

III. BLUNT FORCE TRAUMA OF THE UPPPER AND LOWER EXTREMITIES

1. There is a 3 x 1 cm area of brown-red abrasions of the left posterior mid arm.

2. There are 26 x 11 cm blue-purple and red abrasions and contusions of the right anterior and medial arm and elbow.

3. There is a 30 x 10 cm area of multiple, linear, red-purple abrasions of the right lateral distal arm, elbow and forearm.

4. There is a 12 x 10 cm area of patterned purple-red abrasions and contusions of the right anterior forearm.

5. There are multiple randomly situated red-purple contusions of the right forearm, wrist and dorsal hand measuring form 1.1 x 1 cm to 2.7 x 2 cm.

6. There is a 5 x 2 cm purple-red contusion of the left posterior mid forearm.

7. There is a 14 x 7 cm area on the left lateral and anterior and posterior proximal forearm showing multiple randomly situated punctate and linear purple-red abrasions.

8. There is a 3.2 x 1.5 cm purple contusion of the left dorsal hand.

9. There is a 0.8 x 0.1 cm red-pink abrasion of the left distal hand.

10. There is a 0.3 x 0.1 cm red-pink abrasion of the left posterior distal thumb.

11. There is one pink punctate abrasion of the finger web between the left 5th finger and left ring finger.

12. There are 9 x 7 cm red-purple contusions and punctate abrasions of the right anterior knee.

FILIBERTO VALENCIA

13. There are two red-pink punctate abrasions of the right anterior leg.

14. There is one punctate red-pink abrasion of the left posterior medial calf.

15. There are 13 x 6 cm red-purple contusions and punctate abrasions of the left anterior knee and proximal leg.

16. There is a 9 x 0.5 cm red-purple abrasion of the left anteromedial leg.

17. There are 3.3 x 3 cm blue-red contusions of the left anterior proximal leg.

18. There are several red-purple punctate abrasions of the left lateral distal leg and ankle.

19. There are 15 x 3 cm purple-blue contusions of the left medial and anterior ankle and dorsal foot.

20. There are 9 x 5 cm and 3 x 1 cm areas of brown scabbing abrasions of the left posterior leg.

21. There is a 3 x 0.1 cm superficial laceration of the left distal sole of the foot.

22. There is a 0.5 x 0.4 cm red-pink abrasion of the left lateral 3rd toe.

The body reveals the following evidence of internal trauma:

1. There is a 0.9 x 0.5 x 0.3 cm depressed fracture of the right frontal bone underneath the laceration of the frontal scalp, which has been described above.

2. There are patchy subcutaneous and subgaleal hemorrhages of the right frontal, left frontal and right parietal scalp accompanied by patchy peri-mysial and intra-mysial soft tissue hemorrhages in the left temporalis muscle.

3. There are focal intra-mysial soft tissue hemorrhages in the right sternocleidomastoid muscle and left sternohyoid muscle.

4. There are focal soft tissue hemorrhages on the right anterior caudal chest.

5. There are multifocal, sparse to patchy epicardial petechial hemorrhages accentuated over the inferior oblique and posterior aspects of the heart.

6. There are bilateral patchy sub-pleural petechial hemorrhages of the bilateral pulmonary visceral pleurae.

7. There is approximately 750 cc of liquid blood in the peritoneal cavity[6].

8. There are AAST grade III contusions and lacerations of the medial right and the left lobes of the liver extending to the intra-hepatic inferior vena cava, which shows circumferential soft tissue hemorrhages and focal vascular injury with a transmural laceration measuring less than 0.7 in maximal dimension.

9. There are posterior peri-hepatic soft tissue hemorrhages extending to the right adrenal gland, porta hepatis of the liver and the head and tail of the pancreas.

10. Systematic posterior dissection of the bilateral posterior neck and trunk is made extending from the scalp to the natal cleft and buttocks and to the depths of the muscles and soft tissues, and reveals bilateral multiple randomly situated soft tissue hemorrhages accentuated over the bilateral scapular regions, including multifocal and sparse posterior paravertebral hemorrhages in the cervical, thoracic and lumbosacral spine, with focal sparse spinal ligamentous hemorrhages.

The head and face are symmetrical and reveal evidence of trauma, which has been described above. The scalp hair is brown-black and of a short length measuring approximately 3 cm in maximal length. The eyeballs and orbits are intact. The conjunctivae reveal hemorrhages, which have been described above and are congested. The corneae and sclerae are otherwise smooth and clear. The pupils are central, equal and symmetrical and measure 0.6 cm in diameter. The ires are brown. The pinnae and external auditory meati are intact. The skeleton of the nose is intact. There is no foreign material in the nostrils or oral cavity. The maxillary and mandibular gums are not hypertrophied. The maxillary and mandibular teeth are natural and are in a

---

[6] Representative samples of the intra-peritoneal blood are taken and saved

FILIBERTO VALENCIA

good state of dental repair. The lips, oral mucosa and tongue reveal no evidence of trauma. The frenulae of the lips are intact.

A brown-black short moustache and beard are present measuring approximately 0.5 cm in maximal length.

The neck is symmetrical and reveals evidence of trauma, which has been described above. There is no increased mobility or crepitus of the neck upon manipulation.

The shoulders and chest are symmetrical and reveal evidence of trauma, which has been described above.

The abdomen is bulging, reveals evidence of trauma, which has been described above, without palpable organomegaly.

The back is symmetrical and reveals evidence of trauma, which has been described above.

The penis and scrotum are intact. The testes are palpated within the scrotum and appear unremarkable. The ano-rectum reveals no evidence of trauma, and contains no hemorrhage or foreign material.

The extremities are symmetrical and reveal evidence of trauma, which has been described above. The fingernails are short and regular. There are no broken fingernails and there are no foreign materials beneath the fingernails. The toenails are short and regular. There is no pitting ankle or leg edema. The palms and soles are otherwise smooth.

FILIBERTO VALENCIA

At this time, a cut down incision is made in the right femoral triangle to gain access to the right femoral vein. Representative samples of right femoral venous blood are obtained and saved.

Before the body was washed and cleaned, the following additional evidence are obtained:

1.   Samples of scalp hair

2.   Samples of pubic hair

3.   All fingernail cuttings

The additional evidence is handed over to the evidence technician present.

<u>INTERNAL EXAMINATION</u>:

<u>BODY CAVITIES</u>:

The body is opened by a "Y" shaped incision. The abdominal panniculus measures 7 cm in thickness, at the level of the umbilicus. The muscles of the chest and abdominal wall appear normal in color and consistency. There are no fractures of the ribs, sternum or spine. The domes of the diaphragm are normally positioned. The parietal and visceral pleurae are smooth and glistening. The pleural cavities are moist. The peritoneum is smooth and thin. The peritoneal cavity reveals evidence of trauma, which has been described above. The liver and spleen do not extend below the costal margins. The bladder lies below the level of the pubic symphysis. The organs of the pleural and peritoneal cavities are in the normal anatomic positions in relation to one another in-situ. The mesentery and omentum are intact. The pulmonary artery is opened in situ and no thrombo-emboli are seen.

At this time representative samples of urine, bile and vitreous humor are taken and saved.

<u>CARDIOVASCULAR SYSTEM</u>:

The heart weighs 440 grams. The pericardium is thin, smooth, and contains no abnormal fluid. The epicardial surface is smooth and reveals epicardial petechial hemorrhages, which have been described above. There is a moderate amount of epicardial fat. The external configuration of the heart is

within normal limits. The walls of the left ventricle are hypertrophied and the left ventricular cavity is compressed. The atrioventricular chambers are not dilated. The endocardium and valve leaflets are smooth, transparent, and exhibit no thrombi, vegetations, or significant fibrosis. The circumferences of the valves are as follows: tricuspid 12.9 cm; pulmonic 7.1 cm; mitral 9.9 cm; and aortic 6.7 cm. The trabeculae carneae and papillary muscles are hypertrophied. The chordae tendineae are non-sclerotic. The wall of the right ventricle measures 0.4 cm in greatest thickness. The wall of the left ventricle measures 2.2 cm in greatest thickness. The interventricular septum measures 2.3 cm in greatest thickness. The coronary arteries exhibit a normal anatomic distribution with a right predominance. The right and left coronary ostia are patent. Multiple cut sections of the coronary arteries at 1.0 cm intervals reveal no significant degree of atherosclerosis or other anomalies. The myocardium is firm, red-brown and homogeneous.

The aorta is lined by a tan-yellow tunica intima and reveals focal atheromatous streaking with no ulceration or calcification. The internal carotid arteries are patent. The bifurcation of the common iliac arteries is patent. The major veins show no thrombo-emboli. The superior vena cava is intact. The inferior vena cava reveals focal vascular injury in the intra-hepatic segment, which has been described above.

## RESPIRATORY SYSTEM:

The right lung weighs 830 grams and the left lung weighs 620 grams. The visceral pleurae reveal petechial hemorrhages, which have been described above. The trachea shows a smooth congested red-tan mucosa and contains minimal amounts of frothy fluid. The lungs are distended and are variegated pink-red to gray-purple. The lung parenchyma is of spongy consistency and mottled with a moderate amount of anthracotic pigment. Multiple cut sections exhibit a variegated red-pink to gray-purple, non-crepitant, parenchyma without consolidations or nodules. Several small sub-pleural emphysematous bullae are noted. The lung parenchyma is severely congested and edematous. No purulent exudate is expressed from the parenchyma on compression.

The extra and intrapulmonary bronchi are opened longitudinally, are patent, congested and contain small amounts of frothy fluid. The pulmonary arteries and veins exhibit no significant pathological changes. There is no peri-hilar or mediastinal lymphadenopathy.

## HEPATOBILIARY SYSTEM:

The liver weighs 1820 grams and reveals evidence of trauma, which has been described above. The capsule of Glisson is otherwise glistening. The external surfaces are brown-red and glistening. The borders are sharp. The parenchyma is soft, brown-red and shows a lobular tissue architecture with

evidence of trauma, which has been described above without tumors or cirrhosis.

The gallbladder reveals thin walls and a velvety mucosa. It contains approximately 5 cc of yellow-green bile without gallstones. The intra and extrahepatic biliary ducts are patent. The hepatic and portal veins and the hepatic artery are unremarkable.

HEMOLYMPHATIC SYSTEM:

The spleen weighs 40 grams and is of a normal consistency. The capsule is glistening and smooth. The corpuscles of Malpighii are blurred due to congestion. The parenchyma is homogeneous. There is no central or peripheral lymphadenopathy.

An involuted thymus is found in the superior mediastinum, is infiltrated by adipose tissue and weighs approximately 40 grams. The parenchyma is tan-brown and reveals no hemorrhages.

GASTROINTESTINAL SYSTEM:

The esophagus contains minimal amounts of regurgitated gastric contents without focal mucosal lesions. The stomach contains approximately 700 cc of a recently eaten and identifiable vegetable meal without drug-residue, pills or capsules. Representative samples of the gastric contents are taken, photographed, saved and frozen. The mucosa of the stomach reveals the normal rugal folds without peptic or stress ulcerations. The duodenum,

jejunum, ileum and colon reveal normal serosal surfaces without significant pathologic changes. The vermiform appendix is identified and shows no gross inflammation. The right retroperitoneum reveals evidence of trauma, which has been described above.

ENDOCRINE SYSTEM:

The pancreas weighs 240 grams and reveals focal peri-pancreatic hemorrhages, which have been described above. The parenchyma is gray-pink and homogeneous, and shows a lobular, septated parenchyma without hemorrhages or necrosis.

The adrenal glands reveal the normal shapes and sizes. Multiple cut sections reveal thin yellow-tan cortices and brown-tan medullae without hyperplasia, hemorrhages or adenomata.

The thyroid gland weighs 24 grams. The parenchyma is red-brown and homogenous.

UROGENITAL SYSTEM:

The kidneys are in the normal anatomic positions and reveal no anomalies. The right kidney weighs 150 grams and the left kidney weighs 160 grams. The capsular surfaces are smooth and glistening. The capsules strip with ease and reveal smooth brown surfaces. The cortices are not sclerotic, are brown-red and homogeneous. The medullary pyramids are intact. The cortico-medullary junctions are well-defined. The renal papillae show no hemorrhage

or necrosis.  The calyceal and collecting systems are unremarkable.  The renal arteries and veins are unremarkable.

The ureters are not dilated or obstructed.

The bladder contains approximately 175 cc of clear amber yellow urine and reveals a smooth, tan-pink mucosa with no focal or diffuse lesions. The ureteral orifices are patent.

The internal genitalia, including the prostate, vas deferens and epididymis, appear unremarkable.

MUSCULOSKELETAL SYSTEM:

There are no musculoskeletal anomalies. There is evidence of musculoskeletal trauma, which has been described above. The muscles are well-developed and of the normal color and consistency without sarcopenia. The spinal column and vertebral bodies reveal no fractures or gross degenerative changes. The sternum, ribs, and spine exhibit a normal bone density. The bone marrow reveals no gross lesions.

NECK:

The soft tissues of the neck and the anterior strap muscles reveal focal soft tissue hemorrhages, which have been described above. The thyroid and cricoid cartilages, larynx, and hyoid bone show no fractures.  The larynx reveals a white-pink, congested, smooth mucosa and contains no frothy fluid. The epiglottis and vocal cords are red-pink, intact and smooth. The neck has

been examined at the conclusion of the autopsy, after the blood has drained and the tissues are dry.

CENTRAL NERVOUS SYSTEM:

The scalp is reflected from mastoid process to mastoid process and reveals evidence of trauma, which has been described above. The calvarium reveals a focal fracture, which has been described above. Upon removal of the calvarium, there are no epidural or subdural hemorrhages. The dura mater is white, smooth, and does not exhibit any xanthochromia or membranes. The leptomeninges are smooth and glistening.

The brain is harvested and the fresh brain is processed immediately upon harvest.

The weight of the fresh brain is 1660 grams. The anthropometric dimensions of the brain appear consistent with a well-developed adult brain. The surfaces of the brain reveal no gross malformations. The cerebral and cerebellar hemispheres appear symmetrical and reveal a pattern of gyral and sulcal convolutions that appears within normal limits. There is diffuse symmetrical expansion of gyri and compression of sulci, accompanied by bilateral, symmetrical grooving of the unci and cerebellar tonsils without necrosis. The subarachnoidal cisterns are symmetrically compressed and contain no extravasate or exudate. The vessels of the Circle of Willis and the Basilar-Vertebral arteries are identified and reveal no anomalies,

atherosclerosis or aneurysms. The cranial nerves are identified and appear intact, without atrophy or tumor. There is no olfactory aplasia. There are no optic nerve subdural hemorrhages.

A transverse axial section is made at the level of the posterior commissure separating the brainstem and cerebellum from the diencephalon (thalami) and telencephalon (cerebral hemispheres). A mid-sagittal section is made from the genu of the corpus callosum to the splenium of the corpus callosum, across the body of the corpus callosum, across the septum pellucidum and the anterior and posterior commissures to separate the right and left cerebral hemispheres. The right cerebral hemisphere is fixed in formalin in a brain bucket together with the dura mater and pituitary gland.

Multiple serial coronal sections of the left cerebral hemisphere are made at 1 – 2 cm intervals from the left frontal pole to the occipital pole. The neocortical gray ribbon is intact and reveals no gross cortical dysplasia, contusional hemorrhage or necrosis. The gray-white matter demarcation is distinct. The centrum semiovale and the periventricular white matter reveal central congestion and edema without cystic necrosis or gliding contusional hemorrhages. There is no periventricular leukomalacia.

The ventricles are symmetrically compressed and contain no intraventricular hemorrhage or exudate. The ependymal lining is smooth and glistening. There is no evidence of intraventricular obstruction. The cerebral

aqueduct of Sylvius appears patent. The foramen of Magendie and foramina of Lushka are patent. The choroid plexuses are congested. The septum pellucidum, the lamina terminalis, superior and inferior medullary vela appear intact. The genu, body and splenium of the corpus callosum are intact and reveal no focal hemorrhages or necrosis.

The claustrum, caudate nucleus, putamen, globus pallidus, thalamus and subthalamic nucleus reveal no atrophy, hemorrhage or necrosis. The internal, external and extreme capsule reveal no infarcts or necrosis. The anterior perforated substance shows no necrosis or hemorrhage. The amygdala and the piriform cortex reveal no atrophy or necrosis. The hippocampus and parahippocampal gyrus reveal no gross dysplasia, anomalies, hemorrhage, necrosis or atrophy. The mamillary body and hypothalamus show no hemorrhage, xanthochromia, necrosis or atrophy.

The coronal sections are sandwich-wrapped separately in aluminum foils and placed on a white metal tissue specimen tray

The brain stem is separated from the cerebellum at the cerebellar peduncles and multiple transverse sections of the caudal and rostral midbrain, pons and medulla oblongata are made and reveal no necrosis or hemorrhage. There are no dorsolateral hemorrhages or necrosis. There is no hemorrhagic collicular necrosis. The cerebral peduncles show no necrosis or atrophy. The substantia nigra and locus ceruleus are adequately pigmented for age and

show no necrosis or hemorrhage. The midbrain tegmentum reveals no necrosis or hemorrhage, as well as the pontine and medullary tegmentum. The basis pontis shows no demyelination, central necrosis or hemorrhage. The medullary pyramids reveal no atrophy, necrosis or infarct.

Representative transverse sections of the midbrain, pons and medulla oblongata are sandwich-wrapped in aluminum foils and placed on a white metal tissue specimen tray with the coronal sections of the left cerebral hemisphere.

The cerebellar hemispheres are symmetrical and reveal no malformation or folial atrophy. The primary fissure and the posterolateral fissures are identified as well as the flocculonodular, anterior and posterior lobes. The vermis and paravermal zones are neither cystic nor atrophic. Multiple sagittal sections of the cerebellum are made and reveal no gross cortical dysplasia or necrosis. The cerebellar white matter shows no necrosis or hemorrhage. The dentate nucleus and other deep cerebellar nuclei appear unremarkable. The inferior (restiform body), middle (brachium pontis) and the superior (brachium conjunctivum) cerebellar peduncles reveal no hemorrhages or necrosis.

Representative sagittal sections of the cerebellum are sandwich-wrapped in aluminum foils and placed on a white metal tissue specimen tray with sections of the left cerebral hemisphere and brainstem.

The tissue specimen tray containing the brain sections is placed in the routine 35-40°F autopsy refrigerator at approximately 11:15 P.M. on January 19, 2016. The processed brain was then transported, in the tissue specimen tray, under chain of custody protocol, by Deputy Coroner Frank Mehrer to the Department of Pathology, University of California, Davis, and placed into an ultra-low deep freezer [-70 to -85°F] at approximately 3:00 A.M. on January 20, 2016.

The residual sections of the brainstem and cerebellum are fixed in formalin together with the right cerebral hemisphere, dura mater and pituitary gland, to be examined on a later date [see forensic neuropathology report-attached]

The frozen brain, still in the tissue specimen tray, was removed from the Department of Pathology, University of California, Davis on January 25, 2016 by Deputy Coroner Frank Mehrer and transported to the San Joaquin County autopsy suite. The frozen sandwich-wrapped sections were then transferred by Bennet Omalu, M.D., in the autopsy suite into an insulated styrofoam shipping box containing dry ice. The frozen wraps were not opened. The frozen brain sections were then shipped in the shipping box, under chain of custody protocol, by overnight delivery on January 25, 2016, at approximately 3:00 P.M. by FedEx, tracking number: 8081-7134-6580, to Dr. Deborah Mash, Department of Neurology and Molecular and Cellular Pharmacology, Miller

School of Medicine at the University of Miami, 1951 NW 7th Avenue, Suite 240, Miami, FL 33136. The scheduled delivery date was January 26, 2016. Dr. Mash's laboratory will perform advanced neurochemical analysis of the brain [see forensic neuropathology report- attached].

The pituitary gland is found in the sella turcica, and both appear intact.

The dura covering the vault and the base of the cranium is removed and reveals an intact base of the skull without fractures.

The dens, atlanto-axial joint, atlanto-occipital joint and cervical intervertebral joints are intact without fractures or subluxation. The cervical medulla appears intact without parenchymal or meningeal hemorrhages or exudates.

FILIBERTO VALENCIA

## MICROSCOPIC EXAMINATION

Microscopic examination of submitted tissue histology sections reveals histo-morphologic findings that are consistent with the gross findings and final pathologic diagnoses, which have been stated above. The tissue histology sections have been archived as part of the case records and will be made available upon request.

[Twenty-one Hematoxylin and Eosin Stained Tissue Slides]


Tissue histologic sections are submitted in tissue cassettes as follows, and submitted for tissue histologic analyses:

| Cassette No. | Tissue Section |
| --- | --- |
| 1. | Heart, right ventricle |
| 2. | Heart, left ventricle |
| 3. | Heart, interventricular septum |
| 4. | Heart, sinoatrial node |
| 5. | Heart, atrioventricular node |
| 6. | Aorta; trachea |
| 7. | Coronary arteries |
| 8. | Lung, right, upper lobe |
| 9. | Lung, right, middle lobe |
| 10. | Lung, right, lower lobe |
| 11. | Lung, left, upper lobe |
| 12. | Lung, left, lower lobe |
| 13. | Liver, right and left lobes |
| 14. | Spleen; thymus |
| 15. | Stomach |
| 16. | Small bowel |
| 17. | Large bowel |
| 18. | Pancreas |
| 19. | Kidney, right; adrenal gland, right |
| 20. | Kidney, left; adrenal gland, left |

FILIBERTO VALENCIA

| 21. | Urinary bladder; prostate gland |
| 22. | Psoas muscle, right and left |
| 23. | Diaphragm, right and left |
| 24. | Larynx |
| 25. | Tongue |
| 26. | Thyroid gland, right and left |

CARDIOVASCULAR SYSTEM:
The right ventricle shows very focal and sparse interstitial infiltration by lymphocytes with focal wavy fibers and patchy myofiber hypertrophy with nucleomegaly. The left ventricle and interventricular septum show diffuse myofibrillary hypertrophy with nucleomegaly. Patchy interstitial congestion is noted. There is mild, multifocal fibrous expansion of the extracellular interstitial matrix. The sinoatrial and atrioventricular nodes show no inflammation. The coronary arteries show no significant atherosclerosis and no inflammation. The aorta shows no inflammation, degeneration or any significant atherosclerosis.

RESPIRATORY SYSTEM:
The larynx shows sparse to patchy mononuclear leukocytic infiltration of the mucosa and sub-mucosa. The trachea shows interstitial congestion with diffuse hypertrophy of the mucosal basement membrane. Very sparse mucosal and sub-mucosal mononuclear leukocytic infiltration is noted. The lungs show diffuse congestion and edema with intra-alveolar extravasation of erythrocytes. The edema fluid has been cleared by the tissue processing. There is no bronchopneumonia. Few bronchioles show sparse submucosal mononuclear leukocytic infiltration. The diaphragm is congested and shows no inflammation. Scattered hyper-eosinophilic fibers are noted.

GASTROINTESTINAL SYSTEM AND LIVER:
The liver shows focal contusional hemorrhages with very focal and sparse macro-vesicular steatosis. The portal triads show very sparse and focal chronic inflammation. The stomach shows no acute gastritis. The small and large bowel show no acute or chronic inflammatory changes. The tongue appears unremarkable.

SPLEEN AND THYMUS:
The spleen shows no acute splenitis. The thymus is markedly involuted and shows residual Hassal's corpuscles.

FILIBERTO VALENCIA

ENDOCRINE SYSTEM:
The pancreas shows no atrophy, acute or chronic inflammation. The adrenal glands are congested and show no cortico-medullary hemorrhages. The thyroid gland shows multifocal infiltration by lymphocytes with focal lymphoid follicle formation, with germinal centers.

UROGENITAL SYSTEM:
The kidneys show acute congestion without glomerulosclerosis or interstitial nephritis. The bladder shows no inflammation. The prostate gland shows no inflammation or glandular hyperplasia.

MUSCULOSKELETAL SYSTEM:
The psoas muscles show congestion with no inflammation or myofibrillary atrophy. Scattered hyper-eosinophilic fibers are noted.

FORENSIC PHOTOGRAPHY

Digital gross images of the body and autopsy prosection were taken by Dr. Omalu and the autopsy room assistant(s) and will be saved in digital format as part of the digital case file. The images will be made available upon request according to the governing statutes and standard operating procedures.

FILIBERTO VALENCIA

<u>OTHER SAMPLES OBTAINED</u>

1.  Vitreous humor: two red-top tubes, each approximately 2.5 cc

2.  Femoral blood:

    a.  Nine gray-top tubes, each approximately 4 cc

    b.  Three purple-top tubes, each approximately 8 cc

3.  Peritoneal blood:

    a.  Four gray-top tubes, each approximately 4 cc

4.  Plasma from centrifuged femoral blood: one clear-top tube, approximately 3 cc

5.  Bile from gallbladder: two red-top tubes, each approximately 2.5 cc

6.  Urine from urinary bladder: two red-top tubes, each approximately 3 cc

7.  Gastric contents, approximately 200 cc, frozen

8.  Blood spots on a DNA card


The DNA card is handed over to the evidence technician present.

MEDICAL RECORDS REVIEW
I asked Deputy Coroner Frank Mehrer to provide me with the medical records on the deceased, and he provided me with a compact disk, which he received from the City of Stockton Police Department, containing five pdf files as follows:
1.   PD@ci.stockton.ca.us_20160302_120353
2.   PD@ci.stockton.ca.us_20160302_120521
3.   PD@ci.stockton.ca.us_20160302_120839
4.   PD@ci.stockton.ca.us_20160302_121240
5.   PD@ci.stockton.ca.us_20160302_121435

PD@ci.stockton.ca.us_20160302_120353
This file contains five pages of administrative documents including a search warrant and affidavit, a declaration and an invoice letter. The declaration and invoice letter came from the San Joaquin County Behavioral Health Services, 1212 North California Street, Stockton, CA 95202, dated February 26, 2016.

PD@ci.stockton.ca.us_20160302_120521
This file contains one hundred and twelve pages of medical records from the San Joaquin County Behavioral Health Services belonging to the deceased. Filiberto Valencia had apparently been under the care of the forensic court program prop 63 since August 2011 until July 2015 for Schizophreniform Disorder and was intermittently under institutional care and supervision. In a court appearance on July 31, 2015 it was stated that he had been out of contact with mental health for the month of July and attended his last scheduled psychiatric appointment in June. He was preparing to move out of county and was aware that he needed to address court and probation requirements before leaving. His whereabouts were unknown at this time. He was judged to have an unsuccessful completion of the program.

In a court competency training program, he was assessed on August 31, 2012 as follows: "Mr. Valencia's performance over the month of August was variable. Although his attendance and participation were consistent throughout the month, his conduct varied from very good to poor. Mr. Valencia has been

volatile throughout the month and he constantly required redirection to stay on task. Although Mr. Valencia did not display any mental health symptoms, he was routinely defiant in his interactions with the court competency training staff.

A similar assessment on July 27, 2012 reported that his conduct was either mixed or poor for the month and he required almost constant redirection. His levels of participation showed steady decrease. He constantly disrupted class by making irrelevant comments or talking to his peers. A urine drug screen performed on July 23, 2012 was positive for alcohol.

His other assessments in prior months were reasonably good and stable, however he continued to stray off topic and interact with his peers in class. He continued to improve slowly.

An annual report from the San Joaquin County Conditional Release Program [CONREP] dated July 17, 2012 states that he was found incompetent to stand trial for PC 459 First Degree Residential Burglary, which occurred on May 16, 2011. He was court-ordered into the San Joaquin County Behavioral/ Mental Health Services' [SJCBHS] Conditional Release Program on August 23, 2011. He had a prior contact with SJCBHS on October 4, 2010 for WIC 5150 and received inpatient treatment for paranoid ideation, racing thoughts and decreased sleep. He was positive for THC at the time of admission. Additional encounters in May – July 2011 proved similar symptoms. He had a history of contact with law enforcement, which began at the age of 14. He was charged with a misdemeanor at the age of 19 and was placed on a three-year probation. In this report, his DSM-IV-TR Diagnoses were listed as follows:

Axis I      (P) Schizophreniform D/O by history
            (S) Cannabis Abuse
Axis II     Borderline Intellectual Functioning
Axis III    None or Unknown
Axis IV     H: Problems related to interaction with legal system/crime
Axis V      Current GAF: 55
            Highest GAF Past Year: 55

His medications were listed as follows: Risperdal, 2 mg, per day; Benadryl, 50 mg, at bedtime.

He was assessed to have a history of poor impulse control and poor judgment. His risk factor toward re-offense was judged to be high without continued support and supervision from the CONREP program. It was recommended that he remained on outpatient status with CONREP for court competency, training, mental health treatment and supervision.

In another quarterly report from CONREP dated May 14, 2012, Filiberto Valencia's DSM-IV-TR Diagnoses were listed as follows:

Axis I       (P) Attention Deficit Hyperactive Disorder
             (S) Polysubstance Dependence
Axis II      Mental Retardation, Mild
Axis III     Obesity, Hypertension
Axis IV      H: Problems related to interaction with legal system/crime
Axis V       Current GAF: 55
             Highest GAF Past Year: 55

In a letter addressed to the court dated September 5, 2012, it was reported that Filiberto Valencia was in violation of the terms and conditions of CONREP and was AWOL from both group and psychiatric appointments on September 4, 2012. When he later contacted CONREP later that afternoon, he was directed to report for a mandatory drug screen, and he attempted to alter his drug screen results by using his cousin's urine. He believed his urine would be positive for alcohol since he drank earlier in the day. He had a prior violation of alcohol consumption on July 23, 2012. It was recommended that he be transferred to the San Joaquin County Jail until an appropriate plan could be formulated for him.

PD@ci.stockton.ca.us_20160302_120839
This file contains three pages of completed forms of Hearing Minutes-P.C. 1368/1369 from the Superior Court of California, County of San Joaquin, dated September 20, 2012, April 24, 2012 and January 24, 2012 respectively.

PD@ci.stockton.ca.us_20160302_121240

This file contains seventy-eight pages of documents and medical records from the San Joaquin County Behavioral Health Services. On July 17, 2013 Filiberto Valencia was referred to SJCBHS by law enforcement. He was allegedly arguing with his family who thought that he was aggressive. He stated that he was at the center to get his drugs. Apparently he had been off his medications. At another service date on August 2, 2013, when he was referred to CCRT by a crisis clinician for missing a scheduled appointment on July 18, 2013, Filiberto Valencia stated that he did not want to take his medications and smoked marijuana every day. His father complained of his increased fighting with other people and family members.

On another visit on March 20, 2014, the deceased requested to get back on his medication. He said he blacked out recently and reported that he did not know what he was doing. He also reported a history of audiovisual hallucinations and felt paranoid with a decrease in sleep. In the March 24, 2014 visit notes, it was stated that Filiberto Valencia used weed since age 11 and stopped about a month prior. He had not used cocaine or methamphetamine for about 3 years. He drank alcohol, but the frequency was not stated. In the April 11, 2014 visit notes his diagnoses were stated to be Depressive Disorder, NOS, vs Mood Disorder, NOS, Anxiety Disorder, NOS, and History of Antisocial Personality Disorder. His prescriptions were Mirtazapine and Sertraline. There were other visits on April 25, 2014, May 9, 2014 and May 23, 2014.

In the May 23, 2014 visit, the deceased was referred for the forensics program from the courts after being arrested for an unknown charge. He could not recall what the arrest was for since he blacked out, but believed it was for assault. He did not know what his medications were but the records showed that he took Mirtazapine and Sertraline. He complained of struggling with anxiety when around people, and experienced anger and panic attacks daily. He described his panic attacks as "I can be happy then snap out and be mad for no reason". He appeared to struggle with mood instability. He stated that he used to hear voices but the medications had caused them to go away. He said he felt depressed all the time, felt isolated, hardly ate, or would eat excessively, slept poorly and had suicidal ideation and poor motivation. In the past he has had

elevated mood, including exercising, increased goals, feeling excited and would do more things, with poor sleep, normal appetite, high motivation, reckless and dangerous behaviors [fast driving, drug use], would be more social and talkative. His elevated mood lasted only a few days.

His other visits were May 30, 2014, June 18, 2014, June 26, 2014, July 10, 2014, July 17, 2014, July 30, 2014, August 15, 2014, August 25, 2015, September 3, 2014, September 3, 2014, September 5, 2014, September 22, 2014, September 24, 2014, September 29, 2014, October 15, 2014, October 27, 2014, November 7, 2014, December 1, 2014, December 2, 2014, December 3, 2014, December 8, 2014 and December 11, 2014.

In the June 18, 2014 visit, he complained that he ran out of his medications about a week ago. He felt comfortable when he took his medications but when he did not, he felt grouchy, could not sleep and could not be around people, struggled with anger, episodes of irritation/anxiety, found it difficult to tolerate people and would isolate himself, suffered mood instability, lacked enjoyment of his activities, felt depressed all the time and slept poorly. His Axis I diagnosis at this visit was Mood Disorder, NOS and Cannabis Abuse. Ways he could manager his anger were discussed with him in his visits in July, August and September.

In his December 3 and 8, 2014 visits Filiberto Valencia complained of difficulties in managing feelings of frustration and anger and wanted to hurt others for no reason. On December 11, 2014, in addition to these complaints he also complained of auditory hallucinations, depression, anxiety and paranoia.


PD@ci.stockton.ca.us_20160302_121435
This file contains sixty-six pages of documents and medical records from the San Joaquin County Behavioral Health Services. Filiberto Valencia's family was seen at by the health services on January 9, 2015 and during this visit the mother and two sisters told the case manager that Filiberto had stopped taking his medications three days prior and that he heard voices and was paranoid

that people were following him. He had packed his bags with an intention to move to Bakersfield, he smoked marijuana on an hourly basis, was not violent but had an aggressive tone. He was visited at home by the staff to assess the family's concern. He was seen again on January 26, 2015 and at this time his prescriptions included Abilify, Mirtazapine and Sertraline. He was seen again on February 3 and 4, 2015. He was enrolled into the Recovery House, and the staff complained that he was having urges to leave, felt anxious and paranoid that people were talking about him. He complained of increased symptoms of paranoia since entering treatment, significant mood swings, wanting to hurt others without any specific trigger, depression and auditory hallucinations. He stated that he did not believe that the drugs were helping him, and he wanted to leave treatment to live with his sister. He could not move back home to live with his father since he used marijuana to cope with his father's abuse of his adult sister.

He was seen on February 5, 2015 when he complained that the Abilify was not helping him and made him anxious. The Abilify was discontinued and Quetiapine was begun. He asked for marijuana pills. On February 6, 2015 he was seen again, when he reported that he was AWOL from the Recovery House due to being paranoid and anxious. He was seen again on February 10, 2015 when he reported that he left the Recovery House. He entered the program on January 27, 2015 and walked away on February 4, 2015. He was spoken to by phone on February 19, 2015, February 22, 2015 and February 23, 2015. At this time, he was not receiving any substance abuse treatment. The case manager reached out to him to re-engage him in the substance abuse treatment.

He was seen again on February 26, 2015 and March 3, 2015. During the March 19, 2015 visit, it was noted that he did not contact his case manager and had missed the last two groups at mental health. Other encounter dates included March 20, 2015, March 23, 2015, March 24, 2015, March 27, 2015, March 31, 2015, April 9, 2015, April 14, 2015, April 15, 2015, April 17, 2015, April 28, 2015, May 5, 2016, May 12, 2015, May 21, 2015, May 22, 2015, May 26, 2015, June 16, 2015, June 22, 2015, August 21, 2015, September 29, 2015, November 23, 2015, December 7, 2015, December 11, 2015, December

FILIBERTO VALENCIA

23, 2015, January 7, 2015 and January 11, 2016. His medications on June 16, 2016 included Mirtazapine, Quetiapine and Sertraline. Filiberto Valencia was supposed to move to Bakersfield and wanted transfer of his case to that area. This had been discussed with client's previous case managers. On the December 11, 2015 visit, he reported to have stopped taking his medications about 2 months prior. On January 11, 2016 his prescription was only Mirtazapine. His next visit was January 18, 2016 and he reported he was not sleeping well and had paranoid ideations. He was off his medications for three days. He had not slept well for over one month and felt paranoid. He had thoughts to beat up his dad when they argued. He tried to go back to Bakersfield crisis center and he was turned away and told that he needed to get back on his medications. He suffered poor concentration.

OFFICE OF

# SHERIFF-CORONER

## COUNTY OF SAN JOAQUIN

7000 Michael N. Canlis Blvd.
French Camp, California 95231-9781



**Steve Moore**
Sheriff-Coroner
Public Administrator

# FORENSIC NEUROPATHOLOGY REPORT

NAME: FILIBERTO VALENCIA

AUTOPSY NO.: A16-0148

DATE OF BIRTH: November 2, 1989

AGE: 26 years old

SEX: Male

RACE: Hispanic

DATE OF DEATH: January 19, 2016

CONFIRMED DEAD: 06:50 P.M.

PLACE OF DEATH:     At a residence
3133 Nicole Street
Stockton, CA 95205

The formalin-fixed right cerebral hemisphere and residual sections of the brainstem and cerebellum are examined on June 8, 2016 beginning at approximately 5:00 P.M. and ending at approximately 5:45 P.M.

Bennet I. Omalu, MD, MBA, MPH, CPE, DABP-AP,CP,FP,NP

Forensic Pathologist/Neuropathologist, Prosector

Etta Johnson and Alejandra Gamboa, Autopsy Room Assistants

## FINAL NEUROPATHOLOGICAL DIAGNOSES:

I.  CONGESTIVE BRAIN SWELLING, GLOBAL, WITH DIFFUSE CEREBRAL
    PARENCHYMAL EDEMA, ACUTE, MIXED CYTOTOXIC-VASOGENIC, BRAIN
    WEIGHT:  1660 GRAMS
    a.  Few scattered pyknotic amphophilic to eosinophilic neurons, neocortex
        and Sommer's sector, cerebellum
    b.  Mild subependymal and subventricular astrogliosis with intermittent
        denudation of the ependymal cells
    c.  Rostral cervical spinal medullary neuropil edema and congestion
    d.  See autopsy narrative- attached

II.  FOCAL LYMPHOCYTIC MYELITIS, ROSTRAL CERVICAL SPINE-MEDULLA
     OBLONGATA JUNCTION
     a.  Marked infiltration of several penetrating gray and white matter blood
         vessels by lymphocytes
     b.  Extension into the surrounding neuropil of rostral cervical spinal cord
     c.  Microglial activation in the neuropil

III.  NEUROCHEMICAL REPORT, UNIVERSITY OF MIAMI, MILLER SCHOOL OF
      MEDICINE [SEE REPORT- ATTACHED]
      a.  Neurochemical measures of Dopamine Transporter [DAT] and Shock Protein
          70 [HSPA1B]
          i.  Selective radioligand and validated neurochemical assay for density and
              affinity binding parameters of DAT: Both biomarkers were within the
              reported normal range for age-matched drug-free subjects, no
              neurochemical evidence of Excited Delirium
          ii.  No induction of Hsp70 measured in brain
          iii.  No change in the number of striatal dopamine transporter numbers
          iv.  Nominally increased HSPA1B gene transcript
      b.  RNA integrity number [RIN]: 8.8- high quality

/7774

Bennet I. Omalu, MD, MBA, MPH, CPE, DABP-AP,CP,FP,NP
Forensic Pathologist/Neuropathologist

GROSS DESCRIPTION

DURA MATER:
Two fragments of dorsal and posterior dura mater are submitted to the
neuropathology bench. The epidural and subdural surfaces are smooth and
white-tan without xanthochromia, membranes or extradural hemorrhages. The
falx cerebri, tentorium cerebelli, diaphragma sellae and the tentorial notch
(incisure) are identified and are unremarkable. The infratentorial and
supratentorial compartments contain no tumor or space-occupying lesion. The
dural venous sinuses are identified and appear patent without intraluminal
thromboemboli. The venous/ lateral lacunae of the superior sagittal sinus
appear unremarkable.

BRAIN:
The surfaces of the right cerebral hemisphere reveal no gross malformations.
The pattern of gyral and sulcal convolutions appears within normal limits
without holoprosencephaly, agyria, pachygyria, ulegyria or polymicrogyria.
There is no hydranencephaly, basket brain, porencephaly or schizencephaly.
There is diffuse symmetrical expansion of gyri and compression of sulci
accompanied by grooving of the uncus without necrosis.

The arachnoid and pia mater appear smooth and glistening in the dorsal and
basal hemispheric surfaces without extravasates or exudates. The

subarachnoidal cisterns are symmetrically compressed and contain no extravasate or exudate. The vessels of the Circle of Willis and the Basilar-Vertebral arteries reveal no anomalies, atherosclerosis or aneurysms. The cranial nerves are identified and appear intact, without atrophy or tumor. There is no olfactory aplasia. There is no optic nerve subdural hemorrhage.

Multiple serial coronal sections are made at 1 – 2 cm intervals from the occipital pole to the frontal pole. The neocortical gray ribbon is distinct and reveals no gross cortical dysplasia, contusional hemorrhage or necrosis. The gray-white matter demarcation is distinct. The centrum semiovale and the periventricular white matter reveal central congestion and edema without cystic necrosis or gliding contusional hemorrhages. There is no periventricular leukomalacia.

The ventricles are compressed and contain no intraventricular hemorrhage or exudate. The ependymal lining is smooth and glistening. There is no evidence of intraventricular obstruction. The cerebral aqueduct of Sylvius appears patent. The choroid plexuses are congested. The genu, body and splenium of the corpus callosum reveal no atrophy hemorrhage or necrosis.

The claustrum, caudate nucleus, putamen, globus pallidus, thalamus and subthalamic nucleus reveal no atrophy, hemorrhage or necrosis. The internal, external and extreme capsules reveal no atrophy, infarct or necrosis. The anterior perforated substance shows no necrosis or hemorrhage. The amygdala and the piriform cortex reveal no necrosis or hemorrhage. The hippocampus and parahippocampal gyrus reveal no gross dysplasia, anomalies, hemorrhage, necrosis or atrophy. The mamillary bodies and hypothalamus reveal no atrophy, necrosis, xanthochromia or hemorrhage.

The previously cut residual sections of the brainstem reveal no necrosis or hemorrhage including the pons and medulla oblongata. The residual midbrain is not identified. There are no dorsolateral hemorrhages or necrosis. The pontine and medullary tegmentum reveals no necrosis or hemorrhage. The basis pontis shows no necrosis, hemorrhage or central myelinolysis. The medullary pyramids reveal no atrophy, necrosis or infarct.

Sections of the rostral cervical cord attached to the medulla oblongata are identified and appear unremarkable without any hematomyelia or central contusional necrosis or hemorrhage. The central spinal canal is patent and unremarkable. The gray-white matter configuration is within normal limits and the gray-white matter junction is distinct. There is no necrosis or hemorrhage

in the central gray matter. The white matter funiculi including the anterior, lateral and posterior funiculi show no necrosis, hemorrhage or degeneration.

The previously cut residual sections of the cerebellar hemispheres reveal no malformation or folial atrophy. The vermis and paravermal zones are neither cystic nor atrophic. The cerebellar cortex reveals no gross cortical dysplasia or necrosis. The cerebellar white matter shows no necrosis or hemorrhage. The dentate nucleus and other deep cerebellar nuclei appear intact, without hemorrhagic necrosis. The inferior (restiform body), middle (brachium pontis) and the superior (brachium conjunctivum) cerebellar peduncles reveal no hemorrhages.

PITUITARY GLAND:
A 1.6 x 0.3 x 0.6 cm of a pituitary gland is submitted with an attached segment of infundibular stalk. A mid-transverse section is made and reveals white-tan homogeneous solid tissue without gross hemorrhage or necrosis.

Representative sections of tissue are submitted for histologic tissue processing as follows:
1. Frontal lobe, right
2. Cingulate gyrus, corpus callosum and caudate nucleus, right
3. Insula cortex, putamen and globus pallidus, right
4. Hippocampus, right
5. Thalamus, right
6. Rostral cervical spinal medulla
7. Pons
8. Medulla and pituitary gland
9. Cerebellum
10. Dura mater
11. Splenium of the corpus callosum
12. Temporal lobe, right
13. Cervical-medulla junction
14. Parietal lobe, right

## MICROSCOPIC DESCRIPTION

Examination of hematoxylin and eosin stained sections of the neocortex reveals a homogenetic cortex with the normal homotypical laminar and columnar organization. There is no cortical disorganization, diffuse or nodular neuronal heterotopia. There is no significant neuronal drop-out or astrogliosis. There are few scattered pyknotic amphophilic to eosinophilic neurons. There is patchy perineuronal vacuolation, accompanied by expansion of Virchow Robin spaces and neuropil microspongiosis in both the gray and white matter. The arachnoid mater, pia mater, penetrating vessels and the Virchow Robin's spaces reveal sparse perivascular and intravascular lymphocytic infiltrates in several penetrating parenchymal blood vessels without necrosis. There is diffuse congestion of the arachnoidal and penetrating parenchymal blood vessels with multifocal perivascular microextravasates.

The centrum semiovale and corpus callosum reveal diffuse vascular congestion and neuropil edema without focal necrosis, infarct, demyelination or parenchymal hemorrhage. There is no periventricular leukomalacia or necrosis. The subependymal white matter shows mild astrogliosis with multifocal subventricular gliosis. There is intermittent denudation of the ependymal cells without any inflammation. There are no neuropil calcospherites.

The dentate gyrus and cornu ammonis of the hippocampus reveal no focal dysplasia or sclerosis. The stratum pyramidalis of the Sommer's sector (CA1), CA2, CA3 and CA4 regions of the cornu ammonis and the subiculum reveal several pyknotic and amphophilic to eosinophilic pyramidal neurons in the Sommer's sector without any hippocampal sclerosis. The entorhinal cortex and the alveus reveal no focal necrosis or dysplasia. The internal, external and extreme capsules reveal diffuse edema and vascular congestion without any focal necrosis or infarct. The claustrum, caudate nucleus, putamen, globus pallidus and thalamus reveal neuropil edema and vascular congestion without any focal lacunar infarct or parenchymal hemorrhage, and no significant neuronal dropout. There is no mineralization of the walls of the vessels of the globus pallidus or hippocampus.

The basis pontis shows no central myelinolysis, parenchymal hemorrhage, demyelination or necrosis. There is neuropil edema and congestion of the basis pontis, pontine tegmentum, ventral medulla and medullary tegmentum without focal necrosis or parenchymal hemorrhage. There is no significant neuronal dropout. There is no eosinophilic neuronal necrosis. The inferior olivary nuclei show no neuronal necrosis or marked neuronal dropout. The medullary pyramids show no atrophy or necrosis. The choroid plexus is congested.

The cerebellar cortex reveals no dysplasia. There is vascular congestion of the arachnoid mater without any inflammation. The Purkinje neurons show several scattered amphophilic neurons with minimal dropout and Bergmann astrogliosis. The molecular layer shows no necrosis. The internal granule cell layer shows no neuronal necrosis or marked neuronal dropout. The dentate nucleus shows few amphophilic neurons without marked neuronal dropout. There are neuropil edema and vascular congestion of the cerebellar cortex and white matter. The cerebellar white matter shows no focal necrosis, infarct or parenchymal hemorrhage.

Examination of hematoxylin and eosin stained sections of the pituitary gland reveals the adenohypophysis with the normal polymorphous admixture of acidophilic, basophilic cells and chromophobes with diffuse sinusoidal congestion without necrosis and Crooke's hyaline change. There are focal acute arachnoidal microextravasates without inflammation. The neurohypophysis is absent in the sections examined. Examination of hematoxylin and eosin stained sections of the dura mater reveals acute dural congestion without any inflammation, extradural hemorrhage or membrane, and no pigment-laden histiocytes.

Examination of hematoxylin and eosin stained sections of the rostral cervical spinal medulla and the cervical spine-medulla oblongata junction shows the normal gray-white matter configuration with an intact central gray matter, which shows no central contusional hemorrhage or necrosis. There is no inflammation of the arachnoid mater. There is vascular congestion of the arachnoid mater, central gray matter and white matter funiculi with perivascular microextravasates. There is neuropil edema of the gray and white matter. The anterior horn neurons show no significant dropout, any neuronal degeneration or eosinophilic necrosis. The white matter funiculi show no degeneration or demyelination. There is marked infiltration of several penetrating gray and white matter blood vessels by lymphocytes with extension into the surrounding neuropil of the rostral cervical spinal cord accompanied by microglial activation in the neuropil [Figure B1].

OTHER SPECIALIZED STUDIES
Immunohistochemical stains for Amyloid Precursor Protein [APP] are performed
on sections obtained from the following tissue blocks:
1.  Frontal lobe, right
2.  Cingulate gyrus, corpus callosum and caudate nucleus, right
3.  Insula cortex, putamen and globus pallidus, right
4.  Hippocampus, right
5.  Thalamus, right
6.  Rostral cervical spinal medulla
7.  Pons
8.  Medulla and pituitary gland
9.  Cerebellum
11. Parietal lobe, right
12. Temporal lobe, right
13. Cervical-medulla junction


Examination of the APP-immunostained tissue sections reveals NO APP-
immunopositive traumatic axonal bulbs, axonal spheroids or swollen distorted
axonal forms in all sections examined. Topographically selective perikaryal
cytoplasmic non-specific immunostaining is noted.

PHOTOMICROGRAPHY


<u>Figure B1</u>


A.  [x100 magnification]          B.  [x200 magnification]

C.  [x200 magnification]          D.  [x400 magnification]



Photomicrographs of hematoxylin and eosin stained sections of the rostral
cervical spinal medulla at the junction with the medulla oblongata showing
focal chronic lymphocytic myelitis.

**Name:** Valencia, Filiberto  **County/State:** San Joaquin, CA **UM Case:** HCcVO **ME case:** 2016-148

**Date of Death:** 01-19-2016          **Time of Death:** 6:50 pm          **Age:** 26

**Sex:** Male          **Race:** White/Hispanic          **Height:** 5'11"     **Body weight:** 202 lbs

**Consultant:**        Deborah C. Mash, Ph.D.
                       Depts. Neurology and Molecular and Cellular Pharmacology
                       Miller School of Medicine at the University of Miami

**Incident narrative summary:** Report of a 26 year old white male who died following a struggle with police. According to the decedent's sister, he was known to have unspecified psychiatric disability and behavioral disturbances. On 01/19/2016 police personnel responded to a 911 call from an adult residential facility for the developmentally disabled. According to reports, the decedent had tried breaking in to the residence, claiming that someone was trying to kill him. Once inside, he barricaded himself with a 10 year-old female resident whom he attacked, leaving visible injuries. When the police broke into the bathroom, the decedent attacked the officer by punching him in the face and reaching for his gun. The officers used a stun gun and a baton to subdue him. After placing him in handcuffs, the officers noticed he had become unresponsive. CPR was administered and paramedics were called. Resuscitation attempts were unsuccessful. The time of death was 6:50 PM.

**Neurochemical Pathology Examination:** Coronal brain sections taken from the level of the caudate nucleus and putamen were submitted for neurochemical analysis as described previously (Mash et al., 2009). Regions-of-interest were dissected from the frozen specimen for neurochemical measures of the dopamine transporter (DAT) and heat shock protein 70 (HSPA1B) as a biomarker of hyperthermia. RNA was isolated from the cerebral cortex. The RNA integrity number (RIN) was 8.8. The RIN value, which serves as an RNA quality control measure, was determined to be high quality.

**Biomarker Analyses:** A neurochemical analysis of the number of dopamine transporters (DAT) was completed on this case. The density and affinity binding parameters were assayed within the ventromedial putamen using a selective radioligand and a validated neurochemical assay. Reference specimens were included in the assays for direct comparison to normalized values determined for control subjects and victims of excited delirium (Figure 1; left panel).




**Figure 1: Equilibrium Saturation Binding of [³H]WIN35,428.** (A) Dopamine transporter reference values for cocaine intoxication deaths, age-matched drug-free controls and excited delirium cases for comparison (Mash et al., 2009). (B) The analytical results for Case 2016-148 as compared to an aged-matched control assayed in parallel (right panel).

The results for Case #2016-148 were comparable archived data from age-matched control subjects and ExDS victims who came to autopsy. The qPCR analysis of Hsp70 mRNA demonstrated no change in transcript expression. The neurochemical pathology examination shows that both of the ExDS biomarkers were within the reported normal range for age-matched drug-free subjects examined at autopsy (Figure and Table). There was no induction of Hsp70 measured in brain and we observed no change in the number of striatal dopamine transporter numbers. The assays were done with the inclusion of reference positive and negative control tissues on the day of the assay.

### Table 1. Heat Shock mRNA (HSPA1B gene)

| Subject/Cohort | Fold Change Range (vs. Controls) |
|---|---|
| Case# 2016-148 | 1.09 ; 1.18 |
| Excited Delirium (ExDS, n=80) | 1.8 - 6.0 |
| Reference Controls (n=80) | 0.9 - 1.0 |

Previous studies have demonstrated that there is a defect in the regulation of the dopamine transporter in victims of excited delirium syndrome (Staley et al., 1994; 1995b; Wetli et al., 1996; Mash et al., 2002; 2009). Decreased number of dopamine transporters (DAT) in brain results in the loss of dopamine transport function in cases of excited delirium and sudden in-custody death. High extracellular dopamine levels can exceed functional reuptake, which contributes to the psychotic behaviors (hyperdopaminergia) associated with the excited delirium syndrome (Staley et al, 1995; Mash et al, 2002; Mash et al., 2009). A dysregulation in the dopamine transporter is also demonstrated in cases of exhaustive mania (e.g., Bell's mania). The decedent exhibited violent and combative behavior consisten with what has been reported for victims of ExDS who died suddenly. However, the neurochemical analysis did not show any dysregulation of the dopaminergic transporter as observed in victims of ExDS.

Previous studies have demonstrated increases in heat shock protein (HSPA1B) expression levels (~ 2.0 fold-change) in brain specimens from subjects who had recorded elevations in core body temperature prior to death. Fever-like temperature causes a dramatic induction of hsp70 mRNA within 1 h in brain. Hyperthermia is a frequent harbinger of death in the excited delirium syndrome (ExDS). In this case, core body temperature was reported as 100.3 F and the victim was reported to be "hot to the touch" when examined at the scene. The induction of HSPA1B transcript expression is temperature and time dependent, which may account for the nominal increase in HSPA1B measured for this case. The qPCR assay was repeated twice for this case. Values are shown in the Table above.

Excited Delirium Syndrome (ExDS) is a condition that manifests as a combination of psychomotor agitation, anxiety, hallucinations, speech disturbances, violent and bizarre behavior, insensitivity to pain, and increased strength. The disorder most frequently occures in male subjects, that had a history of psychostimulant abuse or possible mental health issues that were undiagnosed or not

properly controlled with medication. The decedent was reported to have mental health issues, but the diagnosis was not stated. ExDS is often seen in persons with a large BMI. The decedent had a BMI of 28.2.

Brain biospecimens were submitted to NMS for expanded panel toxicology.  The results were positive for desmethylmirtazapine, a metabolite of mirtazapin (Remeron), a dual action antidepressant acting on both noradrenergic and serotoninergic neurotransmission. Remeron is associated with a number of side effects, including variations in the sleep cycle, vivid hallucinations, unusual nocturnal activity, and increased body temperature and weight gain. The toxicology screen demonstrates that the decedent was possibly non-compliant with his medications.  Abrupt discontinuation of Remeron could be the cause of the decedent's emergent mania.

---

## References

Bell, L.V., 1849. On a form of disease resembling some advanced stages of mania and fever. American Journal of Insanity 6, 97-127.

Mash DC, Pablo J, Ouyang Q, Hearn WL, and Izenwasser S.  Dopamine transport function is elevated in cocaine users. *J. Neurochem.*, 81:292-300, 2002.

Mash DC, Duque L, Pablo J, Qin Y, , Adi N, Hearn WL, Hyma BA, Karch SB, Druid H and Wetli, CV. Brain biomarkers for identifying excited delirium as a cause of sudden death. *Foren. Sci. Int.*, 190(1-3), 2009.

Staley JK, Wetli CV, Ruttenber AJ, Hearn WL, Kung HF, and Mash DC.  Dopamine transporter and receptor autoradiography in cocaine psychosis and sudden death. *Biol. Psych.*37:656, 1995.

Vilke GM, DeBard ML, Chan TC, Ho JD, Dawes DM, Hall C, Curtis MD, Costello MW, Mash DC, Coffman SR, McMullen MJ, Metzger JC, Roberts JR, Sztajnkrcer MD, Henderson SO, Adler J, Czarnecki F, Heck J, Bozman WP. Excited Delirium Syndrome (ExDS): defining based on the review of the literature. J Emergency Medicine, 2011; doi: 10.1016/j.jemermed.2011.02.017.

Wetli CV, Mash DC, and Karch S. Agitated delirium and the neuroleptic malignant syndrome.  *Amer. J. Emer. Med., 14*:425-428, 1996.



## CENTRAL VALLEY TOXICOLOGY, INC.

| | |
|---|---|
| **Case Name:** Valencia, Filiberto | **TOXICOLOGY NUMBER:** CVT-16-1756 |

**Specimen Description:** 7 ml femoral blood (2 gray top vials), 7.25 ml peritoneal blood (2 gray top vials), 2 ml vitreous humor, 1 ml bile & 4.5 ml urine each labeled "Valencia, Filberto, 01/19/16; Dr Omalu; EMA; A16-0148"

| **Delivered by** Tricor | **Date** 22-Jan-16 | **Received by** Bill Posey | **Date** 22-Jan-16 |
|---|---|---|---|

| **Request:** Mirtazapine Metabolite | **Agency Case #** 2016-0148 |
|---|---|

| **Requesting Agency** | **Report To** |
|---|---|
| San Joaquin County Auditor-Controller 7000 Michael N. Canlis Blvd. French Camp CA 95231 | San Joaquin Co. Sheriff-Coroner Attn: Sgt. Mike Reynolds 7000 Michael N. Canlis Blvd. French Camp CA 95231 |

## RESULTS

Page 1 of 2

Specimen: Femoral Blood and Peritoneal Blood Samples

Complete Drug Screen: Ibuprofen detected. Specific drug assay for Bath Salts, Synthetic Cannabinoids and THC performed. No other common acidic, neutral or basic drugs detected. No Ethyl Alcohol detected.

"Bath Salts" by LCMS-TOF in femoral blood = Negative
(Cathinone, Methcathinone, Methylone, Mephedrone, MDPV, and alpha-PVP)

Cannabinoids (THC metabolite) by Immunoassay in femoral and peritoneal blood = Positive

Synthetic Cannabinoids ("Spice") by LCMS-TOF in femoral blood = Negative

| | Femoral | Peritoneal |
|---|---|---|
| Ibuprofen | 8.2 mg/L | 10 mg/L |
| delta-9-THC | 16 ng/mL | 6.3 ng/mL |
| delta-9-THC-COOH | 37 ng/mL | 33 ng/mL |
| delta-9-THC-OH | 4.4 ng/mL | 5.1 ng/mL |

B. L. Posey

September 16, 2016

**B.L. POSEY**
**S.N. KIMBLE**
*Directors*

1580 Tollhouse Road
Clovis, California 93611
Phone (559) 323-9940
Fax (559) 323-7502



**CENTRAL VALLEY TOXICOLOGY, INC.**

| | |
|---|---|
| **Case Name:** | **TOXICOLOGY NUMBER:** CVT-16-1756 |
| Valencia, | Filiberto |

**Specimen Description:** 7 ml femoral blood (2 gray top vials), 7.25 ml peritoneal blood (2 gray top vials), 2 ml vitreous humor, 1 ml bile & 4.5 ml urine each labeled "Valencia, Filberto, 01/19/16; Dr Omalu; EMA; A16-0148"

| | | | | | | |
|---|---|---|---|---|---|---|
| **Delivered by** Tricor | **Date** 22-Jan-16 | **Received by** Bill Posey | **Date** 22-Jan-16 |

**Request:** Mirtazapine Metabolite          **Agency Case #** 2016-0148

**Requesting Agency**
San Joaquin County
Auditor-Controller
7000 Michael N. Canlis Blvd.
French Camp CA 95231

**Report To**
San Joaquin Co. Sheriff-Coroner
Attn: Sgt. Mike Reynolds
7000 Michael N. Canlis Blvd.
French Camp CA 95231

## RESULTS

Page 2 of 2

Specimen: Vitreous Humor, Bile and Urine Samples

Complete Drug Screen: Specific drug assay for THC performed in urine. No common acidic, neutral or basic drugs detected in vitreous, bile and urine. No Ethyl Alcohol detected in vitreous, bile and urine.

Cannabinoids (THC metabolite) by Mass Spectrometry = Negative

**** 04, August 2016: Addtional testing: Second Report ****
**** 01, September 2016: Additional testing (Mirtazapine Metabolite): Third Report ****
Specimen: Femoral Blood, Peritoneal Blood, Vitreous Humor, Bile and Urine Samples

Specific Drug Screen/Confirmation/Level:

| | Femoral | Peritoneal | Vitreous | Bile | Urine |
|---|---|---|---|---|---|
| *Mirtazapine | 0.005 mg/L | 0.006 mg/L | 0.003 mg/L | 0.003 mg/L | 0.006 mg/L |
| Desmethylmirtazepine | 0.011 mg/L | Negative | 0.012 mg/L | QNS** | 0.059 mg/L |

*Note: Mirtazapine Reporting Limit = 0.05 mg/L
**QNS: Sample volume quantity not sufficient for further testing

**B.L. POSEY**
**S.N. KIMBLE**
*Directors*

1580 Tollhouse Road
Clovis, California 93611
Phone (559) 323-9940
Fax (559) 323-7502

B. L. Posey          September 16, 2016

 NMS Labs

CONFIDENTIAL

3,01 Welsh Road, PO Box 433A, Willow Grove, PA 19090-04.'.
Phone: (215) 657-4900  Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory Director



## Toxicology Report

**Report Issued**   03/30/2016 07:00

To:   **61036**
      University of Miami Brain Endowment Bank
      Attn: Dr Deborah Mash
      1951 NW 7th Ave - Ste 240
      Miami, FL  33136

| | |
|---|---|
| **Patient Name** | NP |
| **Patient ID** | HCCVO |
| **Chain** | 16083629 |
| **Age** Not Given | **DOB** Not Given |
| **Gender** | Not Given |
| **Workorder** | 16083629 |

**Page 1 of 3**

### Positive Findings:

| Compound | Result | Units | Matrix Source |
|---|---|---|---|
| Desmethylmirtazapine | Positive | ng/g | 002 - Brain Tissue |

See Detailed Findings section for additional information

### Testing Requested:

| Analysis Code | Description |
|---|---|
| 8052Ti | Postmortem Toxicology - Expanded, Tissue (Forensic) |

### Specimens Received:

| ID | Tube/Container | Volume/ Mass | Collection Date/Time | Matrix Source | Miscellaneous Information |
|---|---|---|---|---|---|
| 001 | Blue Plastic Container | 6.3 g | Not Given | Brain Tissue | |
| 002 | Homogenate Container | Not Given | Not Given | Brain Tissue | |

All samp.'.2 · olumes/weights are approximations.

Specimens received on 03/17/2016.



**Detailed Findings:**

| Analysis and Comments | Result | Units | Rpt. Limit | Specimen Source | Analysis By |
|---|---|---|---|---|---|
| Desmethylmirtazapine | Positive | ng/g | | 002 - Brain Tissue | GC/MS |

**Other than the above findings, examination of the specimen(s) submitted did not reveal any positive findings of toxicological significance by procedures outlined in the accompanying Analysis Summary.**

**Reference Comments:**

1. Desmethylmirtazapine - Brain Tissue:

   The reported qualitative result for this substance was based upon a single analysis only. If confirmation testing is required please contact the laboratory.

**Sample Comments:**

001 Tissue specimen required homogenization: 16083629-001

002 NMS Labs generated homogenized Tissue sample: 16083629-002

Unless alternate arrangements are made by you, the remainder of the submitted specimens will be discarded one (1) year from the date of this report; and generated data will be discarded five (5) years from the date the analyses were performed.

Workorder 16083629 was electronically signed on 03/30/2016 06:25 by:

Dawn N. Sherwood,
Certifying Scientist

**Analysis Summary and Reporting Limits:**

All of the following tests were performed for this case. For each test, the compounds listed were included in the scope. The Reporting Limit listed for each compound represents the lowest concentration of the compound that will be reported as being positive. If the compound is listed as None Detected, it is not present above the Reporting Limit. Please refer to the Positive Findings section of the report for those compounds that were identified as being present.

Acode 52452TI - Antidepressants / Antihistamines Confirmation Panel 1, Tissue (Forensic) - Brain Tissue

-Analysis by Gas Chromatography (GC) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Amitriptyline | 200 ng/g | Hydroxyzine | 200 ng/g |
| Chlorpheniramine | 200 ng/g | Mirtazapine | 100 ng/g |
| Desmethyldoxepin | 200 ng/g | Norfluoxetine | 200 ng/g |
| Diphenhydramine | 1000 ng/g | Nortriptyline | 200 ng/g |
| Doxepin | 200 ng/g | Trazodone | 2.0 mcg/g |
| Doxylamine | 1000 ng/g | Verapamil | 200 ng/g |
| Fluoxetine | 200 ng/g | | |

Acode 8052TI - Postmortem Toxicology - Expanded, Tissue (Forensic) - Brain Tissue

-Analysis by Colorimetry (C) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Salicylates | 800 mcg/g | | |



## Analysis Summary and Reporting Limits:

-Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Benzodiazepines | 400 ng/g | Cocaine / Metabolites | 80 ng/g |
| Buprenorphine / Metabolite | 2.0 ng/g | Opiates | 80 ng/g |
| Cannabinoids | 40 ng/g | Oxycodone / Oxymorphone | 40 ng/g |

-Analysis by Gas Chromatography/Mass Spectrometry
(GC/MS) for: Anesthetics, Anticoagulant Agents, Antifungal Agents, Antihypertensive Agents, Anxiolytics (Benzodiazepine and others), Hypnosedatives (Barbiturates, Non-Benzodiazepine Hypnotics, and others) and Non-Steroidal Anti-Inflammatory Agents (excluding Salicylate).

-Analysis by Gas Chromatography/Mass Spectrometry
(GC/MS) for: The following is a general list of compound classes included in the Gas Chromatographic screen. The detection of any particular compound is concentration-dependent. Please note that not all known compounds included in each specified class or heading are included. Some specific compounds outside these classes are also included. For a detailed list of all compounds and reporting limits included in this screen, please contact NMS Labs.
Amphetamines, Analgesics (opioid and non-opioid), Anorectics, Antiarrhythmics, Anticholinergic Agents, Anticonvulsant Agents, Antidepressants, Antiemetic Agents, Antihistamines, Antiparkinsonian Agents, Antipsychotic Agents, Antitussive Agents, Antiviral Agents, Calcium Channel Blocking Agents, Cardiovascular Agents (non-digitalis), Local Anesthetics Agents, Muscle Relaxants and Stimulants (Amphetamine-like and others).

-Analysis by Headspace Gas Chromatography (GC) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Acetone | 20 mg/100 g | Isopropanol | 20 mg/100 g |
| Ethanol | 40 mg/100 g | Methanol | 20 mg/100 g |

# EXHIBIT CC

UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF CALIFORNIA

3     - - - - - - - - - - - - - - - - - -

4     FILIBERTO VALENCIA, SR., et al.,  )  Case No.

5                    Plaintiffs,       )  2:16-CV-02081-JAM-AC

6     vs.                              )

7                                      )

8     CITY OF STOCKTON, et al.,        )

9                    Defendants.       )

10    - - - - - - - - - - - - - - - - - -

11

12

13

14

15            DEPOSITION OF ROGER A. CLARK

16             FRIDAY, JANUARY 12, 2018

17

18

19

20

21

22        BY:  SUZANNE I. ANDRADE, CSR NO.  10682

23

24

25

```
 1            Is that not accurate?

 2     A.    That's right.

 3     Q.    Okay.  Wouldn't that -- if you can describe for

 4 me, what am I missing?

 5            Wouldn't that be near the heart?

 6     A.    Well, yeah.  You are missing something.

 7 Because the Taser also puts out what they call product

 8 warnings.  They're sent out to all the users.  And they

 9 explain this in some detail.  It's also in the

10 PowerPoint.

11            If you can, you'd use it to the back.  And if

12 you -- there's a laser dot that shows where the first

13 dart goes.  And then the other one goes below that

14 point.  It spreads it a foot for every seven feet of

15 distance.  And so you shoot lower.  You try to avoid the

16 chest.

17     Q.    Okay.  The actual deployment of the Taser in

18 this case, paraphrasing, but roughly one of the prongs

19 was in Mr. Valencia's pectoral muscle, the other one was

20 down near around his belly button.

21            How would you characterize that spread; good?

22 bad?

23     A.    I would say that would be -- that would

24 demonstrate -- and I took it as something close to two

25 foot, 18 inches, two foot, which would put the sergeant
```

1   at about 10 feet to -- 12 feet to 15 feet away when he

2   discharged it and put the prongs in.

3          And that's a good spread.  That's an

4   incapacitation.

5     Q.  And that's my understanding.

6          You would have expected, in this case, for the

7   Taser to have incapacitated Mr. Valencia, barring any

8   other factors, given the spread alone, correct?

9     A.  In my understanding of the weapon and all the

10  literature I've read, it is -- it would incapacitate

11  him.  And it would have nothing to do with his mental

12  state or any drugs in his system.

13     Q.  Then if you can, do you have an explanation as

14  to why it didn't incapacitate Mr. Valencia in this case?

15     A.  Well, I think that's an issue that a jury would

16  determine.  Because I cannot understand the offering

17  that it didn't.  I think it's more likely than not that

18  it did.

19     Q.  Okay.  So there's been testimony by the

20  officers in this case that he reached up -- Mr. Valencia

21  reached for the prongs and physically tried to remove

22  them.

23          So I'm clear, is it -- based on your

24  professional experience and expertise, are you

25  essentially offering that that is not correct or you

1    don't believe that testimony?

2        A.   I don't -- I'm not here to testify about my

3    belief.  But I think that a jury reviewing the material

4    would see that that's very -- not probable or likely

5    that that's what happened; and that that statement is

6    inaccurate.

7            Because the Taser creates an involuntary and

8    total incapacitation, especially with a spread like

9    that, that makes everything that Mr. Valencia was doing

10   absolutely beyond his control and involuntary.

11       Q.   So the statements to the effect that

12   Mr. Valencia was not affected by the Taser and reached

13   up and tried to remove the prongs from his body, you

14   disagree with those statements; is that accurate?

15       A.   I would disagree with it in terms of what's

16   offered by the weapon and what the weapon does and

17   what the scientific aspects of it capturing the nerves

18   and the muscles, rendering him helpless and so he would

19   not be able to consciously go for the darts.

20       Q.   You are aware of cases where Tasers have been

21   applied, the spread has been appropriate, and there was

22   no reported effect by the individual being Tasered,

23   correct?

24       A.   Taser has written about that, that that's been

25   alleged.  If anything, it's an extremely small occasion

1  STATE OF CALIFORNIA            )

2                                )  ss.

3  COUNTY OF SAN FRANCISCO        )

4          I hereby certify that the witness in the

5  foregoing deposition, ROGER A. CLARK, was by me duly

6  sworn to testify to the truth, the whole truth and

7  nothing but the truth, in the within-entitled cause;

8  that said deposition was taken at the time and place

9  herein named; and that the deposition is a true record

10 of the witness's testimony as reported by me, a duly

11 certified shorthand reporter and a disinterested person,

12 and was thereafter transcribed into typewriting by

13 computer.

14         I further certify that I am not interested in

15 the outcome of the said action, nor connected with nor

16 related to any of the parties in said action, nor to

17 their respective counsel.

18         IN WITNESS WHEREOF, I have hereunto set my

19 hand this 24th day of January, 2018.

20 Reading and Signing was:

21 ___ requested    ___ waived   _x_ not requested

22

23

24 _____

25         SUZANNE I. ANDRADE, CSR NO. 10682